**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| In re:  DAILY FANTASY SPORTS LITIGATION | ) | MDL No.  16-02677-GAO |
| | ) | |
| This Document Relates To: | ) | |
| | ) | |
| *Tewes v. DraftKings, Inc.* | ) | |
| D. Mass. Case No. 1:16-cv-10277-GAO | ) | |
| M.D. Ga. Case No. 4:16-cv-0006-CDL | ) | |
| | ) | |
| | ) | |

_____)

**PLAINTIFF'S MOTION TO REMAND**
**AND MEMORANDUM OF REASONS IN SUPPORT**

Defendant lacked reasonable grounds for removing this case.  The amount placed in controversy by Plaintiff's class-wide claims is well under $5 million and thus there is no CAFA jurisdiction.  Defendant, however, ignores Plaintiff's *actual* claims and instead asserts that the value of the class-wide claims Plaintiff *should have* asserted is over $5 million.  DraftKings' attempt to usurp Plaintiff's role as the master of his complaint and recast the allegations to establish jurisdiction is baseless.  The value of claims Plaintiff chose – for very good reason – not to bring are not included in the amount in controversy calculus.  Pursuant to 28 U.S.C. § 1447(c), this case should be remanded to state court and DraftKings should be ordered to reimburse Plaintiff for the fees and costs incurred responding to the unwarranted removal.

**BACKGROUND**

**A.**     **Overview of Daily Fantasy Sports.**

Daily fantasy sports contests are an accelerated variant of traditional fantasy sports contests.  <u>See</u> Complaint, ¶ 9 (Dkt. No. 1-2).[1]  As opposed to those that are played across an entire season, daily fantasy sports are conducted over short-term periods, such as a week or

_____

[1] All docket references are to Case No. 16-cv-10277.

single day of competition.  Id.  Individuals pay an entry fee to build a team of athletes in a certain

sport.  Id. at ¶ 10.  Most of the entry fees are pooled together to fund prizes which are paid to

individuals whose chosen athletes accumulate the most points on a specified day or weekend of

competition.  Id. at ¶ 11.  The remainder of the entry fees goes to the provider of the game as a

"rake," or fee for administering the contest.  Id.

Unlike traditional fantasy sports, the providers that host daily fantasy sports are in

complete control of wagering.  Id. at ¶ 12.  They set the prizes, control relevant variables (such as

the salary cap), and profit directly from wagering via the "rake."  Id.  Moreover, because athlete

performance varies greatly on a game-to-game or week-to-week basis, participants are

essentially making propositional wagers on the performance of individual athletes on a given

date, rather than managing their team across a season.  Id. at ¶ 13.

Additionally, because of the quick play and instant gratification, daily fantasy sports have

created public health and economic problems, particularly for those prone to addiction and who

are unequipped to sustain losses.  Id. at ¶ 14.  Thus, while sharing some similarities with fantasy

sports, daily fantasy sports much more resemble traditional gambling contests.  Id. at ¶ 15.

Recently out-of-state governmental agencies from Nevada, New York, Illinois, Texas,

and Vermont have determined that the daily fantasy sports business model is unlawful gambling.

Id. at ¶ 16; also, e.g., Nevada Gaming Control Board Order (Exh. A hereto); Nevada Attorney

General Opinion (Exh. B hereto); New York Attorney General Cease and Desist Order (Exh. C

hereto); Illinois Attorney General Opinion (Exh. D hereto); Texas Attorney General Opinion

(Exh. E hereto).

Gambling, of course, is also illegal in Georgia.  The Georgia Constitution generally

prohibits all forms of "betting" except for certain games run by the State.  Georgia Const., Art. I,

§ II, ¶ VIII.   Under Georgia's criminal statutes, a "bet" is defined as "an agreement that, dependent upon chance even though accompanied by some skill, one stands to win or lose something of value." O.C.G.A. § 16-12-20(1).   Moreover, a "[g]ambling place" means "any real estate, building, room, tent, vehicle, boat or other property whatsoever, one of the principal uses of which is the making or settling of bets; the receiving, holding, recording, or forwarding of bets or offers to bet; or the conducing of a lottery or the playing of gambling devices." Id. at § 16-12-20(3).

Anyone who places or facilitates a "bet" or participates in the operations of a "gambling place" commits the crime of gambling and/or commercial gambling.   O.C.G.A. §§ 16-12-21 (defining "gambling" as making "a bet upon . . . the performance of any participant in [a] game or contest"), 16-12-22 (defining "commercial gambling" as the operation or participation in the earnings of a gambling house, the receipt of a bet, or the holding of anything of value that has been bet).   Georgia law authorizes anyone who has lost money while gambling to institute an action to recover such losses within six months after the loss. Id. at § 13-8-3(b).

**B.      DraftKings' Gambling Contests.**

Defendant DraftKings owns and operates the website "DraftKings.com," whereon it provides daily fantasy sports contests to individuals such as Plaintiff. See Complaint, ¶ 22. Visitors to DraftKings' website are confronted with thousands of contests to choose from, with each affording a cash prize to the eventual winners. Id. at ¶ 34.   Each contest has an entry wager that the bettor must pay in order to join the contest. Id.   DraftKings takes a commission or "rake" of between 5-10% from each such wager. Id.   The remainder of the wager is added to the "pot" which will go to the bettors who have accumulated the most points at the conclusion of the contest. Id.

The "rake" taken out of all entry wagers by DraftKings is the primary source of DraftKings' revenue. Id. at ¶ 35. Thus, DraftKings' revenue is largely dependent upon the price of the entry wager for each contest, as well as the number of bettors in each contest. Id.

Once the entry wager is paid, the participant assembles a team from a pool of available athletes. Id. at ¶ 36. DraftKings has assigned each athlete a dollar value (i.e., similar to a traditional point spread) based upon the perceived potential of such athlete to perform well during his team's game. Id. The total dollar value of the athletes each participant selects must be less than the "salary cap" set by DraftKings. Id.

Once bettors have wagered their sums and selected their lineup of athletes, the bettor has no ability to control the outcome of the betting contest. Id. at ¶ 37. Specifically, DraftKings' bettors have absolutely no ability to control how many points their selected athlete will receive from the athlete's performance. Id. Instead, only the athletes themselves control their performance and, even then, these performances are subject to a number of chance variables, such as the unknown team game plan, "bad" officiating, illegal contact, off-field problems, drug tests, sickness, injury, weather conditions, and any number of other variables well beyond the actual athlete's own control. Id.

As a result, after DraftKings bettors place their bet and set their lineups, they have no ability to influence the outcome of the contest. Id. at ¶ 38. Thus, even if it could be said that a bettor relies on skill in picking players and setting his lineup, whether the chosen players actually produce (and the bettor wins the contest) is entirely dependent on chance. Id. Indeed, a bettor may win with a randomly generated lineup, just as one may win with a carefully crafted roster. Id. at ¶ 39.

DraftKings' daily fantasy sports contests constitute unlawful gambling pursuant to Georgia law.  Id. at ¶ 40; also Letter from Georgia Lottery General Counsel (Exh. F hereto).

**C.     Plaintiff's Claims and Procedural History.**

Within the last six months, Georgia resident Benjamin Tewes has bet on the outcome of several daily fantasy sport contests on Defendant's website DraftKings.com, including but not limited to "Fantasy Football World Champ Qualifiers" and "NFL Millionaire Makers Super Satellites."  See Complaint, ¶ 42.  The bets placed by Plaintiff on each contest have ranged from $3 to $40.  Id. at ¶ 43.

In each contest, Plaintiff assembled a team of NFL or NCAA players pursuant to Defendant's rules and guidelines, hoping that his chosen players would perform better in their real team's games than those chosen by the other individuals who had entered the same contests. Id. at ¶ 44.  Plaintiff had no ability to control how the players he chose would perform in their real team's games.  Id. at ¶ 45.

Within the last six months, Plaintiff has lost money betting on DraftKings contests.  Id. at ¶ 46.  Plaintiff does not know where the money he has lost has gone as this information can only be gleaned from a review of Defendant's internal records and data.  However, Plaintiff is aware that at least a portion of the money he has lost betting on each contest was kept by Defendant as the "rake."  Id. at ¶ 47.  Plaintiff seeks the return of his losses to DraftKings (i.e., "the rakes" DraftKings has kept from each bet) via a claim for restitution pursuant to O.C.G.A. § 13-8-3(b) and, alternatively, the quasi-contractual theory of unjust enrichment.  See Complaint, ¶¶ 66-79.

Plaintiff seeks to represent himself and a class of Georgia citizens who within the six-month period preceding the filing of the Class Action Complaint lost money in a fantasy sports contest on DraftKings.com.  See Complaint, ¶ 52.  The restitution sought is those monies that

DraftKings received from each entry wager of Plaintiff or the class that was lost during the Class Period (i.e., DraftKings' commission or "rake" on losing bets). <u>Id.</u> at ¶ 56. Plaintiff and the Class specifically do ***not*** seek restitution of any other portions of their entry wagers that were paid by DraftKings to other bettors in the daily fantasy sports contests in which Plaintiff and the class participated. <u>Id.</u>

Plaintiff's Complaint was filed December 2, 2015 in the Superior Court of Muscogee County, Georgia. <u>See</u> Complaint. Defendant filed its notice of removal to the United States District Court for the Middle District of Georgia on January 8, 2016, claiming that the federal courts have jurisdiction pursuant to CAFA, 28 U.S.C. § 1332(d). <u>See</u> Notice of Removal, p. 1.

On January 20, 2016, Plaintiff timely filed a motion to remand the case to state court on grounds that the class-wide amount in controversy is well under CAFA's $5 million threshold. Dkt. No. 6. After this case was conditionally transferred to this Court as part of the newly created multi-district litigation ("MDL"), Judge Land of the Middle District of Georgia entered a text only order finding the remand motion moot "since it will be addressed in the MDL." Dkt. No. 13. Plaintiff hereby re-files his remand motion in this Court.

## ARGUMENT AND CITATION OF AUTHORITY

CAFA affords federal district courts jurisdiction over class actions where (1) any member of the plaintiff class is a citizen of a state different from the state of citizenship of any defendant (i.e., "minimal diversity"), (2) the aggregate amount in controversy exceeds $5 million, and (3) the proposed plaintiff class contains at least 100 members. 28 U.S.C. § 1332(d); <u>Dart Cherokee Basin Operating Co. v. Owens</u>, 135 S. Ct. 547, 552 (2014). Plaintiff does not contest the minimal diversity or numerosity elements. Rather, at issue herein is whether the class-wide amount in controversy exceeds $5 million.

Defendant, as the removing party, bears the burden of proving by a reasonable probability that this amount exceeds $5 million. Dart, 135 S. Ct. at 553; Amoche v. Guarantee Trust Life Ins. Co., 556 F.3d 41, 50 (1st Cir. 2009) (holding the "reasonable probability" standard to be "for all practical purposes identical to [a] preponderance standard"). In making this assessment, courts look to what both parties have shown in their preliminary filings. Amoche, 556 F.3d at 51; also, e.g., Lowery v. Alabama Power Co., 483 F.3d 1184, 1214 (11th Cir. 2007). A court "'may [also] rely on evidence put forward by the removing defendant, as well as reasonable inferences and deductions drawn from that evidence.'" Dudley v. Eli Lilly & Co., 778 F.3d 909, 913 (11th Cir. 2014) (quoting South Fla. Wellness, Inc. v. Allstate Ins. Co., 745 F.3d 1312, 1315 (11th Cir. 2014)).

What matters is the amount that is *actually in controversy on the date of removal*. Amoche, 556 F.3d at 51; also, e.g., Scimone v. Carnival Corp., 720 F.3d 876, 882 (11th Cir. 2013). While a plaintiff may not stipulate that the value of the relief sought is less than $5 million to keep an otherwise removable class case out of federal court [Standard Fire Ins. Co. v. Knowles, 133 S. Ct. 1345, 1350 (2013)], the plaintiff is still the "master of his complaint" and is free to assert whatever claims, seek whatever types of relief, and sue whatever parties he deems appropriate. E.g., Scimone, 720 F.3d at 882 ("we have long recognized[] plaintiffs are 'the master of the complaint'"); U.S. v. Jones, 125 F.3d 1418, 1428 (11th Cir. 1997) ("The plaintiff is the master of the complaint. The plaintiff selects the claims that will be alleged in the complaint"); Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 449 (7th Cir. 2005) ("a removing defendant can't make the plaintiff's claim for him; as master of the case, the plaintiff may limit [the substantive nature of] his claims . . . to keep the amount in controversy below the

threshold"); <u>Youtsey v. Avibank Mfg., Inc.</u>, 734 F. Supp. 2d 230, 233 (D. Mass. 2010) (citing <u>Danca v. Private Health Care Sys., Inc.</u>, 185 F.3d 1, 4 (1st Cir. 1999)).

As such, courts assess the amount in controversy requirement in context of the *actual claims* versus what the complaint could have alleged if brought by another plaintiff. <u>E.g.</u>, <u>Merrell Dow Pharmaceuticals, Inc. v. Thompson</u>, 478 U.S. 804, 809 n.6 (1986) ("Jurisdiction may not be sustained on a theory that the plaintiff has not advanced"); <u>Department of Rec. and Sports of P.R. v. World Boxing Ass'n</u>, 942 F.2d 84, 89 (1st Cir. 1991) (refusing to consider value of claims that the plaintiff did not affirmatively assert in the amount in controversy analysis); <u>Porter v. MetroPCS Communications, Inc.</u>, 592 Fed. Appx. 780, 783 (11th Cir. 2014) ("the defendant can take into account damages and any equitable relief *the plaintiff seeks*") (emphasis added); <u>Whaley v. Bay View Law Group, LLC</u>, 2014 WL 4926458, *6 (S.D. Ga. Sept. 30, 2014) (refusing to consider value of claims that were not asserted and are "not before the court"); <u>Leff v. Belfour USA Group, Inc.</u>, 2015 WL 3486883, *3 (D.N.J. June 1, 2015) (finding "no authority which would require a class action plaintiff to file a complaint which pursues all remedies available under a cause of action"). Because of this, it is critical that any evidence of amount in controversy reflect the claims that are *actually at issue*. <u>E.g.</u>, <u>Pretka v. Kohler City Plaza II, Inc.</u>, 608 F.3d 744, 761 n.19 (11th Cir. 2009) ("a declaration [that does] not fit the allegations in the complaint" is "fundamentally flawed"); <u>Thomas v. Bank of Am.</u>, 2009 WL 88450, *3 (M.D. Ga. Jan. 12, 2009) (noting that court will not "look to the stars" to divine jurisdiction), <u>aff'd</u>, 570 F.3d 1280 (11th Cir. 2009).

Here, DraftKings has ignored the allegations of the Complaint. Instead of focusing on the value of the claims Plaintiff did bring, Defendant endeavors to establish the value of class-wide claims it contends Mr. Tewes *should have* brought. <u>See</u> Notice of Removal, ¶¶ 17-19.

However, Defendant is not the master of Plaintiff's Complaint and the value of claims Plaintiff for good reason *did not assert* are irrelevant. The evidence clearly shows that the value of the claims actually brought do not approach $5 million.

**A.      The Restitution Sought Is Well Under $5 Million.**

O.C.G.A. § 13-8-3(b) provides that "[m]oney paid or property delivered upon a gambling consideration may be recovered *from the winner by the loser* by institution of an action for the same within six months after the loss . . ." (emphasis added).

Here, Plaintiff and the proposed class members lost money placing bets on daily fantasy sports contests on DraftKings.com and are thus "the losers" pursuant to the statute. See Complaint, ¶¶ 42-46, 58. Plaintiff's losses went to two types of "winners." Id. at ¶ 69. An alleged 5-10% of the losses went to DraftKings as its "rake" for operating the gambling contests. Id. at ¶¶ 20, 34-35, 47. The remaining 90-95% went to unknown bettors whose fantasy lineups accumulated the most points on the days of the respective contests. Id. at ¶¶ 47, 56.

In his Complaint, Plaintiff sued DraftKings seeking restitution of the "rake" losses that went to DraftKings. Id. at ¶¶ 20, 48. 56, 70. Defendant, however, argues that Plaintiff *should have sought* restitution of the *total* amount of monies the class lost gambling on DraftKings.com during the proposed Class Period.[2] See Notice of Removal, ¶ 18. According to Defendant, by only seeking the "rake" losses, Plaintiff has engaged in "an apparent attempt to avoid federal jurisdiction." Id.

Quite the contrary, Plaintiff's motivation for not seeking to recover monies that he and the Class did not lose to DraftKings is well-intentioned. For example, while O.C.G.A. § 13-8-

---

[2] Defendant does not put an exact dollar figure on the total monies lost by the class on www.DraftKings.com during the class period, but alleges it is over $5 million. See Notice of Removal, ¶ 17.

3(b) is clear that the "loser" can sue the "winner", it does not state that the loser can sue a non-winner that once held the winner's funds in trust for him, nor does it give any indication that concepts of joint and several liability apply.  Additionally, a claim for unjust enrichment requires proof that a party "receive and retain" an unjustly conferred benefit.  E.g., Yoh v. Daniel, 497 S.E.2d 392, 394 (Ga. Ct. App. 1998).  To Plaintiff's knowledge, all DraftKings "retained" from the gambling losses was the "rake" amounts it took from each bet at issue.  Plaintiff thus has sensible grounds for not seeking restitution *from DraftKings* of monies DraftKings neither "won" nor "retained."

Moreover, Plaintiff also has solid justification for ***not*** naming the other individual bettors who "won" the remainder of the class' gambling losses.  Indeed, Plaintiff does not know the identities of the individuals who "won" the contests in which he and the class participated or where they are located.  See Complaint, ¶ 47.  Thus, he does not know (1) who to sue to recover these losses and/or (2) whether these individuals are subject to personal jurisdiction or service.  Even assuming he had such information and such individuals were subject to suit in Muscogee County, locating them, serving them, and enforcing any judgment against them would be, at the very least, impractical.

In short, Mr. Tewes is not attempting to evade federal jurisdiction.  Rather, he has brought claims he believes the facts and law support.  That other plaintiffs have cast their claims in different or broader terms against DraftKings is wholly irrelevant to the Court's determination of whether the claims at issue *in this case* exceed $5 million.

In support of its position that the value of unasserted claims should be included in the amount in controversy analysis, Defendant relies upon Standard Fire Insurance Co. v. Knowles.  See Notice of Removal, ¶ 18.  In Knowles, the named plaintiff had stipulated, prior to class

certification, that he would not pursue damages in excess of $5 million and, on that basis, sought to remand the action for failure to meet the amount in controversy requirement.  133 S.Ct. at 1348.  The Supreme Court rejected this effort, holding that the plaintiff's stipulation regarding damages did not affect the value of each putative class member's claim because "a plaintiff who files a proposed class action cannot legally bind members of the proposed class before the class is certified."  Id. at 1348-49.  Reasoning that the stipulation was not binding, the Court held that the district court should have ignored it when evaluating the amount in controversy.  Id. at 1350 (citing 28 U.S.C. § 1331(d)(6)).

Here, in contrast, Plaintiff has not stipulated to limit the recoverable damages to less than $5 million.  Indeed, Plaintiff seeks to recover the *full value* of the monies the putative class lost *to DraftKings* during the class period (i.e., the "rake").  If the amount of such rake losses was over $5 million, this Court would have CAFA jurisdiction.  But Defendant fails to put a dollar figure on the rake losses, except to vaguely allege they are "millions of dollars."  See Notice of Removal, ¶ 19 (Plaintiff "seeks to recover millions of dollars in alleged 'commissions'").  Of course, if the amount of rake losses was greater than $5 million, Defendant would have simply said so and would not have resorted to (1) arguing that that Plaintiff should have sought restitution of *all* monies lost (regardless of whether they were lost to DraftKings) or (2) attempting to "tack on" punitive damages and statutory attorney fee claims that Plaintiff did not assert.  See Notice of Removal, ¶¶ 17-19.

Knowles did not alter the long-established rule that plaintiffs are masters of their complaints.  Scimone, 720 F.3d at 886 (rejecting a contrary position "as "stretch[ing] the Supreme Court's [Knowles] analysis far past its breaking point").  Because plaintiffs remain the masters of their complaints, courts analyze the amount in controversy requirement by assessing

the value of the claims that are actually brought.  For instance, in <u>Whaley</u>, a removing defendant argued that the plaintiff could have sought statutorily-awarded attorney's fees that would have pushed the amount in controversy over $5 million and, by failing to seek such fees, the plaintiff was attempting to stipulate away damages on behalf of the class.  2014 WL 4926458 at *6.  The court held:

> . . . that Whaley is not stipulating anything.  Plaintiffs are masters of their own complaints.  <u>Burns v. Windsor Ins. Co.</u>, 31 F.3d 1092, 1095 (11th Cir. 1994).  It is Whaley's prerogative, whether well or ill founded, not to seek the favorable relief afforded by the FBPA to GDAA litigants.  Another class member certainly could intervene with an amended complaint to include an FBPA claim, and the Court might permit the action to proceed with a new representative, but Whaley is under no duty to frame her case in that manner.  <u>See Knowles</u>, 133 S.Ct. at 1349.  The Court thus concludes that statutory attorney fees may not be considered in the aggregate to establish the requisite amount in controversy.

2014 WL 4926458 at *6.  Similarly, in <u>Leff</u>, the removing defendant argued that rescission was a remedy available to plaintiff and that, if it had been sought, the value of the case would exceed $5 million.  2015 WL 3486883 at *3.  The court held that:

> The <u>Knowles</u> holding on the assessment of the amount in controversy in a putative class action under CAFA does not direct that a district court go beyond the claims pled by a plaintiff or require that the court consider all forms of relief, whether requested or not.  Nor does Defendant otherwise point to any authority which would require a class action plaintiff to file a complaint which pursues all remedies available under a cause of action.

<u>Id.</u>; <u>also, e.g.</u>, <u>Myers v. BJ's Wholesale Club, Inc.</u>, 2014 WL 1923277, *4 (E.D. Pa. May 14, 2014); <u>Ferrara v. 21st Century N. Am. Ins. Co.</u>, 2014 WL 3889470, *1 (D. Ariz. Aug. 7, 2014).

Here, it is Defendant's burden to prove that the claims actually asserted exceed $5 million.  Defendant has thus failed to sustain this burden and remand is warranted.

## B.   <u>Punitive Damages Are Not Part of the Calculus.</u>

Recognizing that the restitution sought is much less than $5 million, Defendant argues that the value of a potential punitive damage award must also be considered.  <u>See</u> Notice of

Removal, ¶ 19.  The most obvious problem with this position is that nowhere in the Complaint does Plaintiff seek punitive damages.  <u>See generally</u> Complaint.  This, of course, was Plaintiff's choice as master of the Complaint.

Courts have repeatedly recognized that punitive damages are not factored into the CAFA amount in controversy equation *if they are not pled*.  <u>E.g.</u>, <u>Hurst v. Nissan N. Am., Inc.</u>, 511 Fed. Appx. 584, 586-87 (8th Cir. 2013); <u>Turk v. United Servs. Auto. Ass'n</u>, 2015 WL 1249177, *4 (W.D. Wash. Mar. 18, 2015) (punitive damages "are not in this case, and they are not part of the calculus"); <u>Ferrara</u>, 2014 WL 3889470 at *3; <u>also, e.g.</u>, <u>Alliance Shippers, Inc. v. Starrett</u>, 742 F. Supp. 2d 153, 156 (D. Me. 2010) (refusing to consider value of punitive damage claim that was inadequately pled); <u>Finley v. George Weston Bakeries Distribution, Inc.</u>, 473 F. Supp. 2d 105, 108 n.2 (D. Me. 2007) ("The Court has not considered any claims for punitive damages in assessing the requisite amount in controversy based on finding no explicit request for punitive damages in the Complaint in this case").[3]  These precedents are especially persuasive here because Georgia law *explicitly forbids* recovery of punitive damages *unless* they are sought in the complaint.  O.C.G.A. § 51-12-5.1(d)(1) ("An award of punitive damages must be specifically prayed for in a complaint").

Even if the Court were to look past the fact that Plaintiff does not seek punitive damages *and* the fact that Georgia law does not allow recovery of unpled punitive damages, Defendant's argument would still fail.  In Georgia, punitive damages are limited to "tort actions" (O.C.G.A. § 51-12-5.1(b)) and explicitly barred in contract actions (<u>ServiceMaster Co., L.P. v. Martin</u>, 556 S.E.2d 517, 523 (Ga. Ct. App. 2001).  Neither of Plaintiff's claims are "tort actions" and indeed,

---

[3] <u>Jackson v. American Gen. Fin. Servs., Inc.</u>, is not to the contrary.  2006 WL 997614, *3 (M.D. Ga. Apr. 17, 2006).  There, the court included an analysis of the value of punitive damages because they were demanded by the plaintiffs in the complaint.  <u>Id.</u>

Plaintiff's claim for unjust enrichment is an equitable, quasi-contractual claim.[4]  Thus, even if Plaintiff had pled punitive damages, they do not appear recoverable.  Jackson, 2006 WL 997614 at *3.

Lastly, Defendant has introduced no evidence proving the amount of the unasserted, unrecoverable punitive damages.  Id. (remanding case, in part, because the defendant "offer[ed] no specific amount or any evidence in the form of affidavits or similar cases to show the Court that punitive damages, when combined with the specific damages sought in the Complaint, would be in excess of the jurisdictional requirement").  Defendant's punitive damage-based arguments are no help to its efforts to prove CAFA jurisdiction.

**C.    <u>Legal Fees Are Not Part of the Calculus.</u>**

"The general rule is that attorneys' fees do not count towards the amount in controversy unless they are allowed for by statute or contract."  <u>Federated Mut. Ins. Co. v. McKinnon Motors, LLC</u>, 329 F.3d 805, 808 n.4 (11th Cir. 2003); <u>also, e.g.</u>, <u>Cate v. Service Corp. Int'l</u>, 833 F. Supp. 2d 1324, 1330 (M.D. Ala. 2011); <u>Whaley</u>, 2014 WL 4926458 at *5.  While Plaintiff prayed for reasonable attorney's fees in the Complaint, he did not specify any statutory or contract basis for such an award.  <u>See</u> Complaint, p. 14.  This is because in Georgia class action cases, fees are awarded as a percentage of the common fund.  <u>E.g.</u>, <u>Barnes v. City of Atlanta</u>, 281 Ga. 256, 260 (2006) ("Georgia adheres to the common fund doctrine"); <u>Friedrich v. Fidelity Nat'l Bank</u>, 247 Ga. App. 704, 707 (2001) ("we find the percentage of the fund approach to be

---

[4] Although Plaintiff was unable to locate a decision which specifically held that Georgia law forbids punitive damages in unjust enrichment actions, decisions from other states have reached this conclusion.  <u>E.g.</u>, <u>Edible Arrangements Int'l, Inc. v. Chinsammy</u>, 446 Fed. Appx. 332, 334 (2d Cir. 2011) (unjust enrichment is a quasi-contractual, equitable claim for restitution and punitive damages are not recoverable) (Connecticut law); <u>Priority HealthCare Corp. v. Surajit Chaudhuri, M.D., P.A.</u>, 2008 WL 4459041, *5 (M.D. Fla. Oct. 1, 2008) (unjust enrichment is not intended to be punitive and punitive damages are thus not available) (Florida law).

the most equitable, sensible, and fair").   This is the method by which Plaintiff will seek reimbursement of his fees.

However, even if Plaintiff had sought fees pursuant to a statute or contract, Defendant has not proven the value of this claim.  Like all damage claims, a claim for attorney's fees should be evaluated as it exists on the date of removal.  E.g., Dudley, 778 F.3d at 913; Gardynski-Leschuck v. Ford Motor Co., 142 F.3d 955, 958 (7th Cir. 1998) (holding that estimating future fees would "include[] the value of legal services that have not been and may never be incurred, and are therefore not 'in controversy' between the parties").[5]  The legal fees incurred by Plaintiff as of the date of removal were less than $13,000.  See Decl. of E. Webb, ¶¶ 5-6 (Exh. G hereto).

Finally, even if the Court were to go further and consider the value of Plaintiff's unasserted statutory or contract attorney fee claim through trial – which Defendant has not proven and is inherently a speculative inquiry – it still could not reasonably approach $5 million.  Jackson, 2006 WL 997614 at *2-3 (noting that because a Section 13-6-11 fee claim "is left to the discretion of the jury . . . the court has no way of determining whether an award of attorney's fees would be sufficient . . . to meet the jurisdictional requirement"); Baker v. Equity Residential Management, LLC, 996 F. Supp. 2d 1, 8 (D. Mass. Feb. 12, 2014) (noting the inherently speculative nature of future attorney's fees and finding the defendant has not met its burden of establishing "with sufficient particularity" that a class-wide fee claim, when combined with potential damages, could possibly exceed $5 million).  As a result, even presuming a statutory fee claim exists, Defendant still cannot sustain its amount in controversy burden.

---

[5] Some district courts have accounted for the value of attorney's fees through the conclusion of the case (e.g., Raymond v. Lane Constr. Corp., 527 F. Supp. 2d 156, 160 (D. Me. 2007)), but Plaintiff respectfully asserts that such holdings are inconsistent with the First Circuit's instructions that the amount in controversy analysis consider only the value of claims *at the time of removal*.  Amoche, 556 F.3d at 51.  Fees which may (or may not) be incurred later are properly excluded from the analysis.

**D.**     **Plaintiff Should Be Reimbursed for Expenses Incurred as a Result of the Improper Removal.**

28 U.S.C. Section 1447(c) states that "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  Any such award is within the discretion of this Court and may be given in "unusual circumstances" or "where the removing party lack[s] an objectively reasonable basis for seeking removal." Martin v. Franklin Capital Corp., 536 U.S. 132, 141 (2005).

 Here, the undisputed value of the claims Plaintiff has *actually asserted* does not approach $5 million.  Despite being well aware of this fact, Defendant removed this case anyway.  DraftKings' effort to establish the $5 million amount in controversy via evidence of the value of claims that Plaintiff, for good reason, *did not bring* is directly contrary to long-established binding precedent that plaintiffs are masters of their complaints and the amount in controversy analysis looks to the value of claims that the plaintiff has actually brought. Defendant's removal was objectively unreasonable and it should be ordered to reimburse Plaintiff for the fees and costs he has incurred responding to removal. E.g., Rafter v. Stevenson, 680 F. Supp. 2d 275, 278-81 (D. Me. 2010) (awarding fees because removal based on claims not pled in the complaint was objectively unreasonable); Rae v. Perry, 2009 WL 3430023, *3-4 (M.D. Fla. Oct. 21, 2009) (awarding fees because removal was based on a speculative amount in controversy); Beauford v. E.W.H., 2009 WL 3162249, *2-3 (E.D. Cal. Sept. 29, 2009) (awarding fees because relevant case law clearly foreclosed defendant's removal).

## CONCLUSION

The "claims" which DraftKings relies upon to try to push the amount in controversy over $5 million (i.e., restitution of non-rake losses, punitive damages, statutory attorneys' fees) are not

pled in the Complaint and thus are not in controversy.[6]  As a result, Defendant has not and

cannot sustain its burden of proving a class-wide amount in controversy of at least $5 million.

Because CAFA jurisdiction is lacking, Plaintiff's Motion should be GRANTED and this case

REMANDED to the Superior Court of Muscogee County, Georgia.  Plaintiff also respectfully

requests reimbursement of the reasonable fees and costs he incurred because of the improper

removal.[7]

      DATED this 25th day of February, 2016.

                       Respectfully submitted,

         BY:   WEBB, KLASE & LEMOND, LLC

                     */s/ E. Adam Webb*
                     E. Adam Webb
                      Georgia State Bar No. 743910
                     Matthew C. Klase
                      Georgia State Bar No. 141903

                     1900 The Exchange, S.E.
                     Suite 480
                     Atlanta, Georgia 30339
                     (770) 444-0773
                     (770) 217-9950 (fax)
                     Adam@WebbLLC.com
                     Matt@WebbLLC.com

                     Attorneys for Plaintiff

---

[6] If Plaintiff were to later try to add these claims to the case, DraftKings could remove at that time.  Amoche, 556 F.3d at 53 ("successive attempts at removal are permissible where the grounds for removal become apparent only later in the litigation").  As it stands, however, this removal was wholly unjustified.

[7] If the Court orders reimbursement, Plaintiff proposes to try to resolve the matter with Defendant.  If he is unable to do so, Plaintiff will submit evidence of the relevant fees and costs.

## CERTIFICATE OF CONSULTATION

I hereby certify that on February 24, 2016, Matthew Klase of my office emailed counsel for DraftKings inquiring as to whether Defendant would consent to the remand of this case to state court.  DraftKings' counsel Chad Lennon responded that DraftKings would not consent.

DATED this 25th day of February, 2016.

*/s/ E. Adam Webb*
E. Adam Webb

## CERTIFICATE OF SERVICE

I hereby certify that on this day I presented the foregoing to the Clerk of Court for filing and uploading to the CM/ECF system, which will send a notice to the counsel of record listed below:

Frank M. Lowrey IV, Esq.
Chad K. Lennon, Esq.
BONDURANT, MIXSON & ELMORE LLP
3900 One Atlantic Center
1201 W. Peachtree Street, NW
Atlanta, Georgia 30309
lowrey@bmelaw.com
lennon@bmelaw.com

DATED this 25th day of February, 2016.

*/s/ E. Adam Webb*
E. Adam Webb
