UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ ) | | |
| In re: DAILY FANTASY SPORTS LITIGATION ) | MDL No. 16-02677-GAO | |
| ) | | |
| This Document Relates to: ) | JURY TRIAL DEMANDED | |
| ) | | |
| All Cases ) | | |
| ) | | |
| _____ ) | | |

**FIRST AMENDED MASTER CLASS ACTION COMPLAINT AND JURY DEMAND**

INTRODUCTION .................................................................................................................. 1

JURISDICTION AND VENUE ............................................................................................ 10

PARTIES ............................................................................................................................... 11

   A. Plaintiffs ........................................................................................................................ 11

     The Alabama Plaintiff ................................................................................................... 11

     The Arizona Plaintiff ..................................................................................................... 12

     The Arkansas Plaintiff ................................................................................................... 13

     The California Plaintiffs ................................................................................................. 14

     The Colorado Plaintiff ................................................................................................... 18

     The Connecticut Plaintiffs ............................................................................................. 19

     The District of Columbia Plaintiff ................................................................................ 21

     The Florida Plaintiffs ..................................................................................................... 22

     The Georgia Plaintiff ..................................................................................................... 25

     The Illinois Plaintiffs ..................................................................................................... 26

     The Kentucky Plaintiffs ................................................................................................. 28

     The Massachusetts Plaintiffs ......................................................................................... 30

     The Michigan Plaintiff ................................................................................................... 33

     The Minnesota Plaintiff ................................................................................................. 34

     The Missouri Plaintiff .................................................................................................... 35

     The New Hampshire Plaintiff ........................................................................................ 36

     The New Jersey Plaintiffs .............................................................................................. 37

     The New Mexico Plaintiff ............................................................................................. 39

     The New York Plaintiffs ................................................................................................ 40

     The North Carolina Plaintiffs ........................................................................................ 44

     The Ohio Plaintiff .......................................................................................................... 45

The Oregon Plaintiff .................................................................................................. 46

The Pennsylvania Plaintiffs ....................................................................................... 47

The South Carolina Plaintiff ...................................................................................... 50

The Tennessee Plaintiff .............................................................................................. 51

The Texas Plaintiffs .................................................................................................... 51

The Utah Plaintiff ....................................................................................................... 55

The Virginia Plaintiff ................................................................................................. 56

The West Virginia Plaintiff ........................................................................................ 57

The Wisconsin Plaintiff .............................................................................................. 58

The Family Member Plaintiffs .................................................................................... 59

B. DFS Defendants ......................................................................................................... 62

C. Payment Processor Defendants .................................................................................. 63

D. Non-Defendant Banks ................................................................................................ 63

E. Non-Defendant Facilitators ........................................................................................ 64

F. Non-Defendant Enterprise Investors .......................................................................... 65

COMMON FACTUAL ALLEGATIONS .................................................................................. 75

I.      Daily Fantasy Sports ............................................................................................... 75

II.     Representations Made By DraftKings And FanDuel ............................................... 76

    A.      DraftKings and FanDuel Each Engaged In Omnipresent National Advertising
            Campaigns Reaching Millions of Consumers With The Same Messages .................. 76

    B.      DraftKings and FanDuel Advertised Their Products As 100% Legal ........................ 84

    C.      DraftKings and FanDuel Advertised Their Products As Easy, Simple Games of Skill
            That Anyone Could Win ............................................................................................. 88

    D.      DraftKings and FanDuel Advertised Bonus Money When Plaintiffs And Consumers
            Made Deposits ........................................................................................................... 103

        1.      DraftKings ............................................................................................................ 104

2.  FanDuel ................................................................................................ 116

E.   The Reason DraftKings and FanDuel Made Material Misrepresentations and
Omissions Is That They Had To Grow Their User Bases And Could Not Do So With
The Truth About Their Products .............................................................. 127

III.  DraftKings' and FanDuel's Representations Were False; DraftKings and FanDuel Knew
These Representations Were False, And DraftKings and FanDuel Omitted Material
Information From Plaintiffs and Consumers .................................................. 134

A.   Multiple States Have Determined DraftKings and FanDuel Are Not 100% Legal.. 135

B.   DraftKings and FanDuel Helped Create An Unfair Playing Field, A Rigged Game,
One That Was Not Simple and Easy To Win, And One In Which Only Few Players
Won ....................................................................................................... 138

C.   DraftKings and FanDuel Acted In Concert To Allow Their Employees To Use Inside
Information To Gain Unfair Advantage Over Plaintiffs and Consumers ................. 157

D.   DraftKings' and FanDuel's Bonus Offer Was A Scam ............................................. 168

E.   The Arbitration Provisions in DraftKings' and FanDuel's "Terms of Use" Are
Invalid, Unenforceable and Unconscionable ............................................ 170

1.  DraftKings' Unenforceable Arbitration Provision......................................... 170

2.  FanDuel's Unenforceable Arbitration Provision ............................................ 178

IV.  Family Members of DFS Players Were Harmed By Financial Losses.......................... 182

CLASS ACTION ALLEGATIONS ................................................................................. 184

CAUSES OF ACTION ....................................................................................................... 200

COUNT I:

Violation Of The New York Deceptive Acts And Practices Law ................................... 200

COUNT II:

Violation Of The New York False Advertising Law....................................................... 202

COUNT III:

Violation Of The New York General Obligations Law.................................................... 204

COUNT IV:

> Violations Of The Massachusetts Consumer Protection Act .............................................. 205

COUNT V:

> Unfair/Deceptive Practices In Violation Of State Consumer Protection Statutes ............ 207

COUNT VI:

> Deceptive Practices In Violation Of State Consumer Protection Statutes ........................ 213

COUNT VII:

> Unconscionable Practices In Violation Of State Consumer Protection Statutes .............. 217

COUNT VIII:

> Violation Of State Consumer Protection Statutes By Means Of Violation of FTC
> Regulation Regarding Advertising "Free" Offers .......................................................... 222

COUNT IX:

> Negligent Misrepresentation ........................................................................................... 223

COUNT X:

> Negligence ...................................................................................................................... 225

COUNT XI:

> Fraud And Misrepresentation ......................................................................................... 227

COUNT XII:

> Unjust Enrichment .......................................................................................................... 229

COUNT XIII:

> Unjust Enrichment .......................................................................................................... 233

COUNT XIV:

> Civil Conspiracy ............................................................................................................. 233

COUNT XV:

Breach Of Contract And Breach Of Implied Covenant Of Good Faith And
Fair Dealing ......................................................................................... 234

COUNT XVI

Declaratory Relief Regarding Draftkings's And Fanduel's So Called "Terms Of Use" . 236

COUNT XVII:

Violations Of New York General Obligations Law 239§§ 5-441, 5-401 and 5-421....... 239

COUNT XVIII:

Violations Of Massachusetts General Laws C. 137 § 1.................................... 240

COUNT XIX:

 Violations Of State Gambling Statutes ......................................... 242

COUNT XX:

Violation Of Official Code Of Georgia Annotated § 13-8-3: Gambling......................... 247

COUNT XXI

Violation Of Kentucky Revised Statutes § 528.010: Recovery Of Losses From
Unlawful   Gambling Or Wagering Transactions Kentucky Revised
Statutes § 372.040 ............................................................................... 249

COUNT XXII

Violation Of Tennessee Code Annotated § 29-19-104 & 5: Unlawful Gambling Or
Wagering Promotion, Management And Operation....................................... 253

COUNT XXIII:

Violation Of New Mexico Statutes Annotated 1978, §§ 30-19-2 And Action For
Recovery Of Debt Under New Mexico Statutes Annotated 1978, §§ 44-5-1 To -3 --
Unlawful Gambling......................................................................... 254

COUNT XXIV:

Suit By Person Other Than Loser For Recovery Of Losses – South Carolina Code Ann. § 32-1-20 ..................................................................................................................... 257

COUNT XXV:

Violations Of RICO, 18 U.S.C. §1962 (c) ........................................................................ 259

COUNT XXVI:

Violations Of RICO, 18 U.S.C. §1962(d) ......................................................................... 275

COUNT XXVII:

Violation Of Truth-In-Lending Consumer Contract, Warranty And Notice Act [TCCWNA], N.J.S.A. 56:12-14 ..................................................................................... 278

PRAYER FOR RELIEF ............................................................................................................ 280

DEMAND FOR JURY TRIAL ................................................................................................. 281

## INTRODUCTION

1.       Defendants DraftKings, Inc. ("DraftKings"), and FanDuel, LLC, ("FanDuel") (together "DFS Defendants") engaged in sustained, ubiquitous, uniform, and multi-platform national advertising campaigns to mislead millions of American consumers about their products. DraftKings and FanDuel advertised their daily fantasy sports ("DFS") products as 100% legal, easy, and games of skill that anyone could win.  Further, the DFS Defendants advertised that they would give away free bonus money to match anyone's initial deposit. As it turned out, none of those representations were true, and DraftKings and FanDuel knew these representations were not true.  DraftKings and FanDuel also failed to disclose material information to consumers and acted in concert to defraud consumers about the true nature of their products.

2.       Plaintiffs represent themselves and all consumers similarly situated who deposited money into accounts at DraftKings and/or FanDuel, and/or were harmed by DraftKings and FanDuel's deceptive marketing, concerted activities, and enforcement of illegal contracts. Plaintiffs seek monetary damages, equitable relief, and disgorgement of ill-gotten gains by DraftKings and FanDuel, and their partners.

3.       Beginning in 2012 and peaking during the 2015 National Football League ("NFL") season, DraftKings and FanDuel spent hundreds of millions of dollars advertising their products through national and cable television, radio, print, the internet, podcasts, and arena, ballpark and stadium sponsorships.  These advertisements contained the same messages and representations over and over again, and reached cultural saturation that made DraftKings and FanDuel household names.

4.       The proliferation of daily fantasy commercials was inescapable, and those ads were very specifically targeted.  In their advertising, both explicitly and implicitly, DraftKings

and FanDuel deceptively portrayed their products as easy, simple, fair contests of skill that anyone could win.  For example, by showing groups of "regular" or "average" guys[1] playing fantasy sports together and winning, DraftKings and FanDuel misrepresented the true likelihood that the average consumer would win.

5.      As one commentator noted: "By now, just about every American with a television set has seen FanDuel and DraftKings' television commercials that showcase an 'Average Joe' cashing a giant check for winning a daily fantasy sports contest."[2]  This included Plaintiffs and the members of the proposed classes as described more specifically below.

6.      DraftKings consciously decided to attract customers by misrepresenting its product.

7.      In a post on the DFS website www.rotogrinders.com shown by screenshot below, DraftKings' CEO Jason Robins defended a feature that frequent DFS players were complaining about by describing how it helped keep casual players, and how "causal" players - the ones targeted by their advertising - are "necessary to make the industry sustainable long-term."  That is, "casual" players who would deposit money and lose it to better, existing players were required in order to keep DraftKings in business.[3]

---

[1] The male gender is used as it appears most marketing was directed to the males.
[2] Marc Edelman, Daily Fantasy Must Change Its Ad Strategy: Showcasing Average Joe Winners Hurts Legal Claims, Forbes.com, September 18, 2015, http://www.forbes.com/sites/marcedelman/2015/09/18/daily-fantasy-sports-must-change-its-ad-strategy-showcasing-average-joe-winners-hurts-legal-claims/#4b15eb875cef
[3] https://rotogrinders.com/threads/draft-kings-emails-your-opponents-to-edit-their-lineups-8230-269716?page=5

8.     In contrast to the explicit and implicit representations and messages in its advertisements, DraftKings' CEO Jason Robins considered DraftKings' objective "to create a healthy economy where everyone can have fun and the best players can still profit."

9.     As shown in the screenshot below, Robins told users of Rotogrinders that the purpose of DraftKings advertising was to attract new, inexperienced players who would lose to the experienced, winning sharks already playing on the websites who generated the most revenue for DraftKings: "The goal in how we are set up and the tremendous amount of money we spend on marketing are meant to attract and retain casual players, which in turn should make it an attractive environment for those who profit."

**JRobs**                                                        2 years ago



DraftKings CEO

Heavy rakeback simply encourages the best players (those who are putting in thousands per day and are primarily profit-oriented) to play as much volume as possible at DK. I find it amusing that we get labeled high volume player oriented on other threads and the opposite here. The fact is, we have set up our site so stacking is possible (though not high ROI, I assure you) and have significantly lowered multi-entry so that more casual players will continue to play. With the amount of money that the best players in the industry are making playing on DraftKings, to give massive rakeback based purely on volume is a bit ridiculous. We already essentially give rakeback by frequently overlaying and netting less % rake than any site in the industry. By doing it through overlays, we spread it to all instead of making it solely for those who pump in high volume. The objective is to create a healthy economy where everyone can have fun and the best players can still profit. If I told you some of the numbers that winning players are profiting on our site, you would be amazed. Giving pure volume-based rakeback only makes the rich get richer, which is exactly what we are being told you guys don't want on other threads. The goal in how we are set up and the tremendous amount of money we spend on marketing are meant to attract and retain casual players, which in turn should make it an attractive environment for those who profit. I won't call out any names, but I would encourage and appreciate any of you high profit players to speak up and clarify just how much money you are making playing on DK. Some of you are the most vocal and critical of us on these forums, which I find ironic.

Reply Quote Link

10.    In a post on Rotogrinders, FanDuel's CEO admitted that FanDuel's "marketing strategy is more about players the mass market can identify with rather than 'Play the Pros'" as the below screenshot shows:[4]

---

[4] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=1



11.     In another post in the same thread, FanDuel's CEO described analyzing the benefits of bringing in new players as the best way to help "grinder" (i.e. high volume and experienced users) win rates - that is, bringing in new, inexperienced players unlikely to win would help FanDuel's high-value players who make up the biggest source of revenue for FanDuel make more money, and was a better way to help them make more money than reducing FanDuel's fee taken as a percentage of the contests.

12.     Eccles said: "To be honest, at the moment we've focused more on bringing in new players which by our calculations is a lot more important to grinder win rates than cutting rake."

13.     Put simply: FanDuel needed to increase the money high volume users could make, and chose to attract new users through misleading advertising over reducing their fees.



14.     As a result of this strategy, FanDuel's advertisements then fraudulently concealed and mispresented the fact that many of the players portrayed in their ads who won large amounts of money were actually professional players, but they were represented in their ads as if they were not, and as if they were players with whom "the mass market" consumers could identify.

15.     For example, in an ad called "Beat Your Buddies", FanDuel's commercial that included representations like "Nothing special about me" and "If you think it can't be you, it can be you," one of the characters in the commercial who the commercial indicates has won more than $762,000 says "A little bit of time, and a little bit of knowledge" is all it takes to win.  But this player, Chris Prince, was a professional DFS player who had been playing for years and devoted substantially more than "a little bit of time and a little bit of knowledge" to FanDuel.

16.     This ad included the representation that FanDuel was "simple" and that "even a novice can come in and spend $1 or $2 and win 10 or 20 thousand dollars."[5]

---

[5] https://www.ispot.tv/ad/AkWz/fanduel-one-week-leagues-beat-your-buddies.



17.     Unlike what FanDuel told consumers in its advertisements, FanDuel told its investors that only the top 0.1% of users actually win money.  The top 10,000 users had a negative 9.5% return on investment.

18.     In reality, DraftKings' and FanDuel's products were each the exact opposite of what they represented the websites to be.

19.      DraftKings did not offer contests that were 100% legal, fair game of skills that anyone could win, that were easy or simple to win, that required just a love of sports and experience playing season-long fantasy sports to turn a few dollars into millions, and users could not earn the bonus money they were promised.

20.     FanDuel did not offer contests that were 100% legal, fair game of skills that anyone could win, that were easy or simple to win, that required just a love of sports and experience playing season-long fantasy sports to turn a few dollars into millions, and users could not earn the bonus money they were promised.

21.     DraftKings omitted material information about all of these things, including that DraftKings was intentionally trying to attract "casual" players with no hope of winning in order to help the high-revenue generating users, and that only a few people at the top won most of the

money.

22.      FanDuel omitted material information about all of these things, including that FanDuel were intentionally trying to attract "casual" players with no hope of winning in order to help the high-revenue generating users, and that only a few people at the top won most of the money.

23.      Every FanDuel advertisement - on television, radio, print, internet, podcast, sponsored content or otherwise - omitted certain material facts that were necessary to make their affirmative misrepresentations not misleading.  Among these material facts were the following:

   a. Only a miniscule percentage of DFS players made and/or could make a profit. The vast majority of players lost money.
   b. New participants would be competing against full-time professional DFS players that the companies referred to as "sharks" or "grinders", and the DFS Defendants referred to new participants as "fish".
   c. Some of those full-time professional DFS players were statisticians or individuals with backgrounds in mathematics and economics who quit positions as analysts with major corporations to play DFS full-time.
   d. The full-time professional DFS players had advantages that the ordinary user would never have, including the use of sophisticated computer algorithms and "scripts".
   e. Some of those scripts would allow their owners to seek out and compete against new users against whom they had a large advantage.
   f. DraftKings and FanDuel were allowing the use of these scripts by certain users even though their use violated their so-called "Terms of Use".
   g. DraftKings and FanDuel were each allowing employees of the other company to play their contests knowing that those employees had gained inside knowledge that gave them advantages over the average contestants.
   h. DraftKings and FanDuel employees were using player histories to seek out and target weaker players in one-on-one or "heads up" contests.
   i. DraftKings and FanDuel employees had access to data on winning strategies, player pricing models, optimal lineup construction, and lineup ownership percentages and other data analysis about how to win at DFS that was unavailable to non-employees and that was being used by employees to compete against consumers, giving them a huge edge.
   j. Promised bonus money would not be paid on a dollar for dollar match basis but rather only "earned" based on disproportional spending by the player.

24.      Every DraftKings advertisement - on television, radio, print, internet, podcast,

sponsored content or otherwise - omitted certain material facts that were necessary to make their affirmative misrepresentations not misleading.   Among these material facts were the following:

    a. Only a miniscule percentage of DFS players made and/or could make a profit. The vast majority of players lost money

    b. New participants would be competing against full-time professional DFS players that the companies referred to as "sharks" or "grinders", and the DFS Defendants referred to new participants as "fish".

    c. Some of those full-time professional DFS players were statisticians or individuals with backgrounds in mathematics and economics who quit positions as analysts with major corporations to play DFS full-time.

    d. The full-time professional DFS players had advantages that the ordinary user would never have, including the use of sophisticated computer algorithms and "scripts".

    e. Some of those scripts would allow their owners to seek out and compete against new users against whom they had a large advantage.

    f. DraftKings and FanDuel were allowing the use of these scripts by certain users even though their use violated their so-called "Terms of Use".

    g. DraftKings and FanDuel were each allowing employees of the other company to play their contests knowing that those employees had gained inside knowledge that gave them advantages over the average contestants.

    h. DraftKings and FanDuel employees were using player histories to seek out and target weaker players in one-on-one or "heads up" contests.

    i. DraftKings and FanDuel employees had access to data on winning strategies, player pricing models, optimal lineup construction, and lineup ownership percentages and other data analysis about how to win at DFS that was unavailable to non-employees and that was being used by employees to compete against consumers, giving them a huge edge.

    j. Promised bonus money would not be paid on a dollar for dollar match basis but rather only "earned" based on disproportional spending by the player.

25.     As a result of these misrepresentations and omissions, DraftKings attracted millions of new players, including Plaintiffs and members of the proposed classes, generated tens of millions of dollars in revenue and attracted hundreds of millions in investments.  Consumers, on the other hand, lost big.  In addition to never receiving the promised bonus money, consumers pumped hundreds of millions of dollars into the DFS economy that went to the few at the top, including DraftKings and FanDuel employees.

26.     As a result of these misrepresentations and omissions, FanDuel attracted millions of new players, including Plaintiffs and members of the proposed classes, generated tens of millions of dollars in revenue and attracted hundreds of millions in investments. Consumers, on the other hand, lost big.  In addition to never receiving the promised bonus money, consumers pumped hundreds of millions of dollars into the DFS economy that went to the few at the top, including DraftKings and FanDuel employees.

27.     Plaintiffs seek certification of a class of individuals harmed by DraftKings and FanDuel and damages in an amount to be determined at trial.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this class action under 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), provides federal courts original jurisdiction over any class action in which any member of a class is a citizen of a state different from any defendant, where there are at least 100 members of the proposed class and in which the matter in controversy exceeds in the aggregate the sum of $5 million ($5,000,000.00), exclusive of interest and costs.

29.     Minimal diversity exists between the parties because at least one member of the class is diverse from at least one defendant.  There are at least 100 members of the proposed class and the amount in controversy exceeds $5,000,000 to a reasonable probability.  Therefore, CAFA jurisdiction properly lies within this Court.

30.     Defendant DraftKings is subject to personal jurisdiction in the Commonwealth of Massachusetts. DraftKings is headquartered in Massachusetts, conducts substantial business in Massachusetts, and purposefully placed its services into the stream of commerce within Massachusetts and throughout the United States. DraftKings intentionally targeted Massachusetts

10

customers with its games.

31.     Defendant FanDuel is subject to personal jurisdiction in the Commonwealth of Massachusetts.   Defendant FanDuel conducts substantial business in Massachusetts and purposefully placed their services into the stream of commerce within Massachusetts and throughout the United States.

32.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because DraftKings' headquarters is located within the District of Massachusetts and a substantial part of the events and omissions giving rise to the claims alleged herein occurred within this District.

## PARTIES

### A.     Plaintiffs

### The Alabama Plaintiff

33.     Plaintiff Samuel Lozada is a resident and citizen of Alabama. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Samuel Lozada began playing Daily Fantasy Sports on FanDuel and DraftKings in or around August 2015.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Samuel Lozada was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before he began play, Mr. Lozada saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone

could win, and recalls commercials advertising the matching deposit bonus being offered by both DraftKings and FanDuel.  When he signed up, Mr. Lozada believed that his initial deposits on both sites would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  Instead, he was only given incremental credit towards the bonus every time he played and never received the full advertised bonus.  Mr. Lozada would not have deposited money and begun playing on FanDuel and DraftKings had he known that the matching bonus would not occur as advertised.  Before making his first deposit, Mr. Lozada thought that the contests would be fair and level playing field for all players. He has stopped playing on the sites because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

**The Arizona Plaintiff**

34.    Plaintiff Richard Famiglietti is a resident and citizen of Arizona. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Richard Famiglietti began playing Daily Fantasy Sports on FanDuel in or around September 2014 and DraftKings in or around September 2015.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Richard Famiglietti was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before he began play, he saw numerous advertisements for FanDuel and DraftKings, such as those

described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by both FanDuel and DraftKings.  When he signed up, Mr. Famiglietti believed that his initial deposits on FanDuel and DraftKings would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  Instead, he was only given incremental credit towards the bonus every time he played. Mr. Famiglietti would not have deposited money and begun playing on FanDuel and DraftKings had he known that the matching bonus would not occur as advertised.  Before making his first deposit, Mr. Famiglietti thought that the contests would be fair and level playing field for all players. He has stopped playing in contests and tournaments because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

**The Arkansas Plaintiff**

35.    Plaintiff Dustin Price is a resident and citizen of Arkansas.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $100 on DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Mr. Price first deposited money and began playing on DraftKings in or around the fall of 2014.  Plaintiff Dustin Price was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before he began play, he saw numerous advertisements for DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could

win, and recalls commercials advertising the matching deposit bonus being offered by DraftKings. When he signed up, Mr. Price believed that his initial deposit on DraftKings would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments. Mr. Price would not have deposited money and begun playing on DraftKings had he known that the matching bonus would not occur as advertised. Before making his first deposit, Mr. Price thought that the contests would be fair and level playing field for all players. He has stopped playing in the contests and tournaments because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings' products as described more specifically below.

**The California Plaintiffs**

36.     Plaintiff Christine Parks is a resident and citizen of California. She brings this action on behalf of herself individually, and on behalf of a class of persons similarly situated as described in the classes below. Plaintiff Christine Parks began playing Daily Fantasy Sports on FanDuel and DraftKings in or around October 2015. She deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Plaintiff Christine Parks was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof. In addition, she was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof. Before she began play, Ms. Parks saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by both

DraftKings and FanDuel.  Ms. Parks would not have deposited money and begun playing on FanDuel and DraftKings had she known that the matching bonus would not occur as advertised. Before making her first deposit, Ms. Parks thought that the contests would be fair and level playing field for all players. She has stopped playing on the sites because she no longer believes the contests to be fair and would never had signed up and played had she known the truth about DraftKings and FanDuel's products as described more specifically below.

37.     Plaintiff Roderick Lizardo is a resident and citizen of California. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Roderick Lizardo began playing Daily Fantasy Sports on DraftKings in or around September 2015.  He deposited and risked at least $100 on DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Roderick Lizardo was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.   Before he began play, Mr. Lizardo saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the message that it was a fair game of skill that anyone could win.  Before making his first deposit, Mr. Lizardo thought that the contests would be fair and level playing field for all players. He would never had signed up and played had he known the truth about DraftKings' products as described more specifically below.

38.     Plaintiff Jamie Facenda is a resident and citizen of California. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Jamie Facenda began playing Daily Fantasy Sports on DraftKings in or around May 2015.  He deposited and risked at least $100 on DraftKings

tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Jamie Facenda was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Mr. Facenda's funds were drawn against his Visa card by DraftKings, including on the following dates:  May 6, 2015, June 16, 2015, July 1, 2015, July 7, 2015, and August 12, 2015.  Before he began play, Mr. Facenda saw numerous advertisements for DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by DraftKings.  When he signed up, Mr. Facenda believed that his initial deposit would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  Instead, he was only given incremental credit towards the bonus every time he played and has never received the full advertised bonus.  Mr. Facenda would not have deposited money and begun playing on DraftKings had he known that the matching bonus would not occur as advertised.  Before making his first deposit, Mr. Facenda thought that the contests would be fair and level playing field for all players. He has stopped playing on the sites because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings' products as described more specifically below.

39.    Plaintiff Michael Moton is a resident and citizen of California.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $100 on DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed

classes.   Mr. Moton first deposited money and began playing on DraftKings in or around September 2014.  Plaintiff Michael Moton was caused by DraftKings' illegal gambling scheme, to place bets with DraftKings, including on the following dates, and lost money as a result thereof:   May 9, 2015, June 15, 2015, July 28, 2015, and September 3, 2015.  Mr. Moton's funds were drawn against his MasterCard account by DraftKings through wire and/or internet transfers, including on the following dates:  May 9, 2015, June 15, 2015, July 28, 2015, and September 3, 2015. Mr. Moton's funds were drawn against his bank account by DraftKings through wire and/or internet transfers, including on the following dates:  November 10, 2014, January 5, 2015, January 21, 2015, March 2, 2015 and March 4, 2015.  Before he began play, he saw numerous advertisements for DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising daily prizes.   When he made his first deposit on DraftKings, Mr. Moton thought that the contests and tournaments would be fair to all players. Mr. Moton stopped playing because he no longer believes the contests and tournaments to be fair. He would never had signed up and played had he known the truth about DraftKings' products as described more specifically below.

40.     Plaintiff Wesley Leung is a resident and citizen of California. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Wesley Leung began playing Daily Fantasy Sports on FanDuel in or around October 2013.   He deposited and risked at least $100 on FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Wesley Leung was caused by FanDuel's illegal gambling scheme, to

17

place bets through the internet with FanDuel and lost money as a result thereof.  Before he began

play, Mr. Leung saw numerous advertisements for FanDuel, such as those described more

specifically below, with the messages and representations that it was a simple and easy fair game

of skill that anyone could win, and recalls commercials advertising the matching deposit bonus

being offered by FanDuel.  When he signed up, Mr. Leung believed that his initial deposits on

FanDuel would be matched 100% immediately such that he would have double his money with

which to play in contests and tournaments.  Instead, he was only given incremental credit

towards the bonus every time he played and has never received the full advertised bonus.  Mr.

Leung would not have deposited money and begun playing on FanDuel had he known that the

matching bonus would not occur as advertised.  Before making his first deposit, Mr. Leung

thought that the contests would be fair and level playing field for all players. He would never had

signed up and played had he known the truth about FanDuel's products as described more

specifically below.

**The Colorado Plaintiff**

41.    Plaintiff Alicia Ferdula is a resident and citizen of Colorado. She brings this

action on behalf of herself individually, and on behalf of a class of persons similarly situated as

described in the classes below.  Plaintiff Alicia Ferdula began playing Daily Fantasy Sports on

FanDuel and DraftKings in or around September 2015.  She deposited and risked at least $100

on both DraftKings and FanDuel tournaments and contests, and without a class action in this

Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor

would any of the members of the proposed classes.  Plaintiff Alicia Ferdula was caused by

FanDuel's illegal gambling scheme, to place bets through the internet with FanDuel including on

the following dates and lost money as a result thereof:  September 22, 2015, September 28, 2015,

October 7, 2015, October 17, 2915, October 31, 2015, and November 14, 2015.  In addition, she was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before she began play, Ms. Ferdula saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by both DraftKings and FanDuel.  When she signed up, Ms. Ferdula believed that her initial deposit would be matched 100% immediately such that she would have double her money with which to play in contests and tournaments.  She never received the promised bonus.  Before making her first deposit, Ms. Ferdula thought that the contests would be fair and level playing field for all players. She has stopped playing on the sites because she no longer believes the contests to be fair and would never had signed up and played had she known the truth about DraftKings and FanDuel's products as described more specifically below.

**The Connecticut Plaintiffs**

42.     Plaintiff Peter Triantafylidis is a resident and citizen of Connecticut.   He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Mr. Triantafylidis began playing Daily Fantasy Sports on both DraftKings and FanDuel in or around November 2013.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Peter Triantafylidis was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets

through the internet and lost money as a result thereof.   Mr. Triantafylidis saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the message that it was a fair game of skill that anyone could win, and specifically, he recalls a commercial referencing a player who deposited $25 and became a millionaire.  Before making his first deposit, Mr. Triantafylidis thought that the contests would be fair to all players. He has stopped playing on the sites because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

43.     Plaintiff Eric Champagne is a resident and citizen of Connecticut. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Eric Champagne began playing Daily Fantasy Sports on FanDuel in or around September 2014 and on DraftKings in or around the September 2015.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Eric Champagne was caused by FanDuel's illegal gambling scheme, to place bets through the internet with FanDuel and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets with DraftKings, and lost money as a result thereof.   Before he began play, Mr. Champagne saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by FanDuel and DraftKings. When he signed up, Mr. Champagne believed that his initial deposit would be matched 100%

20

immediately such that he would have double his money with which to play in contests and tournaments.   He never received the promised bonus. Before making his first deposit, Mr. Champagne thought that the contests would be fair and level playing field for all players. Mr. Champagne would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

**The District of Columbia Plaintiff**

44.     Plaintiff Matt Deady is a resident and citizen of District of Columbia.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $100 on DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.   Mr. Deady first deposited money and began playing on DraftKings in or around January 2015.  Plaintiff Matt Deady was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before he began play, he saw numerous advertisements for DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by DraftKings.  When he signed up, Mr. Deady believed that his initial deposit on DraftKings would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.   Instead, he was only given incremental credit towards the bonus every time he played and has never received the full advertised bonus.  When he made his first deposit on DraftKings, Mr. Deady thought that the contests and tournaments would be fair to all players.   Mr. Deady stopped playing because he no longer believes the contests and

tournaments to be fair. He would never had signed up and played had he known the truth about DraftKings' products as described more specifically below.

**The Florida Plaintiffs**

45.     Plaintiff Alan Cordover is a resident and citizen of Florida. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Alan Cordover began playing Daily Fantasy Sports on FanDuel in or around August 2013 and began playing on DraftKings in or around August 2014. He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Alan Cordover was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before he began play, Mr. McDaid saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the message that it was a fair game of skill that anyone could win. Before making his first deposit, Mr. McDaid thought that the contests would be fair and level playing field for all players. He has stopped playing on the sites because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

46.     Plaintiff Jeff Kaufman is a resident and citizen of Florida.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $100 on DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically

or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Mr. Kaufman first deposited money and began playing on DraftKings in or around November 2014.  Plaintiff Jeff Kaufman was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before he began play, he saw numerous advertisements for DraftKings, such as those described more specifically below, with the message that it was a fair game of skill that anyone could win.  When he made his first deposit on DraftKings, Mr. Kaufman thought that the contests and tournaments would be fair to all players.  Mr. Kaufman stopped playing because he no longer believes the contests and tournaments to be fair. He would never had signed up and played had he known the truth about DraftKings' products as described more specifically below.

47.     Plaintiff Jarred Lokeitz is a resident and citizen of Florida.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  He deposited and risked at least $100 on FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Mr. Lokeitz first deposited money and began playing Daily Fantasy Sports on FanDuel in or around October 2014.  Plaintiff Jarred Lokeitz was caused by FanDuel's illegal gambling scheme, to place bets through the internet with FanDuel including on the following dates and lost money as a result thereof: January 3, 2015, January 10, 2015, December 21, 2014, October 11, 2014 and October 2, 2014.  Before he began play, he saw numerous advertisements for FanDuel, such as those described more specifically below, with the message that it was a fair game of skill that anyone could win.  Before making his first deposit, Mr. Lokeitz thought that the contests and tournaments would be fair to all players.  He would never had signed up and played had he

known the truth about FanDuel's products as described more specifically below.

48. Plaintiff David White is a resident and citizen of Florida. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $100 on DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Mr. White first deposited money and began playing on DraftKings in or around March 2015. Plaintiff David White was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof. Before he began play, he saw numerous advertisements for DraftKings, such as those described more specifically below, with the message that it was a fair game of skill that anyone could win. When he made his first deposit on DraftKings, Mr. White thought that the contests and tournaments would be fair to all players. Mr. White stopped playing because he no longer believes the contests and tournaments to be fair. He would never had signed up and played had he known the truth about DraftKings' products as described more specifically below.

49. Plaintiff Brackie Bryant is a resident and citizen of Florida. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. Plaintiff Brackie Bryant began playing Daily Fantasy Sports on FanDuel and DraftKings in or around September 2015. He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Plaintiff Brackie Bryant was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof. In

24

addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.   Before he began play, Mr. Bryant saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by both FanDuel and DraftKings.   When he signed up, Mr. Bryant believed that his initial deposits on both sites would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.   He never received his promised bonus.   Mr. Bryant would not have deposited money and begun playing on FanDuel and DraftKings had he known that the matching bonus would not occur as advertised.   Before making his first deposit, Mr. Bryant thought that the contests would be fair and level playing field for all players. He has stopped playing on the sites because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

50.     Plaintiff Nelson C. Steiner is a resident and citizen of Florida.   Mr. Steiner is serving as a representative for the use and benefit of the State of Florida against Defendants DraftKings and FanDuel.   Plaintiff Steiner has never had an account with or placed a bet with either of the DFS Defendants but brings this action as a concerned citizen of the State of Florida and believes that, consistent with the public policy of the state of Florida, that illegal gambling is injurious to the citizens of Florida and deprives the state of Florida of tax revenues and lawful employment opportunities and other economic benefits. Plaintiff Steiner is authorized by Florida Statutes § 849.12, *et seq.,* to pursue these claims.

**The Georgia Plaintiff**

51.     Plaintiff Aaron Hodge is a resident and citizen of Georgia.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Mr. Hodge started playing Daily Fantasy Sports on DraftKings in or around 2011 and on FanDuel in or around 2013.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Aaron Hodge was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before he began play, Mr. Hodge saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, on television and the internet, particularly on [www.espn.com](www.espn.com), with the message that it was a fair game of skill that anyone could win .and recalls commercials advertising a matching deposit bonus for both DraftKings and FanDuel.  When he signed up, Mr. Hodge believed that his initial deposits on FanDuel and DraftKings would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  He never received the promised bonus.  Mr. Hodge would not have deposited money and begun playing on the sites had he known that the matching bonus would not occur as advertised.  Before making his first deposit, Mr. Hodge thought that the contests would be fair to all players. He has stopped playing on the sites because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

**The Illinois Plaintiffs**

52.     Plaintiff Nate Jackson is a resident and citizen of Illinois. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Nate Jackson began playing Daily Fantasy Sports on FanDuel and DraftKings in or around September 2015.   He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Nate Jackson was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before he began play, Mr. Jackson saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by both FanDuel and DraftKings.  When he signed up, Mr. Jackson believed that his initial deposits on both sites would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  He never received his promised bonus.  Mr. Jackson would not have deposited money and begun playing on FanDuel and DraftKings had he known that the matching bonus would not occur as advertised.   Before making his first deposit, Mr. Jackson thought that the contests would be fair and level playing field for all players. He has stopped playing on the sites because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

53.     Plaintiff Tom Guarino is a resident and citizen of Illinois.  He brings this action

27

on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $100 on DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Mr. Guarino first deposited money and began playing on DraftKings in or around April 2015.  Plaintiff Tom Guarino was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before he began play, he saw numerous advertisements for DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by DraftKings.  When he signed up, Mr. Guarino believed that his initial deposit on would be matched 100% immediately such that he would have double his money with which to play in DraftKings' contests and tournaments.  He never received his promised bonus.  When he made his first deposit on DraftKings, Mr. Guarino thought that the contests and tournaments would be fair to all players.  Mr. Guarino stopped playing because he no longer believes the contests and tournaments to be fair.  He would never had signed up and played had he known the truth about DraftKings' products as described more specifically below.

**The Kentucky Plaintiffs**

54.    Plaintiff Dustin Turner is a resident and citizen of Kentucky. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Dustin Turner began playing Daily Fantasy Sports on FanDuel and DraftKings in or around August 2013.  He deposited and risked at least $100 on

both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Plaintiff Dustin Turner was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof. In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof. Before he began play, Mr. Turner saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the message that it was a fair game of skill that anyone could win. Before making his first deposit, Mr. Turner thought that the contests would be fair and level playing field for all players. He has stopped playing on the sites because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

55. Plaintiff Ryan Williams is a resident and citizen of Kentucky. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. Plaintiff Ryan Williams began playing Daily Fantasy Sports on DraftKings in or around the spring of 2015 and on FanDuel in or around the summer of 2015. He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Plaintiff Ryan Williams was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof. In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof. Before he began play, Mr. Williams saw numerous advertisements for DraftKings and FanDuel, such as

those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by both FanDuel and DraftKings.  When he signed up, Mr. Williams believed that his initial deposits on both sites would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  Mr. Williams would not have deposited money and begun playing on FanDuel and DraftKings had he known that the matching bonus would not occur as advertised.  Before making his first deposit, Mr. Williams thought that the contests would be fair and level playing field for all players. He has stopped playing in the public contests and tournaments because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

**The Massachusetts Plaintiffs**

56.     Plaintiff Ryan Leonard is a resident and citizen of Massachusetts.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $100 on DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Mr. Leonard first deposited money and began playing on DraftKings in or around September 2014.  Plaintiff Ryan Leonard was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Mr. Leonard's funds were drawn against his Chase Visa account by DraftKings through wire and/or internet transfers, including on the following dates: October 3, 2014. Before he began play, he saw numerous advertisements for DraftKings, such as those described more specifically below, with the

message that it was a fair game of skill that anyone could win.  When he made his first deposit on DraftKings, Mr. Leonard thought that the contests and tournaments would be fair to all players.   Mr. Leonard stopped playing because he no longer believes the contests and tournaments to be fair. He would never had signed up and played had he known the truth about DraftKings' products as described more specifically below.

57.     Plaintiff Karl Medina is a resident and citizen of Massachusetts. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Karl Medina began playing Daily Fantasy Sports on FanDuel in or around December 2014 and on DraftKings in or around the September 2015.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Karl Medina was caused by FanDuel's illegal gambling scheme, to place bets through the internet with FanDuel including on the following dates and lost money as a result thereof:   December 21, 2014, January 24, 2015, September 13, 2105 and October 4, 2015.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets with DraftKings, including on the following dates, and lost money as a result thereof:   September 20, 2015, September 27, 2015 and October 4, 2015.  Before he began play, Mr. Medina saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by FanDuel.  When he signed up, Mr. Medina believed that his initial deposits on FanDuel would be matched 100% immediately such that he would have double his money with which to play in

contests and tournaments.  Instead, he was only given incremental credit towards the bonus every time he played and has never received the full advertised bonus.  Mr. Medina would not have deposited money and begun playing on FanDuel had he known that the matching bonus would not occur as advertised.  Before making his first deposit, Mr. Medina thought that the contests would be fair and level playing field for all players. He has stopped playing in   contests and tournaments because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

58.     Plaintiff James Gardner is a resident and citizen of Massachusetts. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff James Gardner began playing Daily Fantasy Sports on both FanDuel and DraftKings in or around the April 2015.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff James Gardner was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.   Before he began play, Mr. Gardner saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by both FanDuel and DraftKings.  When he signed up, Mr. Gardner believed that his initial deposits on FanDuel and DraftKings would be matched 100% immediately such that he would

have double his money with which to play in contests and tournaments.  Instead, he was only given incremental credit towards the bonus every time he played and has never received the full advertised bonus.  Mr. Gardner would not have deposited money and begun playing on FanDuel and DraftKings had he known that the matching bonus would not occur as advertised.  Before making his first deposit, Mr. Gardner thought that the contests would be fair and level playing field for all players. He has stopped playing in contests and tournaments because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

59.     Plaintiff Jeremy Rohrs is a resident and citizen of Massachusetts.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  He deposited and risked at least $175 on DraftKings tournaments and contests.  Mr. Rohrs first deposited money and began playing on DraftKings on or around January 2014.  Mr. Rohrs was caused by DraftKings' illegal gambling scheme to place bets through the internet and lost money as a result.

**The Michigan Plaintiff**

60.     Plaintiff Scott Murphy is a resident and citizen of Michigan. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $400 on Draft Kings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Mr. Murphy first deposited money and began playing on DraftKings and FanDuel in or around October, 2015. DraftKings'/Fanduels' illegal gambling scheme induced Mr. Murphy to place bets through the internet and he lost money as a result.

Before he began play, Mr. Murphy saw numerous advertisements for [DraftKings/FanDuel], such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by DraftKings/FanDuel. When he signed up, Mr. Murphy believed that his initial deposit on DraftKings/FanDuel would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments. Instead, he was only given incremental credit towards the bonus every time he played and has never received the full advertised bonus.  When he made his first deposit on DraftKings/FanDuel, Mr. Murphy thought that the contests and tournaments would be fair to all players. Mr. Murphy stopped playing because he no longer believes the contests tournaments to be fair. He would never had signed up and played had he known the truth about DraftKings/FanDuel products as described more specifically below.

**The Minnesota Plaintiff**

61.     Plaintiff Kurt Elliott is a resident and citizen of Minnesota. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked roughly $48,000 on Draft Kings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Mr. Elliott first deposited money and began playing on DraftKings and FanDuel in or around December 14, 2014. DraftKings'/Fanduels' illegal gambling scheme induced Mr. Elliott to place bets through the internet and he lost money as a result.    Before he began play, Mr. Elliott saw numerous advertisements for [DraftKings/FanDuel], such as those described more specifically below, with the messages and

representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by DraftKings/FanDuel. When he signed up, Mr. Elliott believed that his initial deposit on DraftKings/FanDuel would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments. Instead, he was only given incremental credit towards the bonus every time he played and has never received the full advertised bonus. When he made his first deposit on DraftKings/FanDuel, Mr. Elliott thought that the contests and tournaments would be fair to all players. Mr. Elliott stopped playing for a while because he no longer believes the contests tournaments to be fair. He would never had signed up and played had he known the truth about DraftKings/FanDuel products as described more specifically below.

**The Missouri Plaintiff**

62.    Plaintiff Cooper Ogborn is a resident and citizen of Illinois but was attending school in Missouri at the time that he made his initial deposits and played both FanDuel and DraftKings while in Missouri. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. Plaintiff Cooper Ogborn began playing Daily Fantasy Sports on both FanDuel and DraftKings in or around the October 2014.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Cooper Ogborn was caused by FanDuel's illegal gambling scheme to place bets through the internet and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a

result thereof.   Before he began play, he saw numerous advertisements for DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by DraftKings.   When he signed up, Mr. Ogborn believed that his initial deposit on DraftKings would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.   Instead, he was only given incremental credit towards the bonus every time he played and has never received the full advertised bonus.  Mr. Ogborn would not have deposited money and begun playing on DraftKings had he known that the matching bonus would not occur as advertised.   Before making his first deposit, Mr. Ogborn thought that the contests would be fair and level playing field for all players. He has stopped playing in contests and tournaments because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

**The New Hampshire Plaintiff**

63.     Plaintiff Peter Johnson is a resident and citizen of New Hampshire. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Peter Johnson began playing Daily Fantasy Sports on both FanDuel and DraftKings in or around September 2015.   He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Peter Johnson was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.   In addition, he was caused by DraftKings' illegal gambling scheme, to place bets

through the internet and lost money as a result thereof.   Before he began play, Mr. Johnson saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the message that it was a fair game of skill that anyone could win. Before making his first deposit, Mr. Johnson thought that the contests would be fair and level playing field for all players. He has stopped playing in   contests and tournaments because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

**The New Jersey Plaintiffs**

64.     Plaintiff Jodi Siegel is a resident and citizen of New Jersey.  She brings this action on behalf of herself individually, and on behalf of a class of persons similarly situated as described in the classes below.  She deposited and risked at least $100 on FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect her rights, nor would any of the members of the proposed classes. Ms. Siegel first deposited money and began playing Daily Fantasy Sports on FanDuel in or around September 2015.   Plaintiff Jodi Siegel was caused by FanDuel's illegal gambling scheme, to place bets through the internet with FanDuel including on the following dates and lost money as a result thereof: September 27, 2015, October 4, 2015, October 11, 2015, October 18, 2015, October 25, 2015, November 1, 2015, November 8, 2015, November 5, 2015, November 15, 2015, November 19, 2015, November 22, 2015, November 29, 2015, December 6, 2015, December 13, 2015, December 27, 2015, January 16, 2016 and January 24, 2016.  Ms. Siegel's funds were drawn against her Chase credit card by FanDuel on or about September 27, 2015. Before she began play, she saw numerous advertisements for FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair

game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by FanDuel.  When she signed up, Ms. Siegel believed that her initial deposit would be matched 100% immediately such that she would have double his money with which to play in contests and tournaments.  Instead, she was only given incremental credit towards the bonus every time she played and has never received the full advertised bonus.  Ms. Siegel would not have deposited money and begun playing on FanDuel had she known that the matching bonus would not occur as advertised.  Before making her first deposit, Ms. Siegel thought that the contests and tournaments would be fair to all players.  She would never had signed up and played had she known the truth about FanDuel's products as described more specifically below.

65.   Plaintiff Ryan Franco is a resident and citizen of New Jersey.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $100 on DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Mr. Franco first deposited money and began playing on DraftKings in or around October 2014.  Plaintiff Ryan Franco was caused by DraftKings' illegal gambling scheme, to place bets with DraftKings, including on the following dates, and lost money as a result thereof:  September 4, 2015, September 11, 2015, September 15, 2015, September 22, 2015, and October 8, 2015.  Before he began play, he saw numerous advertisements for DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising daily prizes.  When he made his first deposit on DraftKings, Mr. Franco thought that the contests

and tournaments would be fair to all players.  Mr. Franco stopped playing because he no longer believes the contests and tournaments to be fair. He would never had signed up and played had he known the truth about DraftKings' products as described more specifically below.

**The New Mexico Plaintiff**

66.     Plaintiff Brad Boast is a resident and citizen of New Mexico. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Brad Boast began playing Daily Fantasy Sports on FanDuel in or around the fall of 2014 and on DraftKings in or around the fall of 2015.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Brad Boast was caused by FanDuel's illegal gambling scheme to place bets through the internet and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before he began play, he saw numerous advertisements for FanDuel and DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by both FanDuel and DraftKings.  When he signed up, Mr. Boast believed that his initial deposits on FanDuel and DraftKings would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  Instead, he was only given incremental credit towards the bonus every time he played.  Before making his first deposit, Mr. Boast thought that the contests would be fair and level playing field for all players. He has stopped playing in contests and tournaments because he no longer believes the

contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

**The New York Plaintiffs**

67.     Plaintiff John McDaid is a resident and citizen of New York. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff John McDaid began playing Daily Fantasy Sports on FanDuel in or around April 2014 and began playing on DraftKings approximately one month later.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Plaintiff John McDaid was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof: on April 6, 2014, $100 was drawn electronically from his Visa credit card account and deposited to his FanDuel account.  On September 13, 2014, $100 was drawn electronically from his Visa credit card account and deposited to his FanDuel account.  In addition, he was caused by DraftKings' illegal gambling scheme, to place placed bets with DraftKings, in similar fashion which was drawn from his Visa credit card into his DraftKings account on various dates. Mr. McDaid's funds were drawn out of his bank account by FanDuel through wire and/or internet transfers, including on the following dates: April 6, 2014 and September 13, 2014.  In addition, Plaintiff lost money and had funds drawn from his FanDuel account electronically on the following dates: July 7, 2015, July 6, 2015, June 4, 2015, June 1, 2015, May 5, 2014, May 3, 2014 and April 7, 2014.  His funds were drawn out of his bank account by DraftKings, through wire and/or internet transfers in similar fashion on dates currently unknown to Plaintiff but which will be available upon production of his account

information by DraftKings.  Before he began play, Mr. McDaid saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and specifically remembers advertising promoting that the "average Joe" could win money by playing. Before making his first deposit, Mr. McDaid thought that the contests would be fair and level playing field for all players. He has stopped playing on the sites because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

68.     Plaintiff Michael Desabato is a resident and citizen of New York.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $100 on DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Mr. Desabato first deposited money and began playing on DraftKings in or around September 2015.  Plaintiff Michael Desabato was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Desabato's funds were drawn against his Visa account by DraftKings through wire and/or internet transfers, including on the following dates: September 15, 2015, September 20, 2015, September, 24, 2015, and October 16, 2015.  Desabato's funds were drawn against his MasterCard account by DraftKings through wire and/or internet transfers, including on the following dates: October 10, 2015. Before he began play, he saw numerous advertisements for DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the

matching deposit bonus being offered by DraftKings. When he signed up, Mr. Desabato believed that his initial deposits on FanDuel would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  Instead, he was only given incremental credit towards the bonus every time he played and has never received the full advertised bonus.  Mr. Desabato would not have deposited money and begun playing on FanDuel had he known that the matching bonus would not occur as advertised.  When he made his first deposit on DraftKings, Mr. Desabato thought that the contests and tournaments would be fair to all players.   Mr. Desabato stopped playing because he no longer believes the contests and tournaments to be fair. He would never had signed up and played had he known the truth about DraftKings' products as described more specifically below.

69.     Plaintiff Scott Walters is a resident and citizen of New York. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Scott Walters began playing Daily Fantasy Sports on FanDuel in or around the spring of 2015 and on DraftKings at a later time.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Scott Walters was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.   Before he began play, he saw numerous advertisements for FanDuel and DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus

being offered by both FanDuel and DraftKings.  When he signed up, Mr. Walters believed that his initial deposits on FanDuel and DraftKings would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  Instead, he was only given incremental credit towards the bonus every time he played and has never received the full advertised bonus.  Before making his first deposit, Mr. Walters thought that the contests would be fair and level playing field for all players. He has stopped playing in contests and tournaments because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

70.     Plaintiff Aissa Khirani is a resident and citizen of New York. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Aissa Khirani began playing Daily Fantasy Sports on both FanDuel and DraftKings in or around October 2015.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Aissa Khirani was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.   In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.   Before he began play, he saw numerous advertisements for FanDuel and DraftKings, such as those described more specifically below, with the message that it was a fair game of skill that anyone could win.  Before making his first deposit, Mr. Khirani thought that the contests would be fair and level playing field for all players. He has stopped playing in contests and tournaments because he no longer believes the

contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

**The North Carolina Plaintiffs**

71.      Plaintiff Keith Wesolowski is a resident and citizen of North Carolina.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  He deposited and risked at least $100 on FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect her rights, nor would any of the members of the proposed classes. Mr. Wesolowski first deposited money and began playing Daily Fantasy Sports on FanDuel in or around 2011.  Plaintiff Keith Wesolowski was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.   Before he began play, he saw numerous advertisements for FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by FanDuel.  When he signed up, Mr. Wesolowski believed that his initial deposit would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  Instead, he was only given incremental credit towards the bonus every time he played.   Mr. Wesolowski would not have deposited money and begun playing on FanDuel had he known that the matching bonus would not occur as advertised. Before making his first deposit, Mr. Wesolowski thought that the contests and tournaments would be fair to all players.  He would never had signed up and played had he known the truth about FanDuel's products as described more specifically below.

72.      Plaintiff Thomas Berg is a resident and citizen of North Carolina. He brings this

action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Thomas Berg began playing Daily Fantasy Sports on FanDuel in or around September 2014 and DraftKings in or around September 2015.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Thomas Berg was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before he began play, he saw numerous advertisements for FanDuel and DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by both FanDuel and DraftKings.  When he signed up, Mr. Berg believed that his initial deposits on FanDuel and DraftKings would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  Instead, he was only given incremental credit towards the bonus every time he played. Before making his first deposit, Mr. Berg thought that the contests would be fair and level playing field for all players. He has stopped playing in  contests and tournaments because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

**The Ohio Plaintiff**

73.    Plaintiff Scott Tyler is a resident and citizen of Ohio.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described

in the classes below.  He deposited and risked at least $100 on FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Mr. Tyler first deposited money and began playing Daily Fantasy Sports on FanDuel in or around August 2015.  Plaintiff Scott Tyler was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before he began play, Mr. Tyler saw numerous advertisements for FanDuel, such as those described more specifically below, with the message that it was a fair game of skill that anyone and recalls commercials advertising the matching deposit bonus being offered by FanDuel.  When he signed up, Mr. Tyler believed that his initial deposit would be matched 100% immediately such that he would have double his money with which to play in FanDuel contests and tournaments.  He never received his promised bonus.  Mr. Tyler would not have deposited money and begun playing on FanDuel had he known that the matching bonus would not occur as advertised.  Before making his first deposit, Mr. Tyler thought that the contests and tournaments would be fair to all players, but he has stopped playing on FanDuel because he no longer believes the contests to be fair. He would never had signed up and played had he known the truth about FanDuel's products as described more specifically below.

**The Oregon Plaintiff**

74.     Plaintiff Scott Levin is a resident and citizen of Oregon. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked approximately $100 on Draft Kings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the

proposed classes. Mr. Levin first deposited money and began playing on DraftKings on or around September, 11, 2015. DraftKings' illegal gambling scheme induced Mr. Levin to place bets through the internet and he lost money as a result. Before he began play, Mr. Levin saw numerous advertisements for DraftKings such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by DraftKings. When he signed up, Mr. Levin believed that his initial deposit on DraftKings would be matched 100% immediately, such that he would have double his money with which to play in contests and tournaments. Instead, he was only given incremental credit towards the bonus every time he played and has never received the full advertised bonus. When he made his first deposit on DraftKings Mr. Levin thought that the contests and tournaments would be fair to all players. Mr. Levin no longer believes the contests tournaments to be fair. He never would have signed up and played had he known the truth about DraftKings products as described more specifically below.

**The Pennsylvania Plaintiffs**

75.     Plaintiff Paul Guercio is a resident and citizen of Pennsylvania.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  He deposited and risked at least $100 on FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Mr. Guercio first deposited money and began playing Daily Fantasy Sports on FanDuel in or around September 2014.  Plaintiff Paul Guercio was caused by FanDuel's illegal gambling scheme, to place bets through the internet with FanDuel including on the

following dates and lost money as a result thereof October 11, 2015, October 4, 2015, September 27, 2015, September 20, 2015, September 13, 2015, January 18, 2015, January 10, 2015, December 14, 2014, November 27, 2014, November 23, 2014, November 16, 2014, November 2, 2014, October 26, 2014, October 19, 2014, October 12, 2014, October 5, 2014 and September 28, 2014.   Mr. Guercio's funds were drawn out of his bank account by FanDuel, through wire and/or internet transfers, including on the following dates: September 27, 2015, September 19, 2015, August 29, 2015, January 15, 2015, January 13, 2015, January 5, 2015, December 10, 2014, November 25, 2014, November 18, 2014, November 14, 2014, October 28, 2014, October 21, 2014, October 15, 2014, October 7, 2014, September 29, 2014 and September 25, 2014.    Before he began play, he saw numerous advertisements for FanDuel, such as those described more specifically below, with the message that it was a fair game of skill that anyone could win.   Before making his first deposit, Mr. Guercio thought that the contests and tournaments would be fair to all players.   He would never had signed up and played had he known the truth about FanDuel's products as described more specifically below.

76.   Plaintiff Brian Martinelli is a resident and citizen of Pennsylvania.   He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $100 on FanDuel and DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.   Mr. Martinelli first deposited money and began playing on FanDuel in or around March 2013 and first deposited and began playing on DraftKings in or around June 2014. Plaintiff Brian Martinelli was caused by FanDuel and DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.   Before he began play, he saw

numerous advertisements for FanDuel and DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by FanDuel.  When he signed up, Mr. Martinelli believed that his initial deposit on FanDuel would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  Before making his first deposit, Mr. Martinelli thought that the contests would be fair and level playing field for all players. He has stopped playing in contests and tournaments because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about FanDuel and DraftKings' products as described more specifically below.

77.     Plaintiff Tony Cantamaglia is a resident and citizen of Pennsylvania.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $100 on DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Mr. Cantamaglia first deposited money and began playing on DraftKings in or around September 2015.  Plaintiff Tony Cantamaglia was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before he began play, he saw numerous advertisements for DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by DraftKings.  When he signed up, Mr. Cantamaglia believed that his initial deposit on DraftKings would be matched 100% immediately such that he would have double his

money with which to play in contests and tournaments.   Mr. Cantamaglia would not have deposited money and begun playing on DraftKings had he known that the matching bonus would not occur as advertised.   Before making his first deposit, Mr. Cantamaglia thought that the contests would be fair and level playing field for all players. He has stopped playing in contests and tournaments because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings' products as described more specifically below.

**The South Carolina Plaintiff**

78.     Plaintiff William Walker is a resident and citizen of South Carolina.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  He deposited and risked at least $100 on FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect her rights, nor would any of the members of the proposed classes. Mr. Walker first deposited money and began playing Daily Fantasy Sports on FanDuel in or around 2011.  Plaintiff William Walker was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.   Before he began play, he saw numerous advertisements for FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by FanDuel.  When he signed up, Mr. Walker believed that his initial deposit would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.   Instead, he was only given incremental credit towards the bonus every time he played.   Mr. Walker would not have deposited money and begun playing on FanDuel had he

known that the matching bonus would not occur as advertised.  Before making his first deposit, Mr. Walker thought that the contests and tournaments would be fair to all players.  He would never had signed up and played had he known the truth about FanDuel's products as described more specifically below.

**The Tennessee Plaintiff**

79.     Plaintiff Martin Backer is a resident and citizen of Tennessee.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $100 on DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect her rights, nor would any of the members of the proposed classes.   Mr. Backer first deposited money and began playing on DraftKings in or around September 2015.  Plaintiff Martin Backer was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Before she began play, she saw numerous advertisements for DraftKings, such as those described more specifically below, with the message that it was a fair game of skill that anyone could win.  When he made his first deposit on DraftKings, Mr. Backer thought that the contests and tournaments would be fair to all players.  He stopped playing because he no longer believes the contests and tournaments to be fair. He would never had signed up and played had he known the truth about DraftKings' products as described more specifically below.

**The Texas Plaintiffs**

80.     Plaintiff Richard Hinojosa is a resident and citizen of Texas. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Richard Hinojosa began playing Daily Fantasy Sports

on FanDuel and DraftKings in or around July 2013.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.   Plaintiff Richard Hinojosa was caused by FanDuel's illegal gambling scheme, to place bets through the internet with FanDuel including on the following dates and lost money as a result thereof:  September 3, 2013, September 12, 2013, and September 15, 2013.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets with DraftKings, including on the following dates, and lost money as a result thereof:  September 20, 2014, December 19, 2014, March 1, 2015 and April 7, 2015.  Before he began play, Mr. Hinojosa saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by both FanDuel and DraftKings.  When he signed up, Mr. Hinojosa believed that his initial deposits on both sites would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  After many deposits and play on FanDuel and DraftKings, he finally earned the matching bonus.  Mr. Hinojosa would not have deposited money and begun playing on FanDuel had he known that the matching bonus would not occur as advertised.  Before making his first deposit, Mr. Hinojosa thought that the contests would be fair and level playing field for all players. He has stopped playing on the sites because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

81.     Plaintiff Jimmy Grundy is a resident and citizen of Texas. He brings this action on

behalf of himself individually, and on behalf of a class of persons similarly situated as described in the class below.  Plaintiff Jimmy Grundy began playing Daily Fantasy Sports on FanDuel and DraftKings in or around October 2013. He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Plaintiff Jimmy Grundy was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof. Before he began play, Mr. Grundy saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by FanDuel. When he signed up, Mr. Grundy believed that his initial deposit on FanDuel would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments. After a year of deposits and play on FanDuel, he finally earned the matching bonus.  Mr. Grundy would not have deposited money and begun playing on FanDuel had he known that the matching bonus would not occur as advertised. Before making his first deposit, Mr. Grundy thought that the contests would be fair and level playing field for all players. He has stopped playing on the sites because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

82.     Plaintiff Lamart Clay is a resident and citizen of Texas. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described

in the classes below.  Plaintiff Lamart Clay began playing Daily Fantasy Sports on FanDuel in or around October 2013 and on DraftKings in or around July 2014.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Lamart Clay was caused by FanDuel's illegal gambling scheme, to place bets through the internet with FanDuel including on the following dates and lost money as a result thereof:  October 27, 2013, September 21, 2014, October 29, 2014, November 2, 2014, January 10, 2015, March 16, 2015, and October 11, 2105.  Mr. Clay's funds were drawn against his Visa card and/or PayPal account by FanDuel through wire and/or internet transfers, including on the following dates:  October 26, 2013, September 13, 2014, September 21, 2014, October 29, 2014, November 1, 2014, January 3, 2015, May 19, 2015, and October 5, 2015.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  Mr. Clay's funds were drawn against his Visa card by DraftKings through wire and/or internet transfers, including on the following dates:  September 14, 2015, September 20, 2015, October 31, 2015, November 1, 2015 and November 21, 2015.  Mr. Clay's funds were drawn against his MasterCard account by DraftKings, through wire and/or internet transfers, including on the following dates: September 26, 2015, October 7, 2015, and October 28, 2015.  Mr. Clay's funds were drawn out of his PayPal account by DraftKings, through wire and/or internet transfers, including on the following dates: September 12, 2015, September 25, 2015, and October 15, 2015.     Before he began play, Mr. Clay saw numerous advertisements for DraftKings and FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials

advertising the matching deposit bonus being offered by FanDuel.  When he signed up, Mr. Clay believed that his initial deposit on FanDuel would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments.  After a year of deposits and play on FanDuel, he finally earned the matching bonus.  Mr. Clay would not have deposited money and begun playing on FanDuel had he known that the matching bonus would not occur as advertised.  Before making his first deposit, Mr. Grundy thought that the contests would be fair and level playing field for all players. He would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

**The Utah Plaintiff**

83.     Plaintiff Steven Siler is a resident and citizen of Utah. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.  Plaintiff Steven Siler began playing Daily Fantasy Sports on both FanDuel and DraftKings in or around the fall of 2015.  He deposited and risked at least $100 on both DraftKings and FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.  Plaintiff Steven Siler was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.  In addition, he was caused by DraftKings' illegal gambling scheme, to place bets through the internet and lost money as a result thereof.    Before he began play, he saw numerous advertisements for FanDuel and DraftKings, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by both

FanDuel and DraftKings. When he signed up, Mr. Siler believed that his initial deposits on FanDuel and DraftKings would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments. Instead, he was only given incremental credit towards the bonus every time he played and has never received the full advertised bonus. Before making his first deposit, Mr. Siler thought that the contests would be fair and level playing field for all players. He has stopped playing in contests and tournaments because he no longer believes the contests to be fair and would never had signed up and played had he known the truth about DraftKings and FanDuel's products as described more specifically below.

**The Virginia Plaintiff**

84.     Plaintiff Logan Crable brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. As a Virginia resident he deposited and risked at least $394 on FanDuel tournaments and contests, and without a class action in this Court he would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Mr. Crable first deposited money and began playing on FanDuel in or around August 26, 2015. FanDuel's illegal gambling scheme induced Mr. Crable to place bets through the internet and he lost money as a result.

85.     Before he began play, Mr. Crable saw numerous advertisements for FanDuel such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by FanDuel. When he signed up, Mr. Crable believed that his initial deposit on FanDuel would be matched 100% immediately such

that he would have double his money with which to play in contests and tournaments. Instead, he was only given incremental credit towards the bonus every time he played and has never received the full advertised bonus.

86.     When he made his first deposit on FanDuel, Mr. Crable thought that the contests and tournaments would be fair to all players. Mr. Crable stopped playing because he no longer believes the contests to be fair. He would never have signed up and played had he known the truth about FanDuel products as described more specifically below.

**The West Virginia Plaintiff**

87.     Plaintiff Steven "Mike" Perry is a resident and citizen of West Virginia. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below. He deposited and risked at least $300 on FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes. Mr. Perry first deposited money and began playing on FanDuel on or around September 17, 2014. FanDuel's illegal gambling scheme induced Mr. Perry to place bets through the internet and he lost money as a result.  Before he began play, Mr. Perry saw numerous advertisements for FanDuel such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by FanDuel. When he signed up, Mr. Perry believed that his initial deposit on FanDuel would be matched 100% immediately such that he would have double his money with which to play in contests and tournaments. Instead, he was only given incremental credit towards the bonus every time he played and has never received the full advertised bonus.  When he made

his first deposit on FanDuel, Mr. Perry thought that the contests and tournaments would be fair to all players. Mr. Perry stopped playing because he no longer believes the contests to be fair. He would never have signed up and played had he known the truth about FanDuel products as described more specifically below.

**The Wisconsin Plaintiff**

88.     Plaintiff Tracy Smith is a resident and citizen of Wisconsin.  She brings this action on behalf of herself individually, and on behalf of a class of persons similarly situated as described in the classes below.  She deposited and risked at least $100 on FanDuel tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect her rights, nor would any of the members of the proposed classes. Ms. Smith first deposited money and began playing Daily Fantasy Sports on FanDuel in or around September 2015.  Plaintiff Tracy Smith was caused by FanDuel's illegal gambling scheme, to place bets through the internet and lost money as a result thereof.   Before she began play, she saw numerous advertisements for FanDuel, such as those described more specifically below, with the messages and representations that it was a simple and easy fair game of skill that anyone could win, and recalls commercials advertising the matching deposit bonus being offered by FanDuel.  When she signed up, Ms. Smith believed that her initial deposit would be matched 100% immediately such that she would have double his money with which to play in contests and tournaments.  Instead, she was only given incremental credit towards the bonus every time she played and has never received the full advertised bonus.   Ms. Smith would not have deposited money and begun playing on FanDuel had she known that the matching bonus would not occur as advertised.  Before making her first deposit, Ms. Smith thought that the contests and tournaments would be fair to all players.   She would never had signed up and played had she

known the truth about FanDuel's products as described more specifically below.

**The Family Member Plaintiffs**

89.     DFS Player William Walker ("DFS Player Walker") did lose over fifty dollars or more at any time FanDuel.com during the time period between the filing of this Complaint and one year prior to the filing of this Complaint. Plaintiff Aurora Walker, is a resident of Horry County, South Carolina, and is a citizen of South Carolina ("Plaintiff Family Member Walker"). Plaintiff Family Member Walker is the spouse of DFS Player Walker.  She brings this action on behalf of herself individually, and on behalf of South Carolina Family Class members (a class of persons similarly situated as described in the class definition below).  More specifically, she is a proposed representative of a class of persons who are residents of South Carolina who are affected, injured, and damaged by FanDuel's illegal gambling activities (including the spouses, children, next-of-kin, heirs, and creditors of DFS Players), as set forth in S.C. CODE ANN. § 32-1-20, as a result of the losses of their family member that paid money or goods to FanDuel within the time period starting three (3) months prior to the filing of this Complaint through the one (1) year preceding the filing of this Complaint.

90.     Aaron Hodge is a resident of DeKalb County, Georgia, and is a citizen of Georgia ("DFS Player Hodge").  DFS Player Aaron Hodge is an individual who has utilized DraftKings' and FanDuel's websites.  He has incurred monetary losses as a result of said use and incurred such losses during a time period between six (6) months and four (4) years prior to the filing of his original complaint.  Plaintiff Michelle Hodge is DFS Player Hodge's wife, is a resident of DeKalb County, Georgia, and is a citizen of Georgia ("Family Member Hodge").  She brings this action on behalf of herself individually, and on behalf of Georgia Family Class members (a class of persons similarly situated as described in the class definition below), for the joint use of

themselves and the educational fund of their respective counties. Family Member Hodge has incurred monetary losses as a result of DFS Player Hodge's use of the DraftKings' and FanDuel's websites. Thus, Defendant DraftKings and FanDuel are indebted to Mrs. Hodge for the money so lost and paid, or received to DFS Player Hodge's use, for the time period between six months prior to the filing of her original complaint up and until four years prior to the filing of her original complaint (for the joint use of herself and the educational fund of her county).

91.     Ryan Williams, is a resident of Warren County, Kentucky, and is a citizen of Kentucky ("DFS Player Williams"). Within the time period starting six (6) prior to the filing of his original complaint through the five (5) years preceding the filing of his original complaint, DFS Player Williams did lose over five dollars or more over twenty-four (24) hours on FanDuel.com. Plaintiff Hillary Williams, is a resident of Warren County, Kentucky, and is a citizen of Kentucky ("Family Member Williams"). Family Member Williams is the wife of Ryan Williams. She brings this action on behalf of herself individually, and on behalf of Kentucky Family Class members (a class of persons similarly situated as described in the class definition below). More specifically, she is a proposed representative of a class of persons who are residents of Kentucky who are affected, injured, and damaged by FanDuel's illegal gambling activities (including the spouses, children, next-of-kin, heirs, and creditors of Kentucky DFS players), as set forth in KY. REV. STAT. § 372.040, as a result of the losses of their family member that paid money or goods to FanDuel within the time period starting six (6) prior to the filing of her original complaint through the five (5) years preceding the filing of her original complaint.

92.     Dustin Turner, is a resident of Warren County, Kentucky, and is a citizen of Kentucky ("DFS Player Turner"). Within the time period starting six (6) prior to the filing of his

original complaint through the five (5) years preceding the filing of the original complaint. DFS Player Turner did lose over five dollars or more over twenty-four (24) hours on DraftKings.com. Plaintiff Crystal Turner, is a resident of Warren County, Kentucky, and is a citizen of Kentucky ("Family Member Turner").   Family Member Turner is the wife of Turner.   She brings this action on behalf of herself individually, and on behalf of Kentucky Family Class members (a class of persons similarly situated as described in the class definition below).   More specifically, she is a proposed representative of a class of persons who are residents of Kentucky who are affected, injured, and damaged by DraftKings' illegal gambling activities (including the spouses, children, next-of-kin, heirs, and creditors of Kentucky DFS players), as set forth in KY. REV. STAT. § 372.040, as a result of the losses of their family member that paid money or goods to DraftKings within the time period starting six (6) prior to the filing of her original complaint through the five (5) years preceding the filing of the Complaint.

93.     Martin Backer is a resident of Davidson County, Tennessee, and is a citizen of Tennessee ("DFS Player Backer"). DFS Player Backer did pay money to FanDuel within the time period beginning ninety-one (91) days through twelve (12) months preceding the filing of his original complaint in order to use "FanDuel.com," and he sustained a monetary loss. Rebecca McGuire, is DFS Player Backer's mother and next-of-kin, a resident of Davidson County, Tennessee, and is a citizen of Tennessee ("Family Member McGuire").   She brings this action on behalf of herself individually, and on behalf of Tennessee Family Class members (a class of persons similarly situated as described in the class definition below).   More specifically, she is a proposed representative of a class of persons who are affected by FanDuel's illegal gambling activities (including the spouses, or if no spouse, the child or children; and if no child or children, the next of kin as set forth in to TENN. CODE ANN. § 29-19- 105) who are residents of

Tennessee and who suffered losses by their family member paying money or delivering anything of value to FanDuel within the time period of the last ninety-one (91) days through twelve (12) months preceding the her original complaint.

94.     Brad Boast is a resident of Bernalillo County, New Mexico, and is a citizen of New Mexico ("DFS Player Boast").  Mr. Boast did deliver money to Defendant DraftKings and FanDuel in order to enter contests on DraftKings.com and FanDuel.com, respectively, and sustained a monetary loss prior within one year prior to the filing of Ms. Boast's original complaint.   Plaintiff Leah Boast, is the wife of DFS Player Boast, is a resident of Bernalillo County, New Mexico, and is a citizen of New Mexico ("Family Member Boast").   Family Member Boast brings this action on behalf of herself individually, and on behalf of New Mexico Family Class members (a class of persons similarly situated as described in the class definition below) who, within one year preceding the filing of her original complaint to the present, were the spouse, children, heirs, executors, administrators or creditors of a person that delivered money to Defendants DraftKings and FanDuel in order to gamble or place wagers on the on-line sports betting site known as "DraftKings.com" and "FanDuel.com," respectively, and who sustained a monetary loss.

**B.      "DFS Defendants"**

95.     Defendant DraftKings, is organized and existing under the laws of Delaware, with its principal place of business located at 225 Franklin St. Boston, Massachusetts 02110.

96.     Defendant DraftKings, operated a processing facility within the City and State of New York where it processed a substantial number of its gaming transactions.

97.     Defendant FanDuel, is organized and existing under the laws of Delaware, with its principal place of business located at 1375 Broadway, New York, New York 10018.

98.     Defendant FanDuel Deposits, LLC, is a Delaware limited liability company with its principal place of business in New York, New York.

99.     Upon information and belief, Defendant FanDuel Deposits LLC was created, after counsel for the Class filed claims against FanDuel, for the purpose of holding player funds of FanDuel users and operates as a subsidiary of FanDuel, LLC.   Hereinafter, "FanDuel" shall mean both FanDuel, LLC and FanDuel Deposits, LLC.

100.     Defendant FanDuel operated a processing facility within the City and State of New York where it processed substantially all of its gaming transactions.

**C.     "Payment Processor Defendants"**

101.     Defendant PAYSAFECARD.COM USA INC. ("PAYSAFE") is a Delaware corporation headquartered in New York. PAYSAFE is a citizen of the States of Delaware and New York. PAYSAFE is a payment processor authorized to conduct business and does conduct business throughout New York and Massachusetts. PAYSAFE is a merchant processor and serves a "player banking function" receiving a fee as the financial intermediary between FanDuel and DraftKings and its customers.

102.     Defendant VANTIV, INC., ("VANTIV") is a Delaware corporation headquartered in Cincinnati, Ohio. VANTIV is a citizen of the States of Delaware and Ohio. VANTIV is a merchant processor authorized to conduct business and does conduct business throughout New York and Massachusetts. VANTIV is a merchant processor and serves a "player banking function" receiving a fee as the financial intermediary between FanDuel and DraftKings and its customers

**D.     Non-Defendant Banks**

103.     JPMORGAN CHASE & CO. ("JP MORGAN") is a Delaware Corporation

headquartered in New York, New York.  JP MORGAN is a citizen of the States of Delaware and

New York. J.P. MORGAN is a bank authorized to conduct business and does conduct business

throughout New York and Massachusetts. JP MORGAN issues loans for deposits onto FanDuel

and DraftKings, which loans the recipients use to enter contests through FanDuel and

DraftKings.

104.    CAPITAL   ONE   FINANCIAL   CORPORATION   ("CAPITAL   ONE")   is   a

Delaware Corporation headquartered in Corner, Virginia. CAPITAL ONE is a bank authorized

to conduct business and does conduct business throughout New York and Massachusetts.

CAPITAL ONE issues loans for deposits onto FanDuel and DraftKings, which loans the

recipients use to enter contests through FanDuel and DraftKings.

E.    **Non-Defendant Facilitators**

105.    VISA INC. ("VISA") is a Delaware corporation headquartered in Foster City,

California.  VISA is a citizen of the States of Delaware and California.  VISA is a financial

services provider authorized to conduct business and does conduct business throughout New

York and Massachusetts. VISA receives a fee from the Banks for facilitating the transfer of the

monies that the Banks lend to persons that such persons use for entering contests on DraftKings

and FanDuel.

106.    MASTERCARD   INCORPORATED   ("MASTERCARD")   is   a   Delaware

Corporation headquartered in Purchase, New York.  MASTERCARD is a citizen of the States

of Delaware and New York. MASTERCARD is a financial services provider authorized to

conduct business and does conduct business throughout New York and Massachusetts.

MASTERCARD receives a fee from the Banks for facilitating the transfer of the monies that

the Bank Non-Defendants lend to persons that such persons use to enter contests on DraftKings

and FanDuel.

107.     AMERICAN EXPRESS CREDIT CORPORATION ("AMEX") is a Delaware Corporation headquartered in New York, New York.  AMEX is a citizen of the States of Delaware and New York. AMEX is a financial services provider authorized to conduct business and does conduct business throughout New York and Massachusetts. AMEX receives a fee from the Banks for facilitating the transfer of the monies that the Bank Non-Defendants lend to persons that such persons use to enter contests on DraftKings and FanDuel.

     **F.**     **Non-Defendant Enterprise Investors**

**FanDuel Investors**

108.     NATIONAL BASKETBALL ASSOCIATION, INC. ("NBA" or "the NBA") is a New York corporation headquartered in New York. The NBA is a citizen of the state of New York and an investor in Defendant FanDuel's illegal internet gambling enterprise. The NBA offers its service and sells its entertainment product throughout the nation and internationally, including the states of New York and Massachusetts. The NBA directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

109.     TURNER SPORTS, Inc. ("TURNER SPORTS"), a division of Turner Broadcasting System, Inc. is a Georgia corporation headquartered in Atlanta, Georgia. TURNER SPORTS is a citizen of the state of Georgia. TURNER SPORTS is an investor in Defendant FanDuel's illegal internet gambling enterprise. TURNER SPORTS offers its service and sells its entertainment product throughout the nation and internationally, including the states of New York and Massachusetts. TURNER SPORTS directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the

states of New York and Massachusetts.

110.   BULLPEN CAPITAL is a California corporation headquartered in California. BULLPEN CAPITAL is a citizen of the state of California. BULLPEN CAPITAL is an investor in Defendant FanDuel's illegal internet gambling enterprise. BULLPEN CAPITAL offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. BULLPEN CAPITAL directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

111.   Upon information and belief, COMCAST VENTURES, LLC ("Comcast Ventures") is a Delaware Corporation headquartered in Pennsylvania. Comcast has offices in California, Pennsylvania and New York. Comcast Ventures is an investor in Defendant FanDuel's illegal internet gambling enterprise. Comcast Ventures offers its service and solicits investors throughout the nation and internationally, including the states of New York and Massachusetts.  Comcast Ventures directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

112.   Upon information and belief, GOOGLE CAPITAL, a division of Alphabet, Inc., is a California Corporation headquartered in San Francisco, California. GOOGLE CAPITAL is a citizen of the state of California. GOOGLE CAPITAL is an investor in Defendant FanDuel's illegal internet gambling enterprise. GOOGLE CAPITAL offers its service and solicits investors throughout the nation and internationally, including the states of New York and Massachusetts.

113.   Upon information and belief, HDS CAPITAL LLC, is a New York Corporation

headquartered in New York. HDS CAPITAL is a citizen of the state of New York. HDS CAPITAL is an investor in Defendant FanDuel's illegal internet gambling enterprise. HDS CAPITAL LLC offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. HDS CAPITAL LLC directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

114.    Upon information and belief, KOHLBERG KRAVIS ROBERTS LP (or "KKR & Co. LP") is a New York Limited Partnership headquartered in New York with offices in California and Washington, D.C. KOHLBERG KRAVIS ROBERTS is a citizen of the state of New York. KKR is an investor in Defendant FanDuel's illegal internet gambling enterprise. KOHLBERG KRAVIS ROBERTS offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. KOHLBERG KRAVIS ROBERTS directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

115.    Upon information and belief, NBC SPORTS VENTURES LLC's ("NBC SPORTS VENTURES") is a Delaware Corporation headquartered in New York, New York. NBC SPORTS VENTURES is an investor in Defendant FanDuel's illegal internet gambling enterprise. NBC SPORTS VENTURES offers its service and solicits investors throughout the nation and internationally, including the states of New York and Massachusetts.

116.    Upon information and belief, PENTECH VENTURES, LLP is headquartered in London, England. PENTECH VENTURES, LLP is a citizen of the United Kingdom. PENTECH VENTURES, LLP is an investor in Defendant FanDuel's illegal internet gambling

enterprise. PENTECH VENTURES, LLP offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. PENTECH VENTURES, LLP directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

117.    Upon information and belief, PITON CAPITAL LLP is headquartered in London, England. PITON CAPITAL LLP is a citizen of the United Kingdom. PITON CAPITAL LLP is an investor in Defendant FanDuel's illegal internet gambling enterprise. PITON CAPITAL LLP offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. PITON CAPITAL LLP directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

118.    Upon information and belief, LEK CONSULTING LLC is headquartered in London, England. LEK CONSULTING LLC is a citizen of the United Kingdom. LEK CONSULTING LLC is an investor in Defendant FanDuel's illegal internet gambling enterprise. LEK CONSULTING LLC offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. LEK CONSULTING LLC directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

119.    Upon information and belief, SCOTTISH INVESTMENT BANK, doing business as Scottish Enterprise, is a Scottish corporation, headquartered in Scotland. SCOTTISH INVESTMENT BANK is a citizen of Scotland. SCOTTISH INVESTMENT

BANK, is an investor in Defendant FanDuel's illegal internet gambling enterprise. SCOTTISH INVESTMENT BANK offers its service and solicits investors throughout the nation internationally, including the states of New York and Massachusetts. SCOTTISH INVESTMENT BANK has offices in Massachusetts, Illinois, Texas and New York. SCOTTISH INVESTMENT BANK, directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the state of states of New York and Massachusetts.

120.    Upon information and belief, SHAMROCK CAPITAL ADVISORS LLC is a California Limited Liability Company headquartered in Los Angeles, California. SHAMROCK CAPITAL ADVISORS is a citizen of the state of California. SHAMROCK CAPITAL ADVISORS LLC is an investor in Defendant FanDuel's illegal internet gambling enterprise. SHAMROCK CAPITAL ADVISORS LLC offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. SHAMROCK CAPITAL ADVISORS LLC directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

121.    Upon information and belief, TIME WARNER INC., doing business as TIME WARNER INVESTMENTS, is a Delaware Corporation headquartered in New York, New York. TIME WARNER, INC. is an investor in Defendant FanDuel's illegal internet gambling enterprise. TIME WARNER, INC. offers its service and solicits investors throughout the nation and internationally, including the states of New York and Massachusetts. TIME WARNER INC. directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

122.    Upon information and belief, TUSK VENTURES, is a Delaware Corporation headquartered in New York, New York. TUSK VENTURES is an investor in Defendant FanDuel's illegal internet gambling enterprise. TUSK VENTURES offers its service and solicits investors throughout the nation and internationally, including the states of New York and Massachusetts. TUSK VENTURES directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

**DraftKings Investors**

123.    Upon information and belief, 21ST CENTURY FOX is a New York corporation headquartered in New York, New York. 21ST CENTURY FOX is an investor in Defendant DraftKings' illegal internet gambling enterprise. 21ST CENTURY FOX offers its service and solicits investors throughout the nation and internationally, including the states of New York and Massachusetts.

124.    Upon information and belief, ATLAS VENTURES ASSOCIATES III, INC., is a Massachusetts corporation headquartered in Massachusetts. ATLAS VENTURES III, INC. is a citizen of the state of Massachusetts. ATLAS VENTURES III, INC. is an investor in Defendant DraftKings' illegal internet gambling enterprise. ATLAS VENTURES ASSOCIATES III, INC. offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. ATLAS VENTURES ASSOCIATES III, INC. directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

125.    Upon information and belief, BDS CAPITAL MANAGEMENT LLC, is a New

York corporation headquartered in New York. BDS CAPITAL MANAGEMENT LLC is a citizen of the state of New York. BDS CAPITAL MANAGEMENT LLC is an investor in Defendant DraftKings' illegal internet gambling enterprise. BDS CAPITAL MANAGEMENT LLC offers its service and solicits investors throughout the nation, internationally, states of New York and Massachusetts. BDS CAPITAL MANAGEMENT LLC directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

126.    Upon information and belief, MAIL.RU GROUP, formerly known as DST GLOBAL, also known as DIGITAL SKY TECHNOLOGIES is a Russian corporation, headquartered in Russia. DST GLOBAL is a citizen of Russia. DST GLOBAL is an investor in Defendant DraftKings' illegal internet gambling enterprise. DST GLOBAL offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. DST GLOBAL directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

127.    FOX SPORTS INTERACTIVE MEDIA LLC is a California corporation headquartered in California. FOX SPORTS is a citizen of the state of California. FOX SPORTS INTERACTIVE MEDIA LLC is an investor in Defendant DraftKings' illegal internet gambling enterprise. FOX SPORTS INTERACTIVE MEDIA LLC offers its service, sells its entertainment product and solicits investors throughout the nation and internationally, including the states of New York and Massachusetts.

128.    GGV CAPITAL is a California corporation headquartered in California. GGV CAPITAL is a citizen of the state of California. GGV CAPITAL is an investor in Defendant

DraftKings' illegal internet gambling enterprise. GGV CAPITAL offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. GGV CAPITAL directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

129.    JASON ROBINS is a resident of Massachusetts. JASON ROBINS is an investor in Defendant DraftKings' illegal internet gambling enterprise. JASON ROBINS directly and through his agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

130.    HUB ANGELS MANAGEMENT LLC is a Massachusetts Limited Liability Company headquartered in Massachusetts. HUB ANGELS MANAGEMENT LLC is a citizen of the state of Massachusetts. HUB ANGELS MANAGEMENT LLC is an investor in Defendant DraftKings' illegal internet gambling enterprise. HUB ANGELS MANAGEMENT LLC offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. HUB ANGELS MANAGEMENT LLC directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

131.    JORDAN MENDELL is a resident of Massachusetts. JORDAN MENDELL is an investor in Defendant DraftKings' illegal internet gambling enterprise. JORDAN MENDELL directly and through his agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

132.    KRAFT GROUP is a Massachusetts corporation headquartered in Massachusetts. KRAFT GROUP is a citizen of the state of Massachusetts. KRAFT GROUP is

an investor in Defendant DraftKings' illegal internet gambling enterprise. KRAFT GROUP offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. KRAFT GROUP directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

133.   LEGENDS HOSPITALITY LLC is a New York corporation headquartered in New York. LEGENDS HOSPITALITY LLC is a citizen of the state of New York. LEGENDS HOSPITALITY LLC is an investor in Defendant DraftKings' illegal internet gambling enterprise. LEGENDS HOSPITALITY LLC offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. LEGENDS HOSPITALITY LLC directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

134.   MSG SPORTS & ENTERTAINMENT, LLC is a New York Corporation headquartered in New York. MSG SPORTS & ENTERTAINMENT LLC is an investor in Defendant DraftKings' illegal internet gambling enterprise. MSG SPORTS & ENTERTAINMENT LLC offers its service and solicits investors throughout the nation and internationally, including the states of New York and Massachusetts.

135.   MAJOR LEAGUE BASEBALL VENTURES is a New York Corporation headquartered in New York. MAJOR LEAGUE BASEBALL VENTURES is an investor in Defendant DraftKings' illegal internet gambling enterprise. MAJOR LEAGUE BASEBALL VENTURES, offers its service, sells its entertainment product and solicits investors throughout the nation and internationally, including the states of New York and Massachusetts.

136.    MAJOR LEAGUE SOCCER LLC is a New York Limited Liability Company headquartered in New York. MAJOR LEAGUE SOCCER LLC is a citizen of the state of New York. MAJOR LEAGUE SOCCER LLC is an investor in Defendant DraftKings' illegal internet gambling enterprise. MAJOR LEAGUE SOCCER LLC, offers its service, sells its entertainment product and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. MAJOR LEAGUE SOCCER LLC, directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

137.    M7 TECH PARTNERS LLC is a New York Corporation headquartered in New York. M7 TECH PARTNERS LLC is a citizen of the state of New York. M7 TECH PARTNERS LLC is an investor in Defendant DraftKings' illegal internet gambling enterprise. M7 TECH PARTNERS LLC offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. M7 TECH PARTNERS LLC directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

138.    NHL ENTERPRISES, INC. and NHL ENTERPRISES, L.P. are Delaware Corporations headquartered in New York, New York. NHL ENTERPRISES, INC. and NHL ENTERPRISES LP are investors in Defendant DraftKings' illegal internet gambling enterprise. NHL ENTERPRISES, INC. and NHL ENTERPRISES LP, offer their service, sells their entertainment product and solicits investors throughout the nation and internationally, including the states of New York and Massachusetts.

139.    REDPOINT VENTURES LLC is a California Corporation headquartered in California. REDPOINT VENTURES LLC is a citizen of the state of California. REDPOINT

VENTURES is an investor in Defendant DraftKings' illegal internet gambling enterprise. REDPOINT VENTURES LLC offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. REDPOINT VENTURES LLC, directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

140.    THE RAINE GROUP LLC is a New York Corporation headquartered in New York. THE RAINE GROUP is a citizen of the state of New York. THE RAINE GROUP LLC is an investor in Defendant DraftKings' illegal internet gambling enterprise. THE RAINE GROUP LLC offers its service and solicits investors throughout the nation, internationally, including the states of New York and Massachusetts. THE RAINE GROUP LLC directly and through its agents, engages in substantial, continuous, systematic, and non-isolated business activity within the states of New York and Massachusetts.

141.    WELLINGTON MANAGEMENT COMPANY LLP is a Delaware Corporation headquartered in Massachusetts. WELLINGTON MANAGEMENT COMPANY LLP is an investor in Defendant DraftKings' illegal internet gambling enterprise. WELLINGTON MANAGEMENT COMPANY LLP offers its service and solicits investors throughout the nation and internationally, including the states of New York and Massachusetts.

## COMMON FACTUAL ALLEGATIONS

### I.    Daily Fantasy Sports

142.    DFS is a contest where individuals compete against other individuals in fantasy sports games on a daily basis.   That is, DFS Defendants operate contests online where individuals accumulate points based on the real-life statistics of players in professional sporting events that occur on a particular day.   Individuals can play for free or pay money to compete

75

for cash prizes.

143.    DFS Defendants make money on the fee, sometimes called the "rake," that they take from each entry into their contests.

144.    While the prize pools of these contests are funded from entry fees, DFS Defendants often guarantee prize pools, and will pay out the difference between the guarantee and the entry fees.

145.    The difference between the entry fees in the prize pool and the guarantee is called the "overlay" and gives DFS Defendants an additional incentive either to attract as many users and entries as possible into contests to avoid having to pay out this overlay, or to have their own employees win prize pool money through inside information.

146.    In situations where an overlay is needed from DFS Defendants, DFS Defendants risked their own assets in the ventures they promoted and, thus, have a significant incentive to attract as many customers as possible in order to avoid paying out their own money to cover the overlay.

II.    **Representations Made By DraftKings And FanDuel**

A.    **DraftKings and FanDuel Each Engaged In Omnipresent National Advertising Campaigns Reaching Millions of Consumers With The Same Messages**

147.    Beginning in 2014 and peaking during the 2015 NFL season, DraftKings and FanDuel spent hundreds of millions of dollars advertising their products through national and cable television, radio, the internet, podcasts, and arena, ballpark and stadium sponsorships. These advertisements contained the same messages over and over again, and reached cultural saturation and made DraftKings and FanDuel household names.

148.    One estimate of advertising put the total spent by DraftKings and FanDuel at

more than $750 million on national television, radio, digital ads and other sponsored content.[6]

149.    During the first 8 months of 2015, DraftKings spent more $82 million on television advertising.

150.    Their TV ads increased so dramatically in the last half of 2015 that DraftKings cracked the top ten in television advertisement spending for the last week of August.    That week a DraftKings commercial aired every 90 seconds. Their top campaign was called "Real People, Real Winnings."[7]  An article describing this spending presented a chart showing that DraftKings ranked fourth among national advertisers during the past week, with an estimated "TV Spend" of more than $16 million and 6.629 national airings:



151.    From August 16, 2015 through the opening weekend of the NFL season, DFS Defendants outspent the entire beer industry.[8]

152.    From August 16, 2015 through the opening weekend of the NFL season

---

[6] http://www.espn.com/espn/feature/story/_/id/17374929/otl-investigates-implosion-daily-fantasy-sports-leaders-draftkings-fanduel
[7] Dustin Gouker, DraftKings' TV Blitz; One Commercial Every 1.5 Minutes, Legal Sports Report, September 2, 2015, http://www.legalsportsreport.com/3483/draftkings-tv-commercial-blitz/
[8] http://www.espn.com/espn/feature/story/_/id/17374929/otl-investigates-implosion-daily-fantasy-sports-leaders-draftkings-fanduel

DraftKings spent $131.4 million on ads for a total of 40,283 national airings. FanDuel spent $74.5 million for a total of 21,545 national airings. In 2014, DraftKings ads ran 8,743 times and FanDuel ads ran 14,017.[9]

153.    DraftKings ads aired 7,282 times on ESPN's family of networks through October 5, 2015, while FanDuel's ads aired 5,644 times.

154.    The proliferation of daily fantasy commercials was inescapable and those ads were very specifically targeted.

155.    As one commentator noted: "By now, just about every American with a television set has seen FanDuel and DraftKings' television commercials that showcase an 'Average Joe' cashing a giant check for winning a daily fantasy sports contest."[10]

156.    In the second week of September 2015, DraftKings became the single biggest advertiser on TV, spending $17.8 million that week alone for approximately 6,000 airings across the country.

157.    FanDuel was also in the top ten for the second week of September 2015 spending more than $11 million on over 2,800 airings.[11]

158.    Between the two DFS Defendants, there was an almost unbelievable total of more than 1,000 ads a day.

159.    A website that tracks television advertising, iSpot.tv, made this graph to show how much more DraftKings was spending than other advertisers:

---

[9] Tom Kludt, <u>DraftKings and FanDuel ads seem to be everywhere on TV because they are</u>,CNN Money October 8, 2015, http://money.cnn.com/2015/10/08/media/fanduel-draftkings-commercials/index.html

[10] Marc Edelman, <u>Daily Fantasy Must Change Its Ad Strategy: Showcasing Average Joe Winners Hurts Legal Claims</u>, Forbes.com, September 18, 2015, http://www.forbes.com/sites/marcedelman/2015/09/18/daily-fantasy-sports-must-change-its-ad-strategy-showcasing-average-joe-winners-hurts-legal-claims/#4b15eb875cef

[11] Jessica Lyons, <u>DraftKings Spends Big on TV Ads for NFL Opening Weekend</u>, iSpot.tv, September 17, 2015, https://www.ispot.tv/blog/draftkings-spends-big-on-tv-ads-for-nfl-opening-weekend/



160.    Two weeks later, FanDuel took over the top spot in the country when it spent nearly $17 million for television ads in just that one week.[12]

161.    FanDuel's top campaign was called "Win Money Every Week."   DraftKings was sixth for that week with more than $12 million, as this chart shows:

---

[12] Dustin Gouker, <u>FanDuel Ascends To No. 1 In TV Commercial Spend With $17 Million In A Week</u>, Legal Sports Report, September 28, 2015, http://www.legalsportsreport.com/4395/fanduel-leading-tv-commercial-spender/



162.    According to Advertising Age, for the entire month of September, 2015, iSpot.tv estimated that DraftKings and FanDuel together spent an almost unfathomable $107 million on television advertising, nearly half of that outlay on NFL broadcasts on CBS, Fox, NBC, ESPN and the NFL Network.

163.    Owing to a two-year exclusivity deal due to start in 2016, ESPN earned the bulk of DraftKings' September spend ($11.8 million), followed by CBS ($9.15 million), Fox ($8.84 million) and NBC ($8.03 million). FanDuel, which spent more on ads during NFL games than did its rival, gave the lion's share to CBS ($15.2 million), followed by NBC ($8.73 million), ESPN ($5.94 million) and Fox ($4.57 million).

164.    The author of the Advertising Age article commented: "As much as Twitter delights in jokily bemoaning the metronomic frequency with which the DraftKings spots run, the actual booking data is almost beyond comprehension.  DraftKings ads have aired a skull-clutching 16,259 times over the course of the month, which works out to 135 hours and 25 minutes of 30-second spots.  That's more than five-and-a-half days, or a full work week, of

commercial messaging that's been hammered out in the span of a 29-day period." [13]



165.    In a report summarizing the industry in 2015, consultant Eilers & Krejcik Gaming, LLC put the combined advertising spend for Defendants at more than $500 million for the 12 months, the majority of that going to television. [14]

| User Acquisition Cost Analysis - 2015 | DraftKings | FanDuel |
|---|---|---|
| First Time Depositors (FTDs) | 1,700,000 | 1,800,000 |
| TV ad spend | $176,000,000 | $156,000,000 |
| Other (sponsorships, web, print, radio, social) | $120,000,000 | $65,000,000 |
| Total user acquisition spend | $296,000,000 | $221,000,000 |
| Implied cost per FTD | $174 | $123 |

166.    According to *The Wall Street Journal*, FanDuel had the most appearances of any brand during NFL telecasts at the start of the 2015 season. [15]

167.    DraftKings also advertises with emails sent directly to potential consumers, including emails that offer free money up to $600 on the first deposit to consumers who have a subscription to the website "Baseball Prospectus."

168.    On March 6, 2015, DraftKings placed an ad in an email sent to subscribers to website "Baseball Prospectus."  That ad stated:  "With your BP Subscription and First Deposit

---

[13] Anthony Crupi, <u>Fantasy Sports Sites DraftKings, FanDuel September Spend Tops $100 Million</u>, Advertising Age, September 30, 2015, http://adage.com/article/media/draftkings-fanduel-spe/300658/
[14] Eilers and Krejick Gaming, LLC, Daily Fantasy Sports Industry Update – 2016, February 22, 2015.
[15] http://www.wsj.com/articles/are-draftkings-and-fanduelbombarding-fans-with-too-many-ads-1442520546..

at DraftKings you get:  Up to $600 Free on Your First Deposit."

169.    Defendants expended a total of $185 million in other advertising: sponsorships, the internet, podcasts, print, radio and social media.

170.    One article in Adweek noted: "DFS companies have been launching ads at sports fans from every direction. Basically, every major American sports venue is covered in signage.  Segments are sponsored on ESPN, the NFL's RedZone Channel, and anywhere else sports is discussed on TV. There are also podcasts, radio shows, and digital banners promising 'real money' for winners.  DraftKings even plasters the PATH train that connects New Jersey and New York."[16]   Another Adweek article pointed out how television viewers watching participants still couldn't avoid these companies: "Floyd Mayweather Jr. had a FanDuel logo on his shorts when he defeated Manny Pacquiao in May.  A month later, American Pharoah was rocking DraftKings gear when he became the first horse to win the Triple Crown since 1978."[17]

---

[16] Brian Flood, Is Too Much Advertising Killing Daily Fantasy Sports?, Adweek, September 11, 2015, http://www.adweek.com/news/advertising-branding/too-much-advertising-killing-daily-fantasy-sports-168069

[17] Brian Flood, How Daily Fantasy Sports Became a Heavyweight in the Advertising World, Adweek, July 6, 2015, http://www.adweek.com/news/advertising-branding/how-daily-fantasy-sports-became-heavyweight-advertising-world-165704





171.    These advertisements, as well as the advertisements that ran before the 2015

NFL season, contained the same messages, both through their explicit statements and

representations and their implicit messages.  Plaintiffs and the members of the proposed classes

actually viewed the advertisements as described generally above and as specifically described

below.

172.    This advertising spending worked: as a result of their advertising spending,

DraftKings and FanDuel combined to take in an estimated $3 billion in player-entry fees in 2015 alone, from which they both took up to 10% in fees as revenue.[18]

B.     **DraftKings and FanDuel Advertised Their Products As 100% Legal**

173.   In television advertisements and through their websites, DraftKings and FanDuel both advertised their products as 100% legal.

174.   For instance, at least as far back as June 25, 2014, DraftKings' website contained the statement that it was 100% legal according to the Internet Archive[19]:



175.   DraftKings' website contained this representation that it was 100% legal throughout 2014 and 2015, as this one example from the internet archive from March 28, 2015 shows:

---

[18] http://www.espn.com/espn/feature/story/_/id/17374929/otl-investigates-implosion-daily-fantasy-sports-leaders-draftkings-fanduel
[19] https://archive.org/web/



176.    As recently as March 2016, DraftKings' website included the statement that it was 100% Legal, as noted by the gambling industry analyst Chris Grove[20], but it was changed in April 2016 to simply say "Legality" and lead the user to a webpage that explained the complicated nature of DraftKings' legality.

---

[20] https://twitter.com/OPReport/status/726083793522556928

## March 2016



## April 2016



https://www.draftkings.com/help/why-is-it-legal



177.   On its website, FanDuel told consumers that it had "received a specific

exemption from the 2006 Unlawful Internet Gambling Enforcement Act (UIGEA 2006)" and

86

therefore was legal.[21] FanDuel represented to consumers that it took "the legal status of the games it offers very seriously and does its utmost to ensure compliance with existing state and federal laws."

178.   As early as February of 2011, FanDuel advertised, "100% Legal" "This is fantasy sports not gambling so it's legal."



179.   Despite representing to consumers with no reservations or qualifications that FanDuel was legal, FanDuel's CEO Nigel Eccles knew that states where illegal gambling is defined "a game of chance as a game with any element of chance" were "problematic" for DFS.  As shown in the screenshot below from the website rotogrinders.com, a DFS-specific website with forums where users discuss DFS, Eccles knew this was not true.  In a question-and-answer thread with users from the fall of 2014 ("Eccles AMA"), Eccles stated: "Laws relating to fantasy sports vary by state but most of the problematic states define games of chance as a game with any element of chance."[22]

---

[21] https://web.archive.org/web/20150813235821/https://www.fanduel.com/legal)
[22] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=1



## C.  DraftKings and FanDuel Advertised Their Products as Easy, Simple Games of Skill That Anyone Could Win

180.    In their advertising, both explicitly and implicitly, DraftKings and FanDuel deceptively portrayed their products as easy, simple, fair contests of skill that anyone could win.  For example, by showing groups of "regular" or "average" guys playing fantasy sports together and winning, DraftKings and FanDuel misrepresented the true likelihood that the average consumer would win.

181.    In their Terms of Use on their websites, FanDuel and DraftKings each represent to consumers that their contests are games of skill.

182.    FanDuel states that "FanDuel is a game of skill."[23]

183.    DraftKings states: "Contests offered on the Website are contests of skill."[24]

184.    Defendants held themselves out to Plaintiffs and consumers as places where their skill made a difference between winning and losing.  For instance, in a television

---

[23] https://www.fanduel.com/terms at 5.1 "Game of Skill".
[24] https://www.draftkings.com/help/terms at "Contest of Skill".

commercial[25] that ran in August 2015, DraftKings advertised "every week, use your knowledge and showcase your skills….you like football, you like winning."

185.    Similarly, FanDuel advertised that players could "get paid for [their] knowledge" if they were "smarter than the average fan."   This ad was available at http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge but has since been removed "at the request of the advertiser."  According to iSpot.tv, this ad ran more than 560 times in 2015.

186.    DraftKings and FanDuel ran advertisements on national television, radio, and the internet, including sponsored segments on sports-themed programming on ESPN and other national cable channels.  As described above, these advertisements were nearly ubiquitous throughout the summer and early fall of 2015, but started at least a year before that.

187.    As shown below, DraftKings' ads repeated the same theme over and over again, specifically: "This is the feeling of turning a game you love, into a lifetime of cash", "It's the simplest way of winning life-changing piles of cash", and "just pick your sport, pick your players, and pick up your cash."

188.    Multiple DraftKings ads also used the words "giving away" to talk about millions or even hundreds of millions of dollars.

189.    DraftKings consciously decided to attract consumers such as Plaintiffs and the members of the proposed classes by misrepresenting its product.  In a post on rotogrinders.com shown by screenshot below, DraftKings' CEO Jason Robins defended a feature that grinders were complaining about by describing how it helped keep casual players, and how "causal" players - the ones targeted by their advertising - are "necessary to make the industry sustainable long-term."  That is, "casual" players who would deposit money and lose it to better, existing

---

[25] https://www.youtube.com/watch?v=VDa-cDu8KYg.

players were required in order to keep DraftKings in business.[26]



190.     DraftKings advertising was crafted to attract casual players, such as Plaintiffs and members of the proposed classes.  For instance, the winners in a DraftKings NFL contest in November 2014, Dave and Rob Gomes, appeared in television commercials more than 32,000 times by mid-December 2015 displaying a check from DraftKings for $1,000,000. [27] The ad described how "real people" could "win a million dollars playing fantasy football."  As the ESPN writer noted: "'Just pick your sport, pick your players and pick up your cash,' the commercial said. 'That's it. It's the simplest way to win life-changing piles of cash every week.' The takeaway was obvious: Anyone, even two average guys from Boston, even you, could win big." A screenshot from that ad is below:

---

[26] https://rotogrinders.com/threads/draft-kings-emails-your-opponents-to-edit-their-lineups-8230-269716?page=5
[27] Mina Kimes, The Fate of Daily Fantasy Is All About These Bros, ESPN The Magazine, December 8, 2015
http://espn.go.com/chalk/story/_/id/14284946/the-fate-daily-fantasy-all-bros



191.    A DraftKings ad entitled "Real People, Real Winnings" described "real people" winning "a million dollars playing fantasy football". The ad showed young and middle aged men watching football with their friends, and then celebrating with a giant check and getting Champagne sprayed on them. The ad said that now that football was back, "you can get your share of $10,000,000" during week 1 of the NFL season. "Just pick your sport, pick your players, and pick up your cash. That's it. It's the simplest way to win life-changing piles of cash every week." According to ispot.tv, this advertisement ran more than 15,000 times in August and September 2015.[28]

192.    A DraftKings ad called "Giant Check" ran more than 5,000 times during this same time period.[29]

193.    In the "Giant Check" ad, DraftKings tells consumers that "At DraftKings, we play for glory, for bragging rights, for fantasy football supremacy. But we also play for this: the giant check. The giant check is no myth, no mirage, no fool's gold. It's our trophy, and many hoist it playing our one week games. Like Dave Gomes, Drew Dinkmeyer, and Adam

---

[28]  https://www.ispot.tv/ad/7U9V/draftkings-fantasy-football-real-people-real-winnings.
[29]  https://www.ispot.tv/ad/Ak1x/draftkings-fantasy-football-giant-check

Goulet.  Are your dreams big enough to cash a giant check?  Put it to the test week 1, in the DraftKings millionaire maker.  The biggest fantasy sports contest of all time.  Go to draftkings.com and play for your share of $10 million in total prizes.  The top prize is $2 million and that's just week 1.  It's 1-week fantasy, draft your team and win cash in the same week, simple as that.  This isn't fantasy as usual, this is DraftKings.  Welcome to the big time."

194.    One of the "regular" people mentioned in the ad, Drew Dinkmeyer, was in fact a full-time fantasy sports professional who left his job as an investment analyst in 2013 to become a fantasy sports professional.[30]  DraftKings intentionally omitted this information and misrepresented Dinkmeyer's background in their advertising through this and other ads.

195.    In an ad with puppets for DraftKings "Millionaire Maker" contest that ran nearly 2,000 times in 2014 according to iSpot.tv, DraftKings advertised that someone named Pete Jennings won more than $2 million, implying that anyone could win.  The puppet representing Pete Jennings said "thanks to DraftKings.com, I've got all this money."[31]  In fact, Pete Jennings was a statistical analyst for another DFS site and then became a professional DFS player.  Jennings filed an affidavit on behalf of DraftKings in a lawsuit brought by the New York Attorney General.  In it, he said that his success was "the result of the immense amounts of research and preparation and the sophisticated analysis I have developed over years of playing."  This included 70-80 hours per week of preparation, and up to 90 hours per week during football season.  (Doc. No. 96).  DraftKings' ad about Mr. Jennings never mentioned his background as a sophisticated statistician or the amount of work, time and effort he put into winning "all this money" from DraftKings.

196.    In an ad before Week 1 of the 2015 NFL season, DraftKings showed two

---

[30] http://www.wsj.com/articles/SB10001424127887323419604578569780709957400;
http://blogs.wsj.com/dailyfix/2014/12/17/how-a-full-time-fantasy-sports-professional-hit-the-jackpot/
[31] https://www.ispot.tv/ad/7CYS/draftkings-puppets

"regular" guys sitting at a bar who see another man holding a giant DraftKings check.  One says to the other, "Dude, that's the guy…the guy that won a million dollars on DraftKings."  The voice over says, "Play DraftKings.com Week 1 millionaire maker.  10 million in total prizes, 2 million for first place in week 1.  Just pick your team in the biggest fantasy sports contest ever.  Then watch the points pile up and collect your cash.  Welcome to the big time." [32] The ad aired hundreds of times.

197.    A 2015 DraftKings ad showed regular people watching football with their friends and celebrating as the announcer said, "This is the feeling of turning a game you love, into a lifetime of cash."  The ad states that "DraftKings.com…is giving away over $300 million bucks this baseball season, and the games are one day, so you can play for your share every single day."  "Just pick your sport, pick your players, and pick up your cash." The ad says "It's the simplest way of winning life-changing piles of cash."  "More sports, more winners, more millionaires."   A thirty second version of this ad states that DraftKings is "giving away over $300 million bucks this baseball season…just pick your sport, pick your players, and pick up your cash."

198.    In an ad before the 2015 NFL season called "Week One", DraftKings advertised its product by saying that users could "[s]howcase your skill, and exploit the matchup."  "You like football, you like winning, how about you like them both at the same time." [33]  This ad showed a small group of friends watching football together and ran more than 900 times.

199.    During the 2014 football playoffs, DraftKings ran ads specifically saying it was "easy" to win and "you can win like a legend."   The ad included misrepresentations that: "[t]hey make winning easier than milking a two-legged goat." "Giant cash prizes every week.

---

[32] https://www.ispot.tv/ad/AkoW/draftkings-thats-the-guy-millionaire-winner-ft-matthew-berry
[33] https://www.ispot.tv/ad/79Rz/draftkings-week-one

Do you want to be a fantasy football hero? Do you want it to be easy and fun with a shot to win millions? Get to draftkings.com and you can win like a legend." This ad ran more than 380 times. [34]

200.     A 2015 DraftKings ad showed people watching football with their friends and celebrating as the announcer said, "This is the feeling of turning a game you love, into a lifetime of cash." The ad featured names of people who won money, including showing Drew Dinkmeyer winning $1,000,000.   The ad said DraftKings was paying out "more than $300 million bucks this baseball season." "Just pick your sport, pick your players, and pick up your cash.  That's it.  It's the simplest way of winning life-changing piles of cash."  This ad ran more than 1,700 times. [35]

201.     In an ad from 2015 that advertised a $5 million baseball prize pool, DraftKings represented: "Fantasy sports legends who have earned hundreds of thousands of dollars playing online.   Meet, Arly Gonzalez.   Average guy, superior sports knowledge. Picked a team in minutes, won enough to throw the party of a lifetime.   In outer space.   Former Accountant Derrick Bradley.  DraftKings one day fantasy baseball took him from a guy with holes in his underpants, to a guy with bikini models in them.  How do we turn our love of fantasy sports into reality cash?  DraftKings.com….and best of all, you could win a shipload of money."  This ad ran more than 12,500 times. [36]

202.     In another ad from 2014, DraftKings advertised that "any player can become a legend of winning, with a shot at thousands, even millions every week" while showing a man in a suit lifting up large bags with dollar signs on them.   "DraftKings.com: bigger events,

---

[34] https://www.ispot.tv/ad/7FuC/draftkings-milking-a-two-legged-goat
[35] https://www.ispot.tv/ad/7Uts/draftkings-fantasy-baseball-glove.
[36] https://www.ispot.tv/ad/7nJm/draftkings-1-day-fantasy-baseball-hall-of-fame

bigger winnings, bigger millionaires."  This 60 second ad ran nearly 500 times. [37]

203.    In an ad showing a man at a backyard cookout with family and friends, the voice over says: "The sleeper pick, the guy only you believe in.  Trust your gut, trust your numbers, trust your uncle Vito if you want, but know this.  That sleeper is out there, the question is, who is going to play him.  This is DraftKings, welcome to the big time.  Play this Sunday for your shot to become a fantasy football millionaire."[38]   This ad ran more than 4,500 times.

204.    In another ad showing people in every day scenarios checking their phones and computers, "there's a game within the game that requires a different set of skills.  There's no offseason.  And we don't just play: we are players, we train and we win.  This isn't fantasy as usual.  This is DraftKings, welcome to the big time."[39]  This ad ran more than 1,300 times.

205.    Just like DraftKings, FanDuel explicitly and implicitly represented to consumers that it was easy to win, that anyone could win, and that FanDuel was a game of skill that allowed people to use their love and knowledge of sports and season-long fantasy sports to win money.  Like DraftKings, these FanDuel commercials were uniform and ubiquitous, airing tens of thousands of times throughout 2014 and 2015 with a heavy concentration during the first few months of the NFL season, and featured "regular" people who won large sums of money on FanDuel without disclosing their backgrounds as professional fantasy writers or players. These ads contained uniform language seen by all members of the proposed classes, including that all consumers had to do was choose a league, pick a team, and get their cash.  These ads also specifically connected the skills required for season-long fantasy sports as being used to win in daily fantasy sports.

206.    In the Eccles AMA, FanDuel's CEO admitted that FanDuel's "marketing

---

[37] https://www.ispot.tv/ad/7rWQ/draftkings-nfl-2014.
[38] https://www.ispot.tv/ad/AVmZ/draftkings-the-sleeper
[39] https://www.ispot.tv/ad/AVwa/draftkings-fantasy-football-welcome-to-the-big-time.

strategy is more about players the mass market can identify with rather than 'Play the Pros'" as the below screenshot shows:[40]



207.    As a result of this strategy, FanDuel's advertisements then fraudulently concealed and mispresented the fact that many of the players portrayed in their ads who won large amounts of money were actually professional players, but they were included in their ads as if they were players with whom "the mass market" consumers could identify.

208.    FanDuel's Chief Product Officer and co-founder Thomas G. Griffiths ("Griffiths") testified that FanDuel's "Typical" user is "a 25-44 year old married man from a small town or suburb.  He has a college degree, works a full-time job and earns more than $75,000 a year.  He is also an all-around fan of fantasy sports, with the vast majority also players of season-long fantasy sports."

209.    Griffiths testified that "the ability for all participants to win" was an intentional theme and message of their advertising campaign.  But he also testified that an "in-depth

---

[40] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=1

analysis of who wins our contests shows that the most skilled players win most often, which is unsurprising because playing DFS requires considerable skill…" Despite this knowledge, FanDuel specifically marketed its product as one in which it was "simple" and "easy" to win.

210.    FanDuel's advertisements, such as one titled "Nothing to Lose," appealed to sports fans by using testimonials of winners making statements such as "Once I used FanDuel, I was hooked" or "I started with a $125 deposit, now I've made over $62,000" while explaining how "easy" it is. Viewers are led to believe the players speaking are average users of the site, but in reality the individual claiming $62,000 in winnings, Erik Hafner, is a former professional poker player who then played fantasy sports for a living. This ad ran more than 1,300 times. [41]

211.    Similarly, in another FanDuel commercial a woman introduces her husband, a personal trainer, who supposedly turned $35 into $2 million. "Scott H." is featured in numerous commercials by FanDuel as demonstrating that anyone can win, but FanDuel omits his last name and does not disclose to consumers that "Scott H." is actually Scott Hanson, who authored articles for the NFL analytics website ProFootBallFocus full-time and was a professional fantasy sports player when he won big.[42]

212.    FanDuel ads contained similar language to DraftKings about how easy it is to win: "Fantasy baseball on FanDuel is easy.  Just choose a league, pick your team, and get your cash winnings the next day." This 60 second ad aired nationally more than 4,800 times.  This ad also contained the testimonial from Erik Hafner, but does not disclose that he was a professional fantasy sports player. [43]

213.    FanDuel's ads convey that one-week fantasy football is the same game and

---

[41] https://www.ispot.tv/ad/7Wgl/fanduel-one-day-fantasy-basketball-leagues-nothing-to-lose.
[42] http://www.businessinsider.com/scott-hanson-fantasy-football-championship-2014-12;
https://www.ispot.tv/ad/AAQX/fanduel-one-week-fantasy-football-leagues-scott.
[43] https://www.ispot.tv/ad/7eEA/fanduel-com-fantasy-baseball-leagues.

requires the same skills as season long fantasy football: "You're shrinking that whole season down into one week." after saying that there were "immediate cash payouts."  This ad ran more than 1,000 times in September 2015.  This ad also featured "Scott H." but did not disclose his true background as a fantasy sports expert and writer, or even his last name so consumers could research him and find out who he was.[44]

214.    FanDuel's advertisement "Nothing to Lose" also advertised that "fantasy basketball on FanDuel is easy: just choose a league, pick your team, and get your cash winnings the next day." This 60 second ad ran more than 1,300 times in 2015, and also includes Erik Hafner without disclosing his true background. [45]

215.    FanDuel's advertisement "Real Money" also contains the uniform misrepresentation that "Playing fantasy football on FanDuel is easy: just choose a league, pick your team, and get your cash winnings Monday night."  This ad also includes Erik Hafner without disclosing his true background.  This ad ran more than 1,200 times during the NFL season in 2015.[46]

216.    A FanDuel ad called "New Leagues Every Week" explicitly linked the skills from season-long fantasy football to DFS.  "So you're into fantasy football, then you've got to check out these new 1 week leagues on fanduel.com.  The ad highlighted Chris Prince as someone who has won more than $762,000 on fanduel.com.  It specifically said: "You can turn your fantasy football skills into real money, like Chris Prince did.  However, FanDuel did not disclose that Chris Prince had been playing DFS for more than 4 years[47] and was a professional

---

[44]  https://www.ispot.tv/ad/7Uzc/fanduel-fantasy-football-one-week-leagues-sunday-million.

[45]  https://www.ispot.tv/ad/7Wgl/fanduel-one-day-fantasy-basketball-leagues-nothing-to-lose.

[46]  https://www.ispot.tv/ad/79j9/fanduel-fantasy-football-one-week-leagues-real-money.

[47]  https://www.fanduel.com/insider/2011/12/13/chris-prince-takes-home-75000-by-winning-the-fanduel-fantasy-football-championship/

DFS player[48].  The ad said that "FanDuel is gonna pay out over $2 billion bucks this year - you've got to get your share." and that "You can pick a new team every week and get immediate cash payouts." This ad ran more than 1,100 times during the first few weeks of the 2015 NFL season. [49]

217.   A FanDuel ad called "Win Big" represented to consumers that "over 1.2 million people have already won money on FanDuel, it can really pay to be a fan."  Both explicitly and implicitly, by showing "regular" people who had turned small deposits into large amounts of money, FanDuel misrepresented how easy it was to win on FanDuel and how knowledge of sports and experience playing season-long fantasy football was all that was required.  The ad explicitly stated: "Choose a one week league, pick your team, and get your cash winnings." This ad also included "Scott H." as someone who deposited $35 and won more than $2 million, without disclosing his last name or his background as a professional fantasy sports player and writer. This 60 second ad ran more than 6,300 times during the 2015 NFL season. [50]

218.   In another advertisement aired during 2014, "Big Winner: Joe," FanDuel advertised daily fantasy as the same as season long fantasy sports: "So, you're into fantasy baseball, then you've gotta check out these new one-day leagues," because one user has already won "29 grand this year." FanDuel's advertisement goes on to suggest that because "over 245,000 people have already won money," the viewer could too.[51] The effect of these statements imply that if you already play season long fantasy sports, you already have the skill to become one of the many winners.

219.   FanDuel's advertisement, "Daily Payout," uses the same strategy to attract

---

[48] http://rotoviz.com/2014/10/joe-2-pro-draftkings-millionaire-maker-gpp-strategy-interview-dfs-pro/
[49] https://www.ispot.tv/ad/79pv/fanduel-com-one-week-fantasy-football-new-leagues-every-week.
[50] https://www.ispot.tv/ad/A7E9/fanduel-one-week-fantasy-football-leagues-win-big.
[51] https://www.ispot.tv/ad/7Knw/fanduel-com-one-day-league-joe.

viewers to play, suggesting "[n]o wonder hundreds of thousands of fantasy baseball players, like you, are already hooked on Fanduel.com," while at the same time showing the faces of various "winners." This ad ran more than 270 times. [52]

220.   At the same time, FanDuel would also promote that it was projected to "pay out about $75 million a week, on average this football season" in advertisements like one titled "Win Big" airing during the 2015 NFL season. FanDuel also states that over 1.2 million people have won on the site. In conjunction with the large weekly payout, FanDuel implies how easy it is to win, and, as they say in the ad, "[i]t can really pay to be a fan."[53]  This ad ran more than 6,300 times in 2015.

221.   In an ad titled "Get Off The Sidelines," FanDuel leads viewers to believe that winning is easy and fair so long as you follow the steps laid out in the commercial. As FanDuel says in the same commercial, "You play fantasy football, but you still haven't tried FanDuel's one-week leagues?" "It's simple." "Make some of that [$75 million] yours." This ad ran more than 3,500 times in 2015. [54]  This ad specifically connected the skills needed to win at season-long fantasy sports with those to win at FanDuel, and described how easy it was to win.

222.   In an ad called "Win Money Every Week" someone named Vernon B. tells consumers that "I've won over $29,000 on FanDuel, nothing special about me.  The difference is that I played, and they didn't."  Another person says: "If you think it can't be you, it can be you."  The announcer then says: "Choose your league, pick your team, and win."  This ad explicitly says that anyone can win on FanDuel. This ad ran nearly 3,000 times through October 2015. [55]

---

[52] https://www.ispot.tv/ad/7owm/fanduel-com-daily-leagues.
[53] https://www.ispot.tv/ad/A7E9/fanduel-one-week-fantasy-football-leagues-win-big.
[54] https://www.ispot.tv/ad/798H/fanduel-com-get-off-the-sidelines.
[55] https://www.ispot.tv/ad/AVzC/fanduel-fantasy-football-one-week-leagues-win-money-every-week.

223.    In an ad called "Beat Your Buddies", FanDuel's commercial that included the same "Nothing special about me" and "If you think it can't be you, it can be you" representations, one of the characters in the commercial who the commercial indicates has won more than $762,000 says "A little bit of time, and a little bit of knowledge" is all it takes to win.  But this player, Chris Prince, was a professional DFS player who had been playing for years and devoted substantially more than "a little bit of time and a little bit of knowledge" to FanDuel.  This ad included the representation that FanDuel was "simple" and that "even a novice can come in and spend $1 or $2 and win 10 or 20 thousand dollars." This 60 second ad ran more than 750 times. [56]



224.    "Like Christmas," another FanDuel commercial, shows a group of white, late 20-30 year old men watching football and saying things like "Sunday morning, I'm like a kid at Christmas," "[i]t's easy to use," and "[i]t's good to see my score rise and rise and rise." At the same time, the voice over states "It can really pay to be a fan" as one of the men celebrates on the couch and gets shoved playfully by his friends. These advertisements implicitly signal to viewers that winning on the site is not difficult if you are a sports fan, and that if one of the guys in the commercial can win, the viewer could as well. This ad ran nearly 400 times in

---

[56] https://www.ispot.tv/ad/AkWz/fanduel-one-week-leagues-beat-your-buddies.

2015.[57]

225.   In another advertisement titled "Win Any Weekend," FanDuel explains, using the leagues it offers, just how "easy" it is for anyone to play so long as they enter by telling views to "[t]ry a 50/50 league, the top half wins cash. Easy enough right?" and "[o]ver 1.1 million people have already won money on FanDuel. Be one." This ad ran more than 860 times.[58]

226.   All of this advertising worked according to FanDuel's and DraftKings' plans. FanDuel and DraftKings attracted more than 3.5 million first-time players in 2015. In October 2015, DraftKings and FanDuel received 7.1 million entries to their guaranteed prize pool tournaments, generating $43.6 million in entry fees.   FanDuel alone signed up 20,000 to 30,000 new players a day.[59]   One analysis estimated a total of $3 billion in total entry fees in 2015, with DraftKings and FanDuel keeping around $280 in revenue.[60]

227.   Both DraftKings and FanDuel have changed their marketing approach as a result of consumer protection lawsuits brought by Plaintiffs and undersigned counsel.

228.   Both DraftKings and FanDuel have also admitted that the focus of their advertising campaign as described above was about players winning money.

229.   In an interview with Fortune Magazine's Brainstorm Tech program, Robins said, "I think we're operating a little bit differently in the sense that our advertising certainly we've taken a second look at.  I think from our perspective, it was less about, hey we thought we were misleading or anything like that and more about how we felt maybe it was a little bit too much emphasis on the winning of money and not enough about the other reasons that

---

[57] https://www.ispot.tv/ad/AA8P/fanduel-one-week-fantasy-football-leagues-like-christmas.
[58] https://www.ispot.tv/ad/AVRx/fanduel-com-fantasy-football-win-any-weekend.
[59] Eilers & Krejcik Gaming, LLC, Daily Fantasy Sports Industry Report-2016, February 22, 2016
[60] http://www.espn.com/espn/feature/story/_/id/17374929/otl-investigates-implosion-daily-fantasy-sports-leaders-draftkings-fanduel

people play.  Things like socializing with their friends, competing, being able to study the stats, understand the game and engage in the game more deeply.  Those are really the real reasons people play, and I think we kind of lost that a little bit with some of the advertising."[61]

230.    Robins told ESPN that he regretted the messaging of the advertisements and could see how consumers understood the ads' messages.  He said: "In hindsight I really regret that we presented ourselves in that way.  I can see why maybe somebody that wasn't familiar with the category and all of a sudden all they see is these ads, and they're thinking…hey, you know, is this a scam?  I totally get it."[62]

231.    However, another DraftKings executive did not regret the advertising campaign, because, he admitted, it worked and successfully delivered new players.  Co-Founder and current executive Matt Kalish, when asked whether he regretted the advertising campaign and heavy spending as described above, told the Boston Globe: "'I don't have any regrets about the results in terms of delivering new players,' Kalish says, pointing to the huge spike in signups those commercials helped generate at the crucial start to this NFL season. 'That was great.'"[63]

232.    FanDuel's CEO Eccles admitted that the TV advertising was focused on winning money, and described changing the focus of the marketing message away from this: "We felt we really overly focused on one aspect of the product, which was around winning money.  We know our players play our product for a whole bunch of reasons."[64]

### D.    **DraftKings and FanDuel Advertised Bonus Money When Plaintiffs And Consumers Made Deposits**

---

[61] http://fortune.com/video/2016/07/14/fortune-live-for-july-14-2016-brainstorm-tech-special-edition/?iid=sr-link7
[62] http://www.espn.com/espnradio/play?id=17408499
[63] https://www.bostonglobe.com/magazine/2015/12/03/inside-draftkings-war-room-fantasy-sports-battle-rages/DAX8tBAZBOEX9kr6zoeOfM/story.html
[64] http://www.usatoday.com/story/sports/fantasy/2016/08/05/draftkings-fanduel-new-york-daily-fantasy-sports/88310544/

***DraftKings***

233.    Included in nearly every single advertisement for DraftKings and FanDuel was a deceptive bonus offer for free money upon a consumer's first deposit of money to play the contests that would supposedly double the deposit.  Here is an example:



234.    The offer to match the first deposit with free money is prevalent in many DraftKings advertisements.  As part of this scheme, DraftKings represents that up to $600 of a user's initial payment will be immediately matched by the site.   For example, these advertisements will represent that if they deposit a payment of $100, consumers will immediately have $200 with which to enter DraftKings' contests. This screenshot shows an example:



235.   On a DraftKings Internet video advertisement touting the superiority of DraftKings over its competitor FanDuel.com and other sites, the announcer states:

> If you go through the link below, www.draftkingsdeal.com, you're going to double your first deposit, up to six-hundred dollars!  That means that if you put in one-hundred bucks, you get two hundred to play with.  Put in three hundred, and get six hundred.  Put in six hundred, and get twelve hundred.  No other site can offer you this.

https://www.youtube.com/watch?v=0Ozm3Mi-rPA

236.   In case the viewer missed the audio, the web page containing the above advertisement states:

> http.www.draftkingsdeal.com  Go through that link to get the BEST DraftKings deal anywhere online!  DOUBLE your first deposit up to $600 …

237.   Clicking on the link brings the consumer to a page on DraftKings' website[65] that states:  "Plus, deposit now and we'll double your cash!"  Here is a screen shot of that page as it appeared on April 21, 2015:

---

[65] https://www.draftkings.com/?aff_sub=78319&s=220267522&aff_oid=126 (accessed 4/21/2015).



238.    That same misrepresentation – "PLUS, deposit now and we'll double your cash! – appears if consumers go directly to www.draftkings.com (accessed 6/20/2016).

239.    DraftKings' website also contains a "contest-lobby page." [66]  As of April 21, 2015, that page displayed the following, including an offer to "Receive a 100% First-Time Deposit Bonus":



240.    Upon clicking on the "CLAIM FREE OFFER" link from the above pages, consumers are routed to a registration page.  After choosing a username and password and providing their email address, state of residence and confirmation that they are at least 18 years

---

[66] https://www.draftkings.com/contest-lobby (accessed 4/21/2015).

of age, consumers are directed to click on a heading entitled "Register."

241.    The "Register" heading is a link taking new registrants to the "Deposit" page, where they are immediately put on notice that they need to deposit their cash quickly, lest they lose the 100-Percent First-Time Deposit Bonus.   A large, prominently displayed count-down clock starts at 10:00 minutes and ticks down the seconds until it supposedly expires.   Adjacent to the clock, the site states:

> **Claim your FREE Entry!**
> Congratulations! As our newest customer with your first deposit, you will receive a **FREE Entry** ($2 value) to play in a paid contest. PLUS, deposit now and we'll **DOUBLE YOUR CASH**, up to $600*! Get started now!  [Bold face and capitalized emphasis in original.]

242.    Directly below the clock are five large text boxes, allowing consumers to choose from the following deposit amounts and receive the corresponding "free bonuses":  "[1] $25: $25 Free Bonus; [2] $100:  $100 Free Bonus; [3] $250:  $250 Free Bonus; [4] $600:  $600 Free Bonus" and [5] "Other," providing a matching bonus up to $600.

243.    Here is a screenshot of this page as it appeared on April 21, 2105:



244.   As can be seen from the above, there is an asterisk after "**DOUBLE YOUR CASH**, up to $600."   Only by scrolling to the bottom of the page can one find the corresponding footnote, which contains the following disclaimer:   "*Deposit bonus funds are not available immediately, but are released into your cash account in increments of $1 for every 100 Frequent Player Points (FPPs) that you earn by playing paid contests.   You can always view your current deposit bonus information on the My Account page.   For more information about deposit bonuses, please click here."   Here is a screen shot of that footnote in a size that is roughly proportional to its appearance in relationship to the screen shot above from the same page:

*Deposit bonus funds are not available immediately, but are released into your cash account in increments of $1 for every 100 Frequent Player Points (FPPs) that you earn by playing paid contests. You can always view your current deposit bonus information on the My Account page. For more information about deposit bonuses, please click here.

245.    This footnote does not explain what "Frequent Player Points" are or how they are to be "earned" in paid contests.  Nor does it state that, without depositing (or winning) additional money and spending that money on additional contests, the consumer will never receive the so called "100% First-Time Deposit Bonus" or "DOUBLE YOUR CASH" bonus. Nowhere does it indicate how much of the bonus the consumer will receive after making his or her initial deposit.

246.    The "click here" link in the footnote that purports to provide more information about deposit bonuses takes the registrant to a page of "Frequently Asked Questions" that, when it first appears, contains eight categories without questions.[67]  The page as it appears after the link is clicked is reproduced below:

---

[67] https://www.draftkings.com/help/faq (accessed 4/21/2015).



247.   Clicking on the categories reveals more than an aggregate of 50 separate questions.  One of those categories is, "Deposits, Withdrawals & Bonuses."  On clicking on that category, eight questions appear.  That list of questions, as it appears on the page, is reproduced below:



248.   As can be seen, the sixth question is, "How Do I Get My Deposit Bonus?"

Assuming the consumer finds that question and clicks on it, he or she is displayed the following disclaimer:  "Deposit bonuses release in increments of $1 for every 100 Frequent Player Points (FPPs) that you earn by playing in paid contests.  All deposit bonuses expire four months after they are created.  If you have an issue with your deposit bonus expiring, please contact support@draftkings.com."  This question and its response, as they appear on the page, are reproduced below:



249.    As with the footnote described above, this answer does not explain what "Frequent Player Points" are or how they are "earned" and does not state that, without depositing (or winning) additional money and spending that money on additional contests, the consumer will never receive the full amount of the "bonus."  Nor does it indicate how much of the bonus the consumer will receive upon paying his or her initial deposit.  Aside from all that, the answer also does not clearly state what is meant by "deposit bonuses expire four months after they are created."   A reasonable interpretation would be that the consumer has four

months to use the bonus in additional contests, but it does not mean that. Instead it means that the consumer has four months to receive the bonus by spending additional money on contests.

250. The next question on the FAQ list is, "What is a Frequent Player Point?" Clicking on that question reveals the following: "Frequent Player Points (FPPs) are points you earn upon the start of every paid contest you enter on DraftKings.com, whether you win or lose. FPPs awarded vary per contest type (displayed on the Draft page) and are not earned for playing in FREE ENTRY games. The more contests you join and money you spend, the more FPPs you earn."

251. Nowhere does this answer explain how FPPs relate to receiving the purported "100% First-Time Deposit Bonus" or "**DOUBLE YOUR CASH**" bonus. Nor does it state how much a consumer must spend to earn a given number of FPPs.

252. Furthermore, there is no realistic way for a consumer to enter the registration information, navigate through the links, find the relevant section of the Frequently Asked Questions, and correctly interpret it within the ten minutes provided.

253. Back on the selection page, after making a selection of deposit amount and entering payment information, the consumer is directed to a deposit confirmation page where he or she can make a deposit of money.

254. The Federal Trade Commission § 5(a)(1) considers "free" offers, such as DraftKings' offers of "Free Bonus," "Free Offer," "100% First-Time Deposit Bonus" or "**DOUBLE YOUR CASH**" bonus to be deceptive and unfair if they do not set forth clearly and conspicuously at the outset of the offer all the terms, conditions and obligations upon which receipt and retention of the "Free" item are contingent.

255. The FTC's Guide Concerning Use of the Word "Free" and Similar

112

Representations ("FTC Guide Concerning 'Free' Offers"), codified in the Code of Federal

Regulations, 16 C.F.R. § 251.1, outlaws the practices of Defendant alleged herein:

> (c) Disclosure of conditions. When making "Free" or similar offers all the terms, conditions and obligations upon which receipt and retention of the "Free" item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood. Stated differently, all of the terms, conditions and obligations should appear in close conjunction with the offer of "Free" merchandise or service. For example, disclosure of the terms of the offer set forth in a footnote of an advertisement to which reference is made by an asterisk or other symbol placed next to the offer, is not regarded as making disclosure at the outset.

> * * *

> (i) Similar terms. Offers of "Free" merchandise or services which may be deceptive for failure to meet the provisions of this section may not be corrected by the substitution of such similar words and terms as "gift", "given without charge", "bonus", or other words or terms which tend to convey the impression to the consuming public that an article of merchandise or service is "Free".

16 C.F.R. § 251.1.

256.    DraftKings' offers of a "Free Bonus," "FREE OFFER," "100% First-Time

Deposit Bonus," and "**DOUBLE YOUR CASH**" Bonus violate the FTC Guide Concerning

"Free" Offers because all of the terms, conditions and obligations do not appear in close

conjunction with the offer of "free" merchandise or services.  Specifically, Defendant does not

disclose in close conjunction with these offers that a consumer will need to spend 25 times the

amount of the initial deposit within four months to receive the full amount of the supposed

"free" bonus.

257.    Not even in the footnote containing the disclaimer described above does

Defendant set forth all of the terms, conditions and obligations necessary to obtain the "free

bonus," but even if it did, it would still not be in compliance with the FTC Guide Concerning

"Free" Offers because such a footnote would not be regarded as making disclosure at the

outset.  16 C.F.R. § 251.1 ("disclosure of the terms of the offer set forth in a footnote of an

advertisement to which reference is made by an asterisk or other symbol placed next to the offer, is not regarded as making disclosure at the outset.")

258.    In addition, the above advertising claims are unfair and deceptive and violate generally accepted principles of ethical business conduct for the following reasons:

- The large-type representations of the offer of a "Free Bonus," "Free Offer," "100% First-Time Deposit Bonus" and "**DOUBLE YOUR CASH**" bonus do not contain simple and consistent statements or representations of all the essential points of the offer, and the overall impression of the "bonus" offer is contradicted by the small-print disclaimers in the footnote and on the "FAQ" page.
- The representations in the footnote and on the "FAQ" page are by their size, placement, and other characteristics unlikely to be noticed and difficult to understand even though they are material to the offer.
- The representations of a "100% First-Time Deposit Bonus" and "**DOUBLE YOUR CASH**" bonus are similar to "free," "2-for-1," or "half-price" representations but have qualifications and conditions that are not clearly and conspicuously disclosed in close conjunction with the representations.  Moreover, to obtain the "100% First-Time Deposit Bonus" or doubling of cash the consumer must pay a higher price than represented.

259.    The ethical principles that DraftKings violated as set forth in the above bullet points are established in, among other sources, the ethical guidelines of the Direct Marketing Association ("DMA"), the leading industry association for companies that, like Defendant, market directly to consumers.  DMA has set forth principles of ethical business practices for such marketing activities, whether engaged in by DMA members or other businesses that market to consumers.  *Direct Marketing Association's Guidelines for Ethical Business Practices*, revised May 2011.  ("DMA Ethical Guidelines"); DMA Ethical Guidelines, revised January 2014.

260.    The DMA Ethical Guidelines "are intended to provide individuals and organizations involved in direct marketing in all media with generally accepted principles of conduct."  *Id.* at 2.  They are based on DMA's "long-standing policy of high levels of ethics

and the responsibility of the Association, its members, and *all marketers* to maintain consumer and community relationships that are based on fair and ethical principles." *Id.* (emphasis added).

261.    In addition, the Ethical Guidelines "are intended to be honored in light of their aims and principles.  All marketers should support the guidelines in spirit and not treat their provisions as obstacles to be circumvented by legal ingenuity." *Id.*

262.    Defendant's practices specifically violate Articles 1, 2 and 17 of the DMA Ethical Guidelines and its companion volume, *Do the Right Thing:  A Companion to DMA's Guidelines for Ethical Business Practice* (Revised January 2009) ("*Do the Right Thing*").  *Do the Right Thing* is intended to "give[] direct marketers advice on how to assure their business practices comply with" the Ethical Guidelines.

263.    Articles 1, 2 and 17 of the DMA Ethical Guidelines state as follows:

**HONESTY AND CLARITY OF OFFER**
**Article #1**

All offers should be clear, honest, and complete so that the consumer may know the exact nature of what is being offered, the price, the terms of payment (including all extra charges) and the commitment involved in the placing of an order. Before publication of an offer, marketers should be prepared to substantiate any claims or offers made. Advertisements or specific claims that are untrue, misleading, deceptive, or fraudulent should not be used.

**ACCURACY AND CONSISTENCY**
**Article #2**

Simple and consistent statements or representations of all the essential points of the offer should appear in the promotional material. The overall impression of an offer should not be contradicted by individual statements, representations, or disclaimers.

**USE OF THE WORD "FREE" AND OTHER SIMILAR REPRESENTATIONS**
**Article #17**

A product or service that is offered without cost or obligation to the recipient may be unqualifiedly described as "free."

If a product or service is offered as "free," all qualifications and conditions should be clearly and conspicuously disclosed, in close conjunction with the use of the term "free" or other similar phrase. When the term "free" or other similar representations are made (for example, 2-for-1, half-price, or 1-cent offers), the product or service required to be purchased should not have been increased in price or decreased in quality or quantity.

115

264.    DraftKings' practices also violate the DMA's companion volume *Do the Right Thing*.  Under Article 2, DMA states:  "Keep in mind that a disclaimer or disclosure alone usually is not enough to remedy a misleading or false claim. … [Y]ou should make sure that the details [of the promotion] will be noticed by the average consumer and that they do not merely explain away the promotion's overall impression."  *Do the Right Thing* at 8.

265.    Under Article 17, *Do the Right Thing* explains:

> If [consumers] respond to a "free" offer in which additional items need to be purchased, … they should be clearly informed of the terms and conditions in the initial promotion before they are billed so there are no misunderstandings. Clear disclosures explaining the offer should appear near a representation that something is "free," before you can be fairly confident that average consumers will understand the offer.

### *FanDuel*

266.    FanDuel commercials also offer free money to entice consumers to make deposits, such as this one:  "Try FanDuel today and we'll match your first deposit dollar for dollar up to $200."[68]

267.    Each and every one of the advertisements listed above that contain misrepresentations about FanDuel's fair, easy to win game of skill also contain misrepresentations about this bonus offer.

268.    One strategy FanDuel and its affiliated entities employ is offering special deals, like:  (1) time sensitive "promo codes,"[69]; and (2) "special" website access, like www.thesportsgeek.com/go/fanduel.[70]

269.    These YouTube advertisements double down on FanDuel's matching deposit ploy.  For example:

---

[68] https://www.ispot.tv/ad/7rA1/fanduel-com-one-week-league-no-commitment.
[69] https://www.youtube.com/watch?v=N7GR6wB6m_U.
[70] https://www.youtube.com/watch?v=gfkHrDAmjBE.

a. https://www.youtube.com/watch?v=B0pd0R1S1ec — "Try FanDuel today and we'll *match the first deposit dollar for dollar up to 200 bucks*. With FanDuel *you get your winnings right away*. Go to FanDuel.com . . . *to get up to 200 dollars free*." (18–28 seconds)

b. https://www.youtube.com/watch?v=cCqaWIvJCpk – "Deposit now and we'll match it up to 200 bucks . . . *that's 200 dollars free*." (51–57 seconds)

c. https://www.youtube.com/watch?v=gfkHrDAmjBE – "It matches your first deposit. So let's say you deposit 20 dollars for the first time, *you're going to get 20 dollars free*. If you deposit 100 dollars, *you'll get 100 dollars free*." (3 minutes 48 seconds– 3 minutes 57 seconds)

d. https://www.youtube.com/watch?v=p2lmIY8YE2U —Large bold letters at the bottom of the YouTube clip state **"$200 free"** and starting at 33 seconds the video itself also displays "$200 FREE" for the remainder of the video.

270. FanDuel also advertises the bonus offer on other websites. For example, on dailyfantasycafe.com, FanDuel represents that the consumer will receive "100% Bonus up to $200." Clicking on the "Play Now" button takes you FanDuel's website, as shown in the screenshot below.



271. Once on the official FanDuel website, fanduel.com, as shown in the screenshot below, a new consumer can select JOIN NOW which prompts a "Create your Account" page to pop up:



(Last accessed June 21, 2016, http://www.FanDuel.com).

    272.    Here is a screenshot from the "Create your Account" page:



(Last accessed June 21, 2016, http://www.FanDuel.com).

    273.    After choosing a username and password and providing the user's email address and full name, the consumer is directed to click on a heading entitled "Play Now."

    274.    The "Play Now" link takes a new registrant to the "Deposit" page, which promises to match the deposit. This doubling offer is presented as a limited time offer, the urgency of which is reinforced by the image of a 10 minute countdown "clock" that ticks down the seconds until it supposedly expires. FanDuel has recently changed the use of the ticking clock from a reference to the bonus offer to a reference to the next contest. But the original clock can be viewed around the 3:00 minute mark at

https://www.youtube.com/watch?v=37RWLYmbYyE, and in the image from the YouTube clip

below.



(Last accessed June 21, 2016, https://www.FanDuel.com).

275.    The deposit page contains large boxes from which consumers choose how much

to deposit.  Below these dollar amounts appear the corresponding deposit bonus amounts as

shown in the screenshot below:



(Last accessed June 21, 2016)

276.    Consumers, rushed by FanDuel to enter their information before the clock runs

out, would have to read the note:  "Your deposit bonus unlocks as you play over time. How it

works," and then click on the link "How it works."



(Last accessed January 13, 2016).

277.     The link brings up a fine-print popup that does not explain how frequently one must play to unlock the deposit; how much of the deposit is unlocked each time one plays; how long it may take to earn the deposit; or, importantly, that consumers cannot get the promised deposit match unless they pay much more in entry fees.   Nor does it explain any restraints on withdrawing the bonus.   Even if the consumer clicks on the link for more information – despite the ticking countdown clock – the "How it Works" link sheds scant light on the deposit bonus policy.   The first paragraph, answering the question "How does the deposit bonus work?" essentially repeats the inscrutable footnote on the deposit page, and states that bonuses are earned "gradually" and are "released automatically."   This explanation states in full:  "Deposit bonus is offered to users upon first deposit and via special promotional offers.   Bonuses are earned gradually after you enter and complete paid contests.   As you play and earn the bonus, the cash you earn is released automatically into your account, reflected in your account balance, and made available for play or withdrawal under the same terms as all funds in your account.   Your remaining deposit bonus available to be earned is shown in your account menu as 'Pending Bonus' and in your My Account area."   Here is a screenshot.

## Deposit Bonus

### How does the deposit bonus work?

Deposit bonus is offered to users upon first deposit and via special promotional offers. Bonuses are earned gradually after you enter and complete paid contests. As you play and earn the bonus, the cash you earn is released automatically into your account, reflected in your account balance, and made available for play or withdrawal under the same terms as all funds in your account. Your remaining deposit bonus available to be earned is shown in your account menu as 'Pending Bonus' and in your My Account area.

(Last accessed January 13, 2016, https://www.fanduel.com/p/AddFundsFtd?#).

278.    The "explanation" then adds a paragraph answering "How Fast does the deposit bonus become real cash?"  However, the answer adds little to a new consumer's understanding of the deposit match; instead it merely states bonuses are "released as real cash at a rate of 4% of the entry fee of the contest you enter" and offers one example.  This unsatisfactory explanation provides new consumers with no concrete understanding of how long it will actually take to "earn" the deposit match, how much money a consumer must spend to "earn" it, and if there are any restraints on recovery of the deposit match once earned.  Here is a screenshot:

### How fast does the deposit bonus become real cash?

Gradually releasing bonuses as you play prevents fraud and discourages multi-accounting. Deposit bonus is released as real cash at a rate of 4% of the entry fee of the contest you enter. For example, if you enter a $25 contest, $1 of deposit bonus will be released into your main funds account. Users collect deposit bonus upon settlement of the contest entered. If a contest or entry is canceled, your entry fee will be refunded and no bonuses will be earned.

(Last accessed January 13, 2016, https://www.fanduel.com/p/AddFundsFtd?#).

279.    Although  in  the  first  sentence,  this  answer  provides  the  non-responsive

statement that gradually releasing bonuses prevents fraud, it is unclear how paying out the bonus as promised could possibly lead to fraud.  If the bonus could promote fraud (other than by FanDuel), FanDuel could have changed the unconditional offer that it promoted to consumers.

280.    The next question is: "What are the benefits of deposit bonuses?" A consumer who had seen the FanDuel offer of a 100% matching bonus on first deposit would naturally think that this is the benefit of the deposit bonus.  However, the answer never offers this as a benefit.   Instead, it converts what had been offered into a benefit only to a reward to loyal users, something that FanDuel had never mentioned in its advertising.  The answer also states: "First time deposit bonuses do not expire so the funds are available until they've been earned and spent."  A natural reading of this is that there are no time constraints on new user bonuses. However, this explanation immediately retracts that representation by stating in a footnote that bonuses may have expiration dates.  This explanation states in full:  "Deposit bonus rewards loyal users who play consistently on FanDuel.  First time deposit bonuses do not expire so the funds are available until they've been earned and spent. *Please note that special offers and reÂload [sic] bonuses may carry an expiration date to be used.  If the indicated time lapses due to inactivity and your special bonus was retracted, please contact customer support.  If you have further questions about bonuses, please refer to our Terms of Use for a full explanation or contact us."  Here is a screenshot:

## What are the benefits of deposit bonuses?

Deposit bonus rewards loyal users who play consistently on FanDuel. First time deposit bonuses do not expire so the funds are available until they've been earned and spent.

*Please note that special offers and reÂload bonuses may carry an expiration date to be used. If the indicated time lapses due to inactivity and your special bonus was retracted, please contact customer support.

If you have further questions about bonuses, please refer to our Terms of Use for a full explanation or contact us.

(Last accessed January 13, 2016, https://www.fanduel.com/p/AddFundsFtd?#).

281.    Clicking on the Terms of Use link in the above statement sends the user to a lengthy Terms of Use page that does, in fact, appear to impose time constraints on consumers: (1) "new users" can only withdraw their bonuses once they have entered into games; and ambiguously, (2) "unless otherwise stated, any unconverted pending bonus remaining in a player's account 45 days after it has been initially credited can be removed by FanDuel."  Here is a screenshot:

**Bonuses and Promotions**

We frequently offer bonuses to newly depositing users and for other marketing purposes. Pending bonus is converted into a player's cash account as the player enters real money contests. Unless otherwise stated, any unconverted pending bonus remaining in a player's account 45 days after it has been initially credited can be removed by FanDuel. Any cash bonus a new user receives is for entry into competitions on FanDuel and can only be withdrawn if they have been previously entered into at least one game. Additionally, if a user immediately withdraws money after a deposit which delivers a deposit bonus then the bonus will be retracted. In the event of abuse of the bonus system by any user, FanDuel reserves the right to retract your user bonuses.

We frequently offer cash rewards for players competing in "Beat The Expert" competitions and Giveaway/Freeroll tournaments. FanDuel reserves the right to reclaim these funds if players do not use them to enter real money contests within 1 month of their initial crediting. These funds can be used to enter real money contests but cannot be immediately withdrawn.

(Last accessed January 13, 2016,
http://web.archive.org/web/20141122001525/https://www.fanduel.com/terms;
https://www.fanduel.com/terms).

282.    Even the relevant Terms of Use section above does not clarify how many games a consumer must play to earn enough points to get the full deposit bonus.  Nor does it explain that, in stark contrast to advertisements and previous pages to act quickly so they can double their "free" cash, it is impossible for consumers to double initial cash deposits of $100 or $200 without depositing and paying thousands more in entry fees.

283.    There is no realistic way for a consumer to enter the registration information, navigate through the links, find the relevant section of the Terms of Use, and correctly interpret it within the ten minutes provided.

284.    The Federal Trade Commission § 5(a)(1) considers "free" offers, such as FanDuel's offers of "$200 Free" and "100% Bonus up to $200" to be deceptive and unfair if they do not set forth clearly and conspicuously at the outset of the offer all the terms, conditions and obligations upon which receipt and retention of the "Free" item are contingent.

285.    The FTC's Guide Concerning Use of the Word "Free" and Similar Representations ("FTC Guide Concerning 'Free' Offers"), codified in the Code of Federal Regulations, 16 C.F.R. § 251.1, outlaws the practices of FanDuel alleged herein:

> (c) Disclosure of conditions. When making "Free" or similar offers all the terms, conditions and obligations upon which receipt and retention of the "Free" item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood. Stated differently, all of the terms, conditions and obligations should appear in close conjunction with the offer of "Free" merchandise or service. For example, disclosure of the terms of the offer set forth in a footnote of an advertisement to which reference is made by an asterisk or other symbol placed next to the offer, is not regarded as making disclosure at the outset.

> * * *

> (i) Similar terms. Offers of "Free" merchandise or services which may be deceptive for failure to meet the provisions of this section may not be corrected by the substitution of such similar words and terms as "gift", "given without charge", "bonus", or other words or terms which tend to convey the impression to the consuming public that an article of

124

merchandise or service is "Free".

16 C.F.R. § 251.1.

286.    FanDuel's offers of a "100% Deposit Bonus," "*match* [of] *the first deposit*

*dollar for dollar up to 200 bucks*" and the like violate the FTC Guide Concerning "Free" Offers

because all of the terms, conditions and obligations do not appear in close conjunction with the

offer of "free" merchandise or services.   Specifically, Defendant does not disclose in close

conjunction with these offers that a consumer will need to spend 25 times the amount of the

initial deposit within four months to receive the full amount of the supposed "free" bonus.

287.    Not even in the popup containing the disclaimer described above does

Defendant set forth all of the terms, conditions and obligations necessary to obtain the "free

bonus," but even if it did, it would still not be in compliance with the FTC Guide Concerning

"Free" Offers because such an explanation would not be regarded as making disclosure at the

outset.   16 C.F.R. § 251.1 ("disclosure of the terms of the offer set forth in a footnote of an

advertisement to which reference is made by an asterisk or other symbol placed next to the

offer, is not regarded as making disclosure at the outset.")

288.    In addition, the above advertising claims are unfair and deceptive and violate

generally accepted principles of ethical business conduct for the following reasons:

a.  The large-type representations of the offer of a "$200 Free," and "100%
    Bonus up to $200," do not contain simple and consistent statements or
    representations of all the essential points of the offer, and the overall
    impression of the "bonus" offer is contradicted by the small-print disclaimers
    in the footnote and on the "How it Works" page.

b.  The representations on the "How it Works" page are by their size, placement,
    and other characteristics unlikely to be noticed and difficult to understand
    even though they are material to the offer.

c.  The representations of a "$200 Free," and "100% Bonus up to $200," are
    similar to "free," "2-for-1," or "half-price" representations but have
    qualifications and conditions that are not clearly and conspicuously disclosed

in close conjunction with the representations.  Moreover, to obtain the "100% Bonus up to $200" the consumer must pay a higher price than represented.

289.    The ethical principles that FanDuel violated as set forth in the above bullet points are established in, among other sources, the ethical guidelines of the Direct Marketing Association ("DMA"), the leading industry association for companies that, like Defendant, market directly to consumers.  DMA has set forth principles of ethical business practices for such marketing activities, whether engaged in by DMA members or other businesses that market to consumers.  *Direct Marketing Association's Guidelines for Ethical Business Practices*, revised May 2011. ("DMA Ethical Guidelines"); DMA Ethical Guidelines, revised January 2014.

290.    The DMA Ethical Guidelines "are intended to provide individuals and organizations involved in direct marketing in all media with generally accepted principles of conduct."  *Id.* at 2.  They are based on DMA's "long-standing policy of high levels of ethics and the responsibility of the Association, its members, and *all marketers* to maintain consumer and community relationships that are based on fair and ethical principles."  *Id.* (emphasis added).

291.    In addition, the Ethical Guidelines "are intended to be honored in light of their aims and principles.  All marketers should support the guidelines in spirit and not treat their provisions as obstacles to be circumvented by legal ingenuity."  *Id.*

292.    Defendant's practices specifically violate Articles 1, 2 and 17 of the DMA Ethical Guidelines and its companion volume, *Do the Right Thing:  A Companion to DMA's Guidelines for Ethical Business Practice* (Revised January 2009) ("*Do the Right Thing*").  *Do the Right Thing* is intended to "give[] direct marketers advice on how to assure their business practices comply with" the Ethical Guidelines.

126

293.     Articles 1, 2 and 17 of the DMA Ethical Guidelines state as follows:

**HONESTY AND CLARITY OF OFFER**

**Article #1**

All offers should be clear, honest, and complete so that the consumer may know the exact nature of what is being offered, the price, the terms of payment (including all extra charges) and the commitment involved in the placing of an order. Before publication of an offer, marketers should be prepared to substantiate any claims or offers made. Advertisements or specific claims that are untrue, misleading, deceptive, or fraudulent should not be used.

**ACCURACY AND CONSISTENCY**

**Article #2**

Simple and consistent statements or representations of all the essential points of the offer should appear in the promotional material. The overall impression of an offer should not be contradicted by individual statements, representations, or disclaimers.

**USE OF THE WORD "FREE" AND OTHER SIMILAR REPRESENTATIONS**

**Article #17**

A product or service that is offered without cost or obligation to the recipient may be unqualifiedly described as "free."

If a product or service is offered as "free," all qualifications and conditions should be clearly and conspicuously disclosed, in close conjunction with the use of the term "free" or other similar phrase. When the term "free" or other similar representations are made (for example, 2-for-1, half-price, or 1-cent offers), the product or service required to be purchased should not have been increased in price or decreased in quality or quantity.

294.     FanDuel's practices also violate the DMA's companion volume *Do the Right Thing.* Under Article 2, DMA states: "Keep in mind that a disclaimer or disclosure alone usually is not enough to remedy a misleading or false claim. … [Y]ou should make sure that the details [of the promotion] will be noticed by the average consumer and that they do not merely explain away the promotion's overall impression." *Do the Right Thing* at 8.

295.     Under Article 17, *Do the Right Thing* explains:

If [consumers] respond to a "free" offer in which additional items need to be purchased, … they should be clearly informed of the terms and conditions in the initial promotion before they are billed so there are no misunderstandings. Clear disclosures explaining the offer should appear near a representation that something is "free," before you can be fairly confident that average consumers will understand the offer.

**E.      The Reason DraftKings and FanDuel Made Material Misrepresentations and Omissions Is That They Had To Grow Their User Bases And Could Not Do So With The Truth About Their Products**

296.   DraftKings and FanDuel knew that they had a problem that threatened the long-term viability of their businesses.  The vast majority of their revenues came from a small number of heavy users called "grinders" or "sharks" who entered the most contests the most often.  To keep these grinders and sharks on their websites, DraftKings and FanDuel needed to attract many more casual users that would lose money to the grinders and sharks and make their playing style profitable.  These casual players are often called "fish" by grinders, sharks, and even DraftKings and FanDuel's employees.

297.   As explained by ESPN, "DFS companies need two vastly different types of players to keep depositing money. Small-stakes players were needed to join -- and continue playing -- but the high-volume players, some of whom entered thousands of lineups in hundreds of contests a night, had become the sites' most reliable cash machines."[71]

298.   DraftKings' CEO Jason Robins referred to its new users as "fish"[72] and knew that DraftKings needed new users who lacked skill to keep its most active users – and therefore profitable entry fee generators – on their site.[73]

299.   In contrast to the explicit and implicit representations and messages in its advertisements, DraftKings' CEO Jason Robins considered DraftKings' objective "to create a healthy economy where everyone can have fun and the best players can still profit."  As shown in the screenshot below, he told users of Rotogrinders.com - a site aimed at frequent participants of fantasy sports - that the purpose of DraftKings advertising was to attract new, inexperienced players who would lose to the experienced, winning sharks already playing on

---

[71] http://www.espn.com/espn/feature/story/_/id/17374929/otl-investigates-implosion-daily-fantasy-sports-leaders-draftkings-fanduel
[72] http://blogs.wsj.com/cmo/2015/09/16/are-draftkings-and-fanduel-bombarding-fans-with-too-many-ads/
[73] *Id.*; *see also* https://rotogrinders.com/threads/dk-frequent-player-points-130623;
https://rotogrinders.com/threads/draft-kings-emails-your-opponents-to-edit-their-lineups-8230-269716?page=5;
(posts by user JRobs, the online screen name for DraftKings CEO Jason Robins)

the websites who generated the most revenue for DraftKings: "The goal in how we are set up and the tremendous amount of money we spend on marketing are meant to attract and retain casual players, which in turn should make it an attractive environment for those who profit."



300.    On March 2, 2015, FanDuel's management consulting and investment banking partner Bain & Company made a presentation to Comcast, an investor in FanDuel.   The document refers to FanDuel as "Falcon" throughout.  This presentation (hereinafter referred to as the "Falcon Presentation") consists of a series of slides, copied below, that show FanDuel knew many things about its product and its consumers that were the opposite of how it advertised its product.

FILED: NEW YORK COUNTY CLERK 11/23/2015 11:47 PM          INDEX NO. 453094/2015
NYSCEF DOC. NO. 97                                         RECEIVED NYSCEF: 11/23/2015



301.   FanDuel told investors that it expected nearly 1,000,000 new users in 2015, more than 1.5 million new users in 2016 and more than 2.2 million new users in 2017.  At the same time, FanDuel told investors that they would increase their earnings to $42 million in 2016 and $192 million in 2017.  To keep up these aggressive growth numbers, FanDuel needed to attract new users in order to keep their highest revenue users happy.  This slide shows the projected growth promised to investors:



302.    The Falcon Presentation showed that FanDuel knew that it needed to increase the number of consumers to keep the "sharks" - what FanDuel defined as "sophisticated heavy users" - happy since those users produced the most revenue for FanDuel.  According to the following chart, the top 0.1% of players accounted for approximately 40% of FanDuel's revenue, and the top 1% account for more than 60% of FanDuel's revenue.



303.    The Falcon Presentation showed that FanDuel knew that the presence of sophisticated users was driving away the casual users needed for FanDuel's growth and viability.  Bain recommended this "should be mitigated through product design."

- **The biggest risk identified in interviews to date is the increased sophistication of users creating a more challenging environment that makes it harder to win money**
  - Sophisticated heavy users (e.g. "sharks") fear inability to make money; lighter users worry consistent losses will reduce element of fun – These can and should be mitigated through product design

304.    The "customer acquisition strategy" slide noted that "sharks/whales must be balanced with amateurs" and that 1% of FanDuel's customers account for 60% of its revenue.



305.    In a report published in February 2016, the independent research firm Eilers &

Krejcik found that in 2015 "heavy users" represented just 1% of the total active paying users,

but accounted for roughly 60% of the DFS Defendants' revenues.  The 376 "Super Heavy

Users"—defined as those who submit more than 2,500 DFS contest entries per year—

generated 20% of all revenues, spending on average $1.6 million each on entry fees in 2015.[74]

306.    The Falcon Presentation shows that FanDuel knowingly misrepresented its

product to consumers in the multi-hundred million dollar advertising campaign FanDuel used

_____

[74]Eilers & Krejcik Gaming, LLC, <u>Daily Fantasy Sports Industry Report-2016</u>, February 22, 2016

to entice consumers to deposit money.

307.   FanDuel even used the promo code FISH1 in an advertisement to encourage new users to join the site, as the attached screenshot shows[75]:



308.   In the Eccles AMA, FanDuel's CEO described analyzing the benefits of bringing in new players as the best way to help "grinder" (i.e., high volume users) win rates - that is, bringing in new, inexperienced players unlikely to win would help FanDuel's high-value players who make up the biggest source of revenue for FanDuel make more money, and was a better way to help them make more money than reducing FanDuel's fee taken as a percentage of the contests.   He said: "To be honest, at the moment we've focused more on bringing in new players which by our calculations is a lot more important to grinder win rates than cutting rake."   Put simply: FanDuel needed to increase the money high volume users could

---

[75] https://www.ispot.tv/ad/AAQX/fanduel-one-week-fantasy-football-leagues-scott

make, and chose to attract new users through misleading advertising over reducing their fees.



309.    Despite the messages and representations in its advertisements and focus on how easy it was to win money, FanDuel's co-founder testified in an affidavit provided in the lawsuit filed by the New York Attorney General that FanDuel's players play because "it provides a new outlet for their passion about sports, lets them pretend that they are general managers of their own teams, and allows them to test their skills against other sports fans. FanDuel users enjoy making the specific roster decisions associated with shorter-term contests based on more current information about performance, expected playing conditions and anticipated matchups.  They love drafting players and the strategy that goes into picking a team; they love the competition and the thrill of victory and they love that it makes watching the games more exciting."

### III.    DraftKings' and FanDuel's Representations Were False; DraftKings and FanDuel Knew These Representations Were False, And DraftKings and FanDuel Omitted Material Information From Plaintiffs and Consumers

310.    Every single DraftKings and FanDuel advertisement - on television, radio, print, internet, podcast, sponsored content or otherwise - omitted certain material facts that were necessary to make their affirmative misrepresentations not misleading.  Among these material

facts were the following:

    a. Only a miniscule percentage of DFS players made and/or could make a profit. The vast majority of players lost money

    b. New participants would be competing against full-time professional DFS players that the companies referred to as "sharks" or "grinders", and the DFS Defendants referred to new participants as "fish"

    c. Some of those full-time professional DFS players were statisticians or individuals with backgrounds in mathematics and economics who quit positions as analysts with major corporations to play DFS full-time

    d. The full-time professional DFS players had advantages that the ordinary user would never have, including the use of sophisticated computer algorithms and "scripts"

    e. Some of those scripts would allow their owners to seek out and compete against new users against whom they had a large advantage

    f. DraftKings and FanDuel were allowing the use of these scripts by certain users even though their use violated their so-called "Terms of Use"

    g. DraftKings and FanDuel were each allowing employees of the other company to play their contests knowing that those employees had gained inside knowledge that gave them advantages over the average contestants

    h. DraftKings and FanDuel employees were using player histories to seek out and target weaker players in one-on-one or "heads up" contests

    i. DraftKings and FanDuel employees had access to data on winning strategies, player pricing models, optimal lineup construction, and lineup ownership percentages and other data analysis about how to win at DFS that was unavailable to non-employees and that was being used by employees to compete against consumers, giving them a huge edge.

## A.    <u>Multiple States Have Determined DraftKings and FanDuel Are Not 100% Legal</u>

311.    Contrary to the advertisements and representations that DraftKings and FanDuel were operating contests that were 100% legal, public officials in many states have declared them to be illegal, and Legislatures have only now begun to affirmatively legalize DFS.

312.    On April 5, 2016, Alabama Attorney General Luther Strange ("Strange") ordered FanDuel and DraftKings to cease and desist their operations in the state.

313.    Strange argued that while picking players for a fantasy team is an activity of skill, player performance can vary, and Alabama law dictates that it is illegal to risk something of value on any game with an element of chance.

135

314.   On April 29, 2016, DraftKings and FanDuel entered into a settlement to cease operations in Alabama.

315.   On January 27, 2016, Hawaii Attorney General Doug Chin issued a formal advisory opinion stating that daily fantasy sports contests, such as those run by FanDuel and DraftKings, constitute illegal gambling under existing state law.

316.   Both DraftKings and FanDuel no longer operate in Hawaii.

317.   On December 23, 2015, Illinois Attorney General Lisa Madigan issued an opinion stating that daily fantasy sports offered by FanDuel and DraftKings constitute illegal gambling.

318.   Both DraftKings and FanDuel continue to operate in Illinois.

319.   On October 16, 2015, the Nevada Attorney General issued a determination letter, in response to a question posed by the Nevada State Gaming Board, and represented that the "contests" offered by FanDuel and DraftKings constituted gambling that required a license pursuant to Nevada law.

320.   The Nevada attorney general based his conclusion of unlicensed gambling on the fact that participants that placed bets using FanDuel and DraftKings DFS schemes had no control over the outcome of events. He also cited the inherent randomness in DFS schemes as well as the prize structures offered by the bookies as indications that the services offered constituted gambling.

321.   Currently, DraftKings does not operate in Nevada.

322.   Currently, FanDuel does not operate in Nevada.

323.   On June 2, 2015, the Louisiana State House considered and killed a bill, proposed by Representative Joseph Lopinto (H.B. 475), which would legalize daily fantasy

sports in Louisiana.

324.     As such, daily fantasy sports such as FanDuel and DraftKings are considered to be illegal in the state of Louisiana.

325.     Louisiana's H.B. 475 encountered lobbying opposition from foundations like the Louisiana Family Forum (who feared that players could develop addiction to daily fantasy in the same vein as gambling addiction) and regulatory/governmental organizations such as the Louisiana Video Gaming Association.

326.     In 1991, then-Louisiana AG William J. Guste, Jr. found fantasy football contests to constitute gambling, and thus are illegal.

327.     DraftKings does not operate in Louisiana.

328.     FanDuel does not operate in Louisiana.

329.     On October 6, 2015, the Office of the New York State Attorney General commenced an investigation of FanDuel and DraftKings.

330.     The attorney general asserted that FanDuel and DraftKings' services constituted illegal gambling pursuant to the New York State Constitution and  NYPL §§ 225.00-225.4.

331.     In addition, the New York State Attorney General served notice on the parties pursuant to New York State General Business Law §§ 349 and 350 as well as Executive Law §63(12).

332.     Attorney General Schneiderman based his conclusions on the nature of the wagering offered by FanDuel and DraftKings, stating that the control the operators have over the schemes and the quick turnaround between the contests create the essence of the illegal gambling scheme.

333.     On December 11, 2015, the Honorable Manuel Mendez of the Supreme Court of

the State of New York ordered FanDuel and DraftKings to shut down and stop accepting entry fees, wagers, or bets from New York consumers.

334.    On January 11, 2016, the Appellate Division of the Supreme Court for the First Judicial Department granted FanDuel and DraftKings stays of a preliminary injunction ordered by the Supreme Court of the State of New York.

335.    On March 21, 2016, FanDuel and DraftKings agreed to halt their business in New York.

336.    On January 19, 2016, Texas Attorney General Ken Paxton declared that daily fantasy sports would likely be considered to be gambling if the issue arose in the courts.

337.    On March 4, 2016, Texas Attorney General Ken Paxton announced that the state reached a settlement with FanDuel that would have FanDuel leave the state on May 2.

338.    DraftKings continues to operate in Texas.

**B.**    **DraftKings and FanDuel Helped Create An Unfair Playing Field, A Rigged Game, One That Was Not Simple and Easy To Win, And One In Which Only Few Players Won**

339.    Contrary to what DraftKings and FanDuel told consumers in advertisements, their contests were in fact rigged in favor of a few sophisticated, heavy users.

340.    While telling consumers one thing in advertisements, DraftKings' CEO personally marketed DraftKings to high volume users on rotogrinders.com as "a site where your competition is more likely to be someone who is looking to play without having to put a lot of time into it" because those players were not as good, and that "a lot" of new players don't "learn and get better" the more they play. He posed a rhetorical question that makes clear the advantages to grinders and reason casual players were necessary: "Wouldn't you rather play

against someone that you know is putting way less time into analysis than you are?"[76] A screenshot of his full comments:



341.    In contrast to the explicit and implicit representations and messages of their advertising, DraftKings CEO noted in another Rotogrinders post that good players "are good for a reason - they understand how to analyze stats and construct winning lineups." [77]

> - Smart stacking is absolutely a good strategy, but it is not the only winning strategy. Good players, stackers or non, are good for a reason – they understand how to analyze stats and construct winning lineups. Stacking is just one of those things that people love or hate, and like all polarizing issues, people tend to be pretty vocal about it.

---

[76] https://rotogrinders.com/threads/draft-kings-emails-your-opponents-to-edit-their-lineups-8230-269716?page=7
[77] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=5

342.   Although DraftKings advertising showed the players that won a lot of money, the vast majority of DFS players lost money.   According to DraftKings data obtained by the Office of the New York State Attorney General, between 2013 and 2014, 89.3 percent of players had a negative return on investment.

343.   Unlike what FanDuel told consumers in its advertisements, FanDuel told its investors that only the top 0.1% of users actually win money.   The top 10,000 users had a negative 9.5% return on investment. A chart of FanDuel data in the Falcon Presentation shows the average return of the top 0.1%, the top 1% and the top 10,000 users, and shows that only the top 0.1% have ever had a positive return:



344.   As shown in another slide from the Falcon Presentation, FanDuel knew that "[a]mong valuable users, the disparity between Falcon's 'winners' and 'losers' is growing."   That is, the top players were increasing their winnings and more people were losing.   This presentation is from March 2015, while FanDuel was spending tens of millions of dollars on advertising with the opposite message to consumers and shortly before FanDuel's huge

increase in advertising spending. This slide also shows why FanDuel had to attract casual players and "fish" to their website: the top users needed people who they could easily beat and from whom they could take money.



345. FanDuel's own data provided in its litigation with the New York Attorney General showed that most of the money in fantasy football contests went to a few players at the very top. For instance, in single entry tournaments and leagues, the top 1% won 40.3% of the money, and the top 10% won 73% of the money. In tournaments where users could enter multiple lineups, and users with sophisticated computer programs could automate this process and gain a huge advantage, the top 1% won 51.7% of the money and the top 10% won 78.6% of the money. In contests known as multiplier tournaments and 50/50 contests, the top 1% won 46.7% of the money, the top 10% won 77.8% of the money and the top 20% won 87% of the money. These numbers were substantially similar for 2014. Thus, under FanDuel's own internal data, known to them, it is not easy or simple for the average player to win and is in fact virtually impossible for the vast majority of players to win.

346. FanDuel's actions helped to create this rigged game. Two slides from the

Falcon Presentation copied below shows that FanDuel's sharks wanted the ability to play in more games and make mass line-up changes easier.  Another slide showed that FanDuel's growth could come from two sources: new users, and increased number of entries per sport. That is, FanDuel knew that its highest revenue producing players wanted tools to help them win, and knew that growth would come from helping those players win in two ways: attracting new, inexperienced players and making it easier for these sharks to play high volume contests through automated systems.  In addition to its advertising campaign focused on attracting new, casual players, FanDuel explicitly allowed certain users to use scripts.

## Among heavy users, there are a few factors that vary

PRELIMINARY  LOW N

| FACTOR | RANGE OF HEAVY USERS WE SPOKE TO | QUOTES |
|---|---|---|
| Background | • Math/Econ background who quit analyst position at major corporation to play DFS full-time<br>• 'Fantasy expert' who plays DFS, writes articles, and has a show<br>• Professional sports better who transitioned to DFS<br>• Part-time players with full-time or part-time jobs outside DFS | "In addition to playing DFS I **write for a DFS site and have a show**. Between all of that and watching games it's a full-time job."<br><br>"I am a **sports better by trade** and stumbled across the daily stuff 2 years ago." |
| Career | • Full-time DFS players who focus on entering contests<br>• Full-time DFS players who produce DFS content (articles etc.)<br>• Part-time DFS players who have other jobs | "**DFS is a full-time career** for me."<br><br>"**I am an accountant** and spend a few hours each day on DFS." |
| Motivation for playing DFS | • Purely financial<br>• Combination of financial and fun<br>• Combination of financial and sports interest | "Mix of work and fun...but I approach it with the **goal of making money.**"<br><br>"It gets you **closer to the game**... **challenge** each day...**money aspect.**" |
| Frequency of play | • Many play at or near the Falcon-imposed caps (max of 500 entries/day for NBA) | "**I would make more entries** if Falcon would allow them." |
| Magnitude of play | • Many play at or near the Falcon-imposed caps (max of ~40-50K in entry fees) | "I was one of the players who **hit the dollar cap** on bets you can place in one day." |
| Approach to selecting lineup | • Sophisticated users with sophisticated statistical models programmed in R<br>• Semi-sophisticated users who use complex excel models and traditional research<br>• Less-sophisticated users who use basic excel model and/or traditional research | "...went to college for math and econ. I **use R** to run **models and algorithms** to predict player performance."<br><br>"**I don't have a model I run**. Numbers stick in my head...I primarily use a notebook to keep track of the stats I research." |
| DFS sites used | • Sophisticated users who view sites used as a capital allocation decision (primarily use Falcon due to scale)<br>• Duel users of Falcon and DraftKings who value higher win percentages on Falcon (perception of less sophisticated player base)<br>• Die-hard Falcon loyalists (value perks like sports tickets) | "We allocate our bankroll based on size of player base and type of players...**allocate to where we will earn the highest return.**"<br><br>"The **volume on Falcon** is much better."<br><br>"One of the top reasons I play one-day is Falcon. The **company and people are great** and have treated me really well." |

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

BOS    Project Falcon interim update_v6    **26**

CONFIDENTIAL TREATMENT REQUESTED BY COMCAST

COM-00000222



347. One of the issues FanDuel faced in attracting new players, as shown in the slide below, was that the "increase in sophistication of users base…may impact future play of heavy users" because increased sophistication of users would drive away many players. That is, making these easier for the high-volume winners drove away the casual customers necessary to make FanDuel financially viable.



**Players perceive increase in sophistication of users base; may impact future play of heavy users**

PRELIMINARY   LOW N

| LIGHT USERS ARE AWARE OF SOPHISTICATED PLAYERS BUT FEEL 'SAFE' IN LOW-ENTRY GAMES | HEAVY USERS WANT TO CONTINUE TO PLAY BUT MAY REDUCE FREQUENCY OF PLAY IF SOPHISTICATION INCREASES |
|---|---|
| *Light users feel they will face sophisticated 'pros' in higher entry fee games* | *Heavy users have observed an increase in the level of sophistication of the player base* |
| "It's less appealing to play in the higher buy in **games** because that is where people are doing a lot more work and analysis to maximize performance... I'd be going up against the pros." | "Basketball is the sport with the biggest gap between 'knows' and 'don't knows.' Overall basketball players have definitely gotten a lot sharper. **You have to get better or your win percentage is going to go down.**" |
| "Those types of players...would **discourage me from playing any of the large contests**." | "The good thing is there are always new players signing up, but I'd say that the **competition at the top has gotten a little harder**, but you can still win without finishing first." |
| *Increasing sophistication may make them less likely to play* | *There is a tipping point at which they will reduce their volume of play* |
| "I probably started using Falcon less because of the fact that I was losing money. It takes a lot of time to do well and **you are bound to run into the types of people who will take your money.** If I knew the quality of the opponents was lower I might play more." | "Increased sophistication would make this more of a source of entertainment for me than a business... **when it truly becomes a level playing field where outcomes are based on luck I would have to reduce my play.**" |
| "If I put up **significant amounts of money I'm not likely to win.** If I put in less money my chances might be higher but the amount of money is too low for it to be worth my time." | "It's hard to say if this will affect the amount I play as it depends on a lot of factors...**there is a possibility I'd have to stop doing this in the near future but I hope not.**" |

Note: heavy users defined as those who enter 100+ DFS contests/week on average
Source: Consumer interviews

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent    BOS   Project Falcon interim update_v7   31
CONFIDENTIAL TREATMENT REQUESTED BY COMCAST                                    COM-00000227

348.   FanDuel also knew that high volume users wanted to be able to manage large numbers of lineups easier, as this slide shows:

**~~MANY USERS WISH IT WAS EASIER TO SIGN UP~~ FOR GAMES AND MANAGE LINEUPS**

*"Signing up for games could definitely be easier... I think DraftKings definitely makes it **easier to sign up for games**."*

*"Falcon **locks your lineup** after your first game is played. This annoys us, because we can't change things just before a game starts."*

*"If you have multiple lineups, Falcon's interface isn't as good as DraftKings to **make last minute changes**."*

*"Falcon makes it really **hard to manage your teams when you have multiple lineups**. To change a lineup, you have to go specifically into that lineup."*

349.   FanDuel thus knew that advertising the true nature of its product would *not*

attract the casual players it needed, and therefore deliberately chose to misrepresent its product and omit material information as described in detail above, and chose to rig the rules and mechanics of the website to the favor of the high-volume, revenue producing sharks.

350.    Other data shows that remarkably few people were winners.  In the first half of the 2015 Major League Baseball season, 91 percent of player profits were won by just 1.3 percent of players.  The top 11 players paid on average $2 million in entry fees (17% of all entry fees) and profited $135,000 each.  The rest of the top 1.3% averaged $9,100 each in entry fees (23% of entry fees) and took in 77% of all profits ($2,400 each).  In contrast, non-professional player, eighty percent of all players make small bets.



351.    Moreover, to overcome the "rake", the roughly 10 percent service fee DraftKings and FanDuel take out of each wager, a player must win approximately 53 percent of his or her bets.  The most efficient way to hit that number is to play as many bad opponents as possible.

352.    Denver-based DFS shark Charles Chon, screen name Condia, discussed his big winnings ($1,000,000) in this YouTube video: https://www.youtube.com/watch?v=vL-zc-rBFFE

353.    Condia "... would ascend to the top spot of the Rotogrinders rankings. It would be a spot he would hold for the better part of the next four years."

354.    Condia was:

• Ranked #1 on the Rotogrinders NFL Seasonal Leaderboard for the past four NFL seasons.
• Ranked #1 on the Rotogrinders NBA Seasonal Leaderboard for the past two NBA seasons.
• Has been the monthly #1 Grinder well over ten times.
• 2015 DraftKings WFFC Finalist (6x) – finished 3rd.

355.    During the football season Condia and his partner Nick Dunham (screenname: 1ucror) "... can enter 5,000 contests per start time, or $30,000 to $50,000 in entry fees."  "It's a team effort. We don't run 5,000 different lineups, it's more like five or six. There are weeks when we return over six figures in profit, but we are happy with anything above 10 percent," he told CBS.  Condia acknowledges bottom feeding, aka "bumhunting", targeting lesser players for maximum profit: "I pretty much avoid playing against anybody in the top 20 of the Rotogrinders rankings, and any other names that I have seen put up respectable teams because if you're playing against other good players, then you're probably both essentially just giving away money to the website through the rake," he told an interviewer for rotogrinders.com.

356.    Analysis from the website Rotogrinders for Bloomberg Businessweek revealed that the top 10 players on DFS sites, combined, win on average: 873 times/day and the remaining field of 20,000 players combined win on average a total of only 13 times per day.

357.    In an affidavit provided on behalf of FanDuel in its litigation with the Attorney General of New York, David Dodds, the CEO of footballguys.com, a website "devoted to

146

providing up to date statistics, information, and strategy for players of fantasy sports" provided

detailed information about how much skill and work went into winning at DFS.

358.    He testified that, far from being simple and easy to win, or based on general

sports knowledge and experience playing season-long fantasy sports:

a.   "The strategies of successful fantasy sports participants across all types of contest formats are largely the same. Participants base their player selections on historical performance, statistics, research and trends, all in an effort to strategically assemble individual athletes into an optimal lineup."

b.   "As explained below, the skill required to be successful in DFS contests is even greater due to the challenges inherent in adhering to a salary cap and evaluating all of the real-time information available in a daily contest."

c.   "Much like a skilled general manager evaluates an enormous amount of data and information before drafting, signing, or trading for a player, fantasy sports participants evaluate similar information. Among other relevant information, participants will look at past performance, injury history, performance trends of statistically comparable players, the particular strength of schedule for an athlete's team, the coaching philosophy of a given athlete's team, and any changes to league rules that might be likely to influence an athlete's statistical performance."

d.   "In my opinion, DFS requires an even greater number of skill-based judgments than season-long fantasy contests in order to assemble a winning roster. In particular, DFS requires participants to make decisions on a daily or, in the case of football, weekly basis with respect to which athletes to place on their teams. Because each contest allows participants to select from all of the players in a professional sport, participants must evaluate the full universe of relevant information for each athlete in order to make informed selection decisions."

e.   "Each week participants must take into account an enormous array of information including: team matchups, player matchups, whether an athlete is playing at home or away, injury reports, recent performance trends, any recent trades, news with respect to which players might receive more or less playing time, field conditions, weather forecasts, and changes to coaching personnel. Like the stock market, this data is available to all participants, but a participant's skill is reflected in how a particular player interprets that data."

f.   "Furthermore, DFS participants must also employ a more "micro" strategy, dependent on an array of factors specific to that day. For example, a star pitcher in a season long fantasy baseball contest may be a participant's first and most valuable selection because of the pitcher's likelihood of success over the course of an entire season. But in DFS, if that same star pitcher's strength is his curve ball and he is facing a team of superior curve ball hitters, that pitcher may not be a smart selection."

359.    DraftKings' Director of Analytics testified about the true nature of DraftKings'
product, skills required to win, internal research and knowledge about optimal strategies, all of
which contradict the implicit messages and explicit representations in DraftKings'
advertisements.  Specifically, he testified that:

a.  "DraftKings' contests are incredibly complex, and their results are not tied to
    the outcomes of real-world sporting events."

b.  "The 'challenge' of DFS - and the skill set required to play DFS successfully -
    has absolutely nothing to do with correctly predicting the ultimate win-loss
    outcome or margin of victory of a basketball game or soccer match.  Instead,
    the relevant skill set involves accurately projecting the performance of
    individual athletes *and* strategically assembling individual athletes into
    optimal lineups given the constraints of the salary cap and the payout structure
    of the contest."

c.  "Sophisticated DFS players know that the 'optimal' lineup construction varies
    dramatically by contest type. In a head-to-head contest against a single DFS
    opponent, the optimal lineup strategy primarily involves avoiding risk and
    maximizing the minimum expected fantasy output of each lineup slot within
    the salary cap. In a large-field 'Guaranteed Prize Pool' (GPP) tournament
    (such as the highly publicized Millionaire Maker), however, merely
    outperforming a single opponent or 50% of a tournament field is not good
    enough, since large GPP contests generally award prizes only to the top 20%
    of entries. GPP prize pools are often so top-heavy, in fact, that fewer than the
    *top 1%* of entries earn a prize of at least five times the entry fee. The
    implication of this—something sophisticated players understand—is that
    sustaining success in GPP contests over time requires employing an extremely
    high-variance, high-upside lineup construction approach (e.g., 'stacking' a
    quarterback and his top pass-catcher in the same DFS lineup; targeting
    individual players historically proven to be "boom or bust" performers; or
    targeting lesser known, 'contrarian' players expected to be selected by
    relatively few other DFS users)."

d.  "Compared to traditional season-long fantasy sports, DFS is significantly
    more skill-based because two primary factors *outside* a user's control—athlete
    injuries and unforeseeable poor performance—have no lasting impact beyond
    a single fantasy contest. In the same vein, DFS forces a user to take into
    account additional factors about the games on a given weekend such as
    weather variables, specific matchups of teams, specific matchups of athletes,
    and many other factors—all of which would not typically be taken into
    account in traditional season-long fantasy sports. Thus, where a season-long
    fantasy player might have to choose whether to start either Tom Brady or Kirk
    Cousins in a given week if those are the only quarterbacks on the player's
    roster (an easy decision since Brady is having an MVP-caliber year to date), a
    DFS player in a given week's contest has to make a much more nuanced,

thoughtful decision – the DFS player has to analyze which of the 32 starting quarterbacks to select at their respective prices, keeping in mind that that decision will affect the rest of the player's lineup and how much money he or she can spend to buy the other athletes in his or her lineup."

e. "Miller and Singer also identified two primary ways in which skilled users succeed over unskilled users: (1) skilled users employ lineups that take advantage of covariance by choosing multiple athletes from the same real-life team to produce the extreme DFS outcomes— good and bad—that are necessary to win an occasional "big score"; and (2) skilled users exploit salary cap pricing inefficiencies by using sophisticated models to optimize their lineups by projecting which athletes are most likely to under- or over-perform relative to their salary on a given day. Practically speaking, then, skilled players often use lineups that take advantage of covariance, meaning that they realize that if New York Giants quarterback Eli Manning has a good game, then that likely correlates to his primary wide receiver Odell Beckham, Jr.'s also having a good game. This type of sophisticated knowledge of a given sport once again highlights the advantages that a skilled player has in DFS contests."

360.    This sophisticated information is available to DraftKings and FanDuel employees and helps them compete against consumers and users on the other site.  DraftKings and FanDuel each knew that the employees of the other site, playing on their own site against their other customers, had access to this type of sophisticated analytics, strategy, data and other edges, and knew this would give employees of DFS sites a huge edge over non-employees and the average players.

361.    The knowledge by DraftKings and FanDuel about the true nature of their products and what it takes to win are in direct contrast to DraftKings and FanDuel's explicit and implicit advertising message about how "easy" and "simple" it was to play and win, how a love of sports and season-long fantasy sports could be used to win on DraftKings and FanDuel, and how anyone could win.

362.    The New York Times describes DFS as "... a rapacious ecosystem in which high-volume gamblers, often aided by computer scripts and optimization software that allow players to submit hundreds or even thousands of lineups at a time, repeatedly take advantage of

new players, who, after watching an ad, deposit some money on DraftKings and FanDuel and start betting.  Both companies mostly looked the other way. "[78]

363.    On March 6, 2015, the Orlando Magic and the Sacramento Kings played an essentially meaningless late-season NBA game.  Roughly 45 minutes before the game, the Magic announced that their starting center would not play, and that career journeyman Channing Frye would start instead.  Frye, a sub who averaged just over 7 points a game that season, would score 22 that night—his personal best for the season. With time running out before that night's $400,000 NBA tournament on DraftKings would "lock" - that is, no more changes to lineups could be made by users - high profile shark Maxdalury (real name Saahil Sud) nonetheless was able to quickly change most of his 400 separate lineup entries in the tournament to reflect the last-minute news that Frye would start.  Competing against nearly 23,000 entries in the tournament, Maxdalury's lineups took first place in the tournament. And third.  And fourth.  And seventh.  It is thought he won upwards of $500,000.  Maxdalury's use of a computer script, a list of commands that a computer can execute without the user's interaction, allowed him to make those changes nearly instantaneously.[79] No ad for DraftKings or FanDuel ever told consumers they would be competing in contests against users like this, and instead touted how easy it would be to make money.

364.    Maxdulary found success playing Major League Baseball contests as well. In May 2015, he won the DraftKings $1 Million Mega Payoff Pitch for $100,000. His win in this contest attracted a lot of attention as he submitted an astounding 888 lineups, finishing in 29 of the top 100 spots including 1st, 3rd, 6th, 8th, and 9th, for total winnings of $221,000.

---

[78] http://www.nytimes.com/2016/01/06/magazine/how-the-daily-fantasy-sports-industry-turns-fans-into-suckers.html
[79] *Id.*

365.   A Bloomberg article[80] about DFS makes clear how difficult it is for the average contestant to win: "Does the influx of new [DFS] players in September make for easier money? Sud laughs at the question. 'A lot easier,' he says."  The article also states: "These ads never spell out a simple truth about daily fantasy competitions: while any player might get lucky on the back of a handful of entries, over time nearly all of the prize money flows to a tiny elite equipped with elaborate statistical modeling and automated tools that can manage hundreds of entries at once and identify the weakest opponents."

366.   When evidence of the competitive advantages enjoyed by these high-volume players became too overwhelming for the companies to ignore, DraftKings and FanDuel enacted rules that actually protected the high-volume players rather than regulated them to protect the average player.  A stricter ban on computer scripting would have been functionally impossible — because, as a representative of FanDuel said, DFS companies cannot reliably detect computer scripting.

367.   Matthew Primeaux, CEO/founder of the DFS site Victiv, said: "Constructive scripts simply attempt to make tedious or repetitive tasks easier or faster for the users … destructive scripts are those that are used to automatically target contests with specific types of users or scripts used to make last-minute, broad-sweeping lineup changes that aren't offered to all players equally."[81]

368.   In July, 2015 instead of banning scripting, or at least forcefully regulating it, both DraftKings and FanDuel announced that they would permit some scripting.  According to the New York Times, DraftKings founder Matt Kalish "told ESPN's David Purdum in July that the decision had been made to 'increase and improve the experience for a couple of users, who

---

[80] http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football
[81] http://espn.go.com/chalk/story/_/id/13259540/are-computer-scripts-bad-daily-fantasy-sports-chalk

I think were experiencing a very poor usability of the site.' In other words, DraftKings had decided to accommodate players who wanted to modify the site to their own specifications. FanDuel, for its part, clarified its position on the practice and asked players to send in their scripts for 'approval.' This, by definition, is a game played by different rules."[82]

369.    Buried in Defendants' Terms of Use are provisions allowing these computer software advantages at Defendants' discretion.   DraftKings: "In certain circumstances, the Company may permit the limited use of scripts on the Website.   Please contact support@draftkings.com for further details."[83]   FanDuel: "you agree not to... use any robot, spider, scraper, sniping software or other automated means to access the Service for any purpose (except for RSS feed access) without our express written permission."[84]

370.    DraftKings changed its script policy and notified high-volume users directly through the rotogrinders.com website and, upon information and belief, direct contact with certain power users.   On July 8, 2015, a DraftKings employee/owner posted this notification in the rotogrinders.com forums, as shown below:

---

[82] http://www.nytimes.com/2016/01/06/magazine/how-the-daily-fantasy-sports-industry-turns-fans-into-suckers.html
[83] DraftKings Terms of Use, updated August 18, 2015
[84] FanDuel Terms of Use, updated August 1, 2014



371.    While providing this scripting and lineup management service to a select few, preferred users, DraftKings did not advertise this new policy to consumers generally and included only this information buried in its Terms of Use: "In certain circumstances, the Company may permit the limited use of scripts on the Website. Please contact support@draftkings.com for further details."  Like its advertisements, DraftKings was telling high-revenue producing users one thing and consumers generally another.

372.    DraftKings had the ability to communicate this to consumers through its advertising, or its own website, but communicated the changes in a way that appeared to be

trying to, as one commentator on the website dfsreport.com colorfully put it, "sneak a fastball by the DFS community" how they actually did it. [85]

373.    Upon information and belief, high volume players already had been able to use these methods and had been engaging in these behaviors, and that DraftKings knew and permitted certain preferred users to violate the terms of use, by using scripts to have their large advantage over other users.[86]

374.    Scripting gave material advantages to players who had them over average users who did not, and there was no way for consumers to know if players they were competing against had this advantage.  However, DraftKings and FanDuel each actually knew which players were using scripts and expressly permitted this unfair advantage in order to cater to high-volume and therefore high revenue producing users.

375.    FanDuel's Terms of Use also misled consumers about the true extent of scripts and other unfair advantages on their website: "use of any robot, spider, scraper, sniping software or other automated means to access FanDuel is only allowed with our express written permission."  FanDuel told users that it required someone to apply for permission through a support ticket, but that "under no circumstances will permission be granted for purposes of scooping multiple head to head contests from the same opponent or opponents (or for other harmful purposes such as cancelling out contests against specific opponents)."[87]

376.    However, FanDuel did not disclose to consumers that it maintained the ability to give some players access to scripts and deny other players, what criteria was used, which users

---

[85] https://rotogrinders.com/threads/official-update-to-scripting-policy-on-draftkings-743658;
https://dfsreport.com/5244/scripts-bots-and-draftkings-terms-of-service/
[86] https://rotogrinders.com/threads/official-update-to-scripting-policy-on-draftkings-743658;
https://dfsreport.com/5244/scripts-bots-and-draftkings-terms-of-service/
[87] https://rotogrinders.com/threads/clarification-of-fanduel-policy-on-automation-updated-7-14-744491?page=11#reply-749374

were using scripts, or in any way, shape or form that FanDuel could rig the game through allowing or not allowing scripts.  That is, as the Falcon Presentation showed, FanDuel's high volume users were its source of revenue growth, and FanDuel's decision to allow scripts through a secret process prevented the average consumer from having any idea how rigged FanDuel's contests were.

377.    FanDuel omitted this material information from all advertisements about their products, and omitted all information about how many scripts were being used, who was using them, how they affected contests or any information whatsoever about how the use of scripts by preferred individuals made the game "easy", "simple" or winnable for the average players FanDuel targeted with its advertising.

378.    FanDuel allowed scripting because high revenue producing players wanted it. FanDuel's communications director admitted this to the New York Times: "I asked Justine Sacco why FanDuel allowed scripting at all. She told me: 'You want to allow people on the site to make their experience meaningfully better. So the idea that big players can't bring in features to improve their time, honestly — it feels a bit Orwellian.'…When asked if part of FanDuel's decision to allow scripts was based on a desire to keep players from taking more of their business to DraftKings, Sacco said, 'You do have to take that into account — if someone is playing hundreds of thousands of dollars and comes and says, "I have some ideas that would help me keep doing what I'm doing," only a bad business would not take that into consideration.' Sacco also said that one reason FanDuel allowed some scripting was that the company could not completely stop it. This confirms the suspicions of many in the D.F.S. community who believe that DraftKings and FanDuel do not regulate scripts because they have become so sophisticated that the companies simply don't know how to detect or disable all of

them."[88]

379.     ESPN reported that "High-volume players are so sophisticated that their computerized scripts and other automated systems are often invisible to the sites, Harber and other high-volume players say, though the sites deny that."[89]

380.     In January 2016, DraftKings banned scripts completely.

381.     In March 2016, FanDuel banned scripts completely.

382.     In addition, FanDuel recognized the harm to consumers of power users seeking out poor users, but allowed their employees to do so on other DFS websites and allowed employees of other DFS websites to play against their own customers in this way.

383.     As shown above, the DFS Defendants market that the average user can win hundreds of thousands or millions of dollars in a simple, easy contest of skill.  But the DFS Defendants do not disclose the use of these tools to gain an unfair advantage, or the identity of the users, whose high-volume play generates millions of dollars for the Defendants through the "rake", their portion of the entry fees.

384.     The DFS Defendants knew that scripts gave players an advantage, and affirmatively chose to allow high revenue producing players to use scripts to have an advantage over other players.  The DFS Defendants created advertising campaigns that intentionally and fraudulently omitted this material information from consumers specifically to entice them to deposit money on their websites and enter contests, and did so specifically to make it easier for high revenue producing players to profit and continue to produce revenue for DraftKings and FanDuel.

---

[88] http://www.nytimes.com/2016/01/06/magazine/how-the-daily-fantasy-sports-industry-turns-fans-into-suckers.html
[89] http://www.espn.com/espn/feature/story/_/id/17374929/otl-investigates-implosion-daily-fantasy-sports-leaders-draftkings-fanduel

385.    The DFS Defendants created a rigged game that only a few could profit, and advertised it as the exact opposite for the express purpose of producing revenue for the DFS Defendants through new players and keeping preferred players happy.

C.    **DraftKings and FanDuel Acted In Concert To Allow Their Employees To Use Inside Information To Gain Unfair Advantage Over Plaintiffs and Consumers**

386.    DraftKings and FanDuel omitted material information about their concerted actions to allow employees with insider information that gave them a huge edge to play against their own consumers.

387.    DFS customers play against each other by choosing a line-up of players at certain positions until they have reached a "salary cap" for their team, and then entering tournaments with entry fees as low as 25 cents and as high as $5,300.  The players whose fantasy teams score the most points – based on the real statistics of those players in that game – win the most money.

388.    The biggest advantage any player can have come from data and information that is not universally shared.  DraftKings' and FanDuel's employees have access to both of these, neither of which is public.

389.    Vice President of Analytics for DraftKings testified, DraftKings performs analytics to determine winning strategies, return on investment of certain strategies and even how lineups on FanDuel would do if they were entered into DraftKings contests.  DraftKings knows the value of this data and knows that it should not be shared, according to DraftKings CEO Jason Robins, in a post on rotogrinders.com[90]: "The reason that I don't want to give the actual numbers is because I believe it creates a slippery slope where people start requesting stats on win rates of various strategies, which I believe is not a positive thing… That said, I

---

[90] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=5

really don't think site owners should be sharing stats on winning vs. non-winning strategies. Part of what makes this a skill game is that people who are skilled at it can figure out for themselves how to win consistently. And on that note, I do also want to point out that skilled stacking is absolutely a winning a strategy on DK. There are plenty of people who stack and win very consistently."  He went on to point out: "A lot of mixed teams that are winning on other sites would fade the stacks on DK [beat the lineups using stacking] and win if they were just entered. But they are not being entered. Take a look at some other site winning lineups and add it up for DK, you'll see it happening."  This shows that DraftKings employees had access to sophisticated information about how lineups on FanDuel would do against DraftKings lineups, and vice versa, and could use their internal data to compete and win on FanDuel, and vice versa.

390.    In addition to years of data on optimal strategies, which gives DFS Defendants' employees a huge advantage over even the most "skilled" DFS players, DFS Defendants' employees also have real-time access to data on current lineups of every player in every contest, and the overall ownership percentages of every player.

391.    Defendants also set player pricing through certain proprietary models, and this data provides them with details about the value of certain players that other contestants do not have.

392.    Because the goal is to beat the other players, a player with statistical data about ownership percentages of competitors would have an advantage over players without this data in many ways, including the ability to make rosters with enough players different from competitors' rosters.

393.    Indeed, a DraftKings employee accidentally posted ownership percentages

online before they were supposed to be publicly available – that is, before all of the contestants' lineups were "locked" and could therefore still be changed. This employee initially claimed he was "the only person with this data and as a [DraftKings] employee, am not allowed to play on site."

394. However, the same week that he posted roster data before he was supposed to, this same employee played on FanDuel and beat 229,883 entrants, coming in 2nd and personally winning $350,000. An analysis of this employee's previous DFS history shows a remarkable increase in winnings since moving from a job with rotogrinders.com covering DFS to inside DraftKings working for a DFS company.

395. DraftKings and FanDuel, in concert, said that this employee beating 229,883 people the same week it was made clear he had access to ownership data was a "coincidence."[91]

396. In all, DraftKings employees have won at least $6,000,000 playing on FanDuel, according to a FanDuel representative, which is more than one million dollars per year considering DraftKings is only a few years old.[92] The ability of FanDuel to calculate that information within days of public knowledge shows the concerted actions taken by FanDuel and DraftKings to share employee data, and shows that FanDuel could easily track which players are from other DFS sites and can track how much they are winning, losing or otherwise what the possibility is that other DFS employees are using non-public information, data and insider strategic information.

397. DraftKings was well aware that its employees were playing at FanDuel, and aware that some of its employees made more money from winnings on FanDuel than the actual

---

salaries that DraftKings was paying them.[93]

398.   Robins admitted that he "had reservations" about allowing employees to play on other sites and allowing other sites' employees to play on his site, and even spoke to his competitors about ending the practice, but ultimately decided, in concert with his competitors, to continue the practice.  Robins said: "And I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one in place."[94]

399.   In that same article, Robins admitted that numerous employees have access to data that could give players an advantage, including customer service and engineering workers.

400.   On rotogrinders.com, as the below screenshot shows, Robins had previously discussed any sort of issue that affected "game integrity" as fraud, and literally the first person to respond is the line-up leaking employee who won $350,000 on FanDuel:

---

[93] https://www.bostonglobe.com/magazine/2015/12/03/inside-draftkings-war-room-fantasy-sports-battle-rages/DAX8tBAZBOEX9kr6zoeOfM/story.html; https://www.bostonglobe.com/business/2015/10/05/draftkings-bans-employees-from-competitors-sites/s36ig5e0eV0OR9C55R8hwL/story.html
[94] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/

**JRobs**                                                           2 years ago



*DraftKings CEO*

This is a very interesting topic. One of the things DraftKings has been talking about from day 1 is fraud prevention, and while I cannot speak for other sites, I would imagine that many of the basic steps we have taken have been adopted by most. There is a whole category of payment fraud and identity fraud that we focus on, but I will focus here on the game integrity question since that is the one that was raised.

First off, we built our customer support tools interface so that the same rules that apply to players on the site also apply to what our customer service representatives can do. In this case, that means that when games start and rosters lock, changes are no longer possible for either party. We have had people contact us claiming their screen "locked early" before they could make a swap and asking us to do it for them. Unfortunately, even if we wanted to, our customer support team literally can't do this.

However, it is possible that someone on our tech team could manually go into the database and change something by writing code. Aside from simply being VERY selective about who we give database access, we recognize that there is a need to protect against fraud here. Not only could a rogue employee be disruptive, but someone could attempt to hack the database, as well. I cannot go into detail about what exactly we do here, but we have put a lot of safeguards in place to prevent this. Additionally, we have very strong monitoring tools and reports that flag suspicious activity or things that simply should never be happening on the site, such as a lineup change made later than a contest start time. There are many other things we look for, as well, and we have actually caught a few players that were attempting fraud. A good sign to me is that every one of them has been caught immediately following their first fraud attempt and each one has been banned from the site by pretty much any identifiable characteristic – name, username, address, and even IP address.

Of course, fraud is an issue that (as Cal mentioned with poker) is naturally going to be a lightning rod for the DFS industry as it grows. I would love to see the sites start to band together on these things to help put current players at ease and make new players more comfortable giving DFS a try. I know within certain industries, fraud techniques are widely shared amongst competition, and I think it serves all of us well to minimize fraud on anyone's sites, not just our own. One no-brainer to me is some sort of public exchange between sites and affiliates of "known fraudster" lists. There is no reason why someone banned from one site should easily be able to go play on another. This is something we have talked about a lot internally, so I'd be interested to hear if other site reps out there think there might be broader interest within the industry in getting something like this going?

                                                                Reply Quote Link

**Ethan**                                                          2 years ago



*DraftKings Rep*

Awesome detailed response, Jason.

                                                                Reply Quote Link

401.    In that post, Robins uses the word "fraud" or "fraudster" nine times.  Robins also discussed how sophisticated its data analysis and fraud prevention efforts were, including tracking users by their Internet Protocol, or IP, addresses.  Thus, DraftKings could easily monitor users who worked for FanDuel or other sites to determine their winnings and whether there existed the possibility they were using inside information.

402.    FanDuel profiled one of its own employees who played on other sites and had won $50,000 in a short period of time.[95]

403.    This FanDuel employee's screen name, PetrGibbons, hid his true identity and occupation at FanDuel from other players because his name was not actually Peter Gibbons.[96]

404.    Peter Gibbons is actually the name of the main character in the movie Office Space, in which employees at a software company engage in a scheme to steal money repeatedly from a large number of people in small quantities so as to avoid detection. This scheme - generally known as "salami slicing" - was also the plot of Superman III.[97]

405.    An analysis by DFS Report showed that PetrGibbons, the employee at FanDuel who works in player price modeling, was one of the top 50 players in all of DFS despite only playing on one site.  While there is no evidence this employee had access to ownership data, this individual won more than $50,000 in the early part of the baseball season on DraftKings. One of his jobs at FanDuel included setting player prices, which gave him detailed daily information about pricing models and could help him identify inefficiencies or opportunities on other sites.  While the article was removed from FanDuel's website, a version is still on the

---

[95] https://www.fanduel.com/insider/2015/06/23/fantasy-baseball-2015-emacks-look-inside-the-belly-of-a-whale/
[96] https://www.fanduel.com/insider/2015/06/23/fantasy-baseball-2015-emacks-look-inside-the-belly-of-a-whale/
[97] http://www.imdb.com/title/tt0151804/plotsummary

Internet. In that article, the FanDuel employee profiling the FanDuel employee noted: "The fact Boccio does not play on FanDuel against you folks is a good thing. He clearly has a winning strategy…or 10."[98]

406.    According to Legal Sports Report, a website devoted to the legal issues surrounding DFS, online gambling, fantasy sports and other topics, an "industry insider who wished to remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are employees – often executives – of other sites.' (From a DFS operator's point of view, a "whale" is simply a high-volume player that generates significant revenue, not necessarily a winning or losing player.)"[99]

407.    FanDuel's CEO admitted to personally playing on competitor sites.[100]

408.    Every DraftKings employee is actually an equity shareholder and owner of DraftKings.[101]

409.    After disclosure of the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites, DraftKings and FanDuel issued numerous joint and/or identical statements on their websites, continuing to act in concert.

410.    DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site, and in fact were playing and winning on their websites at a high rate.

411.    Ultimately, DFS Defendants together changed their internal rules to prevent their employees from playing on other DFS sites and to prevent DFS employees from playing

---

[98] https://www.fanduel.com/insider/2015/06/23/fantasy-baseball-2015-emacks-look-inside-the-belly-of-a-whale/
[99] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/
[100] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=3
[101] https://www.bostonglobe.com/magazine/2015/12/03/inside-draftkings-war-room-fantasy-sports-battle-rages/DAX8tBAZBOEX9kr6zoeOfM/story.html

on their sites, an action that Defendants had previously decided, in concert, not to take.[102]

412. This was not the only way employees from DFS Defendants were using inside information to defraud consumers, and in which the DFS Defendants acted in concert.

413. FanDuel knew that heavy users were targeting "heads up" or one-on-one matches in large quantities; these heavy users included employees of DraftKings and FanDuel using insider information to compete against consumers on the other website. As the Falcon Presentation showed, FanDuel knew there were complaints from users about being targeted:

## USERS HAVE MISCELLANEOUS OTHER COMPLAINTS AS WELL

*"One of the worst things about Falcon is that you can put 40 head-to-head games out in the lobby, and **have one person scoop up all of those games** if they think you're weak."*

414. According to a lawyer representing DraftKings employees, DraftKings and FanDuel employees kept track of users' winning and losing percentages, and then used that information to seek out the biggest money losers and challenge them in one-on-one contests. Specifically, a lawyer for DraftKings executives publicly stated: "what the employees were doing is they were looking at these spreadsheets targeting the losers at the bottom, the people who didn't know what the hell they were doing, right, and then they were challenging these people over email to contests involving specific sporting events, typically baseball games. And they were beating these guys regularly because they were so bad at it, the losers, and they knew they were losers, and they were basically putting money in their own pockets. You know, so

---

[102] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/

the DraftKings guys were betting in FanDuel and vice-versa."[103]

415.    The public admission of this attorney is independent confirmation of complaints that users had been making on sites like Rotogrinders and reddit, and is further confirmed by FanDuel's employee policy, produced in the lawsuit with the New York Attorney General, which stated that FanDuel's employees "targeting weak users as opponents on other sites…in a sense…is happening already":

> -Employees targeting weak users as opponents on other sites.  This seems to concern users less, but is more of a real threat.  In fact, in a sense, it is happening already.  Information that is known can't be un-known, so it's important that we put some controls in place to limit it.

416.    This behavior was not limited to FanDuel employees.  One online user posted on Reddit[104] that a DraftKings employee named Rick Sawyer repeatedly challenged him on FanDuel, and provided a screenshot of his email:



417.    One of DraftKings' founders, Matt Kalish, personally called this user and, according to this user, "agreed that it sounded uncalled for and not in good faith" and said he would look into it.[105]

418.    Another user on rotogrinders.com complained about Rick Sawyer doing the exact same thing, preying on him through heads-up or one-on-one challenges, as shown in the

---

[103] http://www.legalsportsreport.com/9053/dfs-federal-issues/
[104] https://www.reddit.com/r/dfsports/comments/3nsq94/dkleak_day_3_megathread/
[105] *Id.*

screenshot below[106]:



shark61350                                                    2 hours ago

Hi Mr. Robbins, this was my 1st season playing MLB DFS & I had a very steep
learning curve. This summer I was frequently challenged by user Rick Sawyer. I
want to estimate 10 times over a period of a month from between 5-10 dollars. That
was too rich for my blood as I was quite horrible at the time.

Recent news has came out on Reddit that he is employed by Draftkings. I was able
to discover he is employed as your Business Planning Manager.

Was I specifically targeted by DK employees using my DK game data along with
other users as "easy money" on FanDuel? My screen names on DK/FD are
completely separate. I'm curious as to how the connection was made between my
separate screen names on separate sites.

Thank you for coming here to address our concerns & have a fantastic weekend.

Reply Quote Link

419.    According to DraftKings' Vice President of Analytics, Gregory B. Karamitis, in
his sworn affidavit filed in the lawsuit with the New York Attorney General, "DraftKings
maintains an extensive database of all user activity that takes place on its website.  The user
activity database is updated effectively in real time with user activity on the website as it
occurs.  The user activity database includes a comprehensive record of all user activity from the
entire history of DraftKings' (sic) website."  According to his testimony, a "team of analysts"
have access to this data, and regularly studies it.  Finding bad players and seeking them out on
FanDuel would be easy to do from this data, as would understanding and uncovering profitable
strategies that could be used by DraftKings employees on other websites, and FanDuel
employees on the DraftKings website.

420.    FanDuel and DraftKings omitted the material fact that its employees were
targeting its own players on the other site from its advertisements.

421.    FanDuel's Employee Policy included a form where FanDuel employees had to

---

[106] https://rotogrinders.com/threads/jason-robins-grinderslive-interview-with-dan-back-tomorrow-at-2-30-et-ask-your-questions-here-875905?page=4

provide their screen names on other DFS sites.

422.    Upon information and belief, FanDuel provided its employees screen names on DraftKings site to DraftKings.

423.    Upon information and belief, DraftKings had employees disclose their screennames on FanDuel's site and shared that information with FanDuel.

424.    FanDuel's Employee Policy shows how employees were using data to defraud users.  For instance, one of the "goals" of the policy was to "reduce chance of users questioning ability of employees to exploit inside info against them when they play on other sites."

425.    Another goal was to "limit ability of employees to exploit 'inside information' such as the picks of top users, or the win rates of potential opponents."  The employee policy therefore was not designed to *prevent* employees from exploiting consumers, but to "limit" their "ability" to do so and only in the respect of picks of top users or the win rates of potential opponents.

426.    One of the "Principles" of the policy was that employees should not win so much as to make consumers "suspicious or angry" with FanDuel.  Another was that FanDuel hired "people we trust, so we don't have any scandals."

427.    One of the "Rules" for employees was to limit their volume on other sites so as not to "become targets for accusations by other users."

428.    Another of the "Rules" was not to "be the 2nd person into a head to head contest against the same opponent in more than one contest per day.  This rule will greatly limit the ability to exploit information about user performance, and will also limit the likelihood of complaints from users."  However, employees were not barred from being the second person into a head-to-head contest with the same target once a day, every day, or multiple targets

every day.

429.    Another of the "Rules" was that employees should "Seek to avoid playing anyone whose lineups you saw for that time period."  Seeing someone's lineup would give an employee a huge advantage over that opponent, but FanDuel only told employees to "seek to avoid" this.

430.    In sum, DraftKings and FanDuel acted in concert to create a rigged game where Plaintiffs and members of the proposed classes were unknowingly playing against DFS employees with access to non-public information that gave them a huge advantage.  This material information was omitted from the hundreds of millions of dollars of television advertising described above.

431.    Moreover, FanDuel and DraftKings employees were targeting their own customers over whom they had a huge advantage.

432.    Both FanDuel and DraftKings, with inside information at their disposal, employees took money from consumers, with the full knowledge of FanDuel and DraftKings management.

**D.    DraftKings' and FanDuel's Bonus Offer Was A Scam**

433.    After making his or her deposit and receiving deposit confirmation, the consumer learns that the "100% First-Time Deposit Bonus" and "**DOUBLE YOUR CASH**" bonus is in fact nothing of the sort and that his or her payment did not double.

434.    Indeed, consumers receive ***no money*** upon depositing.  They discover, instead, that they are required to incur additional and substantial monetary obligations to obtain the "bonus" and that they will never "**DOUBLE [THEIR] CASH**."

435.    Specifically, to receive the so-called "bonus," consumers have to pay to enter

contests and then receive only a small amount, ***four percent or less*** of every dollar they spend within four months, until those small returns total the initial deposit or the four months expire.

436.    On DraftKings, for games with small entry fees, such as $5, the return is four percent, but for games with larger fees, the return can be an even smaller percentage.

437.    On DraftKings, not until the user has actually paid his or her initial deposit, is he or she ever told that the actual "bonus" paid with that deposit would be only four percent or less of the deposit.

438.    Unbeknownst to players, these consumers actually would have to play and spend 25 times their initial payments or more in order to receive the promised "100% First-Time Deposit Bonus" or "**DOUBLE YOUR CASH**" bonus.

439.    At the high end, a player/consumer who had deposited $600 on DraftKings would have to spend at least $15,000 on contests, and do so within four months, to obtain what was promised as a "100% First-Time Deposit Bonus" or "**DOUBLE YOUR CASH**" bonus of $600; that would be $14,400 more than his or her initial payment.

440.    FanDuel and DraftKings both knew that it was virtually impossible for most player/consumers to ever achieve or receive the "100% First-Time Deposit Bonus" or "**DOUBLE YOUR CASH**" bonus.

441.    On FanDuel, the return was always 4%.  Thus, in contrast to the representations that when consumers deposit cash, FanDuel will give them a "free" deposit match, the only way to get a full matching bonus is to spend *25 times* that initial deposit on contest entry fees. Its so-called "match" bonus is not a match in any sense of the word—it is exceedingly expensive and is skewed 25 to 1 in favor of FanDuel.

442.    For example, a consumer who deposited $100 must pay $2,500 in entry fees to

169

receive a full match of his initial $100 deposit because FanDuel only "releases" the deposit match at a rate of 4%.  And doing so would likely require entering into hundreds of contests.

443.    Not only does FanDuel fail to disclose these and other material conditions to obtaining the so called deposit match, it misrepresents that the deposit is automatic and immediate when it is anything but.

### E.    The Arbitration Provisions in DraftKings' and FanDuel's "Terms of Use" Are Invalid, Unenforceable and Unconscionable

444.    DraftKings and FanDuel purport to require their users to resolve any disputes in an individual, non-class arbitration pursuant to their so-called "Terms of Use."  However, the arbitration provisions contained in their "Terms of Use" are invalid, unenforceable, illusory, inapplicable and unconscionable for a number of different reasons.

### DraftKings' Unenforceable Arbitration Provision

445.    DraftKings' first set of so-called "Terms of Use" were issued sometime in 2012.

446.    DraftKings' "Terms of Use" did not have a section concerning arbitration until the "Terms of Use" were modified on or about July 15, 2014.

447.    None of DraftKings' Terms of Use prior to July 15, 2014 had a section concerning arbitration.

448.    Given the lack of any arbitration clause before July 15, 2014, all claims of class members who signed up with DraftKings and deposited money before July 15, 2014, are not subject to arbitration.

449.    All of the versions of DraftKings' Terms of Use – those prior to the July 15, 2014 version, the July 15, 2014 version, and later versions – stated: "Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in

Suffolk County, Massachusetts."

450.    This lawsuit is pending in a court of competent jurisdiction in Suffolk County, Massachusetts, and therefore it is in compliance with DraftKings' "Terms of Use."

451.    After July 15, 2014, users were not required to read or click through to the Terms of Use before signing up with DraftKings, but were required to agree to them, whether or not they had seen them, had read them, could read them, or without any chance or ability to negotiate or modify any of their terms.

452.    DraftKings' sign-up web page shows this:



https://www.draftkings.com/ (with sign up popup; accessed 6/23/2016).

453.    Assuming that a user clicked on the links to the pages containing the Terms of Use and Privacy Policy, it would be virtually impossible, if not actually possible, for him or her to read and understand the terms.

454.    The so-called "Terms of Use" are set forth on a long web page containing a maze of fine print that consists of nearly 6,000 words in single-spaced tiny print.

455.    To show how difficult it is to read the "Terms of Use," the section entitled, "LIMITATION OF LIABILITY," is reproduced in the screenshot below:

**LIMITATION OF LIABILITY**

YOU UNDERSTAND AND AGREE THAT THE COMPANY LIMITS ITS LIABILITY IN CONNECTION WITH YOUR USE OF THE WEBSITE AS SET FORTH BELOW: UNDER NO CIRCUMSTANCES SHALL THE COMPANY, ITS PARENTS, SUBSIDIARIES, OR AFFILIATES, OR THE DIRECTORS, OFFICERS, EMPLOYEES, OR OTHER REPRESENTATIVES OF EACH OF THEM (COLLECTIVELY, THE "COMPANY ENTITIES AND INDIVIDUALS"), BE LIABLE TO YOU FOR ANY LOSS OR DAMAGES OF ANY KIND (INCLUDING, WITHOUT LIMITATION, FOR ANY SPECIAL, DIRECT, INDIRECT, INCIDENTAL, EXEMPLARY, ECONOMIC, PUNITIVE, OR CONSEQUENTIAL DAMAGES) THAT ARE DIRECTLY OR INDIRECTLY RELATED TO (1) THE WEBSITE, THE CONTENT, OR YOUR UPLOAD INFORMATION; (2) THE USE OF, INABILITY TO USE, OR PERFORMANCE OF THE WEBSITE; (3) ANY ACTION TAKEN IN CONNECTION WITH AN INVESTIGATION BY THE COMPANY OR LAW ENFORCEMENT AUTHORITIES REGARDING YOUR USE OF THE WEBSITE OR CONTENT;(4) ANY ACTION TAKEN IN CONNECTION WITH COPYRIGHT OWNERS; OR (5) ANY ERRORS OR OMISSIONS IN THE WEBSITE'S TECHNICAL OPERATION, EVEN IF FORESEEABLE OR EVEN IF THE COMPANY ENTITIES AND INDIVIDUALS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES WHETHER IN AN ACTION OF CONTRACT, NEGLIGENCE, STRICT LIABILITY TORT (INCLUDING, WITHOUT LIMITATION, WHETHER CAUSED IN WHOLE OR IN PART BY NEGLIGENCE, ACTS OF GOD, TELECOMMUNICATIONS FAILURE, OR THEFT OR DESTRUCTION OF THE WEBSITE). IN NO EVENT WILL THE COMPANY ENTITIES AND INDIVIDUALS BE LIABLE TO YOU OR ANYONE ELSE FOR LOSS OR INJURY, INCLUDING, WITHOUT LIMITATION, DEATH OR PERSONAL INJURY. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU. IN NO EVENT SHALL THE COMPANY ENTITIES AND INDIVIDUALS TOTAL LIABILITY TO YOU FOR ALL DAMAGES, LOSSES, OR CAUSES OF ACTION EXCEED ONE HUNDRED DOLLARS ($100). THE COMPANY ENTITIES AND INDIVIDUALS ARE NOT RESPONSIBLE FOR ANY DAMAGE TO ANY USER'S COMPUTER, HARDWARE, COMPUTER SOFTWARE, OR OTHER EQUIPMENT OR TECHNOLOGY INCLUDING, WITHOUT LIMITATION, DAMAGE FROM ANY SECURITY BREACH OR FROM ANY VIRUS, BUGS, TAMPERING, FRAUD, ERROR, OMISSION, INTERRUPTION, DEFECT, DELAY IN OPERATION OR TRANSMISSION, COMPUTER LINE OR NETWORK FAILURE OR ANY OTHER TECHNICAL OR OTHER MALFUNCTION. YOUR ACCESS TO AND USE OF THIS WEBSITE IS AT YOUR RISK. IF YOU ARE DISSATISFIED WITH THE WEBSITE OR ANY OF THE CONTENT, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE ACCESSING AND USING THE WEBSITE OR THE CONTENT. YOU RECOGNIZE AND CONFIRM THAT IN THE EVENT YOU INCUR ANY DAMAGES, LOSSES OR INJURIES THAT ARISE OUT OF THE COMPANY'S ACTS OR OMISSIONS, THE DAMAGES, IF ANY, CAUSED TO YOU ARE NOT IRREPARABLE OR SUFFICIENT TO ENTITLE YOU TO AN INJUNCTION PREVENTING ANY EXPLOITATION OF ANY WEBSITE OR OTHER PROPERTY OWNED OR CONTROLLED BY THE COMPANY AND/OR ITS PARENTS, SUBSIDIARIES, AND/OR AFFILIATES OR YOUR UPLOAD INFORMATION, AND YOU WILL HAVE NO RIGHTS TO ENJOIN OR RESTRAIN THE DEVELOPMENT, PRODUCTION, DISTRIBUTION, ADVERTISING, EXHIBITION OR EXPLOITATION OF ANY COMPANY WEBSITE OR OTHER PROPERTY OR YOUR UPLOAD INFORMATION OR ANY AND ALL ACTIVITIES OR ACTIONS RELATED THERETO. BY ACCESSING THE WEBSITE, YOU UNDERSTAND THAT YOU MAY BE WAIVING RIGHTS WITH RESPECT TO CLAIMS THAT ARE AT THIS TIME UNKNOWN OR UNSUSPECTED. ACCORDINGLY, YOU AGREE TO WAIVE THE BENEFIT OF ANY LAW, INCLUDING, TO THE EXTENT APPLICABLE, CALIFORNIA CIVIL CODE SECTION 1542, THAT OTHERWISE MIGHT LIMIT YOUR WAIVER OF SUCH CLAIMS.

456.    The first substantive paragraph of the "Terms of Use" states that "the Agreement" consists of the "Terms of Use," DraftKings' "Privacy Policy" and the Rules of the contests.   The second paragraph goes even further by asserting, notwithstanding the Privacy Policy and Rules, that "[t]hese Terms of Use constitute a legal agreement between you and DraftKings, and shall apply to your use of the Website and the Services even after termination."

457.    DraftKings' so-called "Terms of Use" do not constitute a valid, mutual agreement because the promises made by DraftKings are illusory for several different reasons.

458.    DraftKings can simply refuse to perform without suffering any consequences "whatsoever" (to use DraftKings' term).

459.    The so-called "Terms of Use" provide that DraftKings and related individuals such as officers and directors are released from any liability for any claim by the user "whatsoever":

> By entering into a Contest or accepting any prize, entrants, including but not limited to the winner(s), agree to indemnify, release and to hold harmless DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers, directors, employees,

shareholders and representatives of any of the foregoing entities (collectively, the "Released Parties"), from any and all liability, claims or actions of any kind whatsoever, including but not limited to … [examples of various types of liability listed].

460.     Thus, DraftKings can fail to fulfill any of its purported obligations, and the user is powerless to do anything about it.

461.     DraftKings purported release from any and all liability, claims or actions "whatsoever" is reproduced in the screen shot below as it appeared on the "Terms of Use" page on April 21, 2015 (see paragraph beginning "By entering"):

Users further acknowledge that the forfeiture and/or return of any prize shall in no way prevent DraftKings from pursuing criminal or civil proceedings in connection with such conduct.

By entering into a Contest or accepting any prize, entrants, including but not limited to the winner(s), agree to indemnify, release and to hold harmless DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities (collectively, the "Released Parties"), from any and all liability, claims or actions of any kind whatsoever, including but not limited to injuries, damages, or losses to persons and property which may be sustained in connection with participation in the Contest, the receipt, ownership, use or misuse of any prize or while preparing for, participating in and/or relating to or from any prize related activity, as well as any claims based on publicity rights, defamation, or invasion of privacy. DraftKings may, in its sole and absolute discretion, require an Authorized Account Holder to execute a separate release of claims similar to the one listed above in this Paragraph as a condition of being awarded any prize or receiving any payout.

DraftKings is not responsible for: any incorrect, invalid or inaccurate entry information; human errors; postal delays/postage due mail; technical malfunctions; failures, including public utility or telephone outages; omissions, interruptions, deletions or defects of any telephone system or network, computer online systems, data, computer equipment, servers, providers, or software (including, but not limited to software and operating systems that do not permit an entrant to participate in a Contest), including without limitation any injury or damage to any entrant's or any other person's computer or video equipment relating to or resulting from participation in a Contest; inability to access the Website, or any web pages that are part of or related to the Website; theft, tampering, destruction, or unauthorized access to, or alteration of, entries and/or images of any kind; data that is processed late or incorrectly or is incomplete or lost due to telephone, postal issues, computer or electronic malfunction or traffic congestion on telephone lines or transmission systems, or the Internet, or any service provider's facilities, or any phone site or website or for any other reason whatsoever; typographical, printing or other errors, or any combination thereof.

DraftKings is not responsible for incomplete, illegible, misdirected or stolen entries. If for any reason a Contest is not capable of running as originally planned, or if a Contest, computer application, or website associated therewith (or any portion thereof) becomes corrupted or does not allow the proper entry to a Contest in accordance with the Terms of Use or applicable Contest rules, or if infection by a computer (or similar) virus, bug, tampering, unauthorized intervention, actions by entrants, fraud, technical failures, or any other causes of any kind, in the sole opinion of DraftKings corrupts or affects the administration, security, fairness, integrity, or proper conduct of a Contest, the Company reserves the right, at its sole discretion, to disqualify any individual implicated in such action and/or to cancel, terminate, extend, modify or suspend the Contest, and select the winner(s) from all eligible entries received. If such cancellation, termination, modification or suspension occurs, notification will be posted on the Website.

ANY ATTEMPT BY AN ENTRANT OR ANY OTHER INDIVIDUAL TO DELIBERATELY DAMAGE THE WEBSITE OR UNDERMINE   Contact us!          ˄ ✕
CONTEST IS A VIOLATION OF CRIMINAL AND/OR CIVIL LAWS, AND SHOULD SUCH AN ATTEMPT BE MADE, DRAFTKINGS R

462.     Moreover, "Terms of Use" is an illusory contract in that it purports to give DraftKings the right, "without prior notice," to "revoke any or all of your rights granted hereunder." Thus, once again, DraftKings is not bound to any performance obligation. Rather than perform, it can simply revoke the user's rights.

463.     The portion of the so-called "Terms of Use" containing that provision, as it appeared on April 21, 2015, is reproduced in the screen shot below under the heading, "Termination and Effect of Termination":

Any withdrawal requests, after approved by DraftKings, will be credited back to the same credit card or method of payment used to deposit funds on the Website. DraftKings will only release withdrawals to a different credit card or other payment method other than that which was used to make deposit(s) after the aggregate amount of such deposit(s) has already been released back to the credit card(s) or payment method(s) used for the deposit(s).

**TERMINATION AND EFFECT OF TERMINATION**

In addition to any other legal or equitable remedy, DraftKings may, without prior notice, immediately revoke any or all of your rights granted hereunder. In such event, you will immediately cease all access to and use of the DraftKings Website. DraftKings may revoke any password(s) and/or account identification issued to you and deny you access to and use of the Website. Any such action shall not affect any rights and obligations arising prior thereto. All provisions of the Terms of Use which by their nature should survive termination shall survive termination, including, without limitation, ownership provisions, warranty disclaimers, indemnity and limitations of liability.

**DISCLAIMER OF WARRANTIES**

THE WEBSITE, INCLUDING, WITHOUT LIMITATION, ALL CONTENT, SOFTWARE, AND FUNCTIONS MADE AVAILABLE ON OR ACCESSED THROUGH OR SENT

464.    A further reason why the promises made by DraftKings are illusory is that the so-called "Terms of Use" purport to reserve to DraftKings, and DraftKings alone, the right, without notice, to amend the terms of the alleged agreement between it and participants.

465.    A provision near the bottom of the "Terms of Use" states:  "DraftKings reserves the right to amend these Terms of Use at any time and without notice, and it is your responsibility to review these Terms of Use for any changes."

466.    Not only does the right given to DraftKings to amend the "Terms of Use" render it an illusory contract by itself, but DraftKings has made it virtually impossible for a user even to determine what was amended.

467.    Although the "Terms of Use" page shows a "Last Updated" date, it does not show what was updated on that date.

468.    Considering the length and complexity of the purported "Terms of Use," it would be virtually impossible, if not actually impossible, for a user of the site to compare the current version of the purported "Terms of Use" with the most recent past version (which is not available on the DraftKings website) to figure out what was changed.

469.    The so-called "Terms of Use" also state that "[a]ny claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts."

470.    Notwithstanding the provision requiring that any dispute be resolved in a court of competent jurisdiction in Suffolk County, Mass., another provision in the "Terms of Use" states that any claim or dispute arising out of the use of the DraftKings website must be resolved in an individual arbitration proceeding in Suffolk County, Massachusetts; that it cannot be resolved in a class arbitration (*id.*); and that "[i]n the event that either party initiates a proceeding involving any Claim other than an arbitration in accordance with this Section, or initiates a proceeding involving a Claim under this Section other than in the Forum, the other party shall recover all attorneys' fees and expenses reasonably incurred in enforcing this Agreement to arbitrate and the Forum to which the parties have herein agreed."  *Id.*

471.    The section of the so-called "Terms of Use" containing the provision regarding arbitration is hidden in a maze of text more than three-quarters of the way through the legalese that permeates the "Terms of Use."

472.    As it appeared on DraftKings' website on April 21, 2015, it is reproduced in the screen shot below in the section headed, "Arbitration, Consent to Jurisdiction in Massachusetts, Attorney's Fees"; the provision requiring that any dispute be resolved in a court of competent jurisdiction in Suffolk County, Massachusetts, is shown in the same screen shot (*see* second sentence under the heading, "Miscellaneous"):

after a reasonable period of time required for the deletion to take full effect. However, the User Submission may still exist in our backup copies, which are not publicly available. If your User Submission is shared with third parties, those third parties may have retained copies of your User Submissions. In addition, if we made use of your User Submission before you deleted it, we will continue to have the right to make, duplicate, redistribute, and sublicense those pre-existing uses, even after you delete the User Submission. Terminating your account on a Service will not automatically delete your User Submissions.

We may refuse or remove a User Submission without notice to you. However, we have no obligation to monitor User Submissions, and you agree that neither we nor our parents, subsidiaries, affiliates, employees, or agents will be liable for User Submissions or any loss or damage resulting from User Submissions.

Except as provided in the Privacy Policy, we do not guarantee that User Submissions will be private, even if the User Submission is in a password-protected area. Accordingly, you should not provide User Submissions that you want protected from others.

You represent and warrant that you have all rights necessary to grant to DraftKings the license above and that none of your User Submissions are defamatory, violate any rights of third parties (including intellectual property rights or rights of publicity or privacy), or violate applicable law.

### ARBITRATION, CONSENT TO JURISDICTION IN MASSACHUSETTS, ATTORNEY'S FEES

Any and all disputes, claims or controversies arising out of or relating to this Agreement, the breach thereof, or any use of the Website (including all commercial transactions conducted through the Website) ("Claims"), except for claims filed in a small claims court that proceed on an individual (non-class, non-representative) basis, shall be settled by binding arbitration before a single arbitrator appointed by the American Arbitration Association ("AAA") in accordance with its then governing rules and procedures, including the Supplementary Procedures for Consumer-Related Disputes, where applicable. In agreeing to arbitrate all Claims, you and DraftKings waive all rights to a trial by jury in any action or proceeding involving any Claim. The arbitration shall be held in Suffolk County, Massachusetts, and judgment on the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. This arbitration undertaking is made pursuant to and in connection with a transaction involving interstate commerce, and shall be governed by and construed and interpreted in accordance with the Federal Arbitration Act at 9 U.S.C. Section 1, et seq. This arbitration provision shall survive termination of this Agreement. Subject to the limitations set forth below, the arbitrator shall have authority to award legal and equitable relief available in the courts of the Commonwealth of Massachusetts, provided that:

The arbitrator shall not have authority to award punitive damages; and

Any and all claims shall be arbitrated on an individual basis only, and shall not be consolidated or joined with or in any arbitration or other proceeding involving a Claim of any other party. You and DraftKings agree that the arbitrator shall have no authority to arbitrate any Claim as a class action or in any other form other than on an individual basis.

For any Claims that are not subject to arbitration: (a) the exclusive jurisdiction and venue for proceedings involving Claims shall be the courts of competent jurisdiction sitting within Suffolk County, Massachusetts (the "Forum"), and the parties hereby waive any argument that any such court does not have personal jurisdiction or that the Forum is not appropriate or convenient; (b) you and DraftKings waive any and all rights to trial by jury with respect to any Claims.

In the event that either party initiates a proceeding involving any Claim other than an arbitration in accordance with this Section, or initiates a proceeding involving a Claim under this Section other than in the Forum, the other party shall recover all attorneys' fees and expenses reasonably incurred in enforcing this Agreement to arbitrate and the Forum to which the parties have herein agreed.

### MISCELLANEOUS

These Terms of Use shall be governed by the internal substantive laws of the Commonwealth of Massachusetts, without respect to its conflict of laws principles. Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts.

Nothing in the Terms of Use shall create or confer any rights or other benefits in favor of any third parties except as specifically provided herein. By participating in any Contest on the Website, you agree to indemnify, protect, defend and hold harmless DK, its parents, subsidiaries, affiliates and divisions, and their respective directors, officers, employees, agents and representatives (the "DK Entities") from and against any and all third party claims, liabilities, losses, damages, injuries, demands, actions, causes of action, suits, proceedings, judgments and expenses, including reasonable attorneys' fees, court costs and other legal expenses including, without limitation, those costs incurred at the trial and appellate levels and in any bankruptcy, reorganization, insolvency or other similar proceedings, and any other legal expenses (collectively, "Claims") arising from or connected with your use of the Website, any payment methods used, any funding of your account, and/or your participation in any Contest. The Website may contain links to third party websites that are not owned or controlled by DraftKings. DraftKings has no control over, and assumes no responsibility for, the content, privacy policies, or practices of any third party websites. In addition, DraftKings will not and cannot censor or edit the content of any third-party site. By using the Website, you

473.    DraftKings is the drafter of the so-called, "Terms of Use."

474.    There is no way to reconcile the conflicting provisions requiring that disputes be resolved in court and that they be resolved in arbitration.   Under the doctrine of *contra proferentem*," this ambiguity must be resolved against the drafter.

475.    Although the arbitration provision purports to be mutual, it is not in fact mutual because the revocation provision described above gives DraftKings the exclusive right to revoke or amend that (and every other) provision at any time.   Thus, if a user attempted to take DraftKings to arbitration, DraftKings could revoke or amend that provision, blocking

arbitration.  Thus, DraftKings has not agreed to proceed against any user only in arbitration. The same is true for the forum-selection and cost-shifting provisions described above.

476.    The arbitration clauses contained in the Terms of Use agreements were also an unconscionable commercial practice and were, by way of example, in violation of the New Jersey Consumer Fraud Act, constituting violations of the New Jersey Consumer Fraud Act. The DFS Defendants' inclusion of these illegal and unenforceable arbitration clauses was violative of a clearly established consumer right and/or of the responsibilities of the sellers, the DFS Defendants have also violated the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act, as alleged *infra*.

477.    Nowhere in the DraftKings or FanDuel arbitration clauses are there any explanations that a plaintiff is waiving his/her right to seek relief in court for a breach of their statutory rights.  The provisions do not explain what arbitration is, nor do they indicate how arbitration is different from a proceeding in a court of law. Nor are they written in plain language that would be clear and understandable to the average consumer that he/she is waiving statutory rights. The DFS Defendants' respective arbitration provisions have none of the language legally required to uphold such an arbitration provisions—clear and unambiguous language that the plaintiff is waiving his/her right to sue or go to court to secure relief.

478.    As of June 23, 2016, the Terms of Use on DraftKings' website[107] bore a "Last Updated" date of 6/20/2015.  The provisions described above were unchanged from the earlier versions.

479.    FanDuel users have claims against DraftKings that are not subject to arbitration under the civil conspiracy facts and allegations above and as discussed in more detail below.

480.    For the foregoing reasons, the DraftKings Terms of Use are procedurally and

_____

[107] https://www.draftkings.com/help/terms/us (last accessed 6/23/2016).

substantively unconscionable.

**FanDuel's Unenforceable Arbitration Provision**

481.     FanDuel's first "Terms of Use" were issued sometime in March 2013.

482.     The March 2013  version of FanDuel's "Terms of Use" stated, "For any dispute not subject to arbitration, or where no election to arbitrate has been made, you and FanDuel agree to submit to the personal and exclusive jurisdiction of and venue in the federal and state courts located in New York, NY. You further agree to accept service of process by mail, and hereby waive any and all jurisdictional and venue defenses otherwise available."

483.     FanDuel's March 2013 "Terms of Use" do not contain any other provision concerning arbitration and therefore consumers who signed up before the arbitration agreement was added to FanDuel's Terms of Use are not subject to arbitration.

484.     With respect to the versions of FanDuel's "Terms of Use" that contain an arbitration provision, a user does not have to check a box agreeing to the "Terms of Use" for FanDuel or click through them to sign up for the website, as shown in the screenshot below:

(Last accessed June 23, 2016, http://www.FanDuel.com).  The deposit of money and entry into

contests is done through separate transactions that likewise do not require the user to

affirmatively indicate agreement with, or even familiarity with, the "Terms of Use."

485.    FanDuel does not require a user to click on Terms of Service or even make clear

that the Terms of Service are a link that could be clicked on, and focuses the user's attention on

multiple other areas rather than the Terms of Service, such as the Play Now button and required

forms for the user's information and password.  Another link for a "Promo code or referral

username" is blue and indicates more than it is a link than the Terms of Service.

486.    FanDuel's current version of its "Terms of Use," indicating that it was updated

as of April 18, 2016, consists of more than 7,800 words.  Copied into a Word document,

without adjusting the spacing or font, it takes up 24 pages.

487.    Buried three-quarters of the way down those "Terms of Use" (pp. 18-19 of the 24-page Word version), is a hidden, unenforceable arbitration provision – which, as shown above, users need not read nor affirmatively click a box to indicate they had read – that FanDuel has not conspicuously brought to the players' attention.  If a player is one of the likely few who actually know of and review the Terms of Use, the arbitration provision can only be discovered if he or she navigates through windows, clicks an inconspicuous hyperlink, and reads through 72 paragraphs of boilerplate legalese.

488.    Just as grossly one-sided as other provisions in the Terms of Use, the arbitration provision purports to require players to first use FanDuel's customer service department and then to arbitrate "as the sole means to resolve claims," unless filed in small claims court or related to intellectual property.

489.    The arbitration provision is unclear and ambiguous because it also provides that "for any dispute not subject to arbitration" personal and exclusive jurisdiction and venue are in the federal and state courts located in New York, NY. And the "Terms and the relationship between you and FanDuel shall be governed" by New York law.

490.    The promises FanDuel makes in its "Terms of Use" are illusory for some of the same reasons as DraftKings are.

491.    First, FanDuel users are barred from holding FanDuel to any of its supposed promises.  One of the provisions states that the user releases FanDuel from any claims or liabilities "of any kind whatsoever arising from … your use of the service."  Here is the operative language:

> ***You agree to release*** and to indemnify, defend and hold harmless ***FanDuel*** and its parents, subsidiaries, affiliates and agencies, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities, ***from and against any and all*** losses, ***liabilities***, expenses, ***damages***, costs (including attorneys' fees and court

costs) ***claims or actions of any kind whatsoever arising or resulting from your use of the Service*** ….

https://www.fanduel.com/terms (accessed 6/23/2016; emphasis added).

492.    Thus, in the event of a breach of FanDuel's obligations, the user would be powerless to hold FanDuel to its obligations.

493.    In addition, FanDuel reserves the right, at its sole discretion, to modify or replace the Terms of Use at any time, except for the purported arbitration and class action waiver provisions.  This provision states:  "Except for Section 15, providing for binding arbitration and waiver of class action rights, FanDuel reserves the right, at its sole discretion, to modify or replace the Terms of Use at any time."

494.    Moreover, Plaintiffs would not have agreed to those terms or deposited any money with FanDuel had they known about the fraudulent activity and misrepresentations described in this Complaint.

495.    For the foregoing reasons, the terms of FanDuel's arbitration provision and the waiver of class action rights and right to trial by jury are unconscionable.

496.    In addition, FanDuel offers customers a 30-day window to opt out of the provisions in the "Terms of Use" requiring arbitration and class-action waiver.

497.    In addition, FanDuel's arbitration provision has a subsection that provides for an exception in the case of intellectual property disputes.  It states:  "[E]ither party may bring an action in state or federal court to protect its intellectual property rights ('intellectual property rights' means patents, copyrights, moral rights, trademarks, and trade secrets, but not privacy or publicity rights)."  Plaintiffs' lineup data and other information submitted in contests on FanDuel's website constitute their personal intellectual property from which FanDuel, by and through its employees, profited by using that information to play in contests on DraftKings'

website, in violation of Plaintiffs' rights.  By bringing this lawsuit, Plaintiffs are seeking to

protect that intellectual property from being used by FanDuel's employees.

498.    DraftKings users have claims against FanDuel that are not subject to arbitration

under the civil conspiracy facts and allegations above and as discussed in more detail below.

## IV.     Family Members of DFS Players Were Harmed By Financial Losses

499.    Plaintiff Family Members bring this action on their own behalf and on the

behalf of the Family Classes (defined below) who, like Plaintiff Family Members, have

sustained ascertainable losses arising out of Defendants' systematic and continued violation of

certain state laws that prohibit gambling and allow for the recovery of losses incurred by a

gambler by a family member and/or next-of-kin.  These State laws include:

     a.   S.C. CODE ANN. § 32-1-10 to § 32-1-20 and related statutes;

     b.   NEW MEXICO STAT. ANN. § 44-5-1  to § 44-5-3 and related statutes;

     c.   TENN. CODE ANN. § 29-19-l04 to § 29-19-l05 and related statutes;

     d.   OFFICIAL CODE. GA. ANN. § 13-8-3 and related statutes;

     e.   KY. REV. STAT. § 372.010-040 and related statutes;

     f.   All other State laws that are substantially the same and allow substantially the
        same recovery by family members or next-of-kin.

(the "State Gambling Recovery Laws").  Under the authority of the State Gambling Recovery

Laws, the family members or next-of-kin (Plaintiff Family Member and Family Classes

members) of all persons losing money or anything of value from unlawful gambling (DFS

Players and other DFS players in the relevant States) shall have a cause of action to recover those

loses from the winners (Defendants FanDuel and DraftKings). As alleged above, the Attorneys

General and other authorities in various states have determined that DraftKings and FanDuel are

182

not operating legally in their jurisdictions, and in fact are illegal gambling under those states' laws.

500.    While a few states have legalized and regulated Daily Fantasy Sports, numerous states have not and therefore DraftKings and FanDuel are not 100% legal in those states, as they claim.

501.    DFS Players paid money in the form of money, goods, or credit to DFS Defendants to enter contests and lost during the period of time between (a) the limits specified in each of the relevant State Gambling Laws during which the family member or next-of-kin of a plaintiff may seek recovery and (b) prior to the date of this Complaint (or any complaint filed by Plaintiff Family Members and centralized in this District). DFS Defendants' operation of illegal DFS sites caused DFS Players losses resulting in Plaintiff Family Members' losses.

502.    The DFS Defendants profited and/or received money from the DFS Players' entry fees. Additionally, DFS Defendants profited and/or received money from the DFS Players when, (a) upon information and belief, "bots" or fake accounts ("shills") were employed by the DFS Defendants to win contests, (b) to the extent Defendants risked their own money in the "overlay," and/or (c) as one who shares in the profits. Alternatively, DFS Defendants are the winners as the brokers that are paid commissions.

503.    Plaintiff Family Members and Family Classes are entitled, as a matter of law, to recover at least the amount of the losses by DFS Players and up to a multiple of the losses by the DFS Players.

504.    Plaintiff Family Members had no agreement with DFS Defendants to arbitrate or waive class claims.

505.    Plaintiff Family Members had no agreement whatsoever with Defendants.

506.   Plaintiff Family Members never signed up or logged on to the Defendants' websites.

507.   Plaintiff Family Members cannot be compelled to arbitrate and have not waived any class claims.

## CLASS ACTION ALLEGATIONS

508.   A class action is the proper form to bring Plaintiffs' claims under FRCP 23. The potential classes, as defined below, are so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the classes, and the representative parties will fairly and adequately protect the interests of the classes.

509.   This action satisfies all of the requirements of FRCP 23, including numerosity, commonality, typicality, adequacy, predominance and superiority.

510.   **Numerosity**: The Classes are so numerous that joinder of all members is impracticable.  While the exact number is not known at this time, it is generally ascertainable by appropriate discovery.  According to news accounts cited above, millions of users compete on the websites of Defendants, and those users are members of the proposed classes.

511.   **Commonality:** The claims made by Plaintiffs meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the class wide litigation. These shared questions predominate over individual questions, and they include, without limitation:

  a)  Whether DFS Defendants made the representations set forth above and substantially similar representations to Plaintiffs and members of the proposed classes;

b) Whether DFS Defendants' advertisements were false, misleading, unfair, unconscionable, or otherwise in violation of applicable laws as described above;

c) Whether DFS Defendants owed duties to Plaintiffs and the proposed classes, the scope of those duties and whether they breached those duties;

d) Whether Defendants fraudulently induced Plaintiffs and the proposed classes into using their website under false pretenses, through material misrepresentations or material omissions;

e) Whether and to what extent consumers were harmed by Defendants' actions as described above;

f) Whether the Terms of Use on each DFS Defendants' website are unconscionable, constitute illusory contracts, fraudulent or otherwise invalid;

g) The extent of the damages caused by Defendants' acts;

h) The extent to which DFS Defendants' acted in concert to defraud Plaintiffs and the class;

i) Whether DFS Defendants enforced illegal contracts to earn fees from contest entries in violation of New York, Massachusetts and other states' laws;

j) Whether Plaintiff and members of the proposed class have entered into contracts with the Non-Defendant Banks, Non-Defendant Facilitators and/or Payment Processor Defendants over the past six years;

k) Whether such contracts are *per se* void, pursuant to New York law;

l) Whether such contracts are void pursuant to New York civil law;

m) Whether Plaintiff and members of class paid monies to Non-Defendant Banks, Non-Defendant Facilitators and/or Payment Processor Defendants in

185

consideration of those contracts;

n) Whether Non-Defendant Banks, Non-Defendant Facilitators and/or Payment Processor Defendants' collection of debts on those contracts violates New York criminal law;

o) Whether Non-Defendant Banks, Non-Defendant Facilitators and/or Payment Processor Defendants' collection of debts on those contracts violates New York civil law;

p) Whether Non-Defendant Banks, Non-Defendant Facilitators and/or Payment Processor and Defendants aided and abetted the DFS Defendants' primary violations;

q) Whether Plaintiff and members of the proposed classes are entitled to restitution from Online Gambling Non-Defendant Banks, Non-Defendant Facilitators and/or Payment Processor Defendants.

512. **Typicality**: Plaintiffs' claims are typical of those of the other Class members because Plaintiffs, like every other class member, were induced to use DFS Defendants' sites based on false and misleading advertisements of fair play, and lack of information about having to compete against players with inside information.

513. The claims of the Class Representative Plaintiffs are furthermore typical of other class members because they make the same claims as other class members. Plaintiffs have an interest in seeking compensation from Defendants.

514. **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the classes in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the proposed classes. Plaintiffs seek no relief that

is antagonistic or adverse to the members of the proposed classes and the infringement of the rights and the damages they have suffered are typical of other class members.

515.     **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical.

516.     The nature of this action and the nature of New York and/or Massachusetts and/or the laws of the Plaintiffs' home states available to Plaintiffs and the classes make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the class and will establish the right of each member of the class to recover on the cause of action alleged; and Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

517.   A class action is the proper form to bring Plaintiff Family Members and Family Classes' claims under Federal R. Civ. Proc. 23. The potential Family Classes are so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the classes.

518.   **Numerosity:** The members of the Family Classes are so numerous that joinder of all members is impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery. News accounts discuss how millions of users compete on the websites of the DFS Defendants.

519.   Family Classes members meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the class wide litigation. These shared questions predominate over individual questions, and they include, without limitation:

a)   Whether the playing on DFS Defendants' platforms constitute gambling as defined by the State Gambling Recover Laws.

b)   Whether the DFS Defendants' platforms constitute gambling devices as defined by the State Gambling Recover Laws.

c)   Whether the transactions entered into between DFS Defendants and its customers are gambling transactions supported by gambling consideration as defined by the State Gambling Recover Laws;

d)   Whether DFS Defendants promoted, advanced and profited from illegal activity in violation of the State Gambling Recover Laws;

e) Whether DFS Defendants were winners as defined by the State Gambling Recover Laws.

520. **Typicality:** Plaintiff Family Member's claims are typical of those of the other Family Classes members because Plaintiff Family Member like every other Family Classes member, were injured through the DFS Players use of such illegal DFS platforms and induced to engage with the DFS platforms on false and misleading advertisements that DFS was a game of skill when, in fact, it is a game of predominately chance, thus constituting illegal gambling under State Gambling Recovery Laws.

521. The claims of the class representative Plaintiff Family Member is furthermore typical of other Family Classes members because they make the same claims as other Family Classes members; and Plaintiff Family Members' claims are based upon the same legal theories, and arise out of the same practices and course of conduct engaged in by Defendants. Plaintiff Family Member has an interest in seeking compensation from Defendants on behalf of all Family Classes members.

522. Further, the representative Plaintiff Family Members' damages arise out of nearly identical and repetitive policies and practices engaged in by Defendants.

523. **Adequacy:** Plaintiff Family Member will fairly and adequately represent and protect the interests of the Family Classes members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Family Classes members. Plaintiff Family Members seek no relief that is antagonistic or adverse to the Family Classes members and the infringement of the rights and the damages they have suffered are typical of other Family Classes members.

524. **Superiority:** The class litigation is an appropriate method for fair and efficient

189

adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Family Classes members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Family Classes members, who could not individually afford to litigate a complex claim against a large corporate defendant like Defendants. Further, even for those Family Classes members who could afford to litigate such a claim, it would still be economically impractical.

525.    The nature of this action and the nature of State Gambling Recovery Laws available to Plaintiff Family Members and Family Classes members makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff Family Member and Family Classes members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Family Classes members with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff Family Members were exposed is representative of that experienced by the Family Classes members and will establish the right of each Family Classes members to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

526.    The "proposed classes" and/or subclasses are described as follows:

> **Nationwide DraftKings Class: "All persons in the United States who deposited money into a DraftKings account within the last five (5)**

years."

**Nationwide FanDuel Class:** "All persons in the United States who deposited money into a FanDuel account within the last five (5) years."

**Collectively Referred to as the Nationwide Classes**

**Alabama DraftKings Subclass:** "All persons in Alabama who deposited money into a DraftKings account within the last five (5) years."

**Alaska DraftKings Subclass:** "All persons in Alaska who deposited money into a DraftKings account within the last five (5) years."

**Arizona DraftKings Subclass:** "All persons in Arizona who deposited money into a DraftKings account within the last five (5) years."

**Arkansas DraftKings Subclass:** "All persons in Arkansas who deposited money into a DraftKings account within the last five (5) years."

**California DraftKings Subclass:** "All persons in California who deposited money into a DraftKings account within the last five (5) years."

**Colorado DraftKings Subclass:** "All persons in Colorado who deposited money into a DraftKings account within the last five (5) years."

**Connecticut DraftKings Subclass:** "All persons in Connecticut who deposited money into a DraftKings account within the last five (5) years."

**District of Columbia DraftKings Subclass:** "All persons in the District of Columbia who deposited money into a DraftKings account within the last five (5) years."

**Delaware DraftKings Subclass:** "All persons in Delaware who deposited money into a DraftKings account within the last five (5) years."

**Florida DraftKings Subclass:** "All persons in Florida who deposited money into a DraftKings account within the last five (5) years."

191

**Georgia DraftKings Subclass: "All persons in Georgia who deposited money into a DraftKings account within the last five (5) years."**

**Hawaii DraftKings Subclass: "All persons in Hawaii who deposited money into a DraftKings account within the last five (5) years."**

**Idaho DraftKings Subclass: "All persons in Idaho who deposited money into a DraftKings account within the last five (5) years."**
**Illinois DraftKings Subclass: "All persons in Illinois who deposited money into a DraftKings account within the last five (5) years."**

**Indiana DraftKings Subclass: "All persons in Indiana who deposited money into a DraftKings account within the last five (5) years."**

**Iowa DraftKings Subclass: "All persons in Iowa who deposited money into a DraftKings account within the last five (5) years."**

**Kansas DraftKings Subclass: "All persons in Kansas who deposited money into a DraftKings account within the last five (5) years."**

**Kentucky DraftKings Subclass: "All persons in Kentucky who deposited money into a DraftKings account within the last five (5) years."**

**Louisiana DraftKings Subclass: "All persons in Louisiana who deposited money into a DraftKings account within the last five (5) years."**

**Maine DraftKings Subclass: "All persons in Maine who deposited money into a DraftKings account within the last five (5) years."**

**Maryland DraftKings Subclass: "All persons in Maryland who deposited money into a DraftKings account within the last five (5) years."**

**Massachusetts DraftKings Subclass: "All persons in Massachusetts who deposited money into a DraftKings account within the last five (5) years."**

**Michigan DraftKings Subclass: "All persons in Michigan who deposited money into a DraftKings account within the last five (5) years."**

**Minnesota DraftKings Subclass: "All persons in Minnesota who deposited money into a DraftKings account within the last five (5) years."**

**Mississippi DraftKings Subclass:** "All persons in Mississippi who deposited money into a DraftKings account within the last five (5) years."

**Missouri DraftKings Subclass:** "All persons in Missouri who deposited money into a DraftKings account within the last five (5) years."

**Montana DraftKings Subclass:** "All persons in Montana who deposited money into a DraftKings account within the last five (5) years."

**Nebraska DraftKings Subclass:** "All persons in Nebraska who deposited money into a DraftKings account within the last five (5) years."

**Nevada DraftKings Subclass:** "All persons in Nevada who deposited money into a DraftKings account within the last five (5) years."

**New Hampshire DraftKings Subclass:** "All persons in New Hampshire who deposited money into a DraftKings account within the last five (5) years."

**New Jersey DraftKings Subclass:** "All persons in New Jersey who deposited money into a DraftKings account within the last five (5) years."

**New Mexico DraftKings Subclass:** "All persons in New Mexico who deposited money into a DraftKings account within the last five (5) years."

**New York DraftKings Subclass:** "All persons in New York who deposited money into a DraftKings account within the last five (5) years."

**North Carolina DraftKings Subclass:** "All persons in North Carolina who deposited money into a DraftKings account within the last five (5) years."

**North Dakota DraftKings Subclass:** "All persons in North Dakota who deposited money into a DraftKings account within the last five (5) years."

**Ohio DraftKings Subclass:** "All persons in Ohio who deposited money into a DraftKings account within the last five (5) years."

193

**Oklahoma DraftKings Subclass: "All persons in Oklahoma who deposited money into a DraftKings account within the last five (5) years."**

**Oregon DraftKings Subclass: "All persons in Oregon who deposited money into a DraftKings account within the last five (5) years."**

**Pennsylvania DraftKings Subclass: "All persons in Pennsylvania who deposited money into a DraftKings account within the last five (5) years."**

**Rhode Island DraftKings Subclass: "All persons in Rhode Island who deposited money into a DraftKings account within the last five (5) years."**

**South Carolina DraftKings Subclass: "All persons in South Carolina who deposited money into a DraftKings account within the last five (5) years."**
**South Dakota DraftKings Subclass: "All persons in South Dakota who deposited money into a DraftKings account within the last five (5) years."**

**Tennessee DraftKings Subclass: "All persons in Tennessee who deposited money into a DraftKings account within the last five (5) years."**

**Texas DraftKings Subclass: "All persons in Texas who deposited money into a DraftKings account within the last five (5) years."**

**Utah DraftKings Subclass: "All persons in Utah who deposited money into a DraftKings account within the last five (5) years."**

**Vermont DraftKings Subclass: "All persons in Vermont who deposited money into a DraftKings account within the last five (5) years."**

**Virginia DraftKings Subclass: "All persons in Virginia who deposited money into a DraftKings account within the last five (5) years."**

**Washington DraftKings Subclass: "All persons in Washington who deposited money into a DraftKings account within the last five (5) years."**

**West Virginia DraftKings Subclass: "All persons in West Virginia who deposited money into a DraftKings account within the last five**

(5) years."

**Wisconsin DraftKings Subclass: "All persons in Wisconsin who deposited money into a DraftKings account within the last five (5) years."**

**Wyoming DraftKings Subclass: "All persons in Wyoming who deposited money into a DraftKings account within the last five (5) years."**

**Collectively referred to as the State DraftKings Subclasses.**

**Alabama FanDuel Subclass: "All persons in Alabama who deposited money into a FanDuel account within the last five (5) years."**

**Alaska FanDuel Subclass: "All persons in Alaska who deposited money into a FanDuel account within the last five (5) years."**

**Arizona FanDuel Subclass: "All persons in Arizona who deposited money into a FanDuel account within the last five (5) years."**

**Arkansas FanDuel Subclass: "All persons in Arkansas who deposited money into a FanDuel account within the last five (5) years."**

**California FanDuel Subclass: "All persons in California who deposited money into a FanDuel account within the last five (5) years."**

**Colorado FanDuel Subclass: "All persons in Colorado who deposited money into a FanDuel account within the last five (5) years."**

**District of Columbia FanDuel Subclass: "All persons in the District of Columbia who deposited money into a FanDuel account within the last five (5) years."**

**Connecticut FanDuel Subclass: "All persons in Connecticut who deposited money into a FanDuel account within the last five (5) years."**

**Delaware FanDuel Subclass: "All persons in Delaware who deposited money into a FanDuel account within the last five (5) years."**

**Florida FanDuel Subclass: "All persons in Florida who deposited money into a FanDuel account within the last five (5) years."**

**Georgia FanDuel Subclass: "All persons in Georgia who deposited**

money into a FanDuel account within the last five (5) years."

Hawaii FanDuel Subclass: "All persons in Hawaii who deposited money into a FanDuel account within the last five (5) years."

Idaho FanDuel Subclass: "All persons in Idaho who deposited money into a FanDuel account within the last five (5) years."

Illinois FanDuel Subclass: "All persons in Illinois who deposited money into a FanDuel account within the last five (5) years."

Indiana FanDuel Subclass: "All persons in Indiana who deposited money into a FanDuel account within the last five (5) years."

Iowa FanDuel Subclass: "All persons in Iowa who deposited money into a FanDuel account within the last five (5) years."

Kansas FanDuel Subclass: "All persons in Kansas who deposited money into a FanDuel account within the last five (5) years."

Kentucky FanDuel Subclass: "All persons in Kentucky who deposited money into a FanDuel account within the last five (5) years."

Louisiana FanDuel Subclass: "All persons in Louisiana who deposited money into a FanDuel account within the last five (5) years."

Maine FanDuel Subclass: "All persons in Maine who deposited money into a FanDuel account within the last five (5) years."

Maryland FanDuel Subclass: "All persons in Maryland who deposited money into a FanDuel account within the last five (5) years."

Massachusetts FanDuel Subclass: "All persons in Massachusetts who deposited money into a FanDuel account within the last five (5) years."

Michigan FanDuel Subclass: "All persons in Michigan who deposited money into a FanDuel account within the last five (5) years."

Minnesota FanDuel Subclass: "All persons in Minnesota who deposited money into a FanDuel account within the last five (5) years."

Mississippi FanDuel Subclass: "All persons in Mississippi who deposited money into a FanDuel account within the last five (5) years."

**Missouri FanDuel Subclass: "All persons in Missouri who deposited money into a FanDuel account within the last five (5) years."**

**Montana FanDuel Subclass: "All persons in Montana who deposited money into a FanDuel account within the last five (5) years."**

**Nebraska FanDuel Subclass: "All persons in Nebraska who deposited money into a FanDuel account within the last five (5) years."**

**Nevada FanDuel Subclass: "All persons in Nevada who deposited money into a FanDuel account within the last five (5) years."**

**New Hampshire FanDuel Subclass: "All persons in New Hampshire who deposited money into a FanDuel account within the last five (5) years."**

**New Jersey FanDuel Subclass: "All persons in New Jersey who deposited money into a FanDuel account within the last five (5) years."**

**New Mexico FanDuel Subclass: "All persons in New Mexico who deposited money into a FanDuel account within the last five (5) years."**

**New York FanDuel Subclass: "All persons in New York who deposited money into a FanDuel account within the last five (5) years."**

**North Carolina FanDuel Subclass: "All persons in North Carolina who deposited money into a FanDuel account within the last five (5) years."**

**North Dakota FanDuel Subclass: "All persons in North Dakota who deposited money into a FanDuel account within the last five (5) years."**

**Ohio FanDuel Subclass: "All persons in Ohio who deposited money into a FanDuel account within the last five (5) years."**

**Oklahoma FanDuel Subclass: "All persons in Oklahoma who deposited money into a FanDuel account within the last five (5) years."**

**Oregon FanDuel Subclass: "All persons in Oregon who deposited money into a FanDuel account within the last five (5) years."**

**Pennsylvania FanDuel Subclass:** "All persons in Pennsylvania who deposited money into a FanDuel account within the last five (5) years."

**Rhode Island FanDuel Subclass:** "All persons in Rhode Island who deposited money into a FanDuel account within the last five (5) years."

**South Carolina FanDuel Subclass:** "All persons in South Carolina who deposited money into a FanDuel account within the last five (5) years."

**South Dakota FanDuel Subclass:** "All persons in South Dakota who deposited money into a FanDuel account within the last five (5) years."

**Tennessee FanDuel Subclass:** "All persons in Tennessee who deposited money into a FanDuel account within the last five (5) years."

**Texas FanDuel Subclass:** "All persons in Texas who deposited money into a FanDuel account within the last five (5) years."

**Utah FanDuel Subclass:** "All persons in Utah who deposited money into a FanDuel account within the last five (5) years."

**Vermont FanDuel Subclass:** "All persons in Vermont who deposited money into a FanDuel account within the last five (5) years."

**Virginia FanDuel Subclass:** "All persons in Virginia who deposited money into a FanDuel account within the last five (5) years."

**Washington FanDuel Subclass:** "All persons in Washington who deposited money into a FanDuel account within the last five (5) years."

**West Virginia FanDuel Subclass:** "All persons in West Virginia who deposited money into a FanDuel account within the last five (5) years."

**Wisconsin FanDuel Subclass:** "All persons in Wisconsin who deposited money into a FanDuel account within the last five (5) years."

**Wyoming FanDuel Subclass:** "All persons in Wyoming who deposited money into a FanDuel account within the last five (5) years."

**Collectively referred to as the State FanDuel Subclasses, and, along with the State DraftKings Subclasses, the "State Subclasses"**

**Georgia Family Class:** "All persons in the State of Georgia with a family member and/or next-of-kin that participated in Defendants' DFS, deposited money in a Defendants' account, and lost money in any game or contest during the time period starting four years ago until six months prior to filing the original complaint"

**Kentucky Family Class:** "All persons in the State of Kentucky that are spouses, children, next-of-kin, heirs, or creditors, of a person in the State of Kentucky that participated in Defendants' DFS, deposited money in a Defendants' account, and lost money in any game or contest during the time period starting six months from the filing of the Complaint up until five years prior to the filing of the original complaint"

**Tennessee Family Class:** "All persons in the State of Tennessee that are spouses, children, or next of kin of a person in the State of Tennessee that participated in FanDuel's DFS, deposited money in a FanDuel's account, and lost money in any game or contest during the time period starting ninety-one days ago up until one year prior to filing the original complaint"

**New Mexico Family Class:** "All persons in the State of New Mexico who are the spouse, children, heirs, executors, administrators or creditors of those persons in the State of New Mexico that participated in Defendants' DFS, deposited money in a Defendants' account, and lost money in any game or contest during the one year prior to filing of the original complaint"

**South Carolina Family Class:** "All persons in the State of South Carolina that are spouses, children, next-of-kin, heirs, or creditors, of a person in the State of South Carolina that participated in FanDuel's DFS, deposited money in a FanDuel's account, and lost money in any game or contest going for the time period starting three months from the filing of the original complaint up until one year prior to the filing of this Complaint"

**The Family Classes: The South Carolina Family Class, the Georgia Family Class, the Tennessee Family Class, the Kentucky Family Class, and the New Mexico Family Class.**

527.   Plaintiffs reserve the right to modify or amend the definition of the proposed

classes and to modify, amend or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

528.    Plaintiffs will fairly and adequately protect the interests of the classes. The interests of the class representatives are consistent with those of the other members of the proposed classes. In addition, Plaintiffs are represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

529.    The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

530.    Excluded from the Class are:

a.    Defendants and any entities in which Defendants have a controlling interest;

b.    Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendants;

c.    The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

d.    All persons or entities that properly execute and timely file a request for exclusion from the Class;

e.    Any attorneys representing the Plaintiffs or the Class.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE NEW YORK DECEPTIVE ACTS AND PRACTICES LAW (N.Y. GEN. BUS. § 349, et seq.)
**(Asserted by New York Plaintiffs on behalf of the Nationwide Classes and the New York Subclass against FanDuel)**

531.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

532.     By the acts and conduct alleged herein, Defendant FanDuel committed deceptive acts and practices in the State of New York by making the misrepresentations described above.

533.     Defendant FanDuel maintains its principal place of business in the city, county, and State of New York.

534.     Defendant FanDuel processed all, or most of its gaming transactions within the City and State of New York.

535.     Defendant FanDuel operated all, or most of its gaming transactions within the City and State of New York.

536.     Defendant FanDuel transacted all, or most of its gaming transactions within the City and State of New York.

537.     Defendant FanDuel profited from all, or most of its gaming transactions within the City and State of New York.

538.     The foregoing acts, practices, and representations were directed at consumers, DFS players and/or potential DFS players who might use their websites and compete in their DFS contests.  Even when directed at the media or non-consumer individuals who do not compete in DFS contests as provided by Defendant FanDuel, its deceptive acts, practices, or representations were consumer-oriented, at or about their DFS contests as provided and made available to consumers.

539.     The foregoing deceptive acts and practices were misleading in a material way because they fundamentally misrepresented the nature of Defendant FanDuel's DFS contests, the nature of the competition within, the degree of fairness and level playing field maintained, the legality of their products, the free bonus money to anyone who made a deposit and the

extent of inside, non-public information available to certain of their DFS players.

540.    The acts and conduct of Defendant FanDuel emanated from, were concerned from and directed from New York.

541.    Plaintiffs and members of the Nationwide Classes and New York Subclass were injured as a direct and proximate result of Defendant FanDuel's violation of the NYDAPL G.B.L. § 349 which caused Class and Subclass members injury and damage as they joined and paid, placed, deposited, submitted, risked, and/or invested funds into Defendant FanDuel's website, which they would not have done had they known the true facts and/or not been misled.

542.    Plaintiffs and members of the New York Subclass and Nationwide Classes were also injured as a direct and proximate result of Defendant FanDuel's violation of the NYDAPL G.B.L. § 349 in that their ability to fairly compete and win cash prizes on an even playing field was impinged, and they, statistically, won less money as a result.

543.    By virtue of Defendant FanDuel's misrepresentations and willful omissions and actions that emanated from New York, Plaintiffs and members of the New York Subclass and Nationwide Classes have suffered damages.

544.    Accordingly, Plaintiffs and the Nationwide Classes and New York Subclass seek to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, punitive damages, and reasonable attorneys' fees and costs.

## COUNT II

## VIOLATION OF THE NEW YORK FALSE ADVERTISING LAW

### (N.Y. GEN. BUS. § 350, *et seq.*)
**(Asserted by New York Plaintiffs on behalf of the Nationwide Classes and the New York Subclass against FanDuel)**

545.    Plaintiffs repeat, reallege, and incorporates by reference each of the foregoing

allegations as though fully set forth herein.

546.    By the acts and conduct alleged herein, Defendant FanDuel committed false advertising in the conduct of business, trade or commerce in the State of New York contrary to the New York False Advertising Law, G.B.L. § 350, *et seq.*

547.    "False advertising" is defined as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." The foregoing acts and practices were directed at consumers. G.B.L. § 350-a.

548.    In an effort to increase business and, specifically, the volume of and company profits from paying customers using its DFS website to engage in DFS play, FanDuel, in the course of their business, targeted sports fans and the potential DFS players from the public at large with false and misleading advertisements on television and other platforms.

549.    Defendant FanDuel's advertisements were and continue to be false and misleading in a material way because they fundamentally misrepresent the fair play and even-level playing field available for all DFS players on their websites, the legality of their product and the nature of the free bonus money to anyone who made a deposit.  Moreover, FanDuel's advertisements were false and misleading in a material way because they failed to reveal that their viewers that Defendant's employees – some of whom had access to non-public DFS player information and strategies -- were permitted to play in DFS contests on competitor company DFS websites.  In light of FanDuel's representations regarding the legality of its product, its free bonus money, fairness of its contests and the degree to which a player's skill and knowledge of the relevant sport would determine the contests' winnings, the advertisements' omissions were materially misleading.

550.    Plaintiffs and members of the Nationwide Classes and New York Subclass were injured as a direct and proximate result of Defendant FanDuel's violation of NYFAL because they paid for entry into contests and deposited money onto Defendant FanDuel's website, which they would not have done had they known the true facts.

551.    Plaintiffs and members of the Nationwide Classes and New York Subclass were also injured in that their DFS cash prize winnings were statistically lowered as a result of FanDuel's employees playing with non-public and insider information on competitor company DFS websites.

552.    Plaintiffs and the Nationwide Classes and New York Subclass seek to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, punitive damages, and reasonable attorneys' fees.

## COUNT III

## VIOLATION OF THE NEW YORK GENERAL OBLIGATIONS LAW

### (N.Y. GOL § 5-401, *et seq.*)
**(Asserted by New York Plaintiffs on behalf of the Nationwide Classes and the New York Subclass against DFS Defendants)**

553.    Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

554.    Pursuant to NYGOL § 5-401: "All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."

555.    NYGOL § 5-411 sets forth: "All contracts for or on account of any money or property, or thing in action wagered, bet or staked, as provided in section 5-401, shall be void."

556.    Other states, as alleged above, have similar statutes and/or have had Attorneys

General in their state(s) determine that DFS Defendant's products were illegal under that state's law.

557.     Plaintiffs and members of the Nationwide Classes entered into contracts with DFS Defendants that were void and unenforceable pursuant to New York law and/or the laws of the home states of Plaintiffs.

558.     Plaintiffs and members of the Nationwide Classes paid monies to the DFS Defendants in consideration of these contracts that were void and unenforceable, and the DFS Defendants collected entry fees on contests pursuant to void and unenforceable contracts.

559.     DFS Defendants were not allowed to collect money owed pursuant to unenforceable contracts.

560.     Accordingly, Plaintiffs and members of the Nationwide Classes are entitled to damages in the form of restitution for monies paid in connection with these void contracts over the course of the past six (6) years.

## COUNT IV

## VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, M.G.L. CHAPTER 93A
**(Asserted by Plaintiffs on behalf of the members of the Nationwide Classes and Massachusetts Subclass against DraftKings)**

561.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

562.     Massachusetts prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." M.G.L. c. 93A § 2. DraftKings participated in misleading, false or deceptive acts that violated the Massachusetts Act.

563.     A person who has suffered a loss as a result of a violation of the Massachusetts

Consumer Protection Act may recover actual damages, double or treble damages, plus attorney's fees and court.

564.    Defendant DraftKings' actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

565.    M.G.L. c. 93A, provide consumers with a private right of action for the DraftKings' deceptive acts and practices.

566.    DraftKings has been and is engaged in trade and commerce.

567.    DraftKings has engaged in unfair or deceptive acts or practices as alleged herein all conduct of which violates M.G.L. c. 93A.

568.    Defendant DraftKings thus violated the Act by, at a minimum employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission in connection with their participation of Defendant' DraftKings' DFS website.

569.    Plaintiffs have provided pre-suit notices and demands as required by M.G.L. c. 93A and any other applicable pre-suit notice or demand requirements set forth in the consumer protection and consumer fraud laws in the states set forth above, thirty (30) days have passed since such demand was made and Defendant DraftKings has failed to make a reasonable offer of settlement.

570.    The Defendant DraftKings' unfair or deceptive acts and practices have directly, foreseeably, and proximately caused or will cause damages and injury to Plaintiffs and all others similarly situated, including members of the Nationwide Classes and the State Subclasses.

571.     Plaintiffs and all others similarly situated, including all members of the Nationwide Classes and the State Subclasses, were injured and sustained ascertainable losses and damages in amounts to be proven at trial, as a direct and proximate result of DraftKings' unfair, deceptive and unconscionable acts and practices as set alleged herein.

572.     By reason of the foregoing, Plaintiffs and all others similarly situated, including all members of the Nationwide Classes and the State Subclasses, are entitled to receive their actual damages, or statutory damages as applicable. Because Defendant DraftKings acted willfully or knowingly, the Plaintiffs and all others similarly situated, including all members of the Nationwide Classes and the State Subclasses, are entitled to recover up to three times their actual damages, or additional punitive or exemplary damages and attorneys' fees as applicable under the consumer protection and consumer fraud statutes set forth above.

## COUNT V:

### UNFAIR/DECEPTIVE PRACTICES IN VIOLATION OF STATE CONSUMER PROTECTION STATUTES
**(Asserted by Plaintiffs and the other members of the Nationwide Classes or, alternatively, Plaintiffs and the State Subclasses, Against the DFS Defendants)**

573.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

574.     Defendants knowingly made materially false and/or misleading representations related to the fair play and even-level playing field available for all DFS players on their websites, the legality of their product and the nature of the free bonus money to anyone who made a deposit.

575.     A significant number of states' consumer protection statutes closely track the language of the Federal Trade Commission Act ("FTCA"), proscribing "unfair or deceptive

acts or practices in or affecting commerce[.]"  15 U.S.C. § 45(a)(1).  The following states have

consumer protection statutes that prohibit unfair and/or deceptive acts or practices:

**Alaska: ALASKA STAT. § 45.50.471,** *et seq.* provides that "unfair methods of competition and unfair or deceptive acts or practices in trade or commerce are declared to be unlawful."

**California: CAL. BUS. & PROF. CODE § 17200,** *et seq.* prohibits any "unlawful, unfair or fraudulent business act or practices."

**California: CAL. CIV. CODE § 1750,** *et seq.,* prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]"

**Colorado: CO.REV.STAT. § 6-1-104** describes and proscribes "Deceptive trade practices" including *inter alia* contests pursuant to **CO.REV.STAT. 6-1-802(2)** prohibiting misleading and deceptive prize promotions.

**Connecticut:  CONN. GEN. STAT. § 42-110b,** *et seq.* provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

**Florida: FLA. STAT. § 501.204,** *et seq.* provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

**Georgia:  OFFICIAL CODE OF GA. § 10-1-390,** *et seq.* provides that "unfair or deceptive acts or practices in the conduct of consumer transaction and consumer acts or practices in trade or commerce are declared unlawful."

**Hawaii:  HAW. REV. STAT. § 480,** *et seq.* provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

**Illinois:  ILL. COMP. STAT. § 505/1,** *et seq.* **and § 510/1,** *et seq.* "unfair or deceptive acts or practices . . . in the conduct of any trade or commerce are hereby declared unlawful."

**Iowa:  IOWA CODE § 714.16,** *et seq.* prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise…"

**Kentucky: KY REV. STAT. ANN. § 367.110,** *et seq.* prohibits "[u]nfair, false,

misleading or deceptive acts or practices in the conduct of any trade or commerce"

**Louisiana:  LA. REV. STAT. ANN. § 51.1405,** *et seq.* provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

**Maine:  ME. REV. STAT. Tit. 5, § 205-A,** *et seq.* provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."

**Maryland: MD. CODE. ANN., COM. LAW § 13-101,** *et seq.* provides that [a] person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in: (1) The sale . . . of any consumer goods."

**Michigan:  MICH. COMP. LAWS § 445.901,** *et seq.* prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce…"

**Mississippi:  MISS. CODE. ANN. § 75-24-1,** *et seq.* prohibits "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce."

**Missouri:  MO. REV. STAT. § 407.010,** *et seq.* makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise…"

**Montana:  MONT. CODE ANN. § 30-14-101,** *et seq.* provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

**Nebraska:  NEB. REV. STAT. § 59-1601,** *et seq.***, § 87-301,** *et seq.* provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."

**New Hampshire:  N.H. REV. STAT. ANN. § 358-A:1,** *et seq.* provides that "[i]t shall be unlawful for any person to use . . . any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."

**New Mexico: N.M. STAT. ANN. § 57-12-1,** *et seq.* prohibits the "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."

**North Carolina: NC GEN. STAT. § 75-1.1,** *et seq.* provides that "unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

**Ohio:  OHIO REV. CODE ANN. § 1345.01,** *et seq.* provides that [n]o supplier shall

209

commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

**Oklahoma:  OKLA. STAT. Tit. 15, § 751,** *et seq.* provides that [a] person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act . . . when, in the course of the person's business, the person: . . . (20) Commits an unfair or deceptive trade practice…"

**Pennsylvania: 73 PA. STAT. ANN. § 201-1,** *et seq.* prohibit "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…"

**Rhode Island:  R.I. GEN. LAWS § 6-13.1-1,** *et seq.* provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."

**South Carolina:  S.C. CODE § 39-5-10,** *et seq.* provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful."

**Tennessee:  TENN. CODE. ANN. § 47-18-104,** *et seq.* prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce."

**Texas:  TEX. BUS. & COM. CODE ANN. § 17.41,** *et seq.*  prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."

**Vermont: VT. STAT. ANN. Tit. 9, § 2451,** *et seq.* provides that "unfair or deceptive acts or practices in commerce, are hereby declared unlawful."

**Washington: REV. CODE WA. § 19.86.010,** *et seq.* provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

**West Virginia:  W. VA. CODE § 46A-6-**104, *et seq.* provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

**Wisconsin:  WIS. STAT. § 100.20,** *et seq.* prohibits "[u]nfair methods of competition in business and unfair trade practices in business."

**Wyoming:  WYO. STAT. ANN. § 40-12-101,** *et seq.* provides that "[a] person engages in a deceptive trade practice unlawful under this act when, in the course of his business and in connection with a consumer transaction, he knowingly: . . . (xv) Engages in unfair or deceptive acts or practices."

576.    The statutes identified in the preceding paragraph as well as M.G.L. c. 93A provide consumers with a private right of action for the Defendants' unfair acts and practices.

577.    At all relevant times, DFS Defendants have been and are engaged in trade and commerce.

578.    Defendants have engaged in unfair acts or practices as alleged herein all conduct of which violates M.G.L. c. 93A and the statutes identified above.   Defendants' conduct constitutes unfair methods of competition and unfair or deceptive acts or practices and violated the above statutes for, among other things, one or more of the following reasons:

a.    The DFS Defendants made false and/or misleading statements of material fact that their products were a fair game of skill that anyone could win while failing to disclose that this was not a level playing field but a rigged game where only a few elite players, equipped with advanced and elaborate statistical tools and automated tools, actually win money which accounts for only the top .1% of users;

b.    The DFS Defendants failed to disclose that they acted in concert to allow their employees to play on each other's sites and use inside information to gain unfair advantage over Plaintiffs and consumers;

c.    The DFS Defendants made false and/or misleading statements of material fact that Plaintiffs and consumers would receive free bonus money when they made deposits but failed to disclose that consumers would receive no money upon depositing and would have to enter paid contests and then receive only a small amount which would be four percent or less of the deposit and in fact, would have to play and spend 25 times their initial payments or more in order

to receive the promised "100% First-Time Deposit Bonus";

    d.  The DFS Defendants made false and/or misleading statements of material fact that their products were 100% legal and omitted to disclose that this was not accurate because multiple states had already determined that DraftKings and FanDuel are not legal in their states;

579.    Plaintiffs have provided pre-suit notices and demands as required by the consumer protection and consumer fraud laws set forth in states where such notice is required.

580.    These unfair acts and practices have been made unlawful under Massachusetts General Law c. 93A and similar or identical consumer protection and consumer fraud statutes in the other states set forth above.

581.    The DFS Defendants' have engaged in the unfair acts and practices as described above willfully and knowingly.

582.    The DFS Defendants' unfair acts and practices have directly, foreseeably, and proximately caused or will cause damages and injury to Plaintiffs and all others similarly situated, including members of the State Subclasses.

583.    Plaintiffs and all others similarly situated, including all members of the State Subclasses, were injured and sustained ascertainable losses and damages in amounts to be proven at trial, as a direct and proximate result of Defendants' unfair acts and practices as set alleged herein.

584.    By reason of the foregoing, Plaintiffs and all others similarly situated, including all class members, are entitled to relief under the consumer protection and consumer fraud statutes set forth above.

**COUNT VI:**

**DECEPTIVE PRACTICES IN VIOLATION OF STATE CONSUMER PROTECTION STATUTES**
**(Asserted by Plaintiffs and the other members of the Nationwide Classes**
**or, alternatively, Plaintiffs and the State Subclasses, Against the DFS Defendants)**

585.   Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

586.   Defendants knowingly made materially false and/or misleading representations related to the fair play and even-level playing field available for all DFS players on their websites, the legality of their product and the nature of the free bonus money to anyone who made a deposit.

587.   A number of states' consumer protection statutes broadly prohibit false, misleading or deceptive acts or practices, but do not prohibit "unfair" practices.  The following states have consumer protection statutes that prohibit deceptive acts or practices but do not prohibit "unfair" practices:

**Alabama: ALA. CODE §§ 8-19-1,** *et seq.* sets forth a list of twenty-six unlawful trade practices and a catch-all provision that makes it unlawful to "engag[e] in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

**Arkansas: ARK. CODE ANN. § 4-88-107,** *et seq.* prohibits "[d]eceptive and unconscionable trade practices," which include but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade [.]"

**Colorado:  COLO. REV. STAT. § 6-1-101,** *et seq.* prohibits a broad range of "deceptive trade practices," including knowingly making various false representations concerning goods, services, or property.

**Delaware: DEL. CODE ANN. Title 6, § 2511,** *et seq.* prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has

213

in fact been misled, deceived or damaged thereby."

**District of Columbia: D.C. CODE § 28-3901,** *et seq.* provides that "[i]t shall be a violation of this chapter…for any person to: . . . (e) misrepresent as to a material fact which has a tendency to mislead" and "(t) use deceptive representations…in connection with goods or services."

**Idaho: IDAHO CODE § 48-601,** *et seq.* provides that "[t]he following … unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful, where a person knows, or in the exercise of due care should know, that he has in the past or is … [e]gaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer."[108]

**Indiana: IND. CODE § 24-5-0.5-1,** *et seq.* provides protection to "consumers from suppliers who commit deceptive and unconscionable sales acts…"

**Kansas:  KAN. STAT. § 50-623,** *et seq.* provides that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction[;]"

**Minnesota: MINN. STAT. § 325F.68,** *et seq.* prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …"

**Nevada:  NEV. REV. STAT. § 598.0903,** *et seq.* provides that "[a] person engages in a 'deceptive trade practice' if, in the course of his business or occupation, he: . . . (13) Makes false or misleading statements of fact concerning the price of goods . . . for sale. (15) Knowingly makes any other false representation in a transaction."

**New Jersey:  N.J. STAT. ANN. § 56:8-1,** *et seq.* provides that "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . in connection with the   sale . . . of any merchandise . . . is declared to be an unlawful practice."

**North Dakota: N.D. CENT. CODE § 51-15-01,** *et seq.,* prohibits "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale . . . of any merchandise . . ."

**Oregon:  OR. REV. STAT. § 646.605,** *et seq.* provides that: "[a] person engages in an

---

[108] While Idaho's consumer protection statute refers to "unfair or deceptive acts or practices[,]", the court in *In re Pharm. Indus. Average Wholesale Price Litig.,* 252 F.R.D. 83, 110 (D. Mass. 2008) excluded it from the list of statutes that more closely track the FTC Act because the statutes' "general prohibition refers to an enumerated list of prohibited practices, instead of simply prohibiting all unfair or deceptive practices."

unlawful practice when in the course of the person's business, vocation or occupation the person does any of the following: . . . (s) Makes false or misleading representations of fact concerning the offering price of, or the person's cost for . . . goods.″

**South Dakota: S.D. CODIFIED LAWS § 37-24-1, *et seq.*** prohibits "deceptive acts or practices", which are defined to include: [k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby."

**Utah:  UTAH CODE ANN. § 13-11-1 *et seq.*** prohibits "deceptive acts and practices by a supplier in connection with a consumer transaction."  Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not."  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Act."

**Virginia:  VA. CODE § 59.1-196, *et seq.***  makes unlawful certain "fraudulent acts or practices committed by a supplier in connection with a consumer transaction," including "[m]isrepresenting that goods or services are of a particular standard, quality, grade style or model."

588.   The statutes identified in the preceding paragraph as well as N.Y. Gen. Bus. Laws § 349(a), *et seq*, provide consumers with a private right of action for the Defendant's deceptive acts and practices.

589.   Defendants are engaged in trade and commerce.

590.   Defendants have engaged in deceptive acts or practices as alleged herein all conduct of which violates N.Y. Gen. Bus. Laws § 349(a), *et seq.* and the statutes identified in paragraph __ above.  Defendants' conduct constitutes deceptive acts or practices and violated the above statutes for, among other things, one or more of the following reasons:

a.   The DFS Defendants made false and/or misleading statements of material fact that their products were a fair game of skill that anyone could win while failing to disclose that this was not a level playing field but a rigged game where only a few elite players, equipped with advanced and elaborate

215

statistical tools and automated tools, which accounts for only the top .1% of

users, actually win money;

b.   The DFS Defendants failed to disclose that they acted in concert to allow their

employees to play on each other's sites and use inside information to gain

unfair advantage over Plaintiffs and consumers;

c.   The DFS Defendants made false and/or misleading statements of material fact

that Plaintiffs and consumers would receive free bonus money when they

made deposits but failed to disclose that consumers would receive no money

upon depositing and would have to enter paid contests and then receive only a

small amount which would be four percent or less of the deposit and in fact,

would have to play and spend 25 times their initial payments or more in order

to receive the promised "100% First-Time Deposit Bonus";

d.   The DFS Defendants made false and/or misleading statements of material fact

that their products were 100% legal and omitted to disclose that this was not

accurate because multiple states had already determined that DraftKings and

FanDuel are not legal in their states;

591.   These deceptive acts and practices have been made unlawful under N.Y. Gen.

Bus. Laws § 349(a), *et seq*. and similar or identical consumer protection and consumer fraud

statutes in the other states set forth above.

592.   Plaintiffs have provided pre-suit notices and demands as required by the

consumer protection and consumer fraud laws set forth in states in which such notices are

required.

593.   The DFS Defendants' deceptive acts and practices have directly, foreseeably,

and proximately caused or will cause damages and injury to Plaintiffs and all others similarly situated, including class members.

594.    Plaintiffs and all others similarly situated, including all members of the State Subclasses, were injured and sustained ascertainable losses and damages in amounts to be proven at trial, as a direct and proximate result of DFS Defendants' unfair, deceptive and unconscionable acts and practices as set alleged herein.

595.    By reason of the foregoing, Plaintiffs and all others similarly situated, including all members of the State Subclasses, are entitled to relief under the consumer protection and consumer fraud statutes set forth above.

## COUNT VII:

### UNCONSCIONABLE PRACTICES IN VIOLATION OF STATE CONSUMER PROTECTION STATUTES
**(Asserted by Plaintiffs and the other members of the Nationwide Classes
or, alternatively, Plaintiffs and the State Subclasses, Against the DFS Defendants)**

596.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

597.    Defendants knowingly made materially false and/or misleading representations related to the fair play and even-level playing field available for all DFS players on their websites, the legality of their product and the nature of the free bonus money to anyone who made a deposit.

598.    There are numerous states, including some that are listed in Counts V and VI above that expressly prohibit "unconscionable" practices. The following states have consumer protection statutes that expressly prohibit "unconscionable" practices:

**Alabama: ALA. CODE §§ 8-19-1,** *et seq.* sets forth a list of twenty-six unlawful trade practices and a catch-all provision that makes it unlawful to "engag[e] in any other

217

unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

**Arkansas: ARK. CODE ANN. § 4-88-107,** *et seq*. prohibits "[d]eceptive and unconscionable trade practices," which include but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade [.]"

**Florida: FLA. STAT. § 501.204,** *et seq*. provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

**Idaho: IDAHO CODE § 48-601,** *et seq*. provides that "[t]he following … unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful, where a person knows, or in the exercise of due care should know, that he has in the past or is … [e]gaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer."[109]

**Indiana: IND. CODE § 24-5-0.5-1,** *et seq.* provides protection to "consumers from suppliers who commit deceptive and unconscionable sales acts…"

**Kansas:  KAN. STAT. § 50-623,** *et seq.* provides that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction[;]"

**Michigan:  MICH. COMP. LAWS § 445.901,** *et seq*. prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce…"

**New Jersey:  N.J. STAT. ANN. § 56:8-1,** *et seq*. provides that "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . in connection with the   sale . . . of any merchandise . . . is declared to be an unlawful practice."

**New Mexico: N.M. STAT. ANN. § 57-12-1,** *et seq*. prohibits the "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."

**North Dakota: N.D. CENT. CODE § 51-15-01,** *et seq.***,** prohibits "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale . . . of any merchandise . . ."

---

[109] While Idaho's consumer protection statute refers to "unfair or deceptive acts or practices[,]", the court in *In re Pharm. Indus. Average Wholesale Price Litig.,* 252 F.R.D. 83, 110 (D. Mass. 2008) excluded it from the list of statutes that more closely track the FTC Act because the statutes' "general prohibition refers to an enumerated list of prohibited practices, instead of simply prohibiting all unfair or deceptive practices."

**Ohio:  OHIO REV. CODE ANN. § 1345.01,** *et seq.* provides that [n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

**Oregon:  OR. REV. STAT. § 646.605,** *et seq.* provides that: "[a] person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person does any of the following: . . . (s) Makes false or misleading representations of fact concerning the offering price of, or the person's cost for . . . goods.″

**Texas:  TEX. BUS. & COM. CODE ANN. § 17.41,** *et seq.* prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."

**Utah:  UTAH CODE ANN. § 13-11-1** *et seq.* prohibits "deceptive acts and practices by a supplier in connection with a consumer transaction."  Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not."  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Act."

599.    The statutes identified in the preceding paragraph provide consumers with a private right of action for the DFS Defendants' unconscionable acts and practices.

600.    DFS Defendants are and have been engaged in trade and commerce.

601.    DFS Defendants have engaged in unconscionable acts or practices as alleged herein all conduct of which violates the statutes identified above.  Defendants' conduct constitutes unconscionable acts or practices and violated the above statutes for, among other things, one or more of the following reasons:

a.  The DFS Defendants made false and/or misleading statements of material fact that their products were a fair game of skill that anyone could win while failing to disclose that this was not a level playing field but a rigged game where only a few elite players, equipped with advanced and elaborate statistical tools and automated tools, actually win money which accounts for

only the top .1% of users;

b.  The DFS Defendants failed to disclose that they acted in concert to allow their employees to play on each other's sites and use inside information to gain unfair advantage over Plaintiffs and consumers;

c.  The DFS Defendants made false and/or misleading statements of material fact that Plaintiffs and consumers would receive free bonus money when they made deposits but failed to disclose that consumers would receive no money upon depositing and would have to enter paid contests and then receive only a small amount which would be four percent or less of the deposit and in fact, would have to play and spend 25 times their initial payments or more in order to receive the promised "100% First-Time Deposit Bonus";

d.  The DFS Defendants made false and/or misleading statements of material fact that their products were 100% legal and omitted to disclose that this was not accurate because multiple states had already determined that DraftKings and FanDuel are not legal in their states;

602.  These unconscionable acts and practices have been made unlawful under consumer protection and consumer fraud statutes in the other states set forth above.

603.  DFS Defendants' have engaged in the unconscionable acts and practices as described above willfully and knowingly.

604.  The DFS Defendants' unconscionable acts and practices have directly, foreseeably, and proximately caused or will cause damages and injury to Plaintiffs and all others similarly situated, including class members.

605.  Plaintiffs have provided pre-suit notices and demands as required by the

consumer protection and consumer fraud laws set forth in all states in which such notice is required.

606.    Plaintiffs and all others similarly situated, including all class members, were injured and sustained ascertainable losses and damages in amounts to be proven at trial, as a direct and proximate result of DFS Defendants' unfair acts and practices as set alleged herein.

607.    By reason of the foregoing, Plaintiffs and all others similarly situated, including all class members, are entitled to relief under the consumer protection and consumer fraud statutes set forth above.

### **Notice of Consumer Protection Statutes Provided to Defendants**

608.    On June 7, 2016, before filing this Complaint, Plaintiffs Aissa Khirani, Brackie Bryant, Peter Johnson, Samuel Lozada, Karl Medina, Clay Lamart , Richard Hinojosa, who are named in this Consolidated  Complaint and plaintiffs Curry Conaway, Cody Spiegel and Stephen Fernandez, provided pre-suit notices and demands as required by Massachusetts General Laws, Chapter 93A, §§2, 3, and 9; Georgia Code, Title 10, Chapter 1, Article 15, Part 2, Fair Business Practices Act; California Consumer Legal Remedies Act, California Civil Code section 1750, *et seq.*; Alabama Code § 8-19-10; New York Deceptive Acts and Practices Law and False Advertising Law, General Business Law § 349 and §350; and/or Texas Bus. and Com. Code § 17.505 and any other applicable pre-suit notice or demand requirements set forth in the consumer protection and consumer fraud laws in the states set forth above[110].

609.    Additionally, other Plaintiffs, who are named in this Consolidated  Complaint, who filed actions prior to consolidation in this Multi-District Litigation Case have also provided notice pursuant to their respective states statutes and such notice is discussed in the

---

[110] Defendants have agreed that the June 7, 2016, notices were served in a timely manner pursuant to the 30 day notice requirement despite being served within 30 days of the filing of this Master Consolidated Complaint.

respective counts.

610.    Plaintiff Wesley Leung, a California resident, sent a demand for relief to Defendant FanDuel on March 3, 2015, prior to filing his complaint.

611.    Plaintiff Eric Champagne, a Connecticut resident, sent a demand for relief to the DFS Defendants on October 21, 2015, prior to the filing of his complaint.

612.    James Facenda, a California resident, sent a demand for relief to Defendant DraftKings on November 17, 2015, prior to filing his complaint.

## COUNT VIII

## VIOLATION OF STATE CONSUMER PROTECTION STATUTES BY MEANS OF VIOLATION OF FTC REGULATION REGARDING ADVERTISING "FREE" OFFERS
**(Asserted by Plaintiffs and the other members of the Nationwide Classes
or, alternatively, Plaintiffs and the State Subclasses, Against the DFS Defendants)**

613.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

614.    The following states, by statute, state regulation or case law, expressly incorporate the FTC's and the courts' interpretations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) into their consumer protection statutes: Alabama, California, Connecticut, Florida, Georgia, Hawaii, Illinois, Idaho, Maine, Maryland, Massachusetts, Missouri, New Hampshire, North Carolina, Rhode Island, Texas, Washington, and West Virginia.

615.    The statutes identified in the preceding paragraph provide consumers with a private right of action for the DFS Defendants' deceptive acts and practices.

616.    DraftKings' and FanDuel's offers of a "Free Bonus," "FREE OFFER," "100% First-Time Deposit Bonus," "**DOUBLE YOUR CASH**" Bonus, 100% Deposit Bonus," "*match* [of] *the first deposit dollar for dollar up to 200 bucks*" and the like violated the FTC

Guide Concerning "Free" Offers, codified in the Code of Federal Regulations, 16 C.F.R. § 251.1, because all of the terms, conditions and obligations did not appear in close conjunction with the offer of "free" merchandise or services.

617.     Specifically, DFS Defendants did not disclose in close conjunction with these offers that a consumer would need to spend 25 times the amount of the initial deposit within four months to receive the full amount of the supposed "free" bonus.

618.     Plaintiffs have provided pre-suit notices and demands as required by the consumer protection and consumer fraud laws set forth in all states in which such notice is required.

619.     The DFS Defendants' unfair, deceptive and unconscionable acts and practices have directly, foreseeably, and proximately caused or will cause damages and injury to Plaintiffs and all others similarly situated, including class members.

620.     Plaintiffs and all others similarly situated, including all class members, were injured and sustained ascertainable losses and damages in amounts to be proven at trial, as a direct and proximate result of DFS Defendants' unfair, deceptive and unconscionable acts and practices as set alleged herein.

621.     By reason of the foregoing, Plaintiffs and all others similarly situated, including all class members, are entitled to relief under the consumer protection and consumer fraud statutes set forth above.


## COUNT IX

### NEGLIGENT MISREPRESENTATION
**(Asserted by Plaintiffs and the other members of the Nationwide Classes
or, alternatively, Plaintiffs and the State Subclasses, Against the DFS Defendants)**

622.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing

223

allegations as though fully set forth herein.

623.    Defendants DraftKings and FanDuel each maintained a contractual relationship with Plaintiffs and the Nationwide Classes. DFS players reasonably placed their trust and reliance in these Defendants as their DFS provider to provide the DFS online platform, services, and contests as marketed and represented to the players, media, and public at large. Moreover, as the professional DFS contest providers, DraftKings and FanDuel possessed unique or specialized expertise as to the nature of the DFS contests and misrepresented: that it was a fair game of skill that the ordinary person/player could succeed at; that it was actually "100%" legal; the nature of the competition amongst players; the true way in which Bonus money was awarded.  The DFS Defendants also failed to disclose that other players were utilizing information – including non-public data and metrics – not available to Plaintiffs and the Nationwide Classes; and the availability of inside information to their employees who competed on other DFS sites, thus rendering the games fundamentally unfair to other persons competing in the same contests.

624.    Because of this special relationship between the parties, DraftKings and FanDuel owed a duty to use reasonable care to impart correct and reliable disclosure regarding: the nature of the contests and competition and its legality, how bonus moneys were earned after the initial deposit, the degree of their fairness, the information, data, or analytics available to all contest players, and the company policy of permitting employees who had inside information to play on competitor DFS websites.

625.    DraftKings and FanDuel through their agents, representatives, and employees, breached its duties to Plaintiffs and the Nationwide Classes by providing false, misleading, and/or deceptive information regarding the nature of the contests and their fairness.  DraftKings

and FanDuel further breached their duty by failing to prevent persons with inside information and data by virtue of their employment at other competitor DFS sites from competing as DFS players against Plaintiffs and the Nationwide Classes.

626.    Plaintiffs and the Nationwide Classes reasonably and justifiably relied upon the information supplied to them, the media and the public by DraftKings and FanDuel as their DFS online provider. As a result, Plaintiffs and the Nationwide Classes placed, deposited, submitted, and/or invested funds into DraftKings and FanDuel's websites to play in their contests and lost money.

627.    DraftKings and FanDuel failed to use reasonable care in their communications and representations to potential players on their DFS sites.

628.    By virtue of DraftKings' and FanDuel's negligent misrepresentations, Plaintiffs and Nationwide Classes or alternatively Plaintiffs and the State Subclasses have been damaged in an amount to be proven at trial or alternatively, seek rescission and disgorgement under this count.

## COUNT X

### NEGLIGENCE
**(Asserted by Plaintiffs and the other members of the Nationwide Classes or, alternatively, Plaintiffs and the State Subclasses, Against the DFS Defendants)**

629.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

630.    DraftKings and FanDuel owed duties to Plaintiffs and the Nationwide Classes as users and paying customers of their sites to use reasonable care to provide true, reliable and safe information and contests.

631.    Defendants breached their duties to Plaintiffs and the Nationwide Classes by

failing to prevent persons with inside information and data, by virtue of their employment at other DFS sites, from competing against Plaintiffs and the Nationwide Classes.

632.    In the course of their business, profession and employment, DFS Defendants and their agents, representatives and employees supplied false information to Plaintiffs and the Nationwide Classes.

633.    DFS Defendants failed to use reasonable care in communicating that the reality of playing on the sites of DraftKings and FanDuel was the exact opposite of what they represented: it was not 100% legal, was not a fair game of skill that anyone could win, it was not easy or simple to win, it was not just a love of sports and experience playing season-long fantasy sports that could turn a few dollars into millions, and users could not earn the bonus money they were promised.  The DFS Defendants failed to use reasonable care in omitting material information about all of these things, including that they allowed employees of the other site to play against its customers in exchange for the other site allowing the same, that those employees had access to insider information that gave them an edge over the average consumer, that employees would use some of that insider information to challenge the worst players to one-on-one contests, that DraftKings and FanDuel were intentionally trying to attract "casual" players with no hope of winning in order to help the high-revenue generating users, and that only a few people at the top won most of the money.

634.    As a direct and proximate result of DFS Defendants' negligence, Plaintiffs and members of the Nationwide Class or alternatively the State Subclasses have been damaged in an amount to be proven at trial, including all damages allowed by law.

## COUNT XI

## FRAUD AND MISREPRESENTATION
**(Asserted by Plaintiffs and the other members of the Nationwide Classes or, alternatively, Plaintiffs and the State Subclasses, Against the DFS Defendants)**

635.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein**.**

636.    DraftKings and FanDuel intentionally made material representations regarding the nature of their DFS contests, the nature and fairness of the competition within, and the availability of information – both public and non-public – to the players that were false, misleading, and/or deceptive.  DraftKings and FanDuel were aware their representations were false, misleading, and/or deceptive, or, at the least, were reckless as to the veracity of those representations.

637.    These false representations regarding the offered DFS contests served as an inducement for Plaintiffs and the Nationwide Classes to enter into a contract with DraftKings and FanDuel and/or place, deposit, submit, and/or invest funds into DraftKings' and FanDuel's websites to play in their contests.

638.    DraftKings and FanDuel represented that their DFS contests were fair games of skill and were 100% legal.  DraftKings and FanDuel also willfully misrepresented that play on their sites was a fair game of skill that anyone could win, when in fact it was not, and that users by making a deposit on the DFS sites could thereby earn bonus money when, in fact, the process of earning  bonus money was lengthy and illusory. They also willfully failed to disclose that DraftKings and FanDuel  employees were permitted to play against its customers in exchange for the other site allowing the same, that those employees had access to insider information that gave them an edge over the average consumer, that employees would use some of that insider information to challenge the worst players to one-on-one contests, and that

DraftKings and FanDuel were intentionally trying to attract "casual" players with no hope of winning in order to help the high-revenue generating users, and that only a few people at the top won most of the money.   As a result, Plaintiffs and the Nationwide Classes were left to compete at a relative disadvantage with a decreased ability and statistically lower chance to win.

639.    Plaintiffs and the Nationwide Classes acted in reliance on the false, material representations and willful omissions made by DraftKings and FanDuel, which caused them injury.  Because of the alleged contract entered into by the parties, and the position of power, management, knowledge, and control held by DFS contest providers vis-à-vis their paying customer players, Plaintiffs and the Nationwide Classes were justified in relying upon DraftKings and FanDuel to relay complete and accurate information regarding the DFS contests they provide for the public, and all relevant details.

640.    Plaintiffs and the Nationwide Classes would not have deposited money or engaged in any activity on DraftKings' and FanDuel's websites if they had known that they know the truth.

641.    DraftKings and FanDuel were aware of the truth regarding the above, that the misrepresentations and omission they made or engaged in were material facts in inducing Plaintiffs and the Nationwide Classes to give them money in exchange for services and agreeing to the alleged contract.

642.    As a result of DraftKings' and FanDuel's fraudulent representations and fraudulent omissions, Plaintiffs and the Nationwide Class or alternatively each of State Subclasses were misleadingly induced to play DFS contests on DFS Defendants' internet sites that they otherwise would not have made and suffered financial injury, harm and damages as

described in this Complaint.

## COUNT XII

### UNJUST ENRICHMENT

**(Asserted by Plaintiffs and the other members of the Nationwide Classes or, alternatively, Plaintiffs and State Subclasses, Against the DFS Defendants)**

643.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

644.    Defendants DraftKings and FanDuel were unjustly enriched at the expense of Plaintiffs and the Nationwide Classes and State Subclasses. DFS Defendants' knowingly permitted and encouraged its employees to exploit their access to their respective company's inside information to maintain an advantage when playing and earning cash winnings on a competitor's DFS site.  Statistical data gained from Plaintiffs and the Nationwide Classes and State Subclasses DFS selections was used by DFS Defendants' employees with DFS Defendants' knowledge and encouragement to draft fantasy teams on competitor DFS sites that included athletes that were not in widespread use in any given contest, thus increasing the odds of their winnings.

645.    DFS Defendants also willfully failed to disclose to prospective and current players that DraftKings and FanDuel  employees were permitted to play against its customers in exchange for the other site allowing the same, that those employees had access to insider information that gave them an edge over the average consumer, that employees would use some of that insider information to challenge the worst players to one-on-one contests, and that DraftKings and FanDuel were intentionally trying to attract "casual" players with no hope of winning in order to help the high-revenue generating users, and that only a few people at the top won most of the money.   As a result, Plaintiffs and the Nationwide Classes were left to

229

compete at a relative disadvantage with a decreased ability and statistically lower chance to win, thus unjustly enriching Defendants DraftKings and FanDuel.

646.    In addition to permitting its employees to play on each other sites Defendants DraftKings and FanDuel were also unjustly enriched because they represented that their DFS contests were fair games of skill and were 100% legal.  DraftKings and FanDuel also willfully misrepresented that play on their sites was a fair game of skill that anyone could win, when in fact play on their sites was not a fair game of skill, that users by making a deposit on the DFS sites could thereby earn bonus money when, in fact, the process of earning bonus money was lengthy and largely illusory.

647.    In fact, confirming the unfairness of the use of inside information, DraftKings has since implemented an "Updated Policy on Employee Participation" (on https://www.draftkings.com/help/faq) which states, inter alia, that "We have engaged a legal team from Greenberg Traurig, led by former United States Attorney John Pappalardo, to conduct a thorough review to help strengthen our existing policies and controls and ensure a level-playing field[;]" and that "DraftKings has implemented a policy prohibiting employees from other DFS sites from playing in any DraftKings contests that are open to the public."  The same website asserts that "if it's discovered that other DFS site employees used internal data to their advantage on DraftKings" that DraftKings "will take strong and immediate action based on the specific circumstances."

648.    Similarly,    FanDuel's    Terms    of    Use    (available    at https://www.fanduel.com/terms) were changed as a result of the lawsuits brought by Plaintiffs and now state that "By depositing money or entering a contest, you are representing and warranting that… When entering any contest that awards prizes, you are not an employee or

operator of another daily fantasy site that charges entrance fees or offers cash prizes."   The

Terms also require that:

> Employees or operators of other daily fantasy sites that charge entry fees or offer cash prizes, including but not limited to DraftKings, Sportsline.com, and Yahoo, and individuals who, by virtue of affiliation with another daily fantasy site, have access to the site's pre-release non-public confidential data about game-related information may not enter any contests in which a real money prize is awarded. If such person enters a FanDuel contest that awards prizes, FanDuel will disqualify the entry, will not award a prize, and may report such person's violation of this provision to the daily fantasy site for which the entrant is employed by, operates or affiliated with. Additionally, FanDuel may maintain information about the entrant sufficient to assist FanDuel in blocking the user from entering future FanDuel contests, unless and until FanDuel determines, in its sole discretion, that the entrant is no longer an employee or operator of another daily fantasy site or no longer has access to pre-release non-public confidential data about game-related information by virtue of affiliation with a daily fantasy site.

649.    If Plaintiffs and members of the Nationwide Classes had known they were competing against employees, who were playing a game of limited information with superior non-public information; that their DFS contests were not fair games of skill and necessarily 100% legal as represented by DFS Defendants; and that bonus money was not earned as represented by DFS Defendants,  they would not have played and DraftKings and FanDuel would not have profited by taking a portion of the deposits lost by the Plaintiffs and members of the Nationwide Classes. As the Supreme Court recognized, in an analogous situation, in adopting a presumption of reliance in securities fraud cases, "It has been noted that 'it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?" *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988).  In short, the Plaintiffs and the Nationwide Classes were tricked into playing a crooked game, and their deposits were split, in large part, by DraftKings and FanDuel.

650.    Defendants DraftKings and FanDuel's enrichment came at the expense of Plaintiffs and the Nationwide Classes or alternatively each of the State Subclasses.

651.     DraftKings and FanDuel deception and bad faith is contrary to principles of equity to permit them or their employees to retain their additional earnings which came as a result of playing on inside DFS information and analytics would constitute unjust enrichment.

652.     Moreover, this unjust enrichment occurred while Plaintiffs and the Nationwide Classes maintained a special relationship with and were in privity with DraftKings and FanDuel and/or their employees which, as their DFS provider, caused them to reasonably rely and be induced by their business representations.

653.     Moreover, Plaintiffs and the Nationwide Classes conferred a benefit on DraftKings and FanDuel by depositing money and playing in contests on their websites.

654.     Defendants Draft Kings and FanDuel have been unjustly enriched in retaining the revenues derived from Plaintiffs and the Nationwide Classes' deposits and contest entries, retention under these circumstances is unjust and inequitable because DraftKings and FanDuel misrepresented the true facts concerning play on their websites and knowingly permitted and/or encouraged its employees who had superior inside information to play on each other's sites.

655.     Plaintiffs and members of the Nationwide Classes were injured as a direct and proximate result of Defendants' misrepresentations and omissions and bad acts because they paid for entry into contests and deposited money onto Defendants' websites, which they would not have done had they known the true facts. Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiffs and the members of the Nationwide Classes is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the members of the Nationwide Class or alternatively the State Subclasses for their unjust enrichment, as ordered by the Court.

## COUNT XIII

## UNJUST ENRICHMENT

**(Asserted by Plaintiffs and the other members of the Nationwide Classes or, alternatively, Plaintiffs and the State Subclasses, Against the Payment Processor Defendants)**

656.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein

657.     Payment Processor Defendants unlawfully retained payments from Plaintiffs and the Nationwide Classes and profited from the transactions.

658.     As a result, Payment Processor Defendants have been unjustly enriched through their retention of wagers placed pursuant to the DFS Defendants' online gambling scheme.

659.     Plaintiffs and the Nationwide Classes are entitled to restitution for their full share of improperly retained money from Payment Processor Defendants.

## COUNT XIV

## CIVIL CONSPIRACY

**(Asserted by Plaintiffs and the other members of the Nationwide Classes or, alternatively, Plaintiffs and the State Subclasses against the DFS Defendants, or, alternatively, members of the DraftKings Class against FanDuel and FanDuel Class against DraftKings)**

660.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

661.     As detailed above, the DFS Defendants engaged in a corrupt or unlawful combination and/or agreement with each other to do an unlawful act, and continued to act in concert after the act was discovered.

662.     Specifically, by affirmatively agreeing to allow competitors' employees to play on their own sites against their own players and concealing and not disclosing this to Plaintiffs and the Nationwide Classes, the DFS Defendants committed acts of negligence and/or fraud

233

and/or violations of each state's consumer protection statutes as described above.

663.     These overt acts were done pursuant to or in furtherance of the conspiracy to allow their employees and officers to profit, continue to attract new players to their websites, and otherwise profit because of their unlawful activities. FanDuel knew that its employees played on DraftKings' site and DraftKings knew that its employees played on FanDuel's site and DraftKings and FanDuel affirmatively agreed to allow this practice.

664.     The DFS Defendants gave each other assistance and encouragement in accomplishing the tortious result of having their employees compete against and beat players on other DFS sites.

665.     As a direct and proximate result of Defendant DraftKings' and FanDuel's concerted actions, they are both liable to Plaintiffs and the members of the Nationwide Classes or alternatively State Subclasses for the full amount of damages available to Plaintiffs and the proposed classes.

## COUNT XV

## BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
**(Asserted by Plaintiffs and the other members of the Nationwide Classes or, alternatively, Plaintiffs and the State Subclasses against the DFS Defendants)**

666.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

667.     Plaintiffs entered into contracts and "Terms of Use" with The DFS Defendants. Those agreements were subject to the implied covenants that the DFS Defendants would conduct their business with Plaintiffs and Class members in good faith and would deal fairly with Plaintiffs and Class members.

668.    Contrary to the implied covenant of good faith that they would conduct their business in good faith, the DFS Defendants misrepresented that they were 100% legal, that play on their DFS sites was a fair game of skill that anyone could win, when it was not, and that a love of sports and experience playing season-long fantasy sports that could turn a few dollars into millions, and users could not earn the bonus money they were promised.  omitted material information about all of these things, including that they allowed employees of the other site to play against its customers in exchange for the other site allowing the same, that those employees had access to insider information that gave them an edge over the average consumer, that employees would use some of that insider information to challenge the worst players to one-on-one contests, that DraftKings and FanDuel were intentionally trying to attract "casual" players with no hope of winning in order to help the high-revenue generating users, and that only a few people at the top won most of the money.

669.    Absent these misrepresentations and omissions, and if they had known that they were competing against individuals with insider knowledge, access and use of non-public data, Plaintiffs and the other Class members would not have engaged in DFS tournaments, contests or competitions.  Accordingly, Plaintiffs and the other Class members were deceived as to the nature of DFS contests and did not receive the benefit of their bargain.

670.    In failing to provide the fair games of skill as advertised, the DFS Defendants breached their agreement with the Plaintiffs and Class members.  Defendants DraftKings and FanDuel acted intentionally and in bad faith to frustrate the benefits owed to Plaintiffs and the Class, despite a duty to refrain from doing so. DraftKings' and FanDuel's failure to disclose to Plaintiffs and the Nationwide Classes the nature and fairness of the competition, the lack or at best questionable legality of play, the true nature of bonus money awards, is a breach of

DraftKings' and FanDuel's obligation of good faith and fair dealing.

671.    As a direct and proximate result of Defendants DraftKings and FanDuel's breach of contract, Plaintiffs and the Nationwide Classes have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages.

672.    DraftKings' and FanDuel's breach of those implied covenants to Plaintiffs and Class members, have been damaged Plaintiffs and Class members in an amount to be determined at trial.

673.    As a direct and proximate result of DraftKings' and FanDuel's concerted actions, they are both liable to Plaintiffs and the members of the Nationwide Classes or alternatively the State Subclasses.

## COUNT XVI
## DECLARATORY RELIEF REGARDING DRAFTKINGS'S AND FANDUEL'S SO CALLED "TERMS OF USE"
### (Asserted by Plaintiffs and the other members of the Nationwide Class against the DFS Defendants)

674.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

675.    As set forth above, Defendant DraftKings' website contains so-called "Terms of Use" that purport to eliminate all liability of Defendant for any violations of the law whatsoever.

676.    These so-called "Terms of Use" also purport to require that any claim or dispute be heard in a non-class arbitration and also that it be "decided exclusively by a court of competent jurisdiction in Suffolk County [Mass.]."

677.    These so-called "Terms of Use" are not part of a binding, mutual agreement

between Plaintiffs and Defendants and are unenforceable as unconscionable.

678.    Any agreement set forth in the so-called "Terms of Use" is illusory for the following reasons:

a.   The so-called "Terms of Use" purport to provide that the user releases DraftKings "from any and all liability, claims or actions of any kind whatsoever."  As a result, DraftKings has not agreed to do anything and any agreement by the user is without consideration.

b.   DraftKings reserves for itself and itself alone the right to revoke all rights granted to the users of the draftkings.com website without prior notice.  Just as with the provision described in the immediately preceding paragraph, as a result, DraftKings has not agreed to do anything and any agreement by the user is without consideration.

c.   DraftKings reserves for itself and itself alone the right to amend the so-called "Terms of Use" at any time without prior notice and purports to require that it is the responsibility of the user the "to review these Terms of Use for any changes." Considering the length and complexity of the purported "Terms of Use," it would be virtually impossible, if not actually impossible, for a user of the site to review the purported "Terms of Use" every time the user accessed the site, see whether the page indicates that it has been updated since his or her previous viewing and, if so, compare it to the previous version (assuming the user could even find the previous version, which is not on the website) to determine which words or statements had been changed.  As a result, DraftKings has a unilateral right to amend whatever agreement the so-called "Terms of Use" represent.

d.   DraftKings reserves the right to deny service to any user "for any reason whatsoever."  As a result, the consumer does not receive any consideration for his or her agreement.

679.   Important terms, such as the waiver of liability, the class waiver, the arbitration provision, the forum and choice-of-law provisions and the cost-shifting provision are hidden in a maze of fine print and are therefore difficult to find.

680.   The above provisions are difficult for an average consumer to understand.

681.   DraftKings is in a superior bargaining position to the consumers who wish to use the site.

682.   The so-called "Terms of Use" are non-negotiable.

683.   The so-called "Terms of Use" contain unexplained contradictions, are therefore nonsensical, and accordingly do not constitute a meeting of the minds.  Such contradictions include the following:

684.   At one place, they claim that DraftKings' "Terms of Use," Privacy Policy and Rules of the Contest constitute the agreement; at another they claim that the "Terms of Use" by themselves constitute the agreement.  At one place, they claim that any claim or dispute must be resolved in an individual arbitration proceeding in Suffolk Massachusetts; at another that any claim or dispute must be resolved in a court of competent jurisdiction in Suffolk, Massachusetts.

685.   The so-called "Terms of Use" are completely one-sided in DraftKings' favor as to oppress or unfairly surprise consumers, and result in an overall imbalance in the obligations and rights imposed on and provided to the parties.

686.   A consumer is not given the opportunity to attempt to negotiate the terms of the

238

purported "Terms of Use."

687.     Similarly, FanDuel in "Terms of Use" reserves the right, at its sole discretion, to modify or replace the Terms of Use at any time, except for the purported arbitration and waiver of class action rights provisions.  This constitutes an illusory contract that is unenforceable.

688.     Moreover, the terms of FanDuel's arbitration, waiver of class action rights and right to trial by jury are unconscionable and Plaintiffs would not have agreed to those terms or deposited any money on FanDuel's site had they known about the fraudulent activity and misrepresentations as described in this Complaint.

689.     FanDuel is in a superior bargaining position to the consumers who wish to use the site and FanDuel's so-called "Terms of Use" are non-negotiable.

## COUNT XVII

## VIOLATIONS OF NEW YORK GENERAL OBLIGATIONS LAW

### §§ 5-441, 5-401 and 5-421
**(On Behalf of the National Class and New York Subclass against Defendant FanDuel)**

690.     Plaintiffs reallege and incorporate by reference the allegations contained in all preceding and subsequent paragraphs, as if fully set forth herein.

691.     New York GOL § 5-401, which is civil law creating private rights of action against DraftKings. Pursuant to GOL § 5-401: "All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."

692.     New York General Obligations Law § 5-411 provides: "All contracts for or on account of any money or property, or thing in action wagered, bet or staked, as provided in section 5-401, shall be void."

693.     Plaintiffs and members of the Classes entered into contracts with FanDuel that

are void and/or were unenforceable at the time to allow FanDuel to take a percentage of entry fees into contests as a fee.

694.    Plaintiffs and members of the Classes paid monies in consideration of these contracts that are void.

695.    Accordingly, Plaintiffs and members of the Classes are entitled to damages in the form of restitution for monies paid in connection with these void contracts over the course of the past six (6) years.

696.    Pursuant to GOL § 5-401: "All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."

697.    New York GOL § 5-421 provides: "Every person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

698.    Plaintiffs and members of the Classes have sustained losses, and FanDuel has accepted those losses as its profits, within the past three (3) months.

699.    Because every person who shall, lose at any time, the sum or value of twenty-five dollars or more, and renders that amount to the winner within three calendar months, may, after such rendering, sue for and recover the money lost and rendered, Plaintiffs and members of the Classes are entitled to these damages from FanDuel.

## COUNT XVIII

## VIOLATIONS OF MASSACHUSETTS GENERAL LAWS c. 137 § 1
**(On Behalf of the National Class and Massachusetts Subclass against Defendant**

240

**DraftKings)**

700.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding and subsequent paragraphs, as if fully set forth herein.

701.    Massachusetts GL c. 137 § 1 Recovery of Money, etc. Lost at Gaming, provides as follows:

> Whoever, by playing at cards, dice or other game, or by betting on the sides or hands of those gaming, except for gaming conducted in licensed gaming establishments pursuant to chapter 23K, loses to a person so playing or betting money or goods, and pays or delivers the same or any part thereof to the winner, or whoever pays or delivers money or other thing of value to another person for or in consideration of a lottery, policy or pool ticket, certificate, check or slip, or for or in consideration of a chance of drawing or obtaining any money, prize or other thing of value in a lottery or policy game, pool or combination, or other bet, may recover such money or the value of such goods in contract; and if he does not within three months after such loss, payment or delivery, without covin or collusion, prosecute such action with effect, any other person may sue for and recover in tort treble the value thereof.

702.    DraftKings' contests are a "lottery or policy game, pool, combination or other bet" withing the meaning of G.L. c. 137, § 1.

703.    Plaintiffs and members of the classes delivered money to DraftKings in consideration for a chance to win a Daily Fantasy Sports pool, game or combination.

704.    Plaintiffs and members of the classes lost money as a result of playing on DraftKings' website.

705.    Plaintiffs bring this action on behalf of themselves and all other persons who paid any deposit, entry fee, or other consideration to DraftKings to play DraftKings DFS during the past three years.

706.    Pursuant to G.L. c. 137, § 1, Plaintiffs seek as damages treble the total amount of deposits, entry fees and other consideration paid by members of the classes to DrafKings at any time in the past three years.

707.    Plaintiffs seek treble damages under G.L. c. 137, §1, for all members of the

241

classes who were customers of DraftKings during the past three years, to be distributed *pro rata* to those customers pursuant to a plan of allocation to be approved by the Court.

## COUNT XIX

### VIOLATIONS OF STATE GAMBLING STATUTES
### (On Behalf of the National Class and State Subclasses against the DFS Defendants)

708.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding and subsequent paragraphs, as if fully set forth herein.

709.    Defendants' activities as described in detail above are games of chance and/or illegal gambling pursuant to the statutes of every state and territory in the United States.  These statutes also entitle Plaintiffs and/or the members of their households to recover for their losses, render any and all contracts or agreements between Plaintiffs and Defendants as illegal and therefore null and void. Plaintiffs entered into contracts with FanDuel and/or DraftKings that are void and/or were unenforceable at the time to allow DraftKings and/or FanDuel to take a percentage of entry fees into contests as a fee.

710.    Specifically, Defendants' activities as described above violate the following statutes, which also allow Plaintiffs to recover for their gambling losses, recover any fees generated by DraftKings and/or FanDuel and which make any contract between Plaintiffs and Defendants void and unenforceable:

      a.    Alabama: Ala. Code § 8-1-150 ; Ala. Code § 8-1-151; Ala. Code § 13A-12-20; Ala. Code § 13A-12-21; Ala. Code § 13A-12-22; Ala. Code § 13A-12-23;

      b.    Alaska: Alaska Stat. Ann. § 05.15.100; Alaska Stat. Ann. § 11.66.200; Alaska Stat. Ann. § 11.66.210; Alaska Stat. Ann. § 11.66.230;

      c.    Arizona: Ariz. Rev. Stat. Ann. § 13-3301; Ariz. Rev. Stat. Ann. § 13-3303;

Ariz. Rev. Stat. Ann. § 13-3304; Ariz. Rev. Stat. Ann. § 13-3305; Ariz. Rev. Stat. Ann. § 13-2314.04;

d.   Arkansas: Ark. Code Ann. § 16-118-103; Ark. Code Ann. § 5-66-101; Ark. Code Ann. § 5-66-103; Ark. Code Ann. § 5-66-104; Ark. Code Ann. § 5-66-106

e.   California: Cal. Penal Code § 330; Cal. Penal Code § 337a; Cal. Penal Code § 319; Cal. Penal Code § 320; Cal. Penal Code § 321; Cal. Penal Code § 337t(f);

f.   Colorado: C.R.S.A § 18-10-102(2); C.R.S.A § 18-10-102(8); C.R.S.A § 18-10-103;

g.   Connecticut: C.G.S.A. § 52-553; C.G.S.A. § 53-278b; C.G.S.A. § 53-278a;

h.   Delaware: 11 Del. C. § 1401; 11 Del. C. § 1403; Del.C.Ann. Const., Art. 2, § 17;

i.   District of Columbia: § 16-1702; § 16-1702; § 16-1703; DC ST § 22-1704;

j.   Florida: F.S.A. § 849.14; F.S.A. § 849.26; F.S.A. § 849.08; F.S.A. § 849.11; F.S.A. § 849.12; F.S.A. § 849.29.

k.   Georgia: § 13-8-3; § 16-12-21; § 16-12-22; § 16-12-26; § 16-12-27; § 16-12-35

l.   Hawaii: § 712-1220; § 712-1221; § 712-1222; § 712-1223;

m.  Idaho: Const. Art. III, § 20; § 18-3801; § 18-3802;

n.   Illinois: 20 ILCS 5/28-1; 5/28-7; 5/28-8;

o.   Indiana: IC 35-45-5-1; IC 35-45-5-2; IC 35-45-5-3; IC 35-45-5-4;

p.   Iowa: 725.7; 725.8; 725.13; 725.16; 725.19;

243

q.  Kansas: K.S.A. 21-6404; K.S.A 21-6406;

r.  Kentucky: 372.010; 372.020; 528.010;

s.  Louisiana: LSA-R.S. 14:90; LSA-R.S. 14:90.5;

t.  Maine: Me. Rev. Stat. tit. 17-A, § 952; Me. Rev. Stat. tit. 17-A, § 953; Me. Rev. Stat. tit. 17-A, § 954; Me. Rev. Stat. tit. 17-A, § 958;

u.  Maryland: Md. Crim. Law Code Ann. § 12-101; Md. Crim. Law Code Ann. § 12-102; Md. Crim. Law Code Ann. § 12-110;

v.  Michigan: Mich. Comp. Laws Ann. § 750.301; Mich. Comp. Laws Ann. § 750.315

w.  Minnesota: Minn. Stat. Ann. § 541.21; Minn. Stat. Ann. § 609.75; Minn. Stat. Ann. § 609.755; Minn. Stat. Ann. § 609.76 (West);

x.  Mississippi: Miss. Code. Ann. § 87-1-1; Miss. Code. Ann. § 87-1-3; Miss. Code. Ann. § 87-1-5; Miss. Code. Ann. § 97-33-29;

y.  Missouri: Mo. Rev. Stat. Ann. § 434.010; Mo. Rev. Stat. Ann. § 434.030; Mo. Rev. Stat. Ann. § 434.040; Mo. Rev. Stat. Ann. § 572.010; Mo. Rev. Stat. Ann. § 572.020; Mo. Rev. Stat. Ann. § 572.030; Mo. Rev. Stat. Ann. § 572.040;

z.  Montana: Mont. Code Ann. § 23-5-131; Mont. Code Ann. § 23-5-112; Mont. Code Ann. § 23-5-151;

aa. Nebraska: Neb. Rev. Stat. Ann. § 28-1354; Neb. Rev. Stat. Ann. § 28-1355; Neb. Rev. Stat. Ann. § 28-1101; Neb. Rev. Stat. Ann. § 28-1102; Neb. Rev. Stat. Ann. § 28-1103; Neb. Rev. Stat. Ann. § 28-1104; Neb. Rev. Stat. Ann. § 28-1105.01;

bb. Nevada: Nev. Rev. Stat. Ann. § 463.0152; Nev. Rev. Stat. Ann. § 463.0171; Nev. Rev. Stat. Ann. § 463.0193; Nev. Rev. Stat. Ann. § 463.160 (West)

cc. New Hampshire: N.H. Rev. Stat. Ann. § 338:1; N.H. Rev. Stat. Ann. § 338:2; N.H. Rev. Stat. Ann. § 338:3; N.H. Rev. Stat. Ann. § 338:4; N.H. Rev. Stat. Ann. § 647:2;

dd. New Jersey: N.J. Stat. Ann. § 2A:40-1; N.J. Stat. Ann. § 2A:40-2; N.J. Stat. Ann. § 2A:40-3; N.J. Stat. Ann. § 2A:40-5; N.J. Stat. Ann. § 2C:37-1; N.J. Stat. Ann. § 2C:37-2;

ee. New Mexico: N.M. Stat. Ann. § 44-5-1; N.M. Stat. Ann. § 44-5-4; N.M. Stat. Ann. § 30-19-1; N.M. Stat. Ann. § 30-19-2; N.M. Stat. Ann. § 30-19-3

ff. New York: New York GOL § 5-401; New York GOL § 5-411; New York GOL § 5-421; NYPL § 225.10;

gg. North Carolina: N.C. Gen. Stat. Ann. § 16-1; N.C. Gen. Stat. Ann. § 14-292;

hh. North Dakota: N.D. Cent. Code Ann. § 9-08-01; N.D. Cent. Code Ann. § 12.1-28-01; N.D. Cent. Code Ann. § 12.1-28-02;

ii. Ohio: Ohio Rev. Code Ann. § 3763.01; Ohio Rev. Code Ann. § 3763.02 ; Ohio Rev. Code Ann. § 3763.04; Ohio Rev. Code Ann. § 2915.01;

jj. Oklahoma: Okla. Stat. Ann. tit. 21, § 981; Okla. Stat. Ann. tit. 21, § 982 (West);

kk. Oregon: Or. Rev. Stat. Ann. § 30.740; Or. Rev. Stat. Ann. § 167.117; Or. Rev. Stat. Ann. § 167.109; Or. Rev. Stat. Ann. § 167.112; Or. Rev. Stat. Ann. § 167.122;

ll. Pennsylvania: Pa. Stat. Ann. tit 73, § 2031; 18 Pa. Stat. and Consol. Stat.

Ann. § 5513 11;

mm.   Rhode Island: R.I. Gen. Laws Ann. § 11-19-1;

nn. South Carolina: S.C. Code Ann. § 32-1-10; S.C. Code Ann. § 32-1-20; S.C. Code Ann. § 16-19-40; S.C. Code Ann. § 16-19-80;

oo. South Dakota: S.D. Codified Laws § 53-9-2; S.D. Codified Laws § 21-6-1; S.D. Codified Laws § 22-25-1;

pp. Tennessee: Tenn. Code Ann. § 29-19-101; Tenn. Code Ann. § 29-19-102; Tenn. Code Ann. § 29-19-104; Tenn. Code Ann. § 39-17-501; Tenn. Code Ann. § 39-17-502; Tenn. Code Ann. § 39-17-503; Tenn. Code Ann. § 39-17-504 (West);

qq. Texas: Tex. Penal Code Ann. § 47.02 (Vernon); Tex. Penal Code Ann. § 47.03 (Vernon); Tex. Penal Code Ann. § 47.01 (Vernon);

rr. Utah: Utah Const. art. VI, § 27; Utah Code Ann. § 76-10-1101; Utah Code Ann. § 76-10-1102; Utah Code Ann. § 76-10-1104;

ss. Vermont: Vt. Stat. Ann. tit. 9, § 3981; Vt. Stat. Ann. tit. 9, § 3982; Vt. Stat. Ann. tit. 13, § 2134; Vt. Stat. Ann. tit. 9, § 3981; Vt. Stat. Ann. tit. 9, § 3982; Vt. Stat. Ann. tit. 13, § 2134;

tt. Virginia: Va. Code Ann. § 11-14; Va. Code Ann. § 11-15; Va. Code Ann. § 11-16; Va. Code Ann. § 18.2-325; Va. Code Ann. § 18.2-326; Va. Code Ann. § 18.2-328;

uu. Washington: Wash. Rev. Code Ann. § 4.24.070; Wash. Rev. Code Ann. § 4.24.090; Wash. Rev. Code Ann. § 9.46.0237; Wash. Rev. Code Ann. § 9.46.0225; Wash. Rev. Code Ann. § 9.46.240;

vv. West Virginia: W. Va. Code Ann. § 55-9-2; W. Va. Code Ann. § 55-9-1; W.

Va. Code Ann. § 55-9-3; W. Va. Code Ann. § 61-10-4; W. Va. Code Ann. §

61-10-2; and

ww.    Wisconsin: Wis. Stat. Ann. § 895.055; Wis. Stat. Ann. § 945.01; Wis. Stat.

Ann. § 945.10; Wis. Stat. Ann. § 945.02; Wis. Stat. Ann. § 945.03;

xx. Wyoming: Wyo. Stat. Ann. § 1-23-106; Wyo. Stat. Ann. § 6-7-101; Wyo.

Stat. Ann. § 6-7-102; Wyo. Stat. Ann. § 6-7-103.

711.    Plaintiffs and members of the proposed class paid consideration for gambling on

Defendants' websites.  By collecting on these illegal contracts, Defendants violated the law of

Massachusetts, New York and/or each state in which Plaintiffs and members of the class are

located, and therefore Plaintiffs and members of the proposed class are entitled to damages in

the form of restitution for monies paid in connection with these void contracts over the course

of the past four (4) years.

### COUNT XX
### VIOLATION OF OFFICIAL CODE OF GEORGIA
### ANNOTATED § 13-8-3: GAMBLING
**(On Behalf of the Georgia Family Class against the DFS Defendants)**

712.    Family Member Hodge repeats, realleges, and incorporates by reference each of

the foregoing allegations as though fully set forth herein.

713.    Family Member Hodge represents herself and all Georgia Family Class

Members in this Count and asserts this Count on behalf of the same.

714.    Under Georgia law, "[g]ambling contracts are void; and all evidences of debt,

except negotiable instruments in the hands of holders in due course or encumbrances or liens

on property, executed upon a gambling consideration, are void in the hands of any person."

O.C.G.A. § 13-8-3(a). "Money paid or property delivered upon a gambling consideration may

be recovered from the winner by the loser by institution of an action for the same within six months after the loss and, after the expiration of that time, by institution of an action by any person, at any time within four years, for the joint use of himself and the educational fund of the county." O.C.G.A. § 13-8-3(b).

715.    To state a claim against Defendants under O.C.G.A. §13-8-3, Family Member Hodge must allege that a "gambling contract," which was supported by a "gambling consideration," existed between the parties.   A gambling or wagering contract was defined in *Martin v. Citizens' Bank of Marshallville*, 177 Ga. 871, 874, 171 S.E. 711 (1933), as "one in which the parties in effect stipulate that they shall gain or lose upon the happening of an event in which they have no interest except that arising from the possibility of such gain or loss."  As noted herein, there was a "gambling contract" between Defendants, on the one hand, and DFS Player Hodge and other Georgia DFS players, on the other, and such gambling contract was supported by "gambling consideration," such gambling consideration being the monies paid by DFS Player Hodge and other Georgia DFS players to Defendants. The contract between Defendants and DFS Player Hodge and other Georgia DFS players was one in which they stipulated that they would gain or lose upon the outcome of the sporting event(s) and individual performances in events in which neither Defendants nor DFS Player Hodge and other Georgia DFS players had an interest except that arose from the possibility of gain or loss of monies.

716.    Defendants' contracts with DFS Player Hodge and other Georgia DFS players for DFS are not based upon skill, but instead constitute a game predominately of chance and, thus illegal gambling under Georgia State law. The offense of "[g]ambling" includes making a "bet upon the partial or final result of any game or contest or upon the performance of any participant in such game or contest."  O.C.G.A § 16-12-21 (a).  Under Georgia law,  a "'[b]et

248

means an agreement that, dependent upon chance even though accompanied by some skill, one stands to win or lose something of value." O.C.G.A § 16-12-21(1).  As such, those contracts violate O.C.G.A § 16-12-21 (a), O.C.G.A § 16-12-21(1), and O.C.G.A §13-8-3, and, therefore, are void as a matter of law.

717.    As to DFS Player Hodge and other Georgia DFS players, Defendants are indebted to the DFS Player Hodge and other Georgia DFS players for the money so lost and paid, or received to the DFS Player Hodge's and other Georgia DFS players' use.  The gambling, gambling transactions, and operation of a gambling device at issue took place in Georgia.  Family Member Hodge, as wife of DFS Player Hodge, and Georgia Family Member Class members are entitled to recover, and seek to recover, such monies from Defendants that were lost to Defendants at any time after six months and before four years of the loss for the joint use of themselves and the educations fund of DeKalb County.

718.    As a direct and proximate result of Defendants' violation of O.C.G.A §13-8-3 (a) and related statutes, Plaintiff Family Member Hodge and Georgia Family Class members were damaged and are entitled to recover all monies lost as a result of Defendants' void gaming contracts, as allowed under O.C.G.A § 13-8-3(b), as well as punitive damages, in an amount to be determined at trial.

## COUNT XXI
## VIOLATION OF KENTUCKY REVISED STATUTES § 528.010: RECOVERY OF LOSSES FROM UNLAWFUL GAMBLING OR WAGERING TRANSACTIONS KENTUCKY REVISED STATUTES § 372.040
### (On Behalf of the Kentucky Family Class against the DFS Defendants)

719.    Plaintiff Family Member Williams and Plaintiff Family Member Turner repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

720.   Plaintiff Family Member Williams and Plaintiff Family Member Turner represent themselves and Kentucky Family Class members in this Count and assert this Count on behalf of the same.

721.   As noted herein, DFS Player Williams and other Kentucky DFS players' wagering on DraftKings' DFS website was gambling and DraftKings.com is an illegal gambling device.  As also noted herein, DFS Player Turner and other Kentucky DFS players' wagering on FanDuel's DFS website was gambling and FanDuel.com is an illegal gambling device.

722.   KY. REV. STAT. § 372.010 provides:

> Every contract, conveyance, transfer or assurance for the consideration, in whole or in part, of money, property or other thing won, lost or bet in any game, sport, pastime or wager, or for the consideration of money, property or other thing lent or advanced for the purpose of gaming, or lent or advanced at the time of any betting, gaming, or wagering to a person then actually engaged in betting, gaming, or wagering, is void.

723.   As noted herein, the transactions entered into between Defendants and DFS Player Williams, DFS Player Turner and other Kentucky DFS players are void because they involved a transaction (contract, conveyance, transfer or assurance) for money and credit resulted in things won, lost, and bet in games, sports, and wagers.

724.   KY . REV. STAT. § 372.020 provides:

> If any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser or any of his creditors may recover it, or its value, from the winner, or any transferee of the winner, having notice of the consideration, by action brought within five (5) years after the payment, transfer or delivery.

725.   DFS Player Williams, DFS Player Turner and other Kentucky DFS players paid money or delivered money or other things of value (namely the charging of credit against their credit cards or money) to Defendants more than six months ago and less than five years ago

from the filing of his original complaint, which was lost upon a game or wager in an amount exceeding five (5) dollars within twenty-four (24) hours. The payment or delivery of said money or credit resulted in a loss to DFS Player Williams, DFS Player Turner and other Kentucky DFS players for which Defendants are obligated to return under KY . REV. STAT. § 372.020 because, as alleged above, Defendants' activities in Kentucky constitute "gambling" as defined under KY. REV. STAT. § 528.010(3) and DraftKings.com and FanDuel.com are each a "gambling device" under KY. REV. STAT. § 528.010(4), which is against public policy and unlawful.  DFS Player Williams, DFS Player Turner, and other Kentucky DFS players did and do not sue under KY . REV. STAT. § 372.020 for the losses alleged in this Count within (6) months after its payment to Defendants.

726.    KY. REV. STAT. § 372.040 provides:

> If the loser or his creditor does not, within six (6) months after its payment or delivery to the winner, sue for the money or thing lost, and prosecute the suit to recovery with due diligence, any other person may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment.

727.    Family Member Williams and Family Member Turner are the spouses, heirs, and next of kin of DFS Player Williams and DFS Player Turner, respectively, and, therefore, have the right to bring an action on behalf of themselves and the Kentucky Family Class Members (as the spouses, children, next-of-kin, heirs, and creditors of DFS Player Williams, DFS Player Turner and other Kentucky DFS players (losers)) under KY. REV. STAT. § 372.040 because, as alleged above, Defendants' activities in Kentucky constitute "gambling" as defined under KY. REV. STAT. § 528.010(3) and DraftKings.com and FanDuel.com are each a "gambling device" under KY. REV. STAT. § 528.010(4), which is against public policy and unlawful.

728.   Kentucky law expressly defines "gambling" to mean "staking or risking something of value upon the outcome of a contest, game, gaming scheme, or gaming device *which is based upon an element of chance*, in accord with an agreement or understanding that someone will receive something of value in the event of a certain outcome." *See*, KY. REV. STAT. § 528.010(4)(a) (emphasis added).  In Kentucky, all gambling transactions are void as a matter of law.  KY. REV. STAT. § 372.010 provides: "every contract, conveyance, transfer or assurance for the consideration, in whole or in part, of money, property or other thing won, lost or bet in any game, sport, pastime or wager, or for the consideration of money, property or other thing lent or advanced for the purpose of gaming, or lent or advanced at the time of any betting, gaming, or wagering to a person then actually engaged in betting, gaming, or wagering, is void."

729.   The gambling, gambling transactions, and operation of a gambling device at issue took place in Kentucky, Defendants collected the bets, and Defendants' operation of the illegal DFS websites proximately caused injury and damage to Plaintiff Family Member Williams, Plaintiff Family Member Turner, and Kentucky Family Class members in the form of the losses to DFS Player Williams, DFS Player Turner, and other Kentucky DFS players more than six months ago and less than five years ago from the filing of her original complaint.

730.   KY. REV. STAT. § 372.040 provides that Plaintiff Family Member Williams, Plaintiff Family Member Turner, and Kentucky Family Class members may sue and recover treble the value of the money or thing lost, and Plaintiff Family Member Williams, Plaintiff Family Member Turner, and Kentucky Family Class members hereby sue for the same. Based upon the above allegations and factors, Plaintiff Family Member Williams, Plaintiff Family Member Turner, and Kentucky Family Class members request entry of damages equal

to treble the losses incurred by DFS Player Williams, DFS Player Turner, and other Kentucky

DFS players, respectively.

## COUNT XXII

### VIOLATION OF TENNESSEE CODE ANNOTATED § 29-19-104 & 5: UNLAWFUL GAMBLING OR WAGERING PROMOTION, MANAGEMENT AND OPERATION
**(On Behalf of the Tennessee Family Class against the DFS Defendants)**

731.    Plaintiff McGuire repeats, realleges, and incorporates by reference each of the

foregoing allegations as though fully set forth herein.

732.    Plaintiff Family Member McGuire represents herself and all Tennessee Family

Class members in this Count and asserts this Count on behalf of the same.

733.    Tennessee law expressly defines "gambling" to mean "risking anything of value

for a profit whose return is ***to any degree contingent on chance***, or any games of chance

associated with casinos, including, but not limited to, slot machines, roulette wheels and the

like." *See*, TENN. CODE ANN. § 39-17-50l(l) (emphasis added).   As noted above, FanDuel's

DFS is a game of predominately chance and thus gambling.

734.    In Tennessee, all gambling contract are void as a matter of law.   TENN. CODE

ANN. § 29-19-101 provides: "All contracts founded, in whole or in part, on a gambling or

wagering consideration, shall be void to the extent of such consideration." *See*, TENN. CODE

ANN. § 29-19-101.  Additionally, TENN. CODE ANN. § 39-17-501(1) provides that "Gambling is

contrary to the public policy of this State . . . ."  Under Tennessee law, then, "when a contract is

void, the law treats it as if it never came into existence." *Isbell v. Hatchett*, 2015 Tenn. App.,

2015 WL 756883 (Tenn. Ct. App. Feb. 23, 2015).

735.    TENN. CODE ANN. § 29-19-l 04 provides:

> Any person who has paid any money, or delivered anything of value, lost upon any
> game or wager, may recover such money, thing, or its value, by action commenced

253

within ninety (90) days from the time of such payment or delivery.

736.    TENN. CODE ANN. § 29-19-105 provides:

> Any other person may, after the expiration of the ninety (90) days, and within twelve (12) months thereafter, recover the amount of such money, thing, or its value, by action for the use of the spouse; or, if no spouse, the child or children; and, if no child or children, the next of kin of the loser.

737.    Within the ninety-one (91) days to twelve (12) months preceding the filing of his original complaint, DFS Player Backer and other Tennessee DFS players  delivered money to FanDuel which was lost upon a game or wager.  The gambling, gambling transactions, and operation of a gambling device at issue took place in Tennessee.  Plaintiff Family Member McGuire is the mother and next of kin of DFS Player Backer and, therefore, has the right to bring an action, and does bring that action, on behalf of herself and the Tennessee Family Class under TENN. CODE ANN. § 29-19-105 because FanDuel's activities in Tennessee constitute "gambling" as defined under TENN. CODE ANN. § 39-17-50  (1), which is against public policy and unlawful. TENN. CODE ANN. § 39-17-501(1).   Based upon the above allegations and factors, Plaintiff Family Member McGuire and Tennessee Family Class members request entry of damages equal to the losses incurred by DFS Player Backer and other Tennessee DFS players, respectively.

## COUNT XXIII

### VIOLATION OF NEW MEXICO STATUTES ANNOTATED 1978, §§ 30-19-2 AND ACTION FOR RECOVERY OF DEBT UNDER NEW MEXICO STATUTES ANNOTATED 1978, §§ 44-5-1 to -3 -- UNLAWFUL GAMBLING
**(On Behalf of the New Mexico Family Class against the DFS Defendants)**

738.    Plaintiff Family Member Boast repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

739.    Plaintiff Family Member Boast represents herself and all New Mexico Family

Class members in this Count and asserts this Count on behalf of the same.

740.   New Mexico law expressly defines "gambling device" to mean "a contrivance other than an antique gambling device that is not licensed for use pursuant to the Gaming Control Act [Chapter 60, Article 2E NSMA 1978] and that, for a consideration, affords the player an opportunity to obtain anything of value, t*he award of which is determined by chance, even though accompanied by some skill*, whether or not the prize is automatically paid by the device. NMSA 1978, § 30-19-l (C) (emphasis added).  A "bet" "means a bargain in which the parties agree that, dependent upon chance, even though accompanied by some skill, one stands to win or lose anything of value specified in the agreement."  NMSA 1978, § 30-19-l (B).  Defendants' DFS is a game predominately of chance where players stand to win or lose money.

741.   In New Mexico, all gambling contracts and conveyances are void as a matter of law.  NMSA 1978, § 44-5-4.

742.   As pled above, Defendants' operation of their DFS platforms DraftKings.com and FanDuel.com in New Mexico constitute operation of a "gambling device" as defined under NEW MEXICO. STAT. ANN.  § 39-19-1, DraftKings is engaged in "gambling" as defined under NEW MEXICO. STAT. ANN.  § 39-19-2, and payments or wagers made on DraftKings.com and FanDuel.com are "bets" as defined under NEW MEXICO. STAT. ANN.  § 39-19-1, which are against public policy and unlawful.

743.   NEW MEXICO STAT. ANN. § 44-5-l provides:

Any person who shall lose any money or property at any game at cards, or at any gambling device, may recover the same by action of debt, if money; if property, by action of trover, replevin or detinue.

744.   NEW MEXICO STAT. ANN. § 44-5-2 provides:

In such action it shall be sufficient for the plaintiff to declare generally as in actions for debt for money had and received for the plaintiff's use, or as in actions of trover or detinue for a supposed finding and the detaining or converting the property of the plaintiff to the use of the defendant whereby an action hath accrued to the plaintiff.

745.    DFS Player Boast and the other New Mexico DFS players paid money or delivered money or other things of value (namely the charging of credit against their credit cards) to Defendants for DFS Player Boast's and other New Mexico DFS players use, such money or things of value being converted to the use of Defendants, during the one year preceding the filing of his original complaint, which was lost upon a game or wager in gambling on Defendants' illegal gambling devices, DraftKings.com and FanDuel.com.   The gambling, gambling transactions, and operation of a gambling device at issue took place in New Mexico.   Said money or credit was consideration that afforded DFS Player Boast and other New Mexico DFS players an opportunity to obtain winnings, the awarding of such winnings being determined predominately by chance.

746.    NEW MEXICO STAT. ANN. § 44-5-3  provides:

The spouse, children, heirs, executors, administrators and creditors of the person losing may have the same remedy against the winner as provided in Sections 44-5-1 and 44-5-2 NMSA 1978.

747.    The payment or delivery of said money or thing of value resulted in a loss and/or debt to Player and Players that DraftKings is obligated to return to Plaintiff Family Member Boast and New Mexico Family Class members under NEW MEXICO. STAT. ANN. §§ 44-5-3.  Plaintiff Family Member Boast and New Mexico Family Class members bring this suit to recover said losses incurred by DFS Player Boast and other New Mexico DFS players as a result their payment of money or delivery of money or other things of value to Defendants for DFS Player Boast's and other New Mexico DFS players use and as a result of such money or things of value being converted to the use of Defendants.   Based upon the above allegations

256

and factors, Plaintiff Family Member Boast and New Mexico Family Class members request entry of damages equal to the losses incurred by DFS Player Boast and other New Mexico DFS players, respectively.

## COUNT XXIV

### SUIT BY PERSON OTHER THAN LOSER FOR RECOVERY OF LOSSES – SOUTH CAROLINA CODE ANN. § 32-1-20
**(On Behalf of the South Carolina Class against the DFS Defendants)**

748.    Plaintiff Family Member Walker repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

749.    Plaintiff Family Member Walker represents herself and all South Carolina Family Class members in this Count and asserts this Count on behalf of the same.

750.    As noted herein, DFS Player Walker and other South Carolina DFS players' wagering on FanDuel's DFS website was gambling and FanDuel.com is a gambling device.

751.    As noted herein, the transactions entered into between DFS Player Walker and FanDuel are void because they involved a transaction (contract, conveyance, transfer or assurance) for money and credit resulted in things won, lost, and bet in games, sports, and wagers.

752.    S.C. CODE ANN. § 32-1-10 provides:

> Any person who shall at any time or sitting, by playing cards, dice table or any other game whatsoever or by betting on the sides or hands of such as do play at any of the games aforesaid, lose to any person or persons so playing or betting, in the whole, the sum or value of fifty dollars and shall pay or deliver such sum or value or any part thereof shall be at liberty, within three months then next ensuing, to sue for and recover the money or goods so lost and paid or delivered or any part thereof from the respective winner or winners thereof, with costs of suit, by action to be prosecuted in any court of competent jurisdiction.

753.    DFS Player Walker and the other South Carolina DFS players paid money or

delivered money or other things of value (namely the charging of credit against their credit cards or money) to FanDuel during the time period prior to three (3) months preceding the filing of this Complaint, which was lost upon a game or wager in an amount exceeding fifty (50) dollars at any time or sitting.  The gambling, gambling transactions, and operation of a gambling device at issue took place in South Carolina.  The payment or delivery of said money or credit resulted in a loss to DFS Player Walker and other South Carolina DFS players for which FanDuel is obligated to return under S.C. CODE ANN. § 32-1-10 because, as alleged above, FanDuel's activities in South Carolina constitute "gambling" as defined under South Carolina Law and FanDuel.com is a "betting, pool selling, bookmaking or the like" under S.C. CODE ANN. § 16-19-130, which is against public policy and unlawful.

754.    S.C. CODE ANN. § 32-1-20 provides:

> In case any person who shall lose such money or other thing as aforesaid shall not, with the time aforesaid, really and bona fide and without covin or collusion sue and with effect prosecute for the money or other things so by him or them lost and paid and delivered as aforesaid, it shall be lawful for any other person, by any such action or suit as aforesaid, to sue for and recover the same and treble the value thereof, with costs of suit, against such winner or winners as aforesaid, the one moiety thereof to the use of the person that will sue for the same and the other moiety to the use of the county in which the offense shall have been committed.

755.    Plaintiff Family Member Walker is the spouse and next of kin of DFS Player Walker and, therefore, has the right to bring an action, and does bring that action, on behalf of herself and the South Carolina Family Class (as the spouses, children, next-of-kin, heirs, and creditors of DFS Player Walker and other South Carolina DFS players (losers)) under S.C. CODE ANN. § 32-1-20 because, as alleged above, FanDuel's activities in South Carolina constitute "gambling" as defined under South Carolina Law and FanDuel.com is "betting, pool selling, bookmaking or the like" under S.C. CODE ANN. § 16-19-130, which is against public policy and unlawful.  DFS Player Walker and other South Carolina DFS players did not and do

258

not sue under S.C. CODE ANN. § 32-1-10 for losses within the period of time between the filing of this Complaint and three months prior.

756.    Such gambling transactions took place in South Carolina, FanDuel collected the bets, and FanDuel's operation of the illegal DFS proximately caused injury and damage to Plaintiff Family Member Walker and South Carolina Family Class members in the form of the losses to DFS Player Walker's and other South Carolina DFS players during a time period between three (3) months and one year preceding the filing of this Complaint.

757.    S.C. CODE ANN. § 32-1-20 provides that Plaintiff Family Member Walker and South Carolina Family Class members may sue in lieu of the loser, and recover treble the value of the money or thing lost, along with costs of the suit, and Plaintiff Family Member Walker and South Carolina Family Class members hereby sue for the same with one moiety thereof to the use of Plaintiff Family Member Walker and South Carolina Family Class members and the other moiety to the use of the county in which the offenses were committed.

758.    Based upon the above allegations and factors, Plaintiff Family Member Walker and South Carolina Family Class members request entry of damages equal to treble the losses incurred by DFS Player Walker other South Carolina DFS players, respectively, along with costs of the suit.


**COUNT XXV**

**VIOLATIONS OF RICO, 18 U.S.C. §1962 (c)**
**(Asserted by Plaintiffs and the other members of the Nationwide Class against the DFS Defendants and Payment Processor Defendants)**

759.    Plaintiffs, on behalf of themselves and all other similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of

this Complaint.

760.     Plaintiffs, and Defendants FanDuel and DraftKings are each "persons" as that term is defined in 18 U.S.C. §1961(3).

Pursuant to 18 U.S.C. § 1962:

> It shall be unlawful for any person who had received any income derived directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the of which affect, interstate or foreign commerce.

761.     At all relevant times, the DFS Defendants each conducted the affairs of the association-in-fact enterprises identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

762.     Defendants received income derived directly from the pattern of racketeering and through the collection of unlawful debts.

763.     Defendants engaged in the business of assisting in the placing of wagers on sporting events and contests in violation of 18 U.S.C. §1084.

764.     Daily Fantasy Sports involves wagering on the collective performance of individuals participating in sporting events and contests.

765.     Defendants all participated in sports gambling.

766.     Non-Defendant Facilitators received income derived directly and indirectly from the racketeering activity and through the collection of unlawful debts.

767.     Payment Processor Defendants received income derived directly and indirectly from the racketeering activity and through the collection of unlawful debts.

768.     Non-Defendant Enterprise Investors received income derived directly and indirectly from the racketeering activity and through the collection of unlawful debts.

## A.   THE ENTERPRISE ALLEGATIONS

769.   Plaintiffs, on behalf of themselves and all the proposed classes, allege in the aggregate, or alternatively, three association-in-fact enterprises for each of the two DFS Defendants, FanDuel and DraftKings.

### 1.   The Investor Enterprises for FanDuel and DraftKings

770.   For purposes of this claim, the RICO "enterprises" are an association-in- fact consisting of:

*First*: (a) The various FanDuel Investors, as specifically identified above, and (b) FanDuel, including its directors, employees and agents (the "FanDuel Investor Enterprise"); and

*Second*, (a) The various DraftKings Investors, as specifically identified above, and (b) DraftKings, including its directors, employees and agents (the "DraftKings Investor Enterprise").

771.   Together, the FanDuel Investor Enterprise and the DraftKings Investor Enterprise are referred to herein as the "Investor Enterprises."

### 2.   The   Facilitator   Enterprises   for   FanDuel   and   DraftKings

772.   For purposes of this claim, the RICO "enterprises" are an association-in- fact consisting of:

*First*: (a) The various FanDuel Facilitator Entities, as specifically identified above, and (b) FanDuel, including its directors, employees and agents (the "FanDuel Facilitator Enterprise"); and

*Second*, (a) The various DraftKings Facilitator Entities, as specifically identified above, and (b) DraftKings, including its directors, employees and agents (the "DraftKings Facilitator Enterprise").

773.   Together, the FanDuel Facilitator Enterprise and the DraftKings Facilitator

Enterprise are referred to herein as the "Facilitator Enterprises."

### 3.    The Payment Processor Enterprises for FanDuel and DraftKings

774.    For purposes of this claim, the RICO "enterprises" are an association-in-fact consisting of:

*First*: (a) The various FanDuel Payment Processor Entities, as specifically identified above, and (b) FanDuel, including its directors, employees and agents (the "FanDuel Processor Enterprise"); and

*Second*, (a) The various DraftKings Payment Processor Entities, as specifically identified above, and (b) DraftKings, including its directors, employees and agents (the "DraftKings Processor Enterprise").

775.    Together, the FanDuel Processor Enterprise and the DraftKings Processor Enterprise are referred to herein as the "Processor Enterprises."

### 4.    Each Enterprise Member Had a Shared Purpose in The Success of the Enterprise and Illegal Gambling Operations

776.    The Investor Enterprise includes the Investors in and of DraftKings and FanDuel respectively, identified above, who knowingly provided funds on an equity basis to finance all or part of the gambling operation of the DFS Defendants. By virtue of the investments and financing, the gambling scheme of the DFS Defendants was able to continue, to flourish and to grow.

777.    The investments made by the Investors provided the DFS Defendants with the credibility and legitimacy which allowed them to attract more unknowing players to participate as customers in the gambling scheme.

778.    The Investors had systematic linkage because of the contractual relationship, financial ties and coordination of activities, as well as numerous meetings, ongoing

communications, and the conducting of due diligence on the part of the Investors such that they knew or clearly ignored that the DFS Defendants were conducting an ongoing illegal gambling operation and that representations otherwise were false and fraudulent. Despite this the Investors joined together with the DFS Defendants to conduct the enterprises for the shared purpose of defrauding innocent users and taking from innocent users revenues through the illegal gambling operations.

779.    At all relevant times, each of the Investors was aware of the DFS Defendants scheme and was a knowing participant in that scheme, profited from the scheme and was aware of the involvement of other Investors in the scheme.

780.    Independently and collectively, the Investors for each DFS Defendant, respectively, provided the monetary investments necessary to create a multi-billion dollar illegal gambling enterprise.

781.    The multi-million dollar investments provided by the Investors for each DFS Defendant, respectively, were funneled into DraftKings and FanDuel, and allowed each to launch unprecedented multi-million dollar advertising.

782.    Investors for each DFS Defendant, respectively, made multi-million dollar investments over the course of five (5) series of funding. These investments allowed DraftKings and FanDuel to run their own illegal enterprise and indirectly launch an illegal multi-billion dollar enterprise.

783.    FanDuel held five rounds of funding (Series A through Series E).

784.    Based on publicly available information, FanDuel raised approximately $362.5 million dollars to date from investors. At least $100 million was used for advertising, and the rest is presumed to be spent on expanding and maintaining the enterprise.

785.    Defendant DraftKings held four rounds of funding (Series A through Series D). Based on publicly available information, DraftKings has raised approximately $626 million dollars to date from investors. At least $100 million was used towards advertising, and the rest is presumed to be spent on expanding and maintaining the enterprise.

786.    Specifically, each Investor's capital injection created a pillar of the foundation of each daily fantasy sports site, and the publication of each investment in conjunction with each site provided the credibility prospective bettors needed to engage in gambling activities they thought to be legal.

787.    Investors funded the Online Gambling Defendants' websites which enticed Plaintiff and similarly situated individuals to place unlawful wagers with FanDuel and DraftKings.

788.    The Investor Entities received monies not only from their direct investments in the combined enterprises with the DFS Defendants but, in turn, certain Investors received advertising revenues for advertisements that FanDuel and DraftKings placed with them.  In addition, the Investor Entities had direct and constant communications with the DFS Defendants, respectively which related to the success of the operations for their mutual benefit.

789.    The Facilitator Enterprise includes the credit and debit card processors who facilitated the transfer of monies from Plaintiffs and the class to the DFS Defendants herein and received substantial funds for facilitating all or part of the illegal gambling operation of the DFS Defendants.  The Facilitator Entities provided the DFS Defendants with the credibility and legitimacy which allowed them to attract more unknowing players to participate as customers in the gambling scheme.   The Facilitator Entities had systematic linkage because of the contractual relationship, financial ties and coordination of activities, as well as numerous

meetings and the conducting of due diligence on the part of the Facilitator Entities such that they knew or clearly ignored that the DFS Defendants were conducting an ongoing illegal gambling operation and that representations otherwise were false and fraudulent.  Despite this the Facilitator Entities joined together with the DFS Defendants in contributions, meetings, due diligence, and ongoing communications, to conduct the enterprises for the shared purpose of defrauding innocent users and taking from innocent users revenues through the illegal gambling operations.   At all relevant times, each of the Facilitator Entities was aware of the DFS Defendants scheme and was a knowing participant in that scheme, profited from the scheme and was aware of the involvement of other Facilitator Entities in the scheme.

790.    The Payment Processor Enterprises includes the merchant processors for and to DraftKings and FanDuel respectively who knowingly provided the "player banking services" facilitating and processing payment between the customer and the DFS Defendants thus providing them with the ability to pay for all or part of the gambling operation of the DFS Defendants. By virtue of the payment processing provided by the Payment Processing Entities, the gambling scheme of the DFS Defendants was able to continue, to flourish and to grow. The use of such easy payment methods, such as credit card payment, provided the DFS Defendants with the credibility and legitimacy which allowed them to attract more unknowing players to participate as customers in the gambling scheme.   At all relevant times, each of the Payment Processing Entities was aware of the DFS Defendants scheme and was a knowing participant in that scheme, profited from the scheme and was aware of the involvement of other Payment Processing Entities in the scheme.

### 5.    Defendants' Use Of The Mails And Wires

791.    The Investor Enterprises, Facilitator Enterprises and Processor Enterprises

265

engaged in and affected interstate commerce because they engage in the following activities across state boundaries through use of the mails and wires:   The sale, purchase and administration of the financing and receipt of revenues to run and support the gambling operations of Defendants herein; and/or the transmission and/or receipt of sales and marketing literature; and/or transmission and/or receipt of invoices , statements and payments related to the gambling operations of Defendants.   The use of interstate and international mail and wire was for the purposes of obtaining money or property by means of omissions, false pretenses and misrepresentations.

> **6.     The Predicate Acts Of Wire Fraud, Mail Fraud, Enforcement of Illegal Contracts And Gambling, Violation of the Wire Act and Collection of Unlawful Debts**

792.   The Defendants' fraudulent and wrongful practices, illegal conduct and violations of RICO were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

793.   The nature and pervasiveness of the Defendants DraftKings and FanDuel's' scheme, which was orchestrated out of the Defendants DraftKings and FanDuel's' respective corporate headquarters, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and interstate wire facilities with various managers who did oversee the sales forces and the numerous sales and customer representatives who, in turn, directly communicated with the Class Members.

794.   In addition, Defendants FanDuel and DraftKings entire gambling operations were conducted with its need to communicate and interact with each Defendant's respective gambling customer base and by its very nature therefore, engaged in wire communications

which were false, fraudulent and illegal.

795.  Many of the precise dates of the Defendants FanDuel and DraftKings' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the Defendants' books and records. Indeed, an essential part of the successful operations of the illegal gambling scheme and/or the unlawful misrepresentations that such operations were legally being conducted and were being conducted with unlawful use of insider information which was provided through the wires to Defendants, as alleged herein, depended upon secrecy.  As alleged herein, to the extent that Defendants misrepresented that each customer had an equal chance to win, and the Defendants' attempts to hide the insider trading on non-public information received by Defendants though the wires, Defendants' took deliberate steps to conceal their wrongdoing.  However, Plaintiffs can generally describe the occasions on which the RICO predicates acts of mail and wire fraud occurred, and how those acts were in furtherance of the Defendants illegal gambling scheme and insider trading scheme used to defraud.

796.  As described specifically above, Plaintiffs were caused by FanDuel's and/or DraftKings' illegal gambling schemes to place bets through the internet with FanDuel and/or DraftKings on specific dates as alleged above and lost money as a result thereof.  Plaintiffs' funds were drawn out of their bank accounts and/or credit card by FanDuel and/or DraftKings through wire and/or internet transfers, including on the dates described in detail above, as alleged in, for example, ¶¶ 38-39, 41, 47, 64-65, 67-68, 75, 80 and 82.

797.  Each act of acts of mail fraud and wire fraud as aforestated constituted a violation of 18 U.S.C. §1341 relating to mail fraud and 18 U.S.C. §1343 relating to wire fraud.

798.    In addition, by carrying on illegal gambling operations Defendants have engaged in predicate acts comprised of each act of enforcing illegal contracts against Plaintiffs and the Nationwide Classes and/or accepting wagers from Plaintiffs and Class members in violation of state and federal anti-gambling statutes.

799.    The Defendants all committed predicate acts under RICO, in violation of 18 U.S.C. §1955, which provides in relevant part:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both

(b) As used in this section - -

(i)      "illegal gambling business" means a gambling business which - - is a violation of the law of a State or political subdivision in which it is conducted; involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

*          *          *

(4)   "gambling" includes but is not limited to pool-selling, bookmarking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

*          *          *

(6) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

800.    FanDuel and DraftKings conducted illegal gambling businesses because both met the three elements of 18 U.S.C. §1955(b)(1-3).

801.    FanDuel and DraftKings each constitute an illegal gambling business within the meaning of 18 U.S.C. §1955(b)(1), because as set forth herein, each of their activities violate

268

all state laws and at a minimum, New York State Law.  "State" in the context of the statute means any State of the United States under 18 U.S.C. §1955(b)(6).

802.    FanDuel and DraftKings are each an "illegal gambling business" within the meaning of 18 U.S.C. §1955 (b)(2), because each respective business involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of the business. Specifically, there are more than five persons named in this Count that finance (e.g., the Investor Entities, Facilitator Entities and Processing Entities), manage, supervise, direct and own a part of such business (e.g., the Investor Entities).

803.    FanDuel and DraftKings are each an "illegal gambling business" within the meaning of 18 U.S.C. §1955 (b)(2), because each have been or remain in substantially continuous operation since at least February 1, 1012 for a period in excess of thirty days or has a gross revenue of $2000 in any single day.

### 7.    The Conduct Of The Rico Enterprise Affairs' And Rico Conspiracy

804.    During the Class Period, the Defendants DraftKings and FanDuel and the Investors, Facilitator Entities and Processing Entities have exerted control over their respective Enterprises and in violation of Section 1962 (c) of the RICO statute, have conducted or participated in the conduct of the affairs of the RICO enterprise directly or indirectly in the following ways:

    a.  Each of the DFS Defendants directly engaged in saturating the television, print  and internet advertising markets with the advertising targeted at sports fans in particular, as described in detail above, in which they falsely claimed that the DFS games they offered did not constitute illegal gambling and were 100% legal.

    b.  Each of the DFS Defendants directly engaged in and controlled the gambling operations of the Defendants and obtained revenues from Plaintiffs and Class members by falsely claiming that all players had an equal chance to win when in fact Defendants knew that professional players dominated the wins and regular players almost universally were losers.

c. Each of the DFS Defendants directly engaged in and controlled the gambling operations of the Defendants and obtained revenues from Plaintiffs and Class members by falsely claiming that all players had an equal chance to win when, in fact, DFS Defendants knew and in fact encouraged their players to regularly play and compete on the other DFS Defendant's internet site(s) and knew, and in fact encouraged, the other DFS Defendant's employees to regularly compete on its internet site(s), all with the use of inside, non-public information which gave a tremendous and material advantage to such insider players.

d. Each of the DFS Defendants directly engaged in and controlled the gambling operations of the Defendants and obtained revenues from Plaintiffs and Class members by falsely portraying and presenting professional fantasy sports players as regular or casual players.

e. Each of the DFS Defendants directly engaged in and controlled the gambling operations of the Defendants and obtained revenues from Plaintiffs and Class members by falsely claiming that players would receive a matching bonus (e.g., "deposit now and we'll double your cash" or "if you put in one-hundred bucks, you get two hundred to play with") when in fact, a cash bonus was not available and would not be paid upon signing up and in fact, would be paid out over time only by the player spending additional money on contests at which point the so-called additional "bonus" would incrementally be added to the player's account over many months, essentially constituting a fraudulent misrepresentation. As stated by FanDuel's CEO, "To be honest, at the moment, we've focused more on bringing in new players which by our calculations is a lot more important to grinder win rates than cutting rake."

f. Despite the DFS Defendants' use of gambling operations to make money which they represented was legal, many States have declared Defendants' gambling operations as illegal including the Attorneys General of Alabama, Hawaii, Illinois, Nevada, Louisiana, New York and Texas.

g. Each of the DFS Defendants directly engaged in and controlled the illegal gambling operations of the Defendants and obtained revenues from Plaintiffs and Class members as a result thereof, including drawing electronically through the wires from Plaintiff and Class Members' bank accounts through the Facilitators and Payment Processors described in detail hereinabove and inducing Plaintiffs and Class members to sign up to participate on the internet ion Defendants' illegal gambling operations.

**8.      Pattern Of Racketeering Activity Through Predicate Acts Of Wire Fraud, Mail Fraud And Gambling Violations**

805.      Defendants FanDuel and DraftKings have conducted and participated in the

affairs of the respective Enterprises through a pattern of racketeering activity, including acts

that are indictable under 18 U.S.C. §1341, relating to mail fraud, 18 U.S.C. §1343, relating to

wire fraud, 18 U.S.C. §1955 relating to illegal gambling, 18 U.S.C. §1084 and the collection of

an unlawful debt relating to 18 U.S.C. §1961(6). The Defendants' pattern of racketeering

likely involved thousands if not hundreds of thousands of separate instances of the use of the

internet and wires and use of the U.S. mails in furtherance of the enterprise and scheme.

806. The Wire Act, found at 18 U.S.C. § 1084 provides in pertinent part as follows,

(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers *on any sporting event or contest*, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both.

(emphasis added).

807. Defendants engaged in the business of assisting in the placing of wagers on

sporting events and contests.

808. Daily Fantasy Sports involves wagering on the collective performance of

individuals participating in sporting events and contests and thereby violated 18 U/S.C. §1084.

809. Defendants all participated in sports gambling.

810. The Plaintiffs personally participated in sports gambling by placing bets on

sporting events through DraftKings and FanDuel. Accordingly Defendant DraftKings and

FanDuel engaged in predicate acts of violation of the Wire Act which, in the aggregate,

violated and were committed in connection with a pattern of racketeering.

811. Each of the fraudulent interstate wire transmissions constitutes a "pattern of

racketeering" within the meaning of 18 U.S.C. Sec. 1961(1). Collectively these violations

constitute a "pattern of racketeering" within the meaning of 18 U.S.C. §1961(5) in which the

Defendants intended to defraud Plaintiffs, Class Members and other intended victims. In

addition, Defendants' acts constituted the collection of an "unlawful debt" in violation of 18

U.S.C. §1961(6).

812.     Each of the fraudulent uses of interstate mails constitutes a "pattern of racketeering" within the meaning of 18 U.S.C. §1961(1).   Collectively these violations constitute a "pattern of racketeering" within the meaning of 18 U.S.C. §1961(5) in which the Defendants intended to defraud Plaintiffs, Class Members and other intended victims.

813.     The Defendants' fraudulent and unlawful gambling scheme consisted in part of (i) deliberately claiming falsely that each of Defendants' gambling operations were legal when such operations as conducted were, in fact, illegal under State and/or federal laws;   (ii) by claiming falsely that the operations presented an equal, fair and level chance of all players to win when, in fact, use of inside information by its employees and other rigged aspects of the contests as described more further above meant that such operations were designed to allow the "house" or its proxies or its favored players to win big wagers at the expense of Plaintiffs and other Class Members; (iii) The scheme also consisted of providing promotional incentives (bonus fraud), which Defendants failed to make good on, which were offered in order to lure Class Members in as "marks" for Defendants' employees to prey on and fraudulently obtain revenues from.

814.     In addition to wire fraud and mail fraud, Defendants, FanDuel and DraftKings, conducted and participated in the conduct and the affairs of their respective Enterprises through a pattern of illegal internet gambling pursuant to violations of 18 U.S.C. § 1955 thereby constituting racketeering activity that has lasted for several years beginning no later than in or about February, 2012, and continuing to this day, and that consisted of numerous and repeated violations of 18 U.S.C. § 1955, mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in

violation of 18 U.S.C. §§ 1343.

815.    For each Defendant, FanDuel and DraftKings, the purpose of the scheme to violate 18 U.S.C. §1955 was to profit through illegal internet gambling.

816.    By concealing the scope and nature of each illegal gambling enterprise, the Defendants also maintained and boosted consumer confidence in their respective illegal internet gambling enterprises, the brands, and fantasy sports betting, all of which furthered their schemes to defraud and helped both DraftKings and FanDuel generate more users to play their fantasy sports betting games.

817.    As detailed in this Complaint, hereinabove, Defendants FanDuel and DraftKings were well aware that their respective Enterprises constituted illegal internet gambling under federal and under state law. Nonetheless, the Defendants used money generated from investors and innocent bettors to intentionally subject Plaintiff and Class Members to those risks or consciously disregarded those risks in order to maximize their profits at the expense of Plaintiffs and Class Members.

818.    To carry out, or attempt to carry out, the scheme to defraud, the Defendants, FanDuel and DraftKings, each individually conducted or participated in the conduct of the affairs of their respective RICO Enterprises through the pattern of racketeering activity that violated 18 U.S.C. § 1955 through its gambling operations and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud) and violated the 18 U.S.C. §1084, the Wire Act, by conducting and engaging in the placing of bets and wagers on sporting events and contests through the wires; and violated 18 U.S.C. §1961(6) by collection of unlawful debts.

819.    Each Defendant devised and furthered their own schemes to defraud by use of

the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail, email, internet and wire communications with other members of their respective RICO Enterprises, as well as the user fees and transactional costs of the illegal internet gambling activities, advertisements and other communications to the Plaintiffs and Class Members.

820.    The Defendants FanDuel and DraftKings racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and Class members and intended to obtain revenues and proceeds through its illegal gambling operations and activities.  Each separate use of the internet and other interstate wire facilities employed by the Defendants, FanDuel and DraftKings, was related, had similar intended purposes, involved similar participants and methods of execution and had the same results affecting the same victims, including Plaintiffs and Class Members.  Each of the Defendants, FanDuel and DraftKings, has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular Investor Enterprise, Facilitator Enterprise and Processor Enterprise.

### 9.    Defendants' Motives

821.    The predicate acts all had the purpose of generating significant revenue and profits for Defendants FanDuel and DraftKings at the expense of Plaintiffs and the Nationwide Classes.  The predicate acts were committed or caused to be committed by Defendants through their participation in the RICO Enterprises described hereinabove and in furtherance of their fraudulent schemes, and each involved in illegally obtaining entry fees and wagers Plaintiffs and Class Members.

### 10.    Damages Caused By Defendants' Online Gambling Scheme

822.    By reason of and as a result of the conduct of Defendant FanDuel and Defendant

DraftKings, and in particular, by reason of their violation of federal law and the pattern of racketeering activity in the form of the predicate acts, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to the loss of their user fees and wagers on fantasy sports.  Defendants obtained monies from Plaintiffs and Class Members through charges to their credit cards and direct withdrawals from banking accounts for illegal gambling which was misrepresented to be legal.  By virtue thereof, Defendants' predicate acts were the proximate cause of the Plaintiffs and Class' injuries.

823.    In addition, the Defendants' violations of 18 U.S.C. §1955 (relating to illegal gambling), 18 U.S.C. §1341 (relating to mail fraud), 18 U.S.C. §1343 (relating to wire fraud), 18 U.S.C. §1084 (relating to the Wire Act and illegal gambling on sporting events and contests), violations of 1961(6) by the collection of unlawful debts,  and 18 U.S.C. §1962 (c) have directly and proximately caused injuries and damages to Plaintiffs and the Class Members in the form of their losses while betting on Defendants' illegal internet gambling site.  Plaintiffs and Class members are entitled to bring this action for three (3) times their actual damages, as well as injunctive and equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c).

824.    Under the provisions of Section 1964(c), Defendants are jointly and severally liable to Plaintiffs and the Nationwide Classes for three times the damages Plaintiffs and Class Members have sustained, plus the costs of this action and attorneys' fees.

## COUNT XXVI

### VIOLATIONS OF RICO, 18 U.S.C. §1962(d)

**(CONSPIRACY TO VIOLATE RICO STATUTE, 18 U.S.C. §1962 (c))**
**(Asserted by Plaintiffs and the other members of the Nationwide Class against the DFS Defendants and Processor Defendants)**

825.    Plaintiffs restate and reallege herein by reference the proceeding paragraphs as if set forth in full herein.

826.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

827.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

828.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

829.    Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of, the promotion of deceptive and illegal daily fantasy sports contests as described previously through a pattern of racketeering activity. Defendants conspired with, *inter alia*, each other, their personnel, publicists, sales representatives, and other intermediaries to promote daily fantasy sports contests and to suppress information regarding the unfair operation of their websites.

830.    Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff and members of the Nationwide Classes.

831.    The nature of the above-described acts by Defendants and their co-conspirators' in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but also were aware that their ongoing fraudulent and extortionate acts have been and

are part of an overall pattern of racketeering.

832.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. §1962(d), by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and members of the Nationwide Classes have been and continue to be injured in their business or property as set forth more fully above.

833.    Defendants sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicates act:

    a)  Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1343;

    b)  Multiple instances of mail fraud violation of 18 U.S.C. §§ 1341 and 1346;

    c)  Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1343;

    d)  Multiple instances of unlawful activity in violation of 18 U.S.C. § 1955;

    e)  Multiple instances of illegal activity in violation of 18 U.S.C. §1084 relating to illegal gambling wagers on sporting events and contests; and

    f)  Multiple instances of illegal activity in violation of 18 U.S.C. §1961(6) relating to the collection of an unlawful debt.

834.    Defendants' violations of the above federal laws and the effects thereof are ongoing and will continue. Plaintiffs and members of the Nationwide Classes have been injured in their property by reason of these violations in that Plaintiffs and members of the Nationwide Classes have paid hundreds of millions of dollars to play daily fantasy sports that they would not have paid had Defendants not conspired to violate 18 U.S.C. § 1962(c).

835.    Injuries suffered by Plaintiffs and members of the Nationwide Class were directly and proximately caused by Defendants' racketeering activity as described above.

Individuals, including Plaintiffs and members of the Nationwide Classes, directly relied on the representations constituting the racketeering activities of the Defendants. Plaintiffs and members of the Nationwide Class, both directly and indirectly, relied on Defendants' promotions and representations regarding the fair play of their contests. Because Defendants controlled all knowledge upon which the claims of their contests' fair play were based, Plaintiffs and members of the Nationwide Classes, as well as others in the public, were obligated to rely upon Defendants' representations. Further, Defendants perpetuated this reliance by taking the steps itemized above to suppress the dissemination of critical information regarding the unfair operation of their contests.

836.   By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff and the Class for three times the damages Plaintiffs and members of the Nationwide Classes have sustained, plus the cost of this suit, including reasonable attorney's fees.

837.   By reason of the foregoing, and as a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs and members of the Nationwide Classes have suffered damages. Plaintiffs and members of the Nationwide Classes are therefore entitled to compensatory damages, equitable relief, punitive damages, cost and reasonable attorneys' fees.

## COUNT XXVII

**VIOLATION OF TRUTH-IN-LENDING CONSUMER CONTRACT, WARRANTY AND NOTICE ACT [TCCWNA], N.J.S.A. 56:12-14**
(Asserted by Plaintiffs Siegel and Franco and the members of the New Jersey Subclass)

838.   Plaintiffs Jodi Siegel and Ryan Franco hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.  Plaintiffs assert this cause of action on behalf of themselves and the New Jersey Subclass.

839.    TCCWNA provides in part that:

> "No seller…shall in the course of his business offer to any consumer or prospective consumer or enter into any written contract or give or display any written consumer warranty, notice or sign…***which includes any provision that violates a clearly established right of a consumer or responsibility of a seller***…as established by State or Federal Law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed." (emphasis added)

840.    The rights afforded to Plaintiffs and the New Jersey Subclasses pursuant to N.J. Stat. Ann. §56:8-163(a), *et seq.*, are clearly established right which were violated by the DFS Defendants' inclusion of the illegal and unenforceable arbitration clauses in their Terms of Use agreement that Plaintiffs and subclass members were and are required to agree to in order to participate on the DFS Defendants' fantasy online betting websites. As the DFS Defendants' breaches are violative of a clearly established consumer right and/or of the responsibilities of the sellers, DraftKings and FanDuel have violated the Truth-in- Consumer Contract, Warranty and Notice Act.

841.    Nowhere in the arbitration clause is there any explanation that Plaintiffs are waiving their rights to seek relief in court for a breach of their statutory rights. The DFS Defendants' respective Terms of Use do not explain what arbitration is, nor do they indicate how arbitration is different from a proceeding in a court of law. Nor is it written in plain language that would be clear and understandable to the average consumer that he or she is waiving statutory rights. The clauses here have none of the language which a Court would find satisfactory in upholding arbitration provisions—clear and unambiguous language that the Plaintiffs are waiving their right to sue, for a jury trial or go to court to secure relief.

842.    The arbitration clauses contained in the Terms of Use agreements were also an unconscionable commercial practice and violation of a regulation under New Jersey Consumer

279

Fraud Act, constituting violations of the New Jersey Consumer Fraud Act. The DFS Defendants' inclusion of these illegal and unenforceable arbitration clauses is violative of a clearly established consumer right and/or of the responsibilities of the sellers, the DFS Defendants have violated the Truth-in-Consumer Contract, Warranty and Notice Act.

843.    In addition, the violation of the New Jersey Consumer Fraud Act ("NJCFA") through Defendants' misrepresentations that the gambling operations of Defendants were legal when, in fact, they were illegal is also by virtue of such NJCFA violation, a correspondent violation of TCCWNA as well.

844.    TCCWNA provides that: "any person who violates the provisions of this act shall be liable to the aggrieved consumer whom he aggrieved or injured for a civil damages penalty of not less than $100.00 or for actual damages, or both at the election of the consumer, together with reasonable attorney's fees and court costs.  The rights, remedies and prohibitions accorded by the provisions of this act are hereby declared to be in addition to and cumulative of any other right, remedy or prohibition accorded by common law, Federal law or statutes of this State.

845.    The DFS Defendants have violated TCCWNA and the Plaintiff and Sub-Class members request civil damages penalties of not less than $100.00 per violation and attorney's fees afforded under N.J.S.A. 56:12-14.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, for themselves and all others similarly situated, respectfully request that this Court enter a judgment against Defendants and in favor of Plaintiffs, and grant the following relief:

A.    Determine that this action may be maintained as a class action with respect to Nationwide Classes and/or with State Subclasses as asserted above, pursuant to the appropriate

subsections of Rule 23 of the Federal Rules of Civil Procedure; that the Court certify a class action with respect to particular issues if appropriate, and that the Court designate and appoint Plaintiffs to serve as Class Representatives and the undersigned counsel as Class Counsel;

B.   Declare the conduct of Defendants as alleged herein to be unlawful;

C.   Grant Plaintiffs and the other members of the Nationwide Classes and Sub Classes awards of actual and compensatory or other statutory damages or relief, in such amount to be determined at trial and as provided by applicable law;

D.   Grant Plaintiffs and the other Class Members restitution of all monies wrongfully obtained by Defendants;

E.   Grant Plaintiffs and the other Class Members pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded;

F.   Grant Plaintiffs their costs of suit including reasonable attorneys' fees, and expenses, including expert fees, to the extent permitted by law; and

G.   Grant Plaintiffs and the other Class Members such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: September 2, 2016                     Respectfully Submitted,

s/Christopher Weld, Jr.
Christopher Weld, Jr.

281

**TODD & WELD LLP**
One Federal Street
Boston, MA 02110
Telephone: (617) 720-2626
Facsimile: (617) 227-5777
Email: cweld@toddweld.com

*Liaison Counsel and Executive
Committee Member*

Hunter J. Shkolnik
**NAPOLI SHKOLNIK, PLLC**
360 Lexington Avenue, 11th Floor
New York, NY 10017
Telephone: (212) 397-1000
Facsimile: (646) 843-7603
Email: hunter@napolilaw.com

Jasper D. Ward IV
Alexander C. Davis
**JONES WARD PLC**
Taylor Building
312 South Fourth Street, 6th
Floor
Louisville, KY 40202
Telephone: (502) 882-6000
Facsimile: (502) 587-2007
Email: jasper@jonesward.com
        alex@jonesward.com

Melissa R. Emert
Howard T. Longman
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022
Email: memert@ssbny.com
        hlongman@ssbny.com

*Co-Lead Counsel*

Richard S. Cornfeld
**LAW OFFICE OF RICHARD S. CORNFELD**
1010 Market Street, Suite 1720
St. Louis, MO 63101

Telephone: (314) 241-5799
Facsimile: (314) 241-5788
Email:  rcornfeld@cornfeldlegal.com


Kevin S. Hannon
**THE HANNON LAW FIRM, LLC**
1641 Downing Street
Denver, CO  80218
Telephone: (303) 861-8800
Facsimile:  (303) 861-8855
Email:  khannon@hannonlaw.com

Robert K. Shelquist
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
Email:  rkshelquist@locklaw.com


Jennifer L. Duffy
**KAMBER LAW, LLP**
28649 S. Western Avenue, Suite 6571
Los Angeles, CA 90734
Telephone: (310) 714-9779
Facsimile: (212) 202-6364
Email:  jduffy@kamberlaw.com


Michael J. Flannery
**CUNEO GILBERT & LADUCA, LLP**
7733 Forsyth Blvd., Suite 1675
St. Louis, MO 63105
Telephone: (314) 226-1015
Facsimile: (202) 789-1813
Email:  mflannery@cuneolaw.com


John A. Yanchunis
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-2434
Email:  jyanchunis@forthepeople.com

283

Alan Carl Milstein
**SHERMAN SILVERSTEIN KOHL ROSE &
PODOLSKY**
East Gate Corporate Center
308 Harper Drive, Suite 200
Moorestown, New Jersey 08057
Telephone: (856) 661-2078
Facsimile: (856) 488-4744
Email:  amilstein@shermansilverstein.com

W. Lewis Garrison, Jr.
**HENINGER GARRISON DAVIS, LLC**
2224 First Avenue North
Birmingham, AL 35203
Telephone: (205) 326-3336
Facsimile: (205) 326 -3332
Email:  lewis@hgdlawfirm.com

D. Todd Mathews
**GORI JULIAN & ASSOCIATES, P.C.**
Megan Meyers
156 N. Main Street
Edwardsville, IL 62025
Telephone: (618) 659-9833
Facsimile: (618) 659-9834
Email:  todd@gorijulian.com

*Executive Committee Members*

CERTIFICATE OF SERVICE

I, Christopher Weld, Jr., hereby certify that this document has been filed through the ECF
system will be sent electronically to the registered participants as identified on the Notice of
Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered
participants on this date.

Date: September 2, 2016

___/s/_____
Christopher Weld, Jr.