**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: DAILY FANTASY SPORTS LITIGATION | 1:16-md-02677-GAO |

**DEFENDANTS FANDUEL, INC. AND FANDUEL DEPOSITS, LLC'S
MOTION TO COMPEL ARBITRATION AND MEMORANDUM OF REASONS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ................................................................................................... 2

I.    FANDUEL'S ACCOUNT REGISTRATION PROCESS ............................. 2

    A.    FanDuel's Terms of Use and the Arbitration Agreement ..................... 3

        1.    The Arbitration Provision .......................................................... 4

            a.    Scope and Delegation .................................................... 4

            b.    Arbitration Location and Fees ....................................... 4

            c.    Class-Action Waiver Provision...................................... 5

            d.    The Opt-Out Provision................................................... 5

ARGUMENT ....................................................................................................... 5

I.    ALL THREE CATEGORIES OF PLAINTIFFS ARE BOUND BY A VALID AGREEMENT TO ARBITRATE. ........................................................... 7

    A.    Player Plaintiffs.................................................................................. 7

    B.    Non-Player Plaintiffs ......................................................................... 10

        1.    Family Member Plaintiffs ........................................................ 10

            a.    Family Member Plaintiffs Directly Benefitted from FanDuel's Terms of Use. ............................................ 10

        2.    DraftKings Plaintiffs ................................................................ 13

II.    THE ARBITRATOR, NOT THIS COURT, SHOULD DECIDE ARBITRABILITY. .................................................................................. 14

III.    ALL OTHER ENFORCEMENT REQUIREMENTS ARE SATISFIED. ..................... 17

    A.    The Parties Agreed to Arbitrate the Claims Plaintiffs Now Bring. ..................... 17

    B.    Plaintiffs Cannot Avoid their Agreement to Arbitrate......................................... 18

        1.    Procedural Unconscionability................................................... 19

        2.    Substantive Unconscionability.................................................. 19

CONCLUSION..................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Accurate Copy Serv. of Am., Inc. v. Fisk Bldg. Assocs. L.L.C.*,
    72 A.D.3d 456 (N.Y. App. Div. 2010) ..................................................................19

*Allied-Bruce Terminix Cos. v. Dobson*,
    513 U.S. 265 (1995).................................................................................................6

*Am. Libraries Ass'n v. Pataki*,
    969 F. Supp. 160 (S.D.N.Y. 1997)...........................................................................6

*Amkor Tech., Inc. v. Alcatel Bus. Sys.*,
    278 F. Supp. 2d 519 (E.D. Pa. 2003) ....................................................................11

*Anderson v. Pitney Bowes, Inc.*,
    No. C 04-4808 SBA, 2005 WL 1048700 (N.D. Cal. May 4, 2005) .......................16

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011)...........................................................................................6, 19

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
    475 U.S. 643 (1986)...............................................................................................17

*Awuah v. Coverall N. Am., Inc.*,
    554 F.3d 7 (1st Cir. 2009)................................................................................15, 16

*Bekele v. Lyft, Inc.*,
    --- F. Supp. 3d---, No. 15-cv-11650-FDS, 2016 WL 4203412 (D. Mass. Aug. 9, 2016)........15

*Best Concrete Mix Corp. v. Lloyd's of London Underwriters*,
    413 F. Supp. 2d 182 (E.D.N.Y. 2006) ...................................................................12

*Brennan v. Opus Bank*,
    796 F.3d 1125 (9th Cir. 2015) .........................................................................15, 17

*Buckeye Check Cashing, Inc. v. Cardegna*,
    546 U.S. 440 (2006)...............................................................................................15

*Christian v. Christian*,
    365 N.E.2d 849 (N.Y. 1977)..................................................................................20

*Coiro v. Wachovia Bank, N.A.*,
    Civ. No. 11-3587, 2012 WL 628514 (D.N.J. Feb. 27, 2012) ................................10

*Cowen & Co. v. Anderson*,
    558 N.E.2d 27 (N.Y. 1990)......................................................................................7

*Cullinane v. Uber Techs., Inc.*,
    No. 14-14750-DPW, 2016 WL 3751652 (D. Mass. July 11, 2016) ...................8, 16

*Dean Witter Reynolds Inc. v. Byrd,*
  470 U.S. 213 (1985)............................................................................................................7

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,*
  9 F.3d 1060 (2d Cir. 1993)...............................................................................................11

*Denney v. BDO Seidman, L.L.P.,*
  412 F.3d 58 (2d Cir. 2005)...............................................................................................10

*E.H. Ashley & Co. v. Wells Fargo Alarm Servs.,*
  907 F.2d 1274 (1st Cir. 1990)..........................................................................................19

*Express Indus. & Terminal Corp. v. N.Y. State Dept. of Transp.,*
  715 N.E.2d 1050 (N.Y. 1999)............................................................................................8

*First Options of Chi., Inc. v. Kaplan,*
  514 U.S. 938 (1995)........................................................................................................1, 8

*Fluehmann v. Assocs. Fin. Servs.,*
  No. CIV.A. 01-40076-NMG, 2002 WL 500564 (D. Mass. Mar. 29, 2002) ...........................12

*Fteja v. Facebook, Inc.,*
  841 F. Supp. 2d 829 (S.D.N.Y. 2012)................................................................................9

*Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,*
  815 F.2d 840 (2d Cir. 1987)..............................................................................................7

*Gillman v. Chase Manhattan Bank, N.A.,*
  534 N.E.2d 824 (N.Y. 1988).......................................................................................18, 19

*Grand Wireless, Inc. v. Verizon Wireless, Inc.,*
  748 F.3d 1 (1st Cir. 2014)....................................................................................6, 17, 18

*Green Tree Fin. Corp.-Ala. v. Randolph,*
  531 U.S. 79 (2000).............................................................................................................7

*Haskins v. First Am. Title Ins. Co.,*
  866 F. Supp. 2d 343 (D.N.J. 2012) .................................................................................12

*Hayes v. Cty. Bank,*
  26 A.D.3d 465 (N.Y. App. Div. 2006) .............................................................................20

*Hill v. Gateway 2000, Inc.,*
  105 F.3d 1147 (7th Cir. 1997) .........................................................................................19

*Howsam v. Dean Witter Reynolds, Inc.,*
  537 U.S. 79 (2002).........................................................................................................6, 7

*Icdas Celik Enerji Tersane Ve Ulasim Sanayi A.S. v. Travelers Ins. Co.,*
  81 A.D.3d 481 (N.Y. App. Div. 2011) .............................................................................17

*In re Belzberg v. Verus Invs. Holdings Inc.,*
  999 N.E.2d 1130 (N.Y. 2013)...........................................................................................11

*In re Flintlock Constr. Servs., LLC v. Weiss*,
122 A.D.3d 51 (N.Y. App. Div. 2014) ...................................................................16

*In re Lithium Ion Batteries Antitrust Litig.*,
No. 13-MD-2420 YGR, 2015 WL 8293728 (N.D. Cal. Dec. 9, 2015) ..................16

*Infosino v. Infosino*,
204 A.D.2d 324 (N.Y. App. Div. 1994) ...............................................................20

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GmbH*,
206 F.3d 411 (4th Cir. 2000) ...............................................................................12

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
387 F.3d 163 (2d Cir. 2004) ................................................................................19

*KKW Enters., Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*,
184 F.3d 42 (1st Cir. 1999) ....................................................................................6

*Life Receivables Trust v Goshawk Syndicate 102 at Lloyd's*,
66 A.D.3d 495 (2009), *aff'd*, 927 N.E.2d 553 (N.Y. 2010)..................................17

*Life Techs. Corp. v. AB Sciex Pte. Ltd.*,
803 F. Supp. 2d 270 (S.D.N.Y. 2011)...................................................................12

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*,
252 F.3d 218 (2d Cir. 2001)..................................................................................18

*Machado v. System4 LLC*,
28 N.E.3d 401 (Mass. 2015) ...........................................................................13, 14

*Mahoney v. DeNuzzio*,
Civ. No. 13-11501-FDS, 2014 WL 347624 (D. Mass. Jan. 29, 2014) ...................6

*Mance v. Mercedes-Benz USA*,
901 F. Supp. 2d 1147 (N.D. Cal. 2012) ...............................................................19

*Mandel v. Liebman*,
100 N.E.2d 149 (N.Y. 1951).................................................................................20

*McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.*,
858 F.2d 825 (2d Cir. 1988).................................................................................18

*McGrath & Co., LLC v. PCM Consulting, Inc.*,
C.A. No. 11-10930-DJC, 2012 WL 503629 (D. Mass. Feb. 15, 2012) ..................6

*McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*,
Nos. 14-cv-6633(KBF), 14-cv-6675(KBF), 2015 WL 144190 (S.D.N.Y. Jan. 12,
2015) ....................................................................................................................11

*Meisels v. Uhr*,
593 N.E.2d 1359 (N.Y. 1992)...............................................................................18

*Merrill Lynch Int'l Fin., Inc. v. Donaldson*,
895 N.Y.S.2d 698 (2010)......................................................................................10

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ..............................................................................................6, 7, 18

*Nunez v. Citibank, N.A.*,
No. 08 Cv. 5398(BSJ), 2009 WL 256107 (S.D.N.Y. Feb. 3, 2009) ...........................7

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
724 F.3d 1069 (9th Cir. 2013) ................................................................................17

*PacifiCare Health Sys., Inc. v. Book*,
538 U.S. 401 (2003) ...................................................................................................6

*PDC Labs., Inc. v. Hach Co.*,
No. 09-1110, 2009 WL 2605270 (C.D. Ill. Aug. 25, 2009) .....................................10

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
388 U.S. 395 (1967) ...................................................................................................6

*Rent-A-Center, W., Inc. v. Jackson*,
561 U.S. 63 (2010) .............................................................................................15, 16

*Roby v. Corp. of Lloyd's*,
996 F.2d 1353 (2d Cir. 1993) .....................................................................................8

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
490 U.S. 477 (1989) ...................................................................................................6

*Sacchi v. Verizon Online LLC*,
No. 14-cv-423-RA, 2015 WL 765940 (S.D.N.Y. Feb. 23, 2015) ...........................10

*Shearson/Am. Express, Inc. v. McMahon*,
482 U.S. 220 (1987) ...................................................................................................6

*Small Justice LLC v. Xcentric Ventures LLC*,
C.A. No. 13-cv-11701, 2015 WL 1431071 (D. Mass. Mar. 27, 2015).....................10

*Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*,
526 F.3d 38 (1st Cir. 2008) ......................................................................................13

*Starke v. Gilt Groupe, Inc.*,
No. 13 CIV. 5497(LLS), 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014).........8, 9, 10

*Swift v. Zynga Game Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal. 2011) .....................................................................10

*THI of N.M. At Hobbs Ctr., LLC, v. Spradlin*,
893 F. Supp. 2d 1172 (D.N.M. 2012), *aff'd*, 532 F. App'x 813 (10th Cir. 2013) ..................13

*Tompkins v. 23andMe, Inc.*,
No. 5:13-CV-05682-LHK, 2014 WL 2903752 (N.D. Cal. June 25, 2014) ..............10

*Ward v. TheLadders.com, Inc.*,
3 F. Supp. 3d 151 (S.D.N.Y. Mar. 12, 2014) ..........................................................10

*World Gym, Inc. v. Pla-Fit Franchise, LLC*,
 No. 12-cv-11620-DJC, 2013 WL 3830164 (D. Mass. July 19, 2013)......................................13

**STATUTES**

9 U.S.C. §§ 1–2.........................................................................................................................6

9 U.S.C. § 4..............................................................................................................................6

**OTHER REFERENCES**

AAA, Commercial Arbitration Rules and Mediation Procedures, R-7 (Jurisdiction),
 *available at*
 https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004103 ..........................17

## PRELIMINARY STATEMENT

FanDuel has been a leading provider of online fantasy sports contests since 2009.  Its contests allow sports enthusiasts to compete for prizes by pitting their player-selected fantasy team of athletes against other players' fantasy teams.  Before players can compete in these contests, they must register a FanDuel account and confirm that they agree to FanDuel's Terms of Use.  As part of those Terms, players agree to arbitrate any claims related to their use of FanDuel's website.  The ***very first line*** of the Terms tells players that in choosing to participate in FanDuel's contests, they are agreeing to resolve any disputes through arbitration:

> **IMPORTANT NOTICE**:   THIS AGREEMENT IS SUBJECT TO BINDING ARBITRATION AND A WAIVER OF CLASS ACTION RIGHTS AS DETAILED IN SECTION 15

FanDuel asks that prospective players read the "[b]inding arbitration and class action waiver" section "carefully" because "IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO FILE A LAWSUIT IN COURT."

Despite assenting to FanDuel's Terms, Plaintiffs[1] have now filed a class-action lawsuit, in an attempt to end-run the arbitration and class-waiver agreements they made with FanDuel. The Federal Arbitration Act does not countenance such tactics, and neither should this Court. Plaintiffs should be compelled to arbitrate the claims they now try to litigate.

***First***, Plaintiffs are bound by FanDuel's Terms of Use.  The Court should enforce those Terms—including the arbitration and class-waiver provisions.  ***Second***, the arbitration agreement delegates to the arbitrator, not to any court, all disputes "arising out of or relating to the

---

[1] This motion addresses three categories of plaintiffs: (1) "Player Plaintiffs"—those who registered to participate in FanDuel's online fantasy sports contests; (2) "Family Member Plaintiffs"—those whose claims arise out of their family members' use of FanDuel's website; and (3) "DraftKings Plaintiffs"—those plaintiffs who registered only with FanDuel's competitor, DraftKings, but who nevertheless assert claims against FanDuel. The latter two categories are referred to together as "Non-Player Plaintiffs."   All three categories are referred to collectively as "Plaintiffs."  FanDuel does not move to compel arbitration as to plaintiffs Nelson C. Steiner, Brackie Bryant, Peter Johnson, and Aissa Khirani.  *See* ECF No. 312.

interpretation, applicability, enforceability or formation of" the Terms of Use—including

threshold questions of arbitrability.  Thus, not only are all of Plaintiffs' general claims subject to

arbitration, but so too are any challenges to the existence, scope, and validity of the arbitration

clause.  This, FanDuel submits, ends the inquiry.  ***Third***, even if the Court disagrees that the

arbitrator decides arbitrability, the Court still should enforce the arbitration agreement because

all enforcement requirements have been satisfied.  Plaintiffs have no basis for avoiding the

agreement they made to arbitrate their claims, and the Court should direct the parties to

arbitration in accordance with that agreement.

## BACKGROUND

### I.     FanDuel's Account Registration Process

FanDuel offers Internet-based fantasy sports games on its website, fanduel.com.  All

prospective players must create a FanDuel account before they are eligible to play.  According to

the Complaint, each Player Plaintiff set up a FanDuel account between 2011 and 2015.  First

Am. Master Compl. (FAMC)  ¶¶ 33–88, ECF No. 269.

To register an account, prospective players first must navigate to FanDuel's website or

download, install, and open FanDuel's mobile application.[2]  Decl. of Dylan Kidder in support of

FanDuel's Mot. to Compel Arb. ("Kidder Decl.") ¶ 6 & n.1.  Each prospective player then

encounters a button that reads "Join Now" or "Join" and must click it before proceeding.  *Id.*

Clicking that button takes prospective players to FanDuel's online registration form.  *Id.*, Ex. B.

Prospective players must complete the form by entering a name, e-mail address, and a desired

FanDuel username and password, and then clicking the "Play Now" button.  Kidder Decl. ¶¶ 7–

8.  Immediately below that button, a conspicuous notification informs players that

---

[2] No Player Plaintiff alleges he or she registered a FanDuel account using the mobile application.

> By signing up, you confirm that you are at least 18 years of age
> and agree to the **Terms of Use**.

Kidder Decl. ¶ 8, Ex. A; *see also* Ex. B.  The bolded phrase "Terms of Use" is a hyperlink to

FanDuel's complete Terms of Use at "www.fanduel.com/terms."  *Id.*  No prospective player can

complete registration or compete in FanDuel's online contests without first clicking the "Play

Now" button and finishing the entire registration process.  *Id.*

### A.      FanDuel's Terms of Use and the Arbitration Agreement

FanDuel notifies players in several areas that use of the website means they are assenting

to the Terms.  For example, at the very top of its Terms of Use page, FanDuel provides an

> **IMPORTANT NOTICE**:   THIS AGREEMENT IS SUBJECT TO
> BINDING ARBITRATION AND A WAIVER OF CLASS ACTION
> RIGHTS AS DETAILED IN SECTION 15.

Kidder Decl. Exs. C & D.[3]  Section 1 spells out unequivocally what the players are agreeing to:

> By accessing the Site or using any part of the Site or any content or
> services (as each is defined below) on the Site, you agree to become bound
> by these terms and conditions.  If you do not agree to all terms and
> conditions, then you may not access the Site or use the content of any
> services in the Site.

Kidder Decl. Ex. C § 1; *see also* Ex. D § 1.

Section 15—the binding arbitration and class action waiver section—describes the

procedure for resolving disputes between the parties.  It asks players to read the section carefully:

> PLEASE READ THIS SECTION CAREFULLY – IT MAY
> SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING
> YOUR RIGHT TO FILE A LAWSUIT IN COURT.

*See*, *e.g.*, Kidder Decl. Ex. D at § 15.[4]

---

[3] FanDuel has had Terms of Use at least as early as 2010, Kidder Decl. Ex. E, and has updated those Terms from time to time.  The "Important Notice" listed at the very top of FanDuel's Terms has been part of the Terms since at least August 19, 2013.  *Compare* Kidder Decl. Ex. C *with* Ex. D

### 1.     The Arbitration Provision[5]

Section 15 provides a first-level, informal dispute resolution process, but if that process

does not resolve the disagreement, then either party can "initiate binding arbitration as the ***sole***

***means*** to resolve claims." *Id.* §§ 15.1, 15.2 (emphasis added).[6]  Binding arbitration is

administered by the American Arbitration Association (AAA) in accordance with its

Commercial Arbitration Rules and the supplementary procedures for consumer disputes—

excluding rules or procedures governing or permitting class actions.  *Id.* § 15.2.

#### a.     Scope and Delegation

The arbitration agreement is broad, covering "all claims arising out of or relating to these

Terms (including their formation, performance and breach), the parties' relationship with each

other and/or your use of the Service."  *Id.*  Moreover, the parties expressly delegate broad

authority to the arbitrator—including all threshold questions of arbitrability.

> The arbitrator, and ***not*** any federal, state or local court or agency, shall
> have exclusive authority to resolve ***all disputes arising out of or relating***
> ***to the interpretation, applicability, enforceability or formation*** of [the
> Terms of Use], including, but not limited to any claim that all or any part
> of these Terms are void or voidable, or ***whether a claim is subject to***
> ***arbitration***.

*Id.* (emphasis added).

#### b.     Arbitration Location and Fees

For players who are U.S. residents, FanDuel agrees to arbitrate in a place convenient to

the *player*.  *Id.* § 15.3.  FanDuel pays "all of the actual filing and arbitrator fees" for all non-

---

[4] FanDuel has made no substantive changes to its arbitration and class waiver provisions (Section 15 of its Terms of Use) since the August 19, 2013 Terms of Use.  *Compare* Kidder Decl. Ex. C § 15 *with* Ex. D § 15. Therefore, for citations to Section 15 and for ease of reference, FanDuel cites primarily to the current Terms of Use, provided as Exhibit D to Mr. Kidder's declaration.

[5] DraftKings' Terms contains a similar arbitration agreement.  *See* DraftKings Mot. to Compel Arb. at 3–4.

[6] As discussed below, the Terms of Use includes an exception for certain types of claims, including qualifying claims in small claims court.

frivolous claims (as determined by the arbitrator), provided the non-frivolous claim does not exceed $75,000. *Id*. § 15.2.

### c.   Class-Action Waiver Provision

The agreement includes a provision limiting players' and FanDuel's ability to bring class action lawsuits. Specifically, the parties "agree that any arbitration shall be conducted in their individual capacities only and not as a class action or other representative action, and the parties expressly waive their right to file a class action or seek relief on a class basis." *Id*. § 15.4.

> YOU AND FANDUEL AGREE THAT EACH MAY BRING CLAIMS
> AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL
> CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN
> ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

*Id*.

### d.   The Opt-Out Provision

The agreement notifies players that they "have the right to opt-out and not be bound by the arbitration and class action waiver" provisions. *Id*. § 15.6. How players effect a timely opt-out is explained clearly: They must send written notice to FanDuel within 30 days after the player first uses FanDuel's services. *Id*.

### ARGUMENT[7]

Under the FAA, upon motion of either party to an arbitration agreement, courts must compel arbitration "in accordance with the terms of the agreement." 9 U.S.C. § 4.[8] The Act

---

[7] The parties' have stipulated that for purposes of this motion, "Defendant FanDuel's user agreements are to be interpreted in accordance with New York law." Stipulation ¶ 6, ECF No. 283 (filed Sept. 28, 2016).

[8] The FAA broadly applies to any transaction directly or indirectly affecting interstate commerce. *See*, *e.g.*, *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401–02 (1967); *see also* 9 U.S.C. §§ 1–2. FanDuel, a Delaware corporation with its headquarters in New York, offers fantasy sports contests online via its website and mobile app to users throughout the United States (excluding a limited number of specific jurisdictions). Plaintiffs are residents of various states throughout the country. Courts hold that the FAA's interstate commerce requirement is satisfied in these circumstances. *See*, *e.g.*, *Mahoney v. DeNuzzio*, Civ. No. 13-11501-FDS, 2014 WL 347624, at *5 (D. Mass. Jan. 29, 2014) (noting that

embodies the "liberal federal policy favoring arbitration" as an alternative dispute resolution mechanism and the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations and quotation marks omitted); *see also Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 480–81 (1989); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The FAA recognizes a "strong policy in favor of rigorously enforcing arbitration agreements." *KKW Enters., Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 49 (1st Cir. 1999); *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987).

In determining whether to compel arbitration, two gateway issues should be evaluated: (1) whether the parties have a valid agreement to arbitrate; and (2) whether that agreement covers the dispute. *See PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 407 n.2 (2003); *Howsam v. Dean Witter Reynolds, Inc*., 537 U.S. 79, 83–84 (2002); *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 5–6 (1st Cir. 2014). The FAA "leaves no place for the exercise of discretion by the district court, but instead mandates that [it] *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985); *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 844 (2d Cir. 1987). "Once a court is satisfied that an arbitration agreement is valid and the claim before it is arbitrable, it must stay or dismiss further judicial proceedings and order the parties to arbitrate." *Nunez v. Citibank, N.A.*, No. 08 Cv. 5398(BSJ), 2009 WL 256107, at *2 (S.D.N.Y. Feb. 3, 2009).[9]

---

transmissions over the Internet implicate interstate commerce); *McGrath & Co., LLC v. PCM Consulting, Inc.*, C.A. No. 11-10930-DJC, 2012 WL 503629, at *6 (D. Mass. Feb. 15, 2012) (same); *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 170 (S.D.N.Y. 1997) (noting that the Internet "is wholly insensitive to geographic distinctions").

[9] In their Master Complaint, Plaintiffs suggest that their express agreement to FanDuel's Terms was somehow invalid, but their own pleading also alleges that "Plaintiffs entered into contracts and 'Terms of Use' with" FanDuel. FAMC ¶ 667. While the Master Complaint goes on to allege the Terms are unenforceable, Plaintiffs nevertheless

Whether a particular dispute is arbitrable in the first instance is a question for the

*arbitrator* to decide, where, as here, "the parties clearly and unmistakably" delegate that question

to the arbitrator. *Howsam*, 537 U.S. at 83. Any "doubts concerning the scope of arbitrable

issues should be resolved in favor of arbitration, whether the problem at hand is the construction

of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."

*Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25. The party seeking to avoid arbitration has the

burden of showing that the arbitration provision is unenforceable. *Green Tree Fin. Corp.-Ala. v.*

*Randolph*, 531 U.S. 79, 91 (2000).

## I.   All Three Categories of Plaintiffs Are Bound By a Valid Agreement to Arbitrate.

### A.   Player Plaintiffs

"Arbitration agreements are contracts and their meaning is to be determined from the

language employed by the parties under accepted rules of contract law." *Cowen & Co. v.*

*Anderson*, 558 N.E.2d 27, 28 (N.Y. 1990); *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1362 n.2

(2d Cir. 1993). Under New York law, contracts are created when the parties demonstrate mutual

assent to all material terms.[10] *Express Indus. & Terminal Corp. v. N.Y. State Dept. of Transp.*,

715 N.E.2d 1050, 1053 (N.Y. 1999). This includes agreements made over the Internet, where

"binding contracts are made when the user takes some action demonstrating that they have at

least constructive knowledge of the terms of the agreement, from which knowledge a court can

infer acceptance." *Starke v. Gilt Groupe, Inc.*, No. 13 CIV. 5497(LLS), 2014 WL 1652225, at

*2 (S.D.N.Y. Apr. 24, 2014) (quoting *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 25 (2d Cir.

---

have acknowledged the contractual relationship between the parties. As discussed in Section II, *infra*, the Plaintiffs have assented to the delegation clause in the Terms of Use irrespective of whether the Terms are enforceable, and as such, any challenges to the Terms as a whole must be arbitrated, not litigated.

[10] In deciding whether parties agreed to arbitrate their disputes—including threshold questions of arbitrability—courts generally "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

2010); *accord Cullinane v. Uber Techs., Inc.*, No. 14-14750-DPW, 2016 WL 3751652, at *5–8 (D. Mass. July 11, 2016) (applying Massachusetts law).  It does not matter whether the online users "actually read the contract's terms," where, as here, they nevertheless are "directed exactly where to click in order to review those terms."  *Starke*, 2014 WL 1652225, at *3.

By proceeding through FanDuel's online registration, Player Plaintiffs unequivocally manifested assent to FanDuel's Terms—including the arbitration provision and the delegation provision it contains.

- Each player completed a registration form and clicked the "Play Now" button;
- Immediately below that button, just like in *Starke*, conspicuous text advised players that "[b]y signing up, you confirm that you are at least 18 years of age and agree to the Terms of Use"; and
- The phrase "Terms of Use" is in bold font and hyperlinks, with a click of the mouse, directly to FanDuel's full Terms of Use, which make clear that by agreeing to the Terms, the player also agrees to arbitrate any disputes against FanDuel.

Kidder Decl. ¶¶ 7–8 and Exs. A & B.

Courts applying New York law have found contractual assent in similar situations.  For example, in *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829 (S.D.N.Y. 2012), the plaintiff opposed Facebook's invocation of a forum-selection clause because he claimed there was no proof he agreed to those terms.  *Id.* at 834.  Facebook countered that a potential user "cannot become an actual Facebook user unless and until they have clicked through the registration page where they acknowledge they have read and agreed to Facebook's terms of use."  *Id.* (citation and quotation marks omitted).  Facebook explained that to sign up, prospective users had to click a "Sign Up" button and that "immediately below" that button, the following notice appeared:  "By clicking Sign-Up, you are indicating that you have read and agree to the Terms of Service."  *Id.* at 835. The phrase "Terms of Service" was underlined and, like here, hyperlinked to the full Terms of Service.  *See id.*  The plaintiff "was informed of the consequences of his assenting click and he

was shown, immediately below, where to click to understand those consequences. That was enough." *Id*. at 840.

Similarly, in *Starke*, the plaintiff opposed defendant Gilt's invocation of a mandatory arbitration provision, arguing that he "never effectively agreed to it." 2014 WL 1652225, at *2. Gilt's sign-up process included a sign-up box featuring a "Shop Now" button accompanied by statements that the "consumer will become a Gilt member and agrees to be bound by the Terms of Membership" and that by "joining Gilt through email or Facebook sign-up, you agree to the Terms of Membership for all Gilt Groupe sites." *Id*. at *1 (citations, quotation marks, and emphasis omitted). Within the sign-up box, one click of the mouse would take users to Gilt's full terms and conditions. As in *Fteja*, the court found this process sufficient to demonstrate assent, explaining that when plaintiff "clicked 'Shop Now,' he was informed that by doing so, and giving his email address, [he] agreed to the Terms of Membership," regardless of whether he actually read the contract's terms. *Id*. at *3 (internal quotation marks omitted).[11]

So too here. Player Plaintiffs clicked the "Play Now" button after first being informed that by doing so, they were agreeing to FanDuel's Terms—which they could access directly by the click of a mouse. Under the law, this demonstrates assent and sufficiently binds Player Plaintiffs to those Terms—including the arbitration provision.[12]

---

[11] Numerous courts have reached the same conclusion. *See, e.g.*, *Small Justice LLC v. Xcentric Ventures LLC*, C.A. No. 13-cv-11701, 2015 WL 1431071, at *4 (D. Mass. Mar. 27, 2015) (plaintiff was on inquiry notice of terms when conspicuous links were displayed on users' screens); *Tompkins v. 23andMe, Inc.*, No. 5:13-CV-05682-LHK, 2014 WL 2903752, at *8 (N.D. Cal. June 25, 2014) (plaintiffs bound to arbitration clause in defendant's terms of service; "fact that the TOS were hyperlinked and not presented on the same screen does not mean that customers lacked adequate notice"); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 912 (N.D. Cal. 2011) (enforcing arbitration clause where "Plaintiff was provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the 'I accept' button"); *PDC Labs., Inc. v. Hach Co.*, No. 09-1110, 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009) (regardless of whether plaintiff actually read defendant's terms, plaintiff was bound to them because hyperlink to Terms was conspicuously displayed on defendant's order page).

[12] According to FanDuel's records, only two Plaintiffs registered their FanDuel accounts before August 19, 2013—when the current version of the arbitration agreement became effective: (1) Brian Martinelli signed up on

### B.     Non-Player Plaintiffs

#### 1.     Family Member Plaintiffs

Although Family Member Plaintiffs do not claim to have participated directly in FanDuel's contests, they nevertheless are bound to arbitrate their claims.[13]   A non-signatory to an arbitration agreement may be bound by an arbitration agreement under ordinary principles of contract law, in certain circumstances present here.  *See Merrill Lynch Int'l Fin., Inc. v. Donaldson*, 895 N.Y.S.2d 698, 702 (2010).  Indeed, "it is *not* the case that 'an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision[.]'" *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 71 (2d Cir. 2005) (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)).  Here, the doctrine of equitable estoppel obligates Family Member Plaintiffs to arbitrate their claims.

#### a.     Family Member Plaintiffs Directly Benefitted from FanDuel's Terms of Use.

Under equitable estoppel, "a nonsignatory may be compelled to arbitrate where [it] 'knowingly exploits' the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement."  *In re Belzberg v. Verus Invs. Holdings Inc.*, 999 N.E.2d 1130, 1134 (N.Y. 2013) (citing *MAG Portfolio Consult, GmbH v. Merlin Biomed Grp.*

---

March 28, 2013; (2) Scott Walters signed up March 18, 2013.  Kidder Decl. ¶ 12; *compare* FAMC ¶¶ 76, 78.  Despite their sign-up dates, both Martinelli and Walters are bound by the current arbitration provisions.  First, their continued use of FanDuel's site and services after the current arbitration provision went into effect, together with their express agreement to accept subsequent modifications to the TOUs, binds them to the arbitration provision in its current iteration.  Kidder Decl. ¶¶ 9, 13 & Ex. F § 2; *see Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 158–59 (S.D.N.Y. Mar. 12, 2014); *Sacchi v. Verizon Online LLC*, No. 14-cv-423-RA, 2015 WL 765940, at *5–7 (S.D.N.Y. Feb. 23, 2015).  Indeed, Martinelli last played a FanDuel contest in October 2015; Walters played as recently as November 14, 2016.  Kidder Decl. ¶¶ 14–15.  Both continue to maintain active FanDuel accounts *to this day*, and have access to FanDuel's terms, which are accessible from virtually every page of FanDuel's website.  Kidder Decl. ¶¶ 10, 16.  Second, in April 2016, FanDuel notified, by e-mail, all active registrants of its modified Terms.  Kidder Decl. ¶ 11.  Martinelli's and Walters's decision to continue maintaining active accounts after receiving the notice also binds them to the current arbitration provision.  *See Coiro v. Wachovia Bank, N.A.*, Civ. No. 11-3587, 2012 WL 628514, at *3-4 (D.N.J. Feb. 27, 2012); *Sacchi*, 2015 WL 765940, at *7.

   [13] To be clear, FanDuel denies that Family Member Plaintiffs are entitled to any recovery under the statutes they invoke.   But because this motion addresses only the arbitration issue, FanDuel will reserve its merits-based arguments for another day.

---

*LLC*, 268 F.3d 58, 61 (2d Cir. 2001)). "[S]o long as a non-signatory has received a direct benefit from a contract, it is not essential that the non-signatory be shown to have interacted regularly with the signatory that seeks to enforce an arbitration clause." *Amkor Tech., Inc. v. Alcatel Bus. Sys.*, 278 F. Supp. 2d 519, 523 (E.D. Pa. 2003). "The guiding principle is whether the benefit gained by the nonsignatory is one that can be traced directly to the agreement containing the arbitration clause." *Belzberg*, 999 N.E.2d at 1136. A non-signatory "directly benefits from an agreement . . . if it enables that party to receive a tangible benefit, typically a financial" one. *See McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*, Nos. 14-cv-6633(KBF), 14-cv-6675(KBF), 2015 WL 144190, at *9 (S.D.N.Y. Jan. 12, 2015); *see also Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993).

There is no question that Family Member Plaintiffs stood to benefit directly and tangibly from their relatives' assent to FanDuel's Terms of Use. As the spouses of certain Player Plaintiffs,[14] they would share in whatever economic winnings their relatives netted from competing in FanDuel's contests. Those winnings stemmed directly from the relatives' relationship with FanDuel and flowed in part from the contract between FanDuel and the players.

Allowing Family Member Plaintiffs to avoid the arbitration agreement would permit them to game the system entirely: By suing, they try to avoid any of the economic losses their relatives might have sustained (and the arbitration clause their relatives agreed to), while simultaneously protecting any *winnings* their relatives might have earned. *See generally* FAMC ¶¶ 499–505. By claiming that FanDuel's Terms are unenforceable as to them, *but only insofar* as the losses and the arbitration obligation are concerned (and not the winnings that flowed to them

---

[14] Rebecca McGuire alleges that she is "mother and next-of-kin" of "DFS Player" Martin Backer, a resident of Davidson County, Tennessee. FAMC ¶ 93. Although Ms. McGuire alleges Mr. Backer lost money on FanDuel.com, *id.*, Mr. Backer himself brings claims against only Defendant DraftKings, not FanDuel. FAMC ¶ 79.

by virtue of their relatives' playing FanDuel's contests), Family Member Plaintiffs try to exploit the Terms in a way the law does not countenance.  They can't have it both ways.  *See Best Concrete Mix Corp. v. Lloyd's of London Underwriters*, 413 F. Supp. 2d 182, 187 (E.D.N.Y. 2006) (holding that plaintiff was bound by arbitration provision "because it wishes to avail itself of the protection and direct benefits afforded" by the contract); *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 274, 276 (S.D.N.Y. 2011) (holding non-signatory defendant estopped from avoiding arbitration where it "knowingly exploited a direct benefit of a separate agreement containing an arbitration clause" and where non-signatory's claims "flow[ed] directly from [that] agreement") (citation and quotation marks omitted); *see also Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GmbH*, 206 F.3d 411, 418 (4th Cir. 2000) ("To allow [plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.") (citation and quotation marks omitted); *Haskins v. First Am. Title Ins. Co.*, 866 F. Supp. 2d 343, 350 (D.N.J. 2012) ("[E]quitable estoppel prevents a non-signatory from 'cherry-picking' beneficial contract terms while ignoring other provisions that don't benefit it or that it would prefer not to be governed by such as an arbitration clause."); *Fluehmann v. Assocs. Fin. Servs.*, No. CIV.A. 01-40076-NMG, 2002 WL 500564, at *7 (D. Mass. Mar. 29, 2002) (holding that non-signatory was bound to arbitration agreement in part to avoid allowing her to "game[] the system").[15]

---

[15] In the same vein, Family Member Plaintiffs are bound to arbitrate their claims because they are derivative of the rights of their relatives' agreements to FanDuel's Terms.  *See THI of N.M. At Hobbs Ctr., LLC, v. Spradlin*, 893 F. Supp. 2d 1172, 1190–91 (D.N.M. 2012), *aff'd*, 532 F. App'x 813 (10th Cir. 2013).  Had the relatives not agreed to FanDuel's Terms and participated in FanDuel's contests, the Family Member Plaintiffs would have no causes of action against FanDuel.  As such, their claims are derivative of their relatives' claims, and Family Member Plaintiffs therefore are "likewise bound" to the arbitration provision.  *See Spradlin*, 532 F. App'x at 818.

## 2. DraftKings Plaintiffs

DraftKings Plaintiffs likewise should be compelled to arbitrate their claims against FanDuel by virtue of their assent to DraftKings' Terms of Use, and notwithstanding their claim that they never agreed to *FanDuel's* Terms.  Although FanDuel is not a signatory to the agreements between DraftKings and DraftKings Plaintiffs, a non-signatory to an arbitration agreement nevertheless can compel a signatory to arbitrate "in either of two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or (2) when a signatory raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."  *Machado v. System4 LLC*, 28 N.E.3d 401, 409 (Mass. 2015) (internal citations and quotation marks omitted); *see also Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*, 526 F.3d 38, 47 (1st Cir. 2008) (non-signatory can compel signatory to arbitrate when the signatory's claims "are intertwined with the agreement that the estopped party has signed"); *World Gym, Inc. v. Pla-Fit Franchise, LLC*, No. 12-cv-11620-DJC, 2013 WL 3830164, at *6 (D. Mass. July 19, 2013) (same).[16]

DraftKings Plaintiffs agreed to arbitrate threshold arbitrability questions—including those related to the "existence, scope or validity" of the arbitration clause (*see* DraftKings Mot. to Compel Arb. 5–6)—but even if they had not, both conditions for estoppel are met and either one is sufficient to prevent them from avoiding arbitration.  *See Machado*, 28 N.E.3d at 409 n.15. DraftKings Plaintiffs bring civil conspiracy claims against FanDuel, alleging that DraftKings and FanDuel allowed their employees to compete against players in each other's fantasy sports contests.  *See* FAMC ¶¶ 386–89, 430–32, 662, 664.  DraftKings Plaintiffs claim they were

---

[16] To the extent any of the DraftKings Plaintiffs also registered accounts with *FanDuel*, they should be compelled to arbitrate their claims based on *FanDuel's* Terms of Use, for all the same reasons as Player Plaintiffs.

injured through their use of DraftKings' website because they were unknowingly competing

against FanDuel employees. *Id.* ¶ 430. Thus, their claims intertwine with their participation in

DraftKings online contests. *See Machado*, 28 N.E.3d at 409. By assenting to those Terms

before they played, DraftKings Plaintiffs agreed to arbitrate "[a]ny and all disputes, claims or

controversies arising out of or relating to [the DraftKings] Agreement, the breach thereof, or *any*

*use* of the Website (including all commercial transactions conducted through the Website)."

DraftKings Mot. to Compel Arb. 3–4.

Similarly, DraftKings Plaintiffs' civil conspiracy claims against FanDuel are based on

alleged concerted misconduct by FanDuel (the non-signatory) and DraftKings (a signatory). *See*,

*e.g.*, FAMC ¶¶ 1–2, 386, 395-96, 398, 409–12, 421–23, 661–65; *Machado*, 28 N.E.3d at 412–13.

Given their allegations, DraftKings Plaintiffs cannot avoid the arbitration agreement in

DraftKings' Terms. *See Machado*, 28 N.E.3d at 412.

## II.     The Arbitrator, Not This Court, Should Decide Arbitrability.

The existence of a valid, binding arbitration agreement ends the inquiry because, under

that agreement, the parties have delegated even *threshold* arbitrability questions to the arbitrator.

In other words, because there is a valid agreement with a valid (indeed, uncontested) delegation

provision, whatever objections Plaintiffs might have to arbitrability of their claims are for the

arbitrator, not the Court.

Before reaching questions about the enforceability of an arbitration agreement, a court

examines the underlying contract to determine whether the parties have agreed, clearly and

unmistakably, to commit to the arbitrator any threshold questions of arbitrability. *Awuah v.*

*Coverall N. Am., Inc.*, 554 F.3d 7, 10 (1st Cir. 2009) (arbitrator decides both whether the dispute

is arbitrable as well as challenges "to the validity of the contract itself," where the "parties have

themselves 'clearly and unmistakably [so] agreed'"); *see also Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) ("An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446 (2006).  If the parties have so agreed, the court need look no further because it is the arbitrator—not the court—that then decides arbitrability. *Bekele v. Lyft, Inc.*, --- F. Supp. 3d ----, No. 15-cv-11650-FDS, 2016 WL 4203412, at *4 n.3 (D. Mass. Aug. 9, 2016) ("The validity and enforceability of an arbitration agreement's delegation clause is usually a threshold issue for the court to address, and if it is valid and enforceable, it is the only issue the court will reach."); *accord Brennan v. Opus Bank*, 796 F.3d 1125, 1130–32 (9th Cir. 2015) ("[A] court must enforce an agreement that, as here, clearly and unmistakably delegates arbitrability questions to the arbitrator. . . .").

Here, the parties' delegation provision demonstrates that they clearly and unmistakably agreed that the arbitrator decides arbitrability.

> **The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms**, including, but not limited to any claim that all or any part of these Terms are void or voidable, or whether a claim is subject to arbitration.

Kidder Decl. ¶ 8, Ex. D § 15.2 (emphasis added); *Mohamed v. Uber Techs., Inc.*, 836 F.3d 1102, 1108–10 (9th Cir. 2016) (finding clear and unmistakable delegation where agreement "delegated to the arbitrators the authority to decide issues relating to the 'enforceability, revocability or validity of the'" arbitration provision); *Anderson v. Pitney Bowes, Inc.*, No. C 04-4808 SBA, 2005 WL 1048700, at *3 (N.D. Cal. May 4, 2005) (compelling arbitration where "arbitration clause facially [gave] an arbitrator the exclusive authority to determine his or her own

jurisdiction").  This clear manifestation of an agreement to reserve the arbitrability question for

the arbitrator should end the inquiry—particularly given that none of Plaintiffs' allegations

related to FanDuel's Terms or the arbitration agreement challenge the validity of the delegation

provision.  *See* FAMC ¶¶ 481–98.[17]

Lest there be any doubt about delegation, however, the parties' agreement also

incorporates the AAA's Commercial Arbitration Rules, Kidder Decl. Ex. D § 15.2, which make

clear that the arbitrator decides arbitrability:  "The arbitrator shall have the power to rule on his

or her own jurisdiction, including any objections with respect to the existence, scope, or ***validity***

***of the arbitration agreement or to the arbitrability of any claim or counterclaim***."[18]  As a host

of courts have held, "[w]here [the] parties agree that the AAA rules will govern, questions

concerning the scope and validity of the arbitration agreement, including issues of arbitrability,

are reserved for the arbitrators."  *In re Flintlock Constr. Servs., LLC v. Weiss*, 122 A.D.3d 51, 54

(N.Y. App. Div. 2014); *Awuah*, 554 F.3d at 9–11 (same); *Cullinane*, 2016 WL 3751652, at *8–9

(same); *Icdas Celik Enerji Tersane Ve Ulasim Sanayi A.S. v. Travelers Ins. Co.*, 81 A.D.3d 481,

483 (N.Y. App. Div. 2011) ("[G]iven the arbitration clause's specific incorporation by reference

of AAA rules, the question of arbitrability, which includes the existence, scope and validity of

the arbitration agreement, is for the arbitrator to determine."); *Life Receivables Trust v. Goshawk*

*Syndicate 102 at Lloyd's*, 66 A.D.3d 495, 496 (2009), *aff'd*, 927 N.E.2d 553 (N.Y. 2010) (where

the parties agreement specifically incorporates the AAA rules, "the scope and validity of the

---

[17] As a matter of "substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract," such that a party's "challenge to [other] provision[s] of the contract, or to the contract as a whole, does not prevent a court from enforcing the specific agreement to arbitrate."  *Rent-A-Center*, 561 U.S. at 70–71 (citation and quotation marks omitted).  Indeed, "unless [a party has] challenged the delegation provision specifically, [courts] must treat it as valid under [Section 2 of the FAA], and must enforce it under [Sections 3 and 4], leaving any challenge to the validity of the [contract] as a whole for the arbitrator."  *Id.* at 72.

[18] AAA, Commercial Arbitration Rules and Mediation Procedures, R-7 (Jurisdiction), *available at* https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004103 (emphasis added).

arbitration agreement, necessarily including issues of arbitrability, are for the arbitration tribunal

to determine"); *accord Brennan*, 796 F.3d at 1130; *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724

F.3d 1069, 1074–75 (9th Cir. 2013). Any threshold issues of arbitrability must be decided by the

arbitrator—not this Court.

## III. All Other Enforcement Requirements Are Satisfied.

Although it is clear from the parties' express agreement that the question of arbitrability

is reserved for the arbitrator, Plaintiffs nevertheless make a number of allegations about the

Terms of Use, most of which center on claims of unconscionability. *See* FAMC ¶¶ 486–95.

These assertions are for the arbitrator to decide, and even if reached here (and they should not

be), they are without merit. All requirements for enforcing the parties' arbitration agreement are

satisfied here. *See Grand Wireless*, 748 F.3d at 6 (noting requirements for enforcing an

arbitration agreement).

### A. The Parties Agreed to Arbitrate the Claims Plaintiffs Now Bring.

The parties' arbitration agreement is broad in scope and covers all the claims made by

Plaintiffs. The FAA requires courts to compel arbitration "unless it may be said with ***positive***

***assurance*** that the arbitration clause is not susceptible of an interpretation that covers the

asserted dispute." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)

(citation and quotation marks omitted; emphasis added). Where the "language of an arbitration

clause is broad and in the absence of any express provision excluding a particular grievance from

arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration

can prevail." *Grand Wireless*, 748 F.3d at 8 (citation and internal quotation marks omitted).

Doubts "concerning the scope of arbitrable issues should be resolved in favor of arbitration."

*Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25.

Here, the parties agreed to arbitrate all claims arising out of FanDuel's Terms, the parties' relationship with each other, and the use of FanDuel's site. Plaintiffs' claims against FanDuel indisputably arise out of and relate to Player Plaintiffs' use of FanDuel's site, their participation in FanDuel's contests, or their assent to FanDuel's Terms.[19] *See, e.g.*, FAMC ¶¶ 14, 20, 26, 430, 539, 625–26, 654 (alleging claims and legal theories arising out of participation in FanDuel contests). They must therefore be arbitrated.[20]

### B.    Plaintiffs Cannot Avoid their Agreement to Arbitrate.

FanDuel's Terms are not unconscionable. "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988) (internal quotation marks and citations omitted). Plaintiffs must plead facts supporting both forms of unconscionability, and they bear the burden of proof. *Accurate Copy Serv. of Am., Inc. v. Fisk Bldg. Assocs. L.L.C.*, 72 A.D.3d 456, 457 (N.Y. App. Div. 2010); *E.H. Ashley & Co. v. Wells Fargo Alarm Servs.*, 907 F.2d 1274, 1278 (1st Cir. 1990) (noting that party seeking to invalidate a contract for unconscionability bears the burden of demonstrating unconscionability).

---

[19] And, as discussed in Section I.B.2, *supra*, the DraftKings Plaintiffs should be compelled to arbitration by virtue of their agreement to DraftKings' arbitration provision.

[20] *See, e.g., Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 225 (2d Cir. 2001) ("When parties use expansive language in drafting an arbitration clause, presumably they intend all issues that 'touch matters' within the main agreement to be arbitrated.") (citation omitted); *McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 831–32 (2d Cir. 1988) (strong presumption of arbitrability applies with even greater force when the arbitration provision is a broad one); *Meisels v. Uhr*, 593 N.E.2d 1359, 1364 (N.Y. 1992) ("[B]road arbitration agreements are permissible. [New York courts] have never required that arbitration agreements identify with specificity those disputes which are being submitted."); *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 172 (2d Cir. 2004) ("We have said that [i]f the allegations underlying the claims touch matters covered by the parties' contracts, then those claims must be arbitrated, whatever the legal labels attached to them.") (citation and quotation marks omitted).

### 1.    Procedural Unconscionability

The parties' arbitration agreement is not procedurally unconscionable.   At least five factors determine whether there was a "lack of meaningful choice":  (1) "the size and commercial setting of the transaction"; (2) "whether deceptive or high-pressured tactics were employed"; (3) "the use of fine print in the contract"; (4) "the experience and education of the party claiming unconscionability"; and (5) "whether there was disparity in bargaining power." *Gillman*, 534 N.E.2d at 828 (citations omitted).  FanDuel's arbitration agreement is presented to players clearly and openly during registration, and the prospective player can abandon registration and choose not to move forward or play at any point during sign-up.[21]  *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1150 (7th Cir. 1997) (plaintiffs had multiple ways to discover, and refuse, the applicable terms and conditions both before and after purchase).  Even if Plaintiffs failed to review and reject the agreement at registration, they still could have exercised their "opt out" rights within 30 days.[22]

### 2.    Substantive Unconscionability

Nor are FanDuel's Terms substantively unconscionable.  "[A]n unconscionable bargain has been regarded as one such as no [person] in his [or her] senses and not under delusion would make on the one hand, and as no honest and fair [person] would accept on the other." *Christian v. Christian*, 365 N.E.2d 849, 855 (N.Y. 1977) (quoting *Hume v. United States*, 132 U.S. 406, 411 (1889)) (internal quotation marks omitted).  The inequality "must be so strong and manifest as to shock the conscience and confound the judgment of any man of common sense." *Mandel v.*

---

[21] Plaintiffs may try to argue that FanDuel's Terms constitute an unconscionable adhesion contract.  That's wrong.  *See Concepcion*, 563 U.S. at 346–47; *see also Mance v. Mercedes-Benz USA*, 901 F. Supp. 2d 1147, 1161 (N.D. Cal. 2012) ("The clear import of *Concepcion* . . . pushes against finding that an adhesive contract, without more, is *per se* procedurally unconscionable.").

[22] Indeed, FanDuel is not seeking to compel to arbitration plaintiffs in this MDL who effectively opted out of the arbitration obligation.  *See* FanDuel's Stmnt., ECF No. 312 (filed Nov. 2, 2016).

*Liebman*, 100 N.E.2d 149, 152 (N.Y. 1951) (citation and quotation marks omitted).  "[C]ourts will not set aside an agreement on the ground of unconscionability simply because it was improvident," *Infosino v. Infosino*, 204 A.D.2d 324, 324 (N.Y. App. Div. 1994), and "the fact that the arbitration agreements effectively preclude [plaintiffs] from pursuing a class action does not alone render them substantively unconscionable."  *Hayes v. Cty. Bank*, 26 A.D.3d 465, 467 (N.Y. App. Div. 2006).  Under these precepts, FanDuel's arbitration agreement is not unconscionable.  FanDuel offers a free, simple dispute resolution process through its customer service department and agrees to pay all arbitration fees for claims less than $75,000.  The agreement also includes provisions to ensure that any arbitration is conducted in a location convenient, *not to FanDuel*, but to claimants bringing a dispute.  And if players choose to pursue their respective claims in small claims court, they retain their right to do so.  These aspects demonstrate that FanDuel's arbitration provision easily withstands any claims of unconscionability.

## CONCLUSION

FanDuel respectfully requests that the Court order Plaintiffs to arbitrate their claims against FanDuel.

Dated: November 16, 2016                         Respectfully Submitted,

/s/ David F. McDowell

DAVID F. McDOWELL
DMcDowell@mofo.com
BENJAMIN DAVID WILLIAMS
BWilliams@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA 90017-3543
Telephone: (213) 892-5200
Facsimile: (213) 892-5454

KAI S. BARTOLOMEO
Kbartolomeo@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive Suite 100
San Diego, CA 92130-2040
Telephone: (858) 720-5100
Facsimile: (858) 720-5125


*Attorneys for Defendant FanDuel, Inc.
and FanDuel Deposits, LLC*

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Defendant FanDuel, Inc. respectfully requests oral argument on this motion.  Oral argument would enable FanDuel to address any questions that the Court may have regarding arguments raised by the parties in their briefing.

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1

I hereby certify pursuant to Local Rule 7.1(a)(2) that counsel for Defendant FanDuel, Inc. corresponded with counsel for Plaintiffs on numerous occasions via telephone and other means, in an attempt to resolve the issue presented by this motion, but were unable to do so.  Further, in an attempt to narrow the scope of this motion, and in line with this Court's request (*see* ECF No. 291), counsel for FanDuel filed a Statement Regarding Initial Motions, identifying Plaintiffs for whom FanDuel will not move to compel arbitration (ECF No. 312).

/s/  Benjamin D. Williams
Benjamin D. Williams

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November, 2016, this document was electronically filed with the Clerk of the Court using the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), pursuant to Local Rule 5.4(C).

/s/  Benjamin D. Williams
Benjamin D. Williams