UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: DAILY FANTASY SPORTS LITIGATION | MDL No. 16-02677-GAO |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PAYMENT PROCESSOR DEFENDANTS' MOTION TO COMPEL ARBITRATION**

I.     **INTRODUCTION**

The arbitrability of any given dispute is ultimately a question of consent: that is, whether the parties have consented to arbitrate those issues that arise between them, as opposed to litigating them. A written arbitration agreement signed by both parties is the clearest indicator of consent to arbitrate, but it is not the only one. Where, as here, plaintiff signatories to an arbitration agreement have brought a claim that inextricably arises out of the agreement, and defendants have a sufficiently close relationship with the signatories to the agreement, those non-signatory defendants may compel Plaintiffs to arbitrate their claims just as if there were a written arbitration agreement between them.[1]

II.    **FACTUAL BACKGROUND**

Plaintiffs allege that defendants Paysafecard.com USA, Inc. and Vantiv, Inc. (hereinafter "Payment Processors") are joint operators of a criminal enterprise with FanDuel, LLC ("FanDuel") and DraftKings, Inc. ("DraftKings") (collectively "DFS Defendants") based on the

---

[1] Payment Processors do not seek to compel arbitration against the following Plaintiffs: Nelson Steiner (as to claims related to both the FanDuel and DraftKings Terms of Use), Brackie Bryant (as to claims related to the FanDuel Terms of Use only), Peter Johnson (as to claims related to the FanDuel Terms of Use only), and Aissa Khirani (as to claims related to the FanDuel Terms of Use only) ("Remaining Plaintiffs"). As used in this memorandum, "Plaintiffs" is not intended to refer to, and expressly excludes, Remaining Plaintiffs.

alleged provision of payment processing services to the DFS Defendants.[2]  Plaintiffs did not enter agreements directly with the Payment Processors regarding their play on DFS websites; rather, they entered agreements with the DFS Defendants that governed such play and that expressly and impliedly referenced Plaintiffs' alleged use of the ancillary payment processing services.[3]  Those agreements contain binding arbitration clauses that apply to all actions arising from or connected to the DFS websites.[4]

The Terms of Use governed every aspect of Plaintiffs' use of the DFS Defendants' services, including the payment services provided on the DFS Defendants' websites.[5]  To use the

---

[2] First Amended Master Class Action Complaint and Jury Demand (Dkt. No. 269) ("First Am. Compl."). ¶¶ 759–837.  Plaintiffs have brought three claims against Payment Processors: an unjust enrichment claim (Count XIII, *id.* ¶¶ 656-659), a RICO violation claim (Count XXV, *id.* ¶¶ 759-824), and a RICO conspiracy claim (Count XXVI, *id.* ¶¶ 825-837).  For avoidance of doubt, the Payment Processors dispute all the allegations in the First Amended Complaint.

[3] Declaration of Behnam Dayanim, Ex. A, FanDuel Terms of Use, § 1 Acceptance of terms ("By using or otherwise accessing the Service, or clicking to accept or agree to these Terms where that option is made available, you [] accept and agree to these Terms and our additional Rules and Scoring system[.] . . . If you do not agree to the Terms, then you may not access or use the Content or Services. . . . By depositing money or entering a contest, you are representing and warranting that . . . you will abide at all times by these Terms of Use and any other agreements between you and FanDuel regarding your use of the Service or participation in games . . . ."); Declaration of Behnam Dayanim, Ex. B, DraftKings Terms of Use, § Consideration ("You agree to these Terms of Use by accessing or using the Website, registering for Services offered on the Website, or by accepting, uploading, submitting or downloading any information or content from or to the Website. IF YOU DO NOT AGREE TO BE BOUND BY ALL OF THESE TERMS OF USE, DO NOT USE THE WEBSITE.  These Terms of Use constitute a legal agreement between you and DraftKings, and shall apply to your use of the Website and the Services even after termination.").

[4] FanDuel Terms of Use, § 15 Binding Arbitration and Class Action Waiver; DraftKings Terms of Use, § Arbitration, Consent to Jurisdiction in Massachusetts, Attorney's Fees.  For an explanation of why these arbitration terms bind Plaintiffs, *see generally* DraftKings' Motion to Compel Arbitration (Dkt. No. 317) and FanDuel's Motion to Compel Arbitration (Dkt. No. 318) and supporting memoranda, which the Payment Processors incorporate by reference.

[5] *See, e.g.*, DraftKings Terms of Use, §§ User Agreement, Eligibility (terms of use "apply to [player's] use of the Website and Services," including the "payment method to participate in real money contests."); *see also* FanDuel Terms of Use, §§ 1, 3 (terms of use govern use or access of fanduel.com, the mobile app, and any other features, tools, materials, or other services (including co-branded or affiliated services) offered . . . by FanDuel," including "depositing money").

DFS Defendants' services fully, site users must utilize payment services – which Plaintiffs allege the Payment Processors provided – each time they make deposits to their player accounts.[6] Therefore, the Payment Processors' services, as alleged, are part of the services offered on the DFS Defendants' website and subject to the Terms of Use.

The Terms of Use make specific reference to payment processors, by function though not by name,[7] and the Terms of Use expressly regulate the Plaintiffs' use of the Payment Processors' putative services. For example, it is "a violation of the[] [DraftKings] Terms of Use for any [player] to submit payment using any payment method" other than as authorized by the Terms of Use,[8] and a FanDuel player is disqualified from play if she "violates eligible payment method terms."[9]

### III. **THE COURT SHOULD COMPEL ARBITRATION**

The Court should compel arbitration of Counts XIII, XXV, and XXVI – the only counts brought against Payment Processors – because all parties consented to arbitrate.[10] A number of Circuits – including this one – have recognized that the doctrine of equitable estoppel permits non-signatories to an arbitration agreement to compel arbitration against signatories where the agreement covers the subject matter of the dispute and the parties have a close relationship. *See,*

---

[6] *See, e.g.,* FanDuel Terms of Use, § 5.2 (discussing requirements for paying contest entry fees); Declaration of Behnam Dayanim, Ex. C, (deposit page displayed to FanDuel players, showing payment options for depositing funds into players' account).

[7] *See, e.g.,* DraftKings Terms of Use, § Refund Policy (referring to "[t]he company processing credit card payments for DraftKings").

[8] DraftKings Terms of Use, § Eligibility; *see also* DraftKings Terms of Use, § Miscellaneous (indemnification provision applying to matters "arising from or connect to [player's] use of . . . any payment method used").

[9] FanDuel Terms of Use § 4.4.

[10] The Payment Processors understand that the DFS Defendants will bring a separate motion to compel to determine the arbitrability of claims against them. Because the Payment Processors' right to compel arbitration derives from the DFS Defendants' arbitration agreements, the Payment Processors rely upon and incorporate by reference the separate motion to compel brought by the DFS Defendants.

*e.g.*, *Restoration Pres. Masonry v. Grove Europe Ltd.*, 325 F.3d 54, 63 (1st Cir. 2003) (reasoning that "[a] number of circuits have allowed a non-signatory to compel arbitration under a limited equitable estoppel theory," and listing cases from the Fifth, Eleventh, Seventh and First Circuits to that effect); *see also Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*, 526 F.3d 38, 46 (1st Cir. 2008) (equitably estopping signatory of an arbitration agreement from avoiding arbitration of dispute with a non-signatory). The Court should compel arbitration of the claims against the Payment Processors under the doctrine of equitable estoppel because those same circumstances exist here.[11]

The First Circuit recognizes that a signatory to an arbitration agreement is estopped from avoiding arbitration with a non-signatory "when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Sourcing Unlimited,* 526 F.3d at 47 (quoting *InterGen N.V. v. Grina*, 344 F.3d 134, 145 (1st Cir. 2003)); *see also Chocktaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 404 (2d Cir. 2001) (same) (quoting *Smith/Enron Cogeneration Ltd. P'ship Inc. v. Smith Cogeneration*

---

[11] Federal, not state, law governs questions of arbitrability. *PaineWebber Inc. v. Elahi*, 87 F.3d 589, 593 (1st Cir. 1996). The Federal Arbitration Act "is a congressional declaration of a liberal federal policy favoring arbitration agreements" and effectively "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Id.* (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Moreover, both Massachusetts and New York courts recognize equitable estoppel and apply federal law in evaluating such cases. *See, e.g.*, *Machado v. System4 LLC*, 471 Mass. 204, 211, (2015) (citing *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524 (5th Cir. 2000)); *Merrill Lynch Int'l Fin., Inc. v. Donaldson*, 895 N.Y.S.2d 698, 703 (Sup. Ct. 2010) (citing *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d. Cir. 2001)). Where "questions of federal law" arise in "MDL-transferred cases," these questions are "governed by the law of the transferee circuit." *In re New England Mut. Life Ins. Co. Sales Practices Litigation*, 324 F. Supp. 2d 288, 297 (D. Mass. 2004).

*Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999) and *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)).[12]

Courts have distilled this "intertwined-ness" requirement into two factors: (1) whether the plaintiff/signatory's claims against a non-signatory defendant and signatory defendant are "inextricably intertwined" and arise under the underlying agreement, and (2) whether the plaintiff and non-signatory defendant are "closely affiliated" or have a sufficiently "close relationship." *Paul Revere Variable Annuity Ins. Co. v. Thomas*, 66 F. Supp. 2d 217, 225 (D. Mass. 1999), *aff'd*, *Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*, 226 F.3d 15 (1st Cir. 2000); *see also In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 476 (S.D.N.Y. 2013) (similarly framing "intertwinedness" analysis as a two-part test looking to (1) the subject matter of the underlying agreement and (2) the relationship between the parties). Plaintiffs' claims against the Payment Processors meet both elements of the "intertwinedness" test.

### A. The Claims Against the Payment Processors are Within the Scope of the Arbitration Agreements

Plaintiffs' claims against the Payment Processors are within the scope of their arbitration agreements with the DFS Defendants for two independent reasons, either of which is sufficient to satisfy the first prong of the equitable estoppel test. First, Plaintiffs' dispute with the Payment Processors arises solely out of their use of the DFS Defendants' services, which are governed by FanDuel and DraftKings' respective Terms of Use. Second, the merits of the claims against the

---

[12] A number of Circuits – including the First – have approvingly recognized and often utilize the Second Circuit's doctrine on this issue. *See, e.g.*, *Sourcing Unlimited, Inc.,* 526 F.3d at 46 (regarding equitable estoppel of arbitration provisions (citing with approval *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995), and *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060 (2d Cir. 1993))); *Hays v. HCA Holdings, Inc.*, 838 F.3d 605 (5th Cir. 2016) (regarding equitable estoppel of arbitration provisions (relying on *Denney v. BDO Seidman, LLP*, 412 F.3d 58 (2d Cir. 2005))); *Donaldson Co., v. Burroughs Diesel, Inc.*, 581 F.3d 726 (8th Cir. 2009) (regarding equitable estoppel of arbitration provisions (relying on *Denney*, 412 F.3d at 60–64))). Accordingly, Payment Processors cite to several cases from the Second Circuit as persuasive precedent.

Payment Processors will turn on many of the same facts and law as the claims against the DFS Defendants.

        1. **Plaintiffs' Claims Against the Payment Processors Arise Solely From Their Use of the DFS Defendants' Services**

In equitable estoppel cases, for a claim against a non-signatory to be arbitrated, the claims must be sufficiently related to the agreement that the estopped party has signed. *Sourcing Unlimited*, 526 F.3d at 47. Indeed, this requirement is not unique to equitable estoppel cases. Even where all parties have agreed that an arbitration clause is valid, courts may compel arbitration only if they conclude that the claims fall within the "breadth" of the arbitration agreement; if the dispute does not relate to the arbitration contract, it is not arbitrable. *McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir. 1994); *Grina*, 344 F.3d at 142 (reasoning that "[a] party who attempts to compel arbitration must show that . . . the claim asserted comes within the clause's scope"). The claims must be "integrally related to the contract containing the arbitration clause" for estoppel to apply. *Thomson-CSF*, 64 F.3d at 779.

Federal courts have reasoned that where claims directly or indirectly invoke or rely upon an underlying agreement, such claims necessarily arise from the subject matter of the agreement and the first prong of "intertwinedness" is satisfied. *See, e.g., Sourcing Unlimited*, 526 F.3d at 47 (finding "intertwinedness" indisputably satisfied where most of the claims invoked the terms of the arbitration agreement); *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 127 (2d Cir. 2010) (finding "no question that the subject matter of the dispute between [the signatory and the non-signatory was] is factually intertwined with the dispute between [the two signatories]. It is, in fact, the same dispute."); *Grigson*, 210 F.3d at 527 (reasoning that "[w]hen each of a signatory's claims against a non-signatory makes reference to or presumes the existence of the

written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate").

The claims against the Payment Processors derive entirely from the Plaintiffs' voluntary use of the DFS Defendants' services.[13] That usage was governed by FanDuel and DraftKings' respective Terms of Use, each of which included a binding arbitration provision.[14] The Terms of Use extended to all aspects of usage of the DFS Defendants' websites, including the embedded services allegedly provided by the Payment Processors.[15]

2. **Parallel Arbitration and Judicial Proceedings Are Disfavored Where Substantially The Same Law and Facts Will Apply**

Federal courts will estop a signatory plaintiff from avoiding arbitration with a non-signatory defendant where the plaintiff's claims against the non-signatory turn on the same factual and legal issues as related or similar claims against another defendant that is a signatory to the agreement. *See Paul Revere Variable Annuity Ins. Co. v. Thomas*, 66 F. Supp. 2d 217, 225 (D. Mass. 1999) (in compelling arbitration against non-signatory defendants, reasoning that the plaintiffs' claims against defendants "are all governed by the same set of facts and implicate the same legal arguments"); *Paradise v. Eagle Creek Software Servs., Inc.*, 989 F. Supp. 2d 132, 143 (D. Mass. 2013) (compelling arbitration against non-signatory where claims against signatory and non-signatory defendant were "inextricably intertwined"); *Johnson v. Polaris Sales, Inc.*, 257 F. Supp. 2d 300, 306–07 (D. Me. 2003) (compelling arbitration in part due to the "inseparable nature of the allegations").

---

[13] *See, e.g.*, First Am. Compl. ¶ 658 (Plaintiff's unjust enrichment claim against Payment Processors arises from payments to use DFS Defendants' websites); ¶¶ 822–823 (Plaintiffs' RICO claim against Payment Processors predicated on alleged injuries from payment of "user fees" and "wagers" through the DFS Defendants' websites); ¶ 835 (same).
[14] *See supra* Part II.
[15] *Id.*

- 7 -

In *Choctaw*, for example, a plaintiff sued two defendants over a construction project, only one of whom had signed the construction contract containing the arbitration provision. *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403 (2d Cir. 2001). The non-signatory defendant was an insurer that held a separate surety contract on the project. *Id.* at 404. The claims being litigated against both defendants were not identical but overlapped in their subject matter: one claim involved the plaintiff's entitlement to liquidated damages, while the other claim involved the plaintiff's ability to recover those damages through a related letter of credit. *Id.* at 407. In holding that the plaintiff was required to arbitrate with both defendants, the Second Circuit reasoned that because both sets of claims "turn[ed] upon many of the same provisions," the claims were sufficiently "intertwined." *Id.* Considerations of judicial economy and avoiding conflicting interpretations of the contractual provisions also weighed in favor of deciding the dispute in a single arbitration rather than parallel proceedings. *Id.* at 408.

Those same factors support sending the full dispute to arbitration here. The three claims against the Payment Processors are the same as three of the 27 claims alleged against the primary defendants in this case: the DFS Defendants.[16] The claims against both the Payment Processors and the DFS Defendants arise under the same areas of law – federal RICO law and state unjust enrichment law.[17] And each of these claims turns on the same central set of facts, whether alleged against the DFS Defendants or Payment Processors: namely, the purported illegality of the services offered by the DFS Defendants.[18] Bifurcating the claims against the Payment

---

[16] *Compare* First Am. Compl. ¶¶ 643–655 (unjust enrichment count against DFS Defendants) *with id.* ¶¶ 656–659 (unjust enrichment count against Payment Processors, alleging nearly identical claims). *See also id.* ¶¶759–824; ¶¶ 825–837 (bringing identical RICO and RICO conspiracy claims against both DFS Defendants and Payment Processors).
[17] *Id.*
[18] *Compare* First. Am. Compl. ¶ 654 (alleging that DFS Defendants were unjustly enriched by their retention of Plaintiffs' "deposits and contest entries"), *with id.* ¶ 658 (alleging that Payment

Processors and allowing Plaintiffs to proceed against them in federal district court even though they have agreed to arbitrate the same claims against the DFS Defendants would force the Court to engage in duplicative fact-finding and open the door for inconsistent legal determinations. Doing so risks inconsistent outcomes, wastes judicial resources, and undermines the strong federal policy favoring arbitration.

B. **The Parties Have the Requisite Close Relationship**

The second prong of the "intertwined-ness" test is whether the parties have a sufficiently close relationship or are sufficiently "closely affiliated" to infer consent to arbitrate; here, the facts satisfy this prong, such that the Court should compel arbitration. *Myrick v. GTE Main Street Inc.*, 73 F. Supp. 2d 94, 97 (D. Mass. 1999). For example, non-signatories who are directly or indirectly referenced in contracts as third-party service providers thereunder have successfully compelled signatories to arbitrate under such contracts. *See, e.g.*, *id.* (compelling arbitration against non-signatory who was "closely affiliated" agent of signatory); *Paul Revere Variable Annuity Ins. Co.*, 66 F. Supp. 2d at 225 (compelling arbitration against non-signatory companies who were "closely affiliated with each other despite being organized as separate entities); *Ragone*, 595 F.3d at 128 (estopping make-up artist plaintiff from avoiding arbitration with ESPN, even though ESPN was not a signatory to her employment agreement with ESPN vendor, since artist "knew from the date of her employment by [vendor] that she would work with and be supervised by ESPN personnel in the ordinary course of her daily duties").

A plaintiff-signatory's own pleadings can undermine his argument that the requisite close relationship is lacking if, for example, he pleads a RICO conspiracy against a group of defendants, only some of whom are signatories to an arbitration agreement. *See Denney v. BDO*

---

Processors were unjustly enriched by their retention of "wagers placed pursuant to the DFS Defendants' online gambling scheme").

Processors and allowing Plaintiffs to proceed against them in federal district court even though they have agreed to arbitrate the same claims against the DFS Defendants would force the Court to engage in duplicative fact-finding and open the door for inconsistent legal determinations. Doing so risks inconsistent outcomes, wastes judicial resources, and undermines the strong federal policy favoring arbitration.

B. **The Parties Have the Requisite Close Relationship**

The second prong of the "intertwined-ness" test is whether the parties have a sufficiently close relationship or are sufficiently "closely affiliated" to infer consent to arbitrate; here, the facts satisfy this prong, such that the Court should compel arbitration. *Myrick v. GTE Main Street Inc.*, 73 F. Supp. 2d 94, 97 (D. Mass. 1999). For example, non-signatories who are directly or indirectly referenced in contracts as third-party service providers thereunder have successfully compelled signatories to arbitrate under such contracts. *See, e.g.*, *id.* (compelling arbitration against non-signatory who was "closely affiliated" agent of signatory); *Paul Revere Variable Annuity Ins. Co.*, 66 F. Supp. 2d at 225 (compelling arbitration against non-signatory companies who were "closely affiliated with each other despite being organized as separate entities); *Ragone*, 595 F.3d at 128 (estopping make-up artist plaintiff from avoiding arbitration with ESPN, even though ESPN was not a signatory to her employment agreement with ESPN vendor, since artist "knew from the date of her employment by [vendor] that she would work with and be supervised by ESPN personnel in the ordinary course of her daily duties").

A plaintiff-signatory's own pleadings can undermine his argument that the requisite close relationship is lacking if, for example, he pleads a RICO conspiracy against a group of defendants, only some of whom are signatories to an arbitration agreement. *See Denney v. BDO*

---

Processors were unjustly enriched by their retention of "wagers placed pursuant to the DFS Defendants' online gambling scheme").

*Seidman, LLP*, 412 F.3d 58, 70 (2d Cir. 2005) ("Having alleged in this RICO action that the [signatory and non-signatory defendants alike] acted in concert to defraud plaintiffs, . . . and that defendants' fraud arose in connection with [the contractual services], plaintiffs cannot now escape the consequences of those allegations by arguing that the [signatory and non-signatory defendants] lack the requisite close relationship . . . .").

The relationship among the parties here satisfies this requirement because the Payment Processors' putative services are fully intertwined with the Plaintiffs' use of the DFS websites. Plaintiffs alleged that they obtained services from the Payment Processors as an integrated and required part of their use of the DFS Defendants' websites.[19] The Terms of Use specifically covered the Plaintiffs' payment method,[20] and Plaintiffs' claims against the Payment Processors arise specifically out of their alleged use of the payment methods accepted by the DFS Defendants.[21] Indeed, just as in *Denney*, Plaintiffs allege that the Payment Processors and the DFS Defendants have jointly "exerted control" of a criminal enterprise that interacted with and injured Plaintiffs.[22] Plaintiffs cannot now deny that the Payment Processors lack the requisite relationship when they themselves have pleaded it.

---

[19] *See supra* Part II.
[20] *Id.*
[21] *See, e.g.*, First. Am. Compl. ¶ 658 (Plaintiff's unjust enrichment claim against Payment Processors arises from payments to use DFS Defendants' websites); ¶¶ 822–823 (Plaintiffs' RICO claim against Payment Processors predicated on alleged injuries from payment of "user fees" and "wagers" through the DFS Defendants' websites); ¶ 835 (same).
[22] *Compare Denney*, 412 F.3d at 70 (plaintiffs alleged that the signatory and non-signatory "Defendants knowingly acted in concert to market and implement the fraudulent and illegal . . . tax shelter")*, with* First Am. Compl. ¶ 804 ("the Defendants DraftKings and FanDuel and the . . . Processing Entities have exerted control over their respective Enterprises and in violation of Section 1962 (c) of the RICO statute, have conducted or participated in the conduct of the affairs of the RICO enterprise"), *and* ¶ 829 (alleging that DFS Defendants and Payment Processors "conspire[ed] . . . to conduct or participate in . . . daily fantasy sports contests").

IV. **CONCLUSION**

The Court should compel the Plaintiffs to arbitrate their claims against the Payment Processors. The claims against the Payment Processors arise from Plaintiffs' use of the DFS Defendants' services, which allegedly included the integrated use of the Payment Processors' embedded services. All usage of DFS Defendants' services was governed by FanDuel and DraftKings' respective Terms of Use, which included binding arbitration provisions. Moreover, the relationship among the parties reflects an intention to arbitrate all disputes arising out of the respective Terms of Use.

For the foregoing reasons, the Payment Processors respectfully request that this Court grant their Motion to Compel Arbitration.

Dated: November 16, 2016
Washington, District of Columbia

Respectfully submitted,

| | |
|---|---|
| By: */s/ Behnam Dayanim* | By: */s/ George R. Calhoun, V* |
| Behnam Dayanim (*pro hac vice*) | George R. Calhoun, V (*pro hac vice*) |
| Kathleen Sheridan (*pro hac vice*) | Ifrah PLLC |
| Noah Simmons (*pro hac vice*) | 1717 Pennsylvania Ave., N.W. |
| bdayanim@paulhastings.com | Washington, DC  20006 |
| kathleensheridan@paulhastings.com | Tel: (202) 524-4140 |
| noahsimmons@paulhastings.com | george@ifrahlaw.com |
| Paul Hastings LLP | |
| 875 15th Street, N.W. | David S. Godkin (BBO#196530) |
| Washington, DC  20005 | James E. Kruzer (BBO#670827) |
| Telephone: (202) 551-1700 | Birnbaum & Godkin, LLP |
| Facsimile:  (202) 551-1705 | 280 Summer Street |
| | Boston, MA  02210 |
| David S. Godkin (BBO#196530) | Tel: (617) 307-6100 |
| James E. Kruzer (BBO #670827) | godkin@birnbaumgodkin.com |
| Birnbaum & Godkin, LLP | kruzer@birnbaumgodkin.com |
| 280 Summer Street | |
| Boston, MA 02210 | *Attorneys for Defendant Vantiv, Inc.* |
| Tel: (617) 307-6100 | |
| godkin@birnbaumgodkin.com | |
| kruzer@birnbaumgodkin.com | |

*Attorneys for Defendant Paysafecard.com
USA, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 16, 2016.

*/s/ Behnam Dayanim*
Behnam Dayanim (*pro hac vice*)