**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| In re: DAILY FANTASY SPORTS LITIGATION | ) | MDL No. 16-02677-GAO |
| | ) | |
| This Document Relates To: | ) | |
| | ) | |
|    All Cases | ) | |
| | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT DRAFTKINGS, INC.'S**
**MOTION TO COMPEL ARBITRATION**

## TABLE OF CONTENTS

I.  Introduction ...................................................................................................................1

II.  Factual Background ........................................................................................................2

    A.  DraftKings' Arbitration Agreement and Terms of Use ......................................2

    B.  DraftKings' Fraudulent Scheme ........................................................................3

III.  Argument ........................................................................................................................5

    A.  DraftKings Bears Burden of Proving to This Court a Valid Contract Formed With Plaintiffs ...........................................................................................................5

    B.  DraftKikngs Cannot Show It Formed Contract with Plaintiffs .............................7

        1.  The Terms of Use are Illusory and Therefore No Contract Was Formed ...7

        2.  The Purported Contract Was Void at Formation Because Its Purpose Was to Engage in Illegal Gambling .................................................................10

        3.  DraftKings' "Click-Wrap" Method Did Not Form a Binding Contract .....12

    C.  The Delegation Clause is Unenforceable; It Is Not Clear and Unmistakable and Violates Basic Contract Law Principles ............................................................15

        1.  Plaintiffs Can Challenge the Delegation Clause in Response to DraftKings' Motion ...................................................................................15

        2.  DraftKings Cannot Show Clear and Unmistakable Evidence of Delegation ................................................................................................16

        3.  Incorporation of Delegation Provision Impermissibly Conflicts With Other Provisions Giving Court Authority ..........................................................18

            a.  Arbitration Provision Should Be Evaluated In Context of Terms of Use Despite Severability Clause .............................................................18

            b.  Other Provisions Undercut DraftKings' Characterization of Delegation as Clear and Unmistakable ...............................................................20

        4.  Delegation Clause Is Unenforceable Under General Contract Principles .................................................................................................21

D.    The Arbitration Agreement Is Invalid and Unenforceable ....................................21

    1.    The Terms of Use Require That This Case Be Heard in This Court Because of An Ambiguity that Must Be Resolved Against DraftKings....22

    2.    The Arbitration Provision is Unenforceable Because it Does Not Allow Plaintiffs to Effectively Vindicate Their Rights Under RICO..................23

    3.    The Arbitration Provision Is Invalid Because It Furthers a Fraudulent Scheme .......................................................................................................26

    4.    The Arbitration Agreement was Fraudulently Induced ............................27

    5.    The Arbitration Agreement Is Illusory and Unenforceable ......................28

E.    DraftKings Cannot Enforce an Arbitration Agreement Against Non-Signatory Plaintiffs.............................................................................................................29

    1.    The Family Member Plaintiffs Are Not Bound By Arbitration Agreement................................................................................................29

        a.  Estoppel...................................................................................30

        b.  "Derivative of"........................................................................31

    2.    The Crossover Plaintiffs Are Not Bound By Any Arbitration Agreement................................................................................................33

IV.    Conclusion ...................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*Ajemian v. Yahoo!, Inc*., 83 Mass.App.Ct. 565 (2013) .....................................1, 5, 9, 13, 15

*Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013) .....................................23, 24

*Apollo Computer, Inc. v. Berg*, 886 F.2d 469 (1st Cir. 1989)...........................................18

*AT&T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643 (1986) ..................5

*Atalese v. U.S. Legal Services Group, L.P.*, 219 NJ 430, 448 (2014) .............................27

*Awuah v. Coverall N.A., Inc.,* 554 F.3d 7 (1st Cir. 2009).....................................18, 28, 29

*Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 42 (1st Cir. 2012).....................................18

*A.Z. v. B.Z.,* 431 Mass. 150, 725 N.E.2d 1051 (2000).....................................................10

*Baltazar Contractors, Inc. v. Town of Lunenburg,*
    65 Mass. App. Ct. 718, N.E.2d (2006) ...........................................................11

*Bekele v. Lyft, Inc*., No. CV 15-11650-FDS, 2016 WL 4203412
    (D. Mass. Aug. 9, 2016)...........................................................................................5, 13

*Berkson v. Gogo, LLC,* 97 F. Supp. 3d 359 (E.D.N.Y. Apr. 9, 2015) ..............................12

*Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015) ....................................................18

*Boston Five Cents Sav. Bank v. Brooks*, 309 Mass. 52, 55 (1941) ...................................27

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*,
    622 F.3d 996 (9th Cir. 2010) .........................................................................16

*Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440 (2006) ......................................6

*Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.,*
    271 F.3d 403 (2d Cir. 2001)..........................................................................33

*Commercial Movie Rental, Inc. v. Larry Eagle, Inc.*,
    738 F. Supp. 227 (W.D. Mich. 1989) ....................................................... 9-10

*Commonwealth v. Demogenes,* 211. N.E.2d 226 (Mass. 1965)........................................11

*Commonwealth v. Sullivan*, 218 Mass. 281 (Mass. 1914) .................................................11

*Cullinane v. Uber Techs., Inc.*, No. CV 14-14750-DPW, 2016 WL 3751652
(D. Mass. July 11, 2016) .........................................................................1, 6, 12, 14, 15

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells*,
U.S., 9 F.3d 1060 (2d Cir. 1993) ............................................................... 30-31

*DeLuca v. Bear Stearns & Co.*, 175 F. Supp. 2d 102 (D. Mass. 2001) ..............................7

*Denney v. Jenkens & Gilchrist,* 412 F. Supp. 2d 293 (S.D.N.Y. Dec. 12, 2005) ..33, 34, 35

*Domenichetti v. Salter Sch.*, 2013 WL 1748402 (D. Mass. Apr. 19, 2013)..............................9

*Escobar-Noble v. Luxury Hotels Int'l of Puerto Rico, Inc.*,
680 F.3d 118 (1st Cir. 2012) ...................................................................................5, 9

*Farnsworth v. Towboat Nantucket Sound, Inc.*, 790 F.3d 90 (1st Cir. 2015) .....................6

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) .......................7, 16, 17, 20

*Foss v. Circuit City Stores, Inc.*, 477 F. Supp. 2d 230 (D. Me. 2007) ................................6

*Gambardella v. Pentec, Inc.*, 218 F. Supp. 2d 237 (D. Conn. 2002)................................25

*Garten v. Kurth*, 265 F.3d 136 (2nd Cir. 2001) ..........................................................26, 27

*Gill v. Richmond Co-op. Ass'n*, 309 Mass. 73, 34 N.E.2d 509 (1941) ...............................9

*Glazer v. Lehman Bros., Inc.*, 394 F.3d 444 (6th Cir. 2005) ...........................................19

*Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1 (1st Cir. 2012) ............................................6

*Govt. Emps. Ins. Co. v. Grand Medical Supply, Inc.*, 11-cv-5330,
2012 WL 2577577 (E.D.N.Y. July 4, 2012) ..................................................34

*Graham Oil Co. v. ARCO Prod. Co., a Div. of Atl. Richfield Co.*, 43 F.3d 1244,
(9th Cir. 1994)...................................................................................................25

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010) ........................6, 18, 30

*Grosvenor v. Qwest Commc'ns Int'l, Inc.*, No. 09-cv-2848-WDM-KMT,
2010 WL 3906253 (D. Colo. Sept. 30, 2010)..................................................17

*Hinchey v. NYNEX Corp.*, 144 F.3d 134 (1st Cir. 1998) ...................................................9

*Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 415 (Sup. Ct. 2005)35

*Ingalls v. Spotify USA, Inc.,* No. 16-cv-03533 WHA, 2016 WL 6679561
   (N.D. Cal. Nov. 14, 2016) ................................................................... 16-17, 18

*In re Checking Account Overdraft Litigation*, MDL No. 2036, 685 F.3d 1269
   (11th Cir. 2012) ...................................................................................... 19-20

*In re Humana Inc. Managed Care Litig.,* 285 F.3d 971 (11th Cir. 2002) ........................34

*InterGen N.V.* v. Grina, 344 F.3d 134 (1st Cir. 2003) ...........................................5

*JLM Indus. v. Stolt-Nielsen SA,* 387 F.3d 163 (2d Cir. 2004) ....................................33, 35

*Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 525 N.E.2d 411 (1988) ........9

*Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) .................................6

*Johnson v. Circuit City Stores, Inc.*, 203 F.3d 821 (4th Cir. 2000) ..................................25

*Karnazes v. Expedia, Inc.,*  2014 WL669279 (Cal. Ct. App. 2014) ..................................32

*Katz v. Feinberg*, 290 F.3d 95 (2d Cir. 2002) ...........................................................20, 21

*Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 460 (1st Cir. 2013) .................23

*Kristian v. Comcast Corp.,* 446 F.3d 25 (1st Cir. 2006) .......................................24, 25, 28

*Ladd v. Scudder Kemper Investments, Inc.*, 741 N.E.2d 47 (Mass. 2001) .........................5

*Lee v. Southern Cal. Univ. for Prof. Studies,*
   148 Cal. App. 4th 782 (Cal. Ct. App. 2007) .................................................32

*Licata v. GGNSC Malden Dexter LLC*, 2 N.E.3d 840 (Mass. 2014) ................................30

*Linan-Faye Const. Co. v. Hous. Auth. of City of Camden*, 49 F.3d 915 (3d Cir. 1995) ....10

*Luso-Am. Credit Union v. Cumis Ins. Soc., Inc.*, 616 F. Supp. 846, 848
(D. Mass. 1985) ..........................................................................................22

*Mass. Mun. Wholesale Elect. Co. v. Danvers,* 577 N.E.2d 283 (Mass. 1991) .................10

*McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677 (7th Cir. 2002) .........................................25

*Meyer v. Kalanick,* 2016 WL 4073071
   (S.D.N.Y. July 29, 2016) .............................................................12, 13, 14, 15

*Miron v. BDO Seidman, L.L.P.,* 342 F. Supp. 2d 324 (E.D. Pa. 2004) .............................33

*Moseley v. Electronic & Missile Facilities, Inc.*, 374 U.S. 167, 171 (1963) ...............26, 27

*Nat'l Fed'n of the Blind v. Container Store, Inc.*, No. CV 15-12984-NMG,
   2016 WL 4027711 (D. Mass. July 27, 2016).....................................................................6

*Net2phone, Inc. v. Superior Court,* 109 Cal. App. 4th 583 (Cal. Ct. App. 2003)..............32

*Newton v. Am. Debt Servs., Inc.*, 549 F. App'x 692 (9th Cir. 2013) .................................19

*Noonan v. Wonderland Greyhound Park Realty LLC,*
   723 F. Supp. 2d 298 (D. Mass. 2010) ...............................................................................8

*PacifiCare Health Sys. v. Book,* 538 U.S. 401, 123 S. Ct. 1531,
   155 L.Ed.2d 578 (2003) ...................................................................................................33

*Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054 (11th Cir. 1998) ......................25

*Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331 (11th Cir. 2016) ...................................16

*Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*, 226 F.3d 15, 25 (1st Cir. 2000) ..23

*Plymouth Yongle Tape (Shanghai) Co. v. Plymouth Rubber Co., LLC,*
   750 F. Supp. 2d 297 (D. Mass. 2010) ...............................................................................7

*Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*,
   288 U.S. 395 (1967).........................................................................................2, 20, 26

*Ragone v. Atl. Video,* No. 07-cv-06084, 2008 WL 4058480
   (S.D.N.Y. Aug. 29, 2008) ................................................................................................34

*Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010)....................................15, 16,19

*Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
170 F.3d 1, 19 (1st Cir.1999) ..............................................................................................18

*Ryan v. Delbert Servs. Corp.*, No. 5:15-cv-05044, 2016 WL 4702352,
   (E.D. Pa. Sept. 8, 2016) .............................................................................................15, 21

*Sanford v. Memberworks, Inc.*, 483 F.3d 956 (9th Cir. 2007).............................................6

*Saravia v. Dynamex, Inc.*, 310 F.R.D. 412 (N.D. Cal. 2015) .....................................21, 29

*SBRMCOA, LLC v. Bayside Resort, Inc.*, 707 F.3d 267 (3rd Cir. 2013)............................6

*Senior Mgmt., Inc. v. Capps*, 240 F. App'x 550 (4th Cir. 2007) ......................................20

*Shank/Balfour Beatty, a Joint Venture of M.L. Shank, Co., Balfour Beatty Constr. v. Int'l Bhd. of Elec. Workers Local 99*, 497 F.3d 83 (1st Cir. 2007)..........................16, 17

*Silgan Containers Corp. v. Sheet Metal Workers Int'l Ass'n, Local Union No. 2*, 820 F.3d 366, 369 (8th Cir. 2016) ........................................................................................6

*Spahr v. Secco*, 330 F.3d 1266 (10th Cir. 2003).....................................................................6

*Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002) ...................13, 15

*Stechler v. Sidley Austin Brown & Wood*, 382 F. Supp. 2d 580 (S.D.N.Y. Apr. 5, 2005) ...............................................................35

*St. Fleur v. WPI Cable Systems/Mutron*, 250 Mass. 345, 879 N.E.2d 27, (Jan. 4, 2008) ..............................................................................................27

*Tepper Realty Co. v. Mosaic Tile Co.*, 259 F. Supp. 688 (S.D.N.Y. Sept. 20, 1966)........34

*Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327 (11th Cir. 2005) .....18

*THI of N.M. at Hobbs Ctr., LLC v. Spradlin*. 893 F. Supp. 2d 1172 (2012) ..............31, 32

*Thompkins v. 23andMe, Inc.*, No. 5:13-cv-05682-LHK, 2014 WL 2903752 (N.D. Cal. June 25, 2014), *aff'd*, 840 F.3d 1016 (9th Cir. 2016)............................17, 18

*Thomson–CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995).............33

*Torncello v. United States*, 681 F.2d 756 (Fed. Cir. 1982)................................................10

*Town & Country Salida, Inc. v. Dealer Computer Servs., Inc.*, 521 F. App'x 470, 474 (6th Cir. 2013)................................................................................6

*United States v. Gianelli*, 585 F. Supp. 2d 150, 162 (D. Mass. 2008 )..............................11

*United States v. Marder*, 48 F.3d 564 (1st. Cir. 1995) ......................................................11

*Walker v. Collyer*, 9 N.E.3d 854 (Mass. App. Ct. 2013) .......................................30, 31, 32

**Other**

3 *Williston on Contracts* § 7:7 (4th ed. 2008, Richard A. Lord ed.).....................................8

9 U.S.C. § 3.........................................................................................................................16

18 U.S.C. § 1962 ...............................................................................................................23

18 U.S.C. § 1964(c) ......................................................................................................23, 25

Georgia: O.C.G.A. § 13-8-3(b) .........................................................................................29

Kentucky: KY. REV. STAT. § 372.040 .............................................................................29

New Mexico: NEW MEXICO STAT. ANN. § 44-5-3 ........................................................29

Tennessee: TENN. CODE ANN. § 29-19-105 ....................................................................29

M.G.L. c. 219 § 135 ...........................................................................................................11

M.G.L. c. 271 § 17 .............................................................................................................11

940 C.M.R. § 34 .................................................................................................................12

940 C.M.R. § 34.05 ............................................................................................................12

940 C.M.R. § 34.07 ............................................................................................................12

940 C.M.R. § 34.09 ............................................................................................................12

940 C.M.R. § 34.12 ............................................................................................................12

*Restatement (Second) of Contracts* § 77 (1981) ................................................................8

## I.   **INTRODUCTION**

Arbitration clauses in online user agreements are not magic.   These clauses do not supersede black letter contract formation law or cut short the Court's legal analysis of whether a contract exists in the first place merely through invocation by DraftKings.   Under Massachusetts law, DraftKings has the burden to show that it formed a contract with Plaintiffs.   Specifically, DraftKings must show that the Terms of Use it seeks to enforce as a contract were reasonably communicated to and accepted by Plaintiffs, and that it would be reasonable to enforce the arbitration clause against Plaintiffs under the circumstances.   *Cullinane v. Uber Techs, Inc.*, 2016 WL 3751652, *5 (D. Mass. July 11, 2016) (*citing Ajemian v. Yahoo!, Inc.*, 83 Mass. App. Ct. 565, 573-74, 987 N.E.2d 604, 611 (2013).   But DraftKings failed to form a contract containing an arbitration clause here because the Terms of Use it seeks to enforce (1) are illusory, (2) void *ab initio* for violating Massachusetts gambling laws, and (3) so confusing, ambiguous and internally inconsistent as to violate the standard in *Ajemian* and *Cullinane*.   This ends the analysis.

However, even if the Court finds a formed contract, DraftKings' Motion must still be denied.   Because DraftKings did not include a valid and enforceable delegation clause, the question of whether the arbitration agreement is valid and enforceable is for this Court.   Under Massachusetts law, it would be unreasonable to enforce an arbitration agreement that is itself invalid: the arbitration agreement conflicts with dispute resolution procedures giving this Court sole jurisdiction over this case, furthers a fraudulent, concerted scheme with co-Defendants FanDuel, Inc., and FanDuel Deposits, LLC ("FanDuel"), and is an illusory remedy that would prevent the effective vindication of substantive statutory rights.   For these reasons, DraftKings cannot meet its burden to compel arbitration here, and this Court must deny DraftKings' Motion.

## II.   FACTUAL BACKGROUND

### A.   DraftKings' Arbitration Agreement and Terms of Use

DraftKings and FanDuel are the primary companies offering Daily Fantasy Sports ("DFS") contests, where consumers compete against each other for cash prizes based on the individual performances of professional athletes in baseball, football and basketball games.  *See* Plaintiffs' First Amended Master Complaint ("FAMC"), DE#269, at ¶¶ 142-46.  DraftKings seeks to enforce its "Terms of Use" as a valid contract containing an arbitration provision.  But the Terms of Use also have provisions that negate the formation a contract in the first place because DraftKings simply did not bind itself to any of its purported promises.  The Terms of Use allowed DraftKings to amend and even revoke provisions unilaterally and without notice, and contained a provision releasing it from any liability or claim "whatsoever" – meaning the customers could never hold DraftKings to any of its promises.

Moreover, DraftKings cannot show that users actually assented to the terms.  Users signed up with DraftKings on this screen without the text of the "Terms of Use" (FAMC ¶ 452.):

They had to check a box indicating they agreed to the Terms of Use, but were not required to actually read or even see them before indicating this agreement, and the checkbox appears before the link to the Terms of Use.  The arbitration clause was buried halfway through a 6,000 word,

single-spaced webpage where it is neither conspicuous nor understandable.  See *Id.* at ¶¶ 453-55. In addition, it is contradicted by another provision that requires all claims to be brought in a court of competent jurisdiction in Suffolk County, Massachusetts (such as this Court).  There could be no unambiguous assent to such an ambiguous, confusing and self-conflicting document.

B.      **DraftKings' Fraudulent Scheme**

DraftKings makes money from a fee - also known as the "rake" – that it takes from each participant's entry fees.  *Id.* at ¶ 143.  These fees, less the rake, are pooled together, and the winners are paid from these pools.  *Id.* at ¶ 144.  Fraud permeated DraftKings' meteoric growth. Beginning in 2014, DraftKings ran television, radio, internet and other advertising in order to attract new players, including Plaintiffs.  *Id.* at ¶ 147.  In these advertisements, DraftKings made representations that its product was 100% legal, that it consisted of easy games of skill that anyone could win, and that DraftKings would give away free bonus money to match anyone's initial deposit.  *Id.* at *e.g.*, ¶¶ 1, 5, 173-76, 180, 183, 186-88, 190-204, 233-244.  None of these representations were true, and DraftKings was aware that they were untrue.  *Id.* at *e.g.,* ¶¶ 1, 18, 21, 24, 245-252, 310-385.

There was a reason why it made the misrepresentations: DraftKings needed less-skilled players to keep the better players, who entered more contests and therefore generated more fees for DraftKings, in the game.  *Id.* at *e.g.,* ¶¶ 6-9, 296-299, 340-41.  DraftKings' CEO Jason Robins was clear on this.  He wrote that "casual" players targeted by advertising were "necessary to make the industry sustainable long-term."  *Id.* at ¶ 7.  He stated that DraftKings' marketing was designed "to attract and retain casual players, which in turn should make it an attractive environment for those who profit."  *Id.* at ¶ 9.  In other words, to stay in business, DraftKings needed players who would lose their money to better, existing players.  *Id.* at ¶¶ 7-9.  In direct contrast to DraftKings' misrepresentations that anyone could win, Robins wrote that its objective

3

was "to create a healthy economy where everyone can have fun and the best players can still profit." *Id.* at ¶ 8. Plaintiffs have thus alleged and provided sufficient evidence of DraftKings' fraudulent misrepresentations.

Robins also publicly admitted to the Boston Globe that DraftKings acted in concert with FanDuel to allow employees of each site to play on the other against their own customers. *Id.* at ¶ 398. This included using confidential data to give the employees an edge, even to the point of identifying DraftKings' worst players, figuring out their identities on FanDuel, and challenging them in one-on-one contests because it was easier to beat them. *Id.* at ¶¶ 360, 382, 386-420. According to a FanDuel internal document, employees at FanDuel did the same thing to its customers playing on DraftKings. FanDuel's employee policy noted that FanDuel employees "targeting weak users as opponents on other sites….[was] happening already." *Id.* at ¶ 415. DraftKings omitted these material facts from consumers, as well. *Id.* at ¶¶ 24(g), 24(h), 24(i).

In sum, DraftKings spent hundreds of millions on advertising to intentionally deceive consumers about its product in order to benefit the small slice of customers that produced the most revenue for DraftKings. DraftKings then acted in concert with its primary competitor to allow employees to use inside information to further defraud its own customers on each other's websites. As discussed below, DraftKings' purported arbitration agreement was in furtherance of this fraudulent scheme through concerted activity with FanDuel, and therefore unenforceable.

DraftKings also seeks to enforce the arbitration agreement against two groups of Plaintiffs that did not play on, click on, or agree to anything on DraftKings' website: "Family Member Plaintiffs" and "Crossover Plaintiffs." Family Member Plaintiffs are suing under various state statutes allowing them to recover for gambling losses incurred by a member of their household. See FAMC at ¶¶ 499-507. Crossover Plaintiffs are players of FanDuel who did not

play on DraftKings but who played against DraftKings' employees on FanDuel, and were harmed by DraftKings' and FanDuel's concerted actions. *Id.* at ¶¶ 660-665.

## III.   ARGUMENT

### A.   DraftKings Bears Burden of Proving to this Court a Valid Contract Formed with Plaintiffs

DraftKings bears the burden of showing that a "valid and binding agreement to arbitrate" exists "because, if the contract containing the arbitration agreement was never binding on the plaintiff[], the arbitration clause cannot be enforced against [him]." *Bekele v. Lyft, Inc*., 2016 WL 4203412, at *6 (D. Mass. Aug. 9, 2016) (citations omitted; alterations in original). "'[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *InterGen N.V. v. Grina*, 344 F.3d 134, 142-43 (1st Cir. 2003) (*quoting AT&T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648 (1986)); *accord, Ladd v. Scudder Kemper Investments, Inc*., 741 N.E.2d 47, 52 (Mass. 2001). "A court may [not] order parties to arbitrate a given dispute [unless] they have agreed to submit such a dispute to arbitration." *Escobar-Noble v. Luxury Hotels Int'l of Puerto Rico, Inc.,* 680 F.3d 118, 121-122 (1st Cir. 2012).

"When it comes to specific clauses in [online] adhesion contracts, as is the case here, under Massachusetts law, courts have held that such clauses will be enforced provided they have been reasonably communicated and accepted, and if, considering all the circumstances, it is reasonable to enforce the provision at issue." *Bekele* at *6 (quoting *Ajemian v. Yahoo!, Inc*., 83 Mass.App.Ct. at 573–574).[1]  DraftKings cannot meet those burdens.

Plaintiffs' contract formation challenges are for the Court, not the arbitrator.  As noted by the First Circuit, there is a distinction between "the issue of whether a contract containing an

---

[1] The parties agreed Massachusetts law applies here.  *See* DraftKings' Motion ("Motion") at fn. 10.

arbitration clause is valid and the issue of whether the contract was ever actually formed." *Farnsworth v. Towboat Nantucket Sound, Inc.*, 790 F.3d 90, 97 (1st Cir. 2015). The Supreme Court has held that "where the dispute at issue concerns contract formation, the dispute is generally for the courts to decide." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010). The proponent of arbitration in that case relied, as does DraftKings (*see* DraftKings' Motion at 10), on *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440 (2006), but the *Granite Rock* Court distinguished that case on the ground that "the formation of the parties' arbitration agreement was not at issue …." *Granite Rock Co.* at 300.

Thus, relying on *Granite Rock*, the First Circuit has stated that the presumption of arbitrability "is utilized only where an arbitration agreement is 'validly formed and enforceable' under state law ...." *Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 6 n. 2 (1st Cir. 2012). 790 F.3d 90, 97, fn.7; *see also Cullinane v. Uber Techs., Inc.*, 2016 WL 3751652, at *4 (D. Mass. July 11, 2016) ("[I]f the contract containing the arbitration agreement was never binding on the plaintiffs, the arbitration clause cannot be enforced against them"); *Nat'l Fed'n of the Blind v. Container Store, Inc.*, 2016 WL 4027711, at *8 (D. Mass. July 27, 2016) ("questions regarding the formation or existence of a contract that contains an agreement to arbitrate is a gateway question for the court"); *Foss v. Circuit City Stores, Inc.*, 477 F. Supp. 2d 230, 235 (D. Me. 2007) ("challenge to whether a contract was ever validly concluded is for the court").[2]

This contract formation analysis also applies to any attempt by DraftKings to assert a

---

[2]Other courts of appeal agree. *See SBRMCOA, LLC v. Bayside Resort, Inc.*, 707 F.3d 267, 274 (3rd Cir. 2013) ("[R]elevant distinction is between challenges to a contract's validity, which are arbitrable, and challenges to a contract's formation, which generally are not."); *Town & Country Salida, Inc. v. Dealer Computer Servs., Inc.*, 521 F. App'x 470, 474 (6th Cir. 2013) (rejecting defendant's argument, based on *Granite* Rock); *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) ("court must decide whether a contract exists"); *Silgan Containers Corp. v. Sheet Metal Workers Int'l Ass'n, Local Union No. 2*, 820 F.3d 366, 369 (8th Cir. 2016) (arbitration award vacated based on *Granite Rock*); *Sanford v. Memberworks, Inc.*, 483 F.3d 956, 962–64 (9th Cir. 2007) (challenge to whether contract was concluded must be determined by court); *Spahr v. Secco*, 330 F.3d 1266, 1268, 1272–73 (10th Cir. 2003) (courts hear a  challenge to the whole contract based on the claim that the signor did not have mental capacity to sign).

delegation clause. "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–945 (1995). "Although there is a strong federal policy favoring arbitration, that presumption of arbitrability 'presumes proof of a preexisting agreement to arbitrate disputes.'" *Plymouth Yongle Tape (Shanghai) Co. v. Plymouth Rubber Co., LLC*, 750 F. Supp. 2d 297, 304 (D. Mass. 2010) (internal quotations omitted).

## B.      DraftKings Cannot Show It Formed Contract with Plaintiffs

DraftKings cannot meet its burden to show that a binding contract was formed between it and any Plaintiff for three reasons:  first, the Terms of Use are an illusory contract under Massachusetts law and therefore no agreement was ever formed; second, the contract was void because DraftKings sought to bind Plaintiffs to an illegal contract for gambling under Massachusetts law; and third, the method used by DraftKings to bind plaintiffs was insufficient to form a contract because it did not provide reasonable notice of DraftKings' true dispute resolution terms and Plaintiffs did not unambiguously manifest assent to those terms.

### 1.      The Terms of Use Are Illusory and Therefore No Contract Was Formed

DraftKings' Terms of Use are not a binding contract because DraftKings' promises are illusory and provided no consideration.   Under Massachusetts law "a promise that binds one to do nothing at all is illusory and cannot be consideration." *DeLuca v. Bear Stearns & Co.*, 175 F. Supp. 2d 102, 112 (D. Mass. 2001). DraftKings' purported promises fit that description exactly: they bind it "to do nothing at all" (*id.*) by permitting it to deny service "for any reason whatsoever" and even, without notice, to "revoke any or all of [users'] rights granted hereunder." *See* FAMC at ¶¶ 678(b) and 678(d).[3]  DraftKings also reserves the right to amend the agreement

---

[3] Certain provisions survive termination, but they all benefit DraftKings, specifically "ownership provisions, warranty disclaimers, indemnity and limitations of liability."  They do not provide users with any rights.  *See*

without notice.  *Id.* at ¶¶ 678(c).  Thus, DraftKings could change the arbitration provision at any time without notice to any user who had asserted a claim.  It would be unreasonable to find such terms actually formed a contract.

Plaintiffs have alleged the facts showing the illusory nature of the contract in great detail. FAMC at ¶¶ 457-468, 677-678.  Yet DraftKings all but ignores these allegations and never argues that a binding contract consisting of the Terms of Use was actually formed.  Thus, it has waived that argument.  As the court ruled in *Noonan v. Wonderland Greyhound Park Realty LLC*, "arguments that could have been raised in a supporting memorandum" are waived even if raised in a reply brief.  723 F. Supp. 2d 298, 349 (D. Mass. 2010).  There is likely a good reason for DraftKings' silence.  Clear black-letter law holds that where the promises of one party are illusory, no contract is formed.  "[W]here the promisor may perform or not, solely on the condition of his whim, his promise will not serve as consideration."  3 *Williston on Contracts* § 7:7 at 111-112 (4th ed. 2008, Richard A. Lord ed.).  As Comment *a* to the *Restatement (Second) of Contracts* § 77 (1981) states, "Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise."

Further, the Terms of Use provide that the user releases DraftKings and its representatives "from any and all liability, claims or actions of any kind whatsoever."  *Id.* at ¶ 678(a).  What then is to hold DraftKings to any of its promises?  If it fails to pay a winner his or her prize money, the winner has no remedy.  Or a user could take DraftKings to arbitration, DraftKings could fail to show up, the arbitrator could award damages, and then … nothing. Plaintiffs would have released DraftKings from that claim, and all other claims – if the Terms of Use were binding.  But a purported agreement that by its very terms is not enforceable cannot be binding.  It is simply not a contract in the first place.

---

versions of the Terms of Use submitted with DraftKings' motion, Docs. 317-2 at 8; 317-3 at 8; 317-4 at 9-10.

These provisions are similar to those that Massachusetts courts have found to render contracts illusory.  In the leading case of *Gill v. Richmond Co-op. Ass'n*, a promise to buy only "such milk as [the promisors] might order" was not consideration because "[t]he only measure of their promise was their own will."  309 Mass. 73, 80, 34 N.E.2d 509, 513-14 (1941).  This principle is still in effect, as seen in *Domenichetti v. Salter Sch.*, where the defendants, like DraftKings here, retained the right to modify the terms of a dispute resolution provision.  2013 WL 1748402, at *7 (D. Mass. Apr. 19, 2013).  "Defendants thus had the power to require plaintiff to arbitrate the covered dispute, while simultaneously reserving the right to modify the agreement.  Such an agreement is not enforceable."  *Id; see also Hinchey v. NYNEX Corp.*, 144 F.3d 134, 142 (1st Cir. 1998) ("Further, there was an explicit disclaimer, in which NYNEX retained the right to unilaterally modify the [alleged contract]."); *Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 14-15, 525 N.E.2d 411, 415 (1988) ("It is undisputed that the defendant retained the right to modify unilaterally the personnel manual's terms. This tends to show that any 'offer' made by the defendant in distributing the manual was illusory.")

According to the First Circuit, "a court should not compel arbitration unless and until it determines that the parties entered into a validly formed and legally enforceable agreement covering the underlying claim(s)."  *Escobar-Noble*, 680 F.3d at 121–22.  But here the users are powerless to enforce any promises DraftKings made in the Terms of Use.  Courts in other jurisdictions have held that such provisions render the contract illusory because of the inability of the other party to enforce the promisor's agreement.  For instance, in *Commercial Movie Rental, Inc. v. Larry Eagle, Inc.*, the court ruled that a contract provision exempting one party "from all liability for a breach of its obligations" made the contract illusory "because, under the unambiguous terms of the contract it drafted, Commercial could never be held liable for the

failure to perform those promises." 738 F. Supp. 227, 230-31 (W.D. Mich. 1989). Similarly, in *Torncello v. United States*, the court stated, "We note as one of the most elementary propositions of contract law that a party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void." 681 F.2d 756, 760 (Fed. Cir. 1982). The Third Circuit has called this principle "hornbook law." *Linan-Faye Const. Co. v. Hous. Auth. of City of Camden*, 49 F.3d 915, 924 (3d Cir. 1995).

In sum, DraftKings' attempt to enforce the arbitration provision can succeed only if the Court were to ignore longstanding, hornbook law under which DraftKings and Plaintiffs never formed a contract and Plaintiffs are not bound to arbitrate any disputes.

### 2.      The Purported Contract Was Void At Formation Because Its Purpose Was to Engage in Illegal Gambling

Because DraftKings' contests were illegal at the time Plaintiffs purportedly agreed to the Terms of Use, those Terms are void and were never formed as a matter of law. A contract that is void *ab initio* is invalid at its formation; it may not be enforced because it was never made in the first place. *Mass. Mun. Wholesale Elect. Co. v. Danvers,* 577 N.E.2d 283, 293 (Mass. 1991) ("When adjudicating rights between parties to a contract that is void *ab initio*, courts treat the contract as if it had never been made"). Voiding such a contract *ab initio* is recognized as a "legal fiction ... applied with the view of accomplishing justice or effectuating a public policy." *Id.* at 292-293; *see also* A.Z. v. B.Z., 431 Mass. 150, 160, 725 N.E.2d 1051 (2000) ("It is well established that courts will not enforce contracts that violate public policy.").

DraftKings' business model is based on the operation of betting pools. Users enter contests against each other, and the winners' proceeds are taken from that pool. FAMC at ¶¶ 143- 46. Jason Robins, DraftKings' CEO, described the contests as such in 2012: "[Y]ou win

the total wager amount of all the people who had teams in that contest. If there were 10 people and each put in $10 dollars, you'd win $100 (minus 10% which goes to us)."[4]

These pools are illegal under Massachusetts law, regardless of the skill of the entrants into the pool.  M.G.L. c. 271 § 17.  That statute makes it a crime against public policy to possess an apparatus or device for "registering bets, or buying or selling pools, upon the result of a trial or contest or skill ... of man, beast, bird or machine, or upon the result of a game [or] competition."  *Id.*  The term "apparatus" or "device" connotes an instrumentality used in betting. *Commonwealth v. Demogenes,* 211. N.E.2d 226 (Mass. 1965).  A pool is the "combination of stakes, part of which is to go to the winner …."  *Commonwealth v. Sullivan*, 218 Mass. 281, 283 (Mass. 1914).  This statute is not limited to traditional bookmaking, but is instead "broad and encompassing."  *United States v. Gianelli*, 585 F. Supp. 2d 150, 162 (D. Mass. 2008), *quoting United States v. Marder*, 48 F.3d 564, 567 (1st Cir. 1995).  As illustrated and pled, DraftKings possesses an apparatus that registers or evinces a pool betting transaction and then funds payouts, minus DraftKings' fees, funded by the fees paid by the customers.  *See* FAMC at ¶ 134.  Thus, before express legalization discussed below, DraftKings' business was an illegal betting pool.

The Terms of Use enable users to take part in those pools.  Because the pools were contrary to law and public policy, the contracts were void *ab initio*.  "[E]ven if a statute does not expressly provide that a contract made in violation of its terms is invalid, the contract will be deemed void if doing so is necessary to accomplish the statute's objectives."  *Baltazar Contractors, Inc. v. Town of Lunenburg*, 65 Mass. App. Ct. 718, 721, 843 N.E.2d 674, 677 (2006).  That is the case here.

---

[4]    https://www.reddit.com/r/IAmA/comments/x5zrn/we_quit_our_jobs_to_pursue_a_dream_of_starting_a/c5jh1tl/ (accessed Dec. 13, 2016).

This situation only changed when DFS was legalized with strict consumer protections. *See* M.G.L. c. 219 § 135 (declaring that "a fantasy contest shall not be considered illegal gaming" and making the contests subject to the Attorney General's protective regulations); 940 CMR §§ 34.00 et seq.  But when Plaintiffs signed up for DraftKings' services, DraftKings did not follow the consumer protections later promulgated.  *See* 940 CMR §§ 34.05, 34.07, 34.09, and 34.12 (regulating deceptive trade practices and promotional offers and preventing employee play).  Therefore, DraftKings' contests that existed at the time of attempted contract formation would still not be legal even under the new laws legalizing and regulating Daily Fantasy Sports. It would be unreasonable and against Massachusetts public policy to enforce Terms of Use as a contract when those Terms of Use were for an illegal gambling pool.  Therefore, the Terms of Use purportedly entered into by Plaintiffs are void *ab initio* and no contract was ever formed.

**3.    DraftKings' "Click-Wrap" Method Did Not Form a Binding Contract**

DraftKings cannot meet its burden to show the existence of a valid contract between it and Plaintiffs simply by labeling its Terms of Use "clickwrap."  *See* Motion at 6-8.[5]  *Meyer v. Kalanick,* recently summarized the current state of online arbitration agreements in denying a motion to compel arbitration. 2016 WL 4073071 (S.D.N.Y. July 29, 2016).[6]  Although courts, in general, find clickwrap agreements enforceable (*Berkson* at 397), as *Meyer* noted, "all of these labels can take courts only so far.  The issue of whether plaintiff Meyer agreed to arbitrate his claims 'turns more on customary and established principles of contract law than on newly-minted terms of classification.'"  *Meyer,* 2016 WL 4073071 at *6 (citations omitted).  This is the standard in Massachusetts as well.  *See Cullinane* at *14-17.

---

[5] There are multiple ways in which consumers can agree to online contracts.  Clickwrap is one of those.  The others are "browsewrap," "scrollwrap" and "sign-in wrap."  *See Berkson v. Gogo, LLC,* 97 F. Supp. 3d 359, 394-95 (E.D.N.Y. Apr. 9, 2015).

[6] Uber has filed an Interlocutory Appeal to the Second Circuit.  However, the court's discussion and analysis of internet agreements collects the current state of the law involving online user agreements.

"One of these principles is that 'mutual manifestation of assent…is the touchstone of contract.'…'[C]larity and conspicuousness of arbitration terms are important in securing informed assent.'" *Meyer* at *6. (citations omitted).  The court followed the standard set out in *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002) (Sotamayor, J.), namely whether the plaintiff had "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms." *Meyer*, 2016 WL 4073012, at *21, (*citing Specht*, 306 F.3d at 35).  Massachusetts courts follow *Specht* as well:  "Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Ajemian,* 83 Mass.App.Ct. at 574-75, *quoting Specht* at 35.  "When it comes to specific clauses in [online] adhesion contracts, as is the case here, under Massachusetts law, courts have held that such clauses will be enforced provided they have been reasonably communicated and accepted, and if, considering all the circumstances, it is reasonable to enforce the provision at issue." *Bekele*, 2016 WL 4203412 at *6 (quoting *Ajemian* at 573–574 (2013)).

DraftKings' clickwrap process fails that test.  On the sign-in screen, as shown above (Sec. II.A, *supra*), the Terms of Use were not so conspicuous or clear and unmistakable as to put the user on notice as to what the box they were checking meant.  The user could check the box and proceed immediately to the large, conspicuous, green "Sign Up" button without having to read the small-print that follows, stating, "I agree to the <u>Terms of Use</u> and <u>Privacy Policy</u> and confirm that I am at least 18 years of age.  Must be 19 years of age in Alabama and Nebraska."

Even if that were sufficient, the Terms of Use itself provided inadequate notice of what the actual terms were.  *Meyer* demonstrated how what happened if a user actually clicked on the link was critical to the analysis.  "Once users reached the 'Terms of Service' (i.e., the User

13

Agreement), they had to scroll down several pages in order to come across the arbitration provision, located in a 'dispute resolution' section." *Id.* at *33 (citations omitted). The court noted that, while there was bolded language in the arbitration section, there was no "prominent warning about the existence of an arbitration clause" at the beginning or in a more prominent place in the document. *Id.* at *34. "[T]he placement of the arbitration clause in Uber's User Agreement constituted, as a practical matter, a further barrier to reasonable notice.'" *Id.* (citations omitted). This was insufficient to form a contract.

DraftKings did not even do that much. It buried its arbitration provision in a 6,000-word, single-spaced, small-type, difficult-to-read webpage, with no other reference to it. *See* FAMC at ¶¶ 453-55. 471. As in *Meyer* there was no "prominent warning about the existence of an arbitration clause." And, unlike *Meyer*, there was no bolded language inside the arbitration provision. In addition, the section uses long, convoluted sentences (the first with a whopping 84 words) and unfamiliar terms to laypeople, like "thereof," "non-class, non-representative," "then governing rules and procedures" (which are not further described or linked), "waive," "any court having jurisdiction thereof," "construed," "et seq.," "courts of competent jurisdiction," and "herein agreed." The only reason to use sentences and language like this is to obscure.

And distinct from the facts in *Cullinane,* it is unclear what actual Terms of Use DraftKings sought agreement to. The very next section after the arbitration provision flatly contradicts it: "Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts." Which forum has exclusive jurisdiction, arbitration or a court? DraftKings did not reasonably and conspicuously communicate the answer, and cannot unilaterally decide only once a consumer has filed suit in

14

the forum with exclusive jurisdiction.  This is the antithesis of the clarity and conspicuousness required by *Cullinane*, *Specht* and *Meyer*, and it does not comply with Massachusetts law under *Ajemian*.  No reasonable consumer could make any sense of it.  To the extent DraftKings asserts that it can choose which "shall" actually controls, this unilateral and self-serving interpretation further proves that the entire contract is illusory.  *See* Section III.B.2, *supra*.  DraftKings' reliance on "clickwrap," therefore, does not meet its burden of showing that users clearly and unmistakably formed a contract with an arbitration agreement.

Each contract formation failure discussed above, in isolation, would be sufficient to deny DraftKings' Motion.  Taken together, DraftKings' choices that led to these formation issues shows how unreasonable it would be to enforce DraftKings' arbitration clause against Plaintiffs.

## C.   The Delegation Clause Is Unenforceable; It Is Not Clear and Unmistakable and Violates Basic Contract Law Principles

### 1.   Plaintiffs Can Challenge the Delegation Clause in Response to DraftKings' Motion

Even if the Court determines that DraftKings successfully formed a contract with Plaintiffs, it still must find that arbitration clause itself is valid.  This is despite DraftKings' purported delegation clause.  DraftKings argues that, because the Complaint did not challenge the existence or validity of the delegation clause, it must be accepted as valid.  DraftKings' Motion at 11.  But Plaintiffs are challenging it where they are required to, right here in their opposition brief.  (And if the Court were to agree with DraftKings, presumably it would give Plaintiffs the opportunity to amend.)  Contrary to DraftKings' argument, *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010), did not hold that "the plaintiff must plead a separate and distinct challenge to the arbitration clause or delegation clause in the complaint."  *Ryan v. Delbert Servs. Corp.*, 2016 WL 4702352, at *5 n.8 (E.D. Pa. Sept. 8, 2016) (quotation marks and text alterations omitted).  "The topic of arbitration usually does not arise until a defendant moves

to compel arbitration after the suit is filed, *see* 9 U.S.C. § 3, at which time the plaintiff may then address the validity of the delegation clause in a brief." *Id.*

Indeed, *Rent-A-Center* itself addressed arguments in an opposition brief. *See* 561 U.S. at 72 ("Nowhere in his opposition to Rent–A–Center's motion to compel arbitration did he even mention the delegation provision."); *see also Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331, 1335 n.1 (11th Cir. 2016) ("Because Parm directly challenged the delegation clause in her opposition to the motion to compel, there is no waiver ....") (citation omitted); *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1002 (9th Cir. 2010) ("[W]e look not only to the complaint, but to Plaintiffs' motion papers ....").

## 2.    DraftKings Cannot Show Clear and Unmistakable Evidence of Delegation

The Supreme Court has made clear that courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clea[r] and unmistakabl[e] evidence that they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quotation marks omitted; text alterations in original). "[S]ilence or ambiguity on the 'who should decide arbitrability' point" favors judicial resolution. *Id.* at 945. "In this circuit, the clear and unmistakable evidence standard is a high one." *Shank/Balfour Beatty, a Joint Venture of M.L. Shank, Co., Balfour Beatty Constr. v. Int'l Bhd. of Elec. Workers Local 99*, 497 F.3d 83, 89 (1st Cir. 2007) (quotation marks omitted).

DraftKings did not even attempt to include an express delegation clause or language expressly delegating decisions to the arbitrator. Instead, it made a stray reference to the AAA's "then governing rules and procedures, including the Supplementary Procedures for Consumer-Related Disputes, where applicable." DraftKings' Motion at 8-9. The second part, the Supplementary Procedures for Consumer-Related Disputes, was not even applicable as of September 1, 2014, because it had been discontinued. As in *Ingalls v. Spotify USA, Inc.*, that

16

refutes any assertion that its incorporation was clear and unmistakable evidence of delegation. 2016 WL 6679561, at *2-3, n.3 (N.D. Cal. Nov. 14, 2016) ("The fact that Spotify's Terms and Conditions incorporated the AAA procedures under a decommissioned title further refutes Spotify's assertion that its delegation of arbitrability was clear and unmistakable.")

Plaintiffs are thus left with a non-specific reference to the AAA's "then governing rules and procedures."  To locate a delegation clause there, a consumer would have had to find the AAA's website (DraftKings could have provided a link, but did not); pull up the active rules, only to find the Supplementary Procedures for Consumer-Related Disputes missing; decide which of the other 50+ sets of rules might apply[7]; read and digest them; and, finally, determine whether there is a clause delegating to the arbitrator the decision on arbitrability.  Finding that as clear and unmistakable evidence of intent to arbitrate threshold issues would be in direct contravention of the high standard holdings of *First Options* and *Shank/Balfour Beatty*.

For that reason, courts have found time and again that a vague, ambiguous reference to the AAA rules does not satisfy the clear-and-unmistakable standard.  For example, in *Thompkins v. 23andMe, Inc.*, 2014 WL 2903752, at *12-13 (N.D. Cal. June 25, 2014), *aff'd*, 840 F.3d 1016 (9th Cir. 2016), the court held that a provision stating "[a]ny dispute shall be resolved by final and binding arbitration under the rules and auspices of the American Arbitration Association" did not pass muster.  *See also Grosvenor v. Qwest Commc'ns Int'l, Inc.*, 2010 WL 3906253, at *6 (D. Colo. Sept. 30, 2010) ("Qwest's Arbitration Procedures do not expressly incorporate specific AAA Rules.  Accordingly, the Arbitration Procedures are not a 'clear and unmistakable' choice of arbitration of the validity of whether the parties agreed to arbitrate.").

---

[7]*See* https://www.adr.org/aaa/faces/rules/searchrules/rulesearchresult?x_rule_status=A&_afrLoop=1091342216969636&_afrWindowMode=0&_afrWindowId=lavq5jdan_80#%40%3F_afrWindowId%3Dlavq5jdan_80%26_afrLoop%3D1091342216969636%26x_rule_status%3DA%26_afrWindowMode%3D0%26_adf.ctrl-state%3Dlavq5jdan_120.

These concerns are particularly acute with an online click-through consumer agreement. *See Ingalls*, 2016 WL 6679561, at *4 ("[T]he parties, which included two ordinary consumers who could not be expected to appreciate the significance of incorporation of the AAA rules, did *not* clearly and unmistakably intend to delegate the issue of arbitra[bility] to an arbitrator." emphasis in original); *Thompkins*, 2014 WL 2903752, at *11 ("There is good reason not to extend this doctrine from commercial contracts between sophisticated parties to online click-through agreements crafted for consumers.")

In the face of that authority, DraftKings primarily relies on *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7 (1st Cir. 2009). Not only is that case pre-*Granite Rock*, but DraftKings misstates its holding, which was that the *court* must decide "whether the arbitration remedy in this case is illusory." *Id.*, 554 F.3d at 13. In a later appeal, the First Circuit ruled that "the district court was correct, as to this different group of plaintiffs, to address the 'predecessor question of whether there was an agreement at all to arbitrate.'" *Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 42 (1st Cir. 2012) (quoting *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 19 (1st Cir.1999)). DraftKings' other cases are inapplicable because they all involve sophisticated parties.[8]

### 3. Incorporation of Delegation Provision Impermissibly Conflicts with Other Provisions Giving Court Authority

#### a. Arbitration Provision Should Be Evaluated In Context of Terms of Use Despite Severability Clause

None of this is altered by Defendants' argument that the arbitration provision, or its supposed delegation clause, is severable from the rest of the Terms of Use and should be viewed

---

[8] *See Brennan v. Opus Bank*, 796 F.3d 1125, 1131 (9th Cir. 2015) (contract with "an experienced attorney and businessman"; court expressly did not decide "the effect if any of incorporating the AAA arbitration rules into consumer contracts") (quotation marks and text alterations omitted); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005) (two business entities); *Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 470 (1st Cir. 1989) (incorporation of International Chamber of Commerce rules—unlike the AAA, the ICC has only one set of rules, so there is no ambiguity—in distributorship agreement between two business entities).

in isolation.  DraftKings' Motion at 10.  The severability rule does not require the Court to treat the arbitration provision and delegation clause as distinct contracts—separate from the remainder of the Terms of Use.  It is concerned only with whether a court may properly adjudicate a challenge to the enforceability of an arbitration provision or delegation clause.  A court may consider a challenge to those provisions, but not when made as part of a non-specific challenge to the agreement as a whole.  Thus, in *Rent-A-Center*, the Court stated that "unless Jackson challenged the delegation provision specifically, we must treat it as valid under § 2 [of the FAA], and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator."  561 U.S. at 72.  "*All that matters* is whether the party seeking to present the issue to a court has brought a discrete challenge to the validity of the arbitration [provision or delegation] clause." *Id.* at 84 (emphasis added; quotation marks, citation, and text alteration omitted).  That is exactly what Plaintiffs are doing, challenging the supposed delegation provision, as discussed in the previous section and the next one.

What the severability rule does *not* require is that the Court treat the arbitration provision and delegation clause as distinct contracts, viewed in isolation from the rest of the Terms of Use's provisions. *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 454 (6th Cir. 2005) ("If arbitration clauses cannot be considered 'independent contracts' when examining contractual formation issues, like mutuality or consideration, how much more so should such provisions *not* be considered 'separate contracts' when examining other enforceability issues."). *See also Newton v. Am. Debt Servs., Inc.*, 549 F. App'x 692, 694 n.2 (9th Cir. 2013) ("[P]rovisions outside the specific arbitration clause may be considered in determining whether an arbitration agreement is unconscionable if those provisions 'as applied' to the arbitration clause render it unconscionable.") (quoting *Rent-A-Center*, 561 U.S. at 74); *In re Checking Account Overdraft*

*Litigation*, 685 F.3d 1269, 1280 (11th Cir. 2012) (applying a cost-and-fee-shifting provision to find unconscionable an arbitration provision in a separate section of the agreement); *Senior Mgmt., Inc. v. Capps*, 240 F. App'x 550, 553 (4th Cir. 2007) ("Plaintiffs' assertions to the contrary, *Prima Paint* [Corp. v. Flood & Conklin Mfg., 388 U.S. 395 (1967)] does not stand for the proposition that the district court may look to an arbitration provision in isolation[.]").

Accordingly, the Court may consider how the delegation clause and arbitration provision interact with the rest of the Terms of Use when evaluating their enforceability.

### b.     Other Provisions Undercut DraftKings' Characterization of Delegation as Clear and Unmistakable

DraftKings' assertion that the delegation clause is clear and unmistakable is undercut by the conflicts this would create with the forum-selection and severability clauses. In *Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002) (per curiam; Parker, Straub, Sotomayor, JJ.), the Court concluded that a delegation clause was not "clear and unmistakable" where another provision assigned certain decisions not to the arbitrator, but to an accountant. The court stated: "We find the presence of both these clauses creates an ambiguity, which, under *First Options*, requires us to assign questions of arbitrability to the district court, not the arbitrator."

The same ambiguity is present here. Another section of the Terms of Use provides that "[a]ny claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts." *See* DraftKings' Motion at Ex. 1C, pg. 12; Ex. 1B pg. 11. The severability clause states: "If any provision of these Terms of Use is deemed invalid by a *court* of competent jurisdiction, the invalidity of such provision shall not affect the validity of the remaining provisions[.]" *See* DraftKings' Motion at Ex. 1C, pg. 13; Ex. 1B pg. 12 (emphasis added). These provisions, invoking the authority of the court, create the

same kind of ambiguity that led *Katz* to assign the issue of arbitrability to the court.

### 4. Delegation Clause Is Unenforceable Under General Contract Principles

The delegation clause is also unenforceable as a matter of basic contract law principles. The court in *Ryan* analyzed a four-page loan agreement with an actual delegation clause, but it was "obscured among ten paragraphs of boilerplate." 2016 WL 4702352 at *5. The court ruled: "Whether the delegation provision is characterized as unconscionable ..., outside of the parties' 'circle of assent,' ..., or an 'unknown term [ ] which [was] beyond the range of reasonable expectation' ..., it is unenforceable." *Id.* at *5. Here, given the difficulties a consumer would have in locating the delegation clause in the AAA rules, the same is true.

Further, the delegation clause is unenforceable because DraftKings failed to provide a copy of the applicable AAA rules to Plaintiffs. *See, e.g.*, *Saravia v. Dynamex, Inc.*, 310 F.R.D. 412, 420 (N.D. Cal. 2015) (finding delegation clause unconscionable because "Dynamex never provided Saravia with a copy of the AAA rules that were to govern any arbitration pursuant to these agreements (and that form the sole basis for delegating arbitrability under the 2012 agreement")). Because there is no valid delegation clause, it is up to the Court to evaluate the enforceability of the arbitration provision in addition to the contract formation issues.

### D. The Arbitration Agreement is Invalid and Unenforceable

Even if the Court determines the Terms of Use constitute a valid contract, it still must not order arbitration here because the arbitration agreement itself is invalid. Plaintiffs have specifically challenged the validity of the arbitration clause and there is no enforceable delegation clause. Therefore, this Court must decide whether the arbitration agreement itself is valid. DraftKings cannot meet its burden to show that a valid arbitration agreement was ever formed between it and any Plaintiffs for five reasons: the arbitration agreement (1) contains an ambiguity that must be resolved against DraftKings regarding who must hear this dispute; (2)

prevents Plaintiffs from vindicating their rights under RICO; (3) was fraudulently induced; (4) furthers a fraudulent scheme; and (5) is illusory.

> **1.      The Terms of Use Require That This Case be Heard in This Court Because of an Ambiguity That Must be Resolved Against DraftKings**

As noted above, a provision in the "Miscellaneous" section of the Terms of Use requires that these cases be brought in this Court:  "Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest **shall** be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts."  FAMC ¶¶ 449 (emphasis added).  That provision therefore cannot be reconciled with the arbitration provision, which states that "any and all" disputes or claims, "except for claims filed in a small claims court that proceed on an individual (non-class, non-representative) basis, **shall** be settled by binding arbitration …."  *See* DraftKings' Motion at Ex. 1C, pg. 12; Ex. 1B pg. 11 (emphasis added).  In a footnote, DraftKings argues that there is no inconsistency because the provision mandating that cases be brought in court expressly applies "to Claims that are not subject to arbitration."  DraftKings' Motion at 11 n. 16.  But for this proposition, it cites an entirely *different* provision than the one quoted above, which comes from the "Miscellaneous" section and applies, without exception, to "[a]ny claim."  FAMC ¶ 449.  DraftKings thus seeks to add the language "Claims that are not subject to arbitration" to the Miscellaneous section Terms of Use, through a pleading, years after contract was allegedly formed, without legal, factual or any reasonable justification.

Thus, these provisions cannot be reconciled.  The Terms of Use are conflicting and ambiguous on where disputes "shall" be adjudicated.  Any ambiguity in a contract must be construed against the drafter.  *Luso-Am. Credit Union v. Cumis Ins. Soc., Inc.*, 616 F. Supp. 846, 848 (D. Mass. 1985) ("[A]mbiguous language in a contract should be construed against the

drafter ...").  This is known as the doctrine of "contra proferentem," *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 460 (1st Cir. 2013), and it is equally applicable to ambiguities between arbitration and non-arbitration provisions as for other ambiguities.  "[T]he federal policy favoring arbitration does not totally displace ordinary rules of contract interpretation. Thus, numerous courts have employed the tenet of contra proferentem in construing ambiguities in arbitration agreements against the drafters."  *Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*, 226 F.3d 15, 25 (1st Cir. 2000).  Accordingly, interpreting this irreconcilable ambiguity against DraftKings, this dispute must be brought in this Court, and it would be unreasonable to enforce an arbitration agreement to the contrary under these circumstances.

### 2.    The Arbitration Provision is Unenforceable Because It does not Allow Plaintiffs to Effectively Vindicate their Rights Under RICO

Plaintiffs assert claims against DraftKings and the other defendants for their concerted actions under 18 U.S.C. §1962 of the RICO statute.  *See* FAMC at ¶¶ 759-837.  That statute provides for treble damages, expenses and attorney's fees.  18 U.S.C. § 1964(c).  But the Terms of Use contain a limitation of liability clause, which applies to the entire agreement (including the arbitration provision) and prevents Plaintiffs from recovering these statutory damages. Because the limitation-of-liability clause prevents Plaintiffs from effectively vindicating their federal statutory rights in arbitration, the Court should refuse to enforce the arbitration provision.

The Supreme Court noted that its "decisions have developed a mechanism—called the effective-vindication rule—to prevent arbitration clauses from choking off a plaintiff's ability to enforce congressionally created rights."  *Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2313 (2013) (Kagan, J., dissenting).  "When an arbitration agreement prevents the effective vindication of federal rights, a party may go to court."  *Id.* at 2317.  The decision by the majority in *American Express* upheld a class-arbitration ban against the argument that the ban deprived

them of an economic incentive to pursue their claims because of the expense of proving such claims on an individual basis.   At the same time, however, the Court recognized that the effective-vindication rule "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights" (*Am. Exp. Co.*, 133 S. Ct. at 2310), an exception that applies to the limitation-of-liability provision in DraftKings' Terms of Use.

Specifically, "if the remedies limitation in the arbitration agreement pose[s] a clear conflict with the remedies available in the RICO statute, that clear conflict would pose a question of arbitrability. In other words, in the face of a vindication of statutory rights claim based on such a clear conflict, the court would decide the question of the enforceability of the arbitration clause in the first instance." *Kristian v. Comcast Corp.*, 446 F.3d 25, 46 (1st Cir. 2006).   In *Kristian*, the court applied the effective-vindication rule to find an agreement's general limitation of liability, which foreclosed the recovery of punitive, treble, exemplary, special, indirect, incidental, or consequential damages, as applied to the arbitration provision, prevented plaintiffs from effectively vindicating their right to treble damages under the Sherman Act. *Id.* at 44-48.[9]

Here, the limitation-of-liability clause provides that "under no circumstances shall the company . . . be liable to you for any loss or damages of any kind (including, without limitation, for any special, direct, indirect, incidental, exemplary, economic, punitive, or consequential damages)."   In addition, notwithstanding the above, it states:   "[I]n no event will the company entities and individuals total liability to you for all damages, losses, or causes of action exceed one hundred dollars ($100)."   *See* DraftKings' Motion at Ex. 1C, pg. 9-10; Ex. 1B pg. 8-9. This

---

[9] In *Kristian*, unlike here, the limitation of liability provision contained its own broad savings clause, which provided that "[i]f the law does not permit waiver of a remedy, a plaintiff will still have that remedy, the . . . liability limitation notwithstanding."  446 F.3d at 48.  "The savings clause, in other words, remove[d] the conflict between the language of the arbitration agreements and the federal antitrust statutes on the issue of treble damages." *Id.* While there is a *general* savings clause in the Terms of Use that is only applicable if the *court* finds a provision invalid, not the arbitrator.

section applies to the arbitration provision.

This directly conflicts with Plaintiffs' right of recovery under RICO, which provides: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter . . . *shall* recover threefold the damages he sustains and the cost of suit, including reasonable attorney's fee[.]"  18 U.S.C. § 1964(c) (emphasis added); *see, e.g.*, *Kristian*, 446 F.3d at 47 ("Congress's use of the word 'shall' makes the treble damages remedy a mandatory result[.]").  Accordingly, the Court should refuse to enforce the arbitration provision.  *See McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 685 (7th Cir. 2002) ("[T]he clause here purports to forfeit McCaskill's statutory right to attorney's fees, a remedy that we have already recognized is essential to fulfill the remedial and deterrent functions of Title VII.  Because the provision prevents her from effectively vindicating her rights in the arbitral forum by preemptively denying her remedies authorized by Title VII, the arbitration agreement is unenforceable.") (Rovner, J., concurring); *Johnson v. Circuit City Stores, Inc.*, 203 F.3d 821 (4th Cir. 2000) (per curiam) ( "the arbitration agreement was unenforceable because it failed to provide Johnson with the full set of remedies to which she would be entitled under Section 1981, and thus ... prevented Johnson from vindicating her rights") (quotation marks and text alterations omitted); *Gambardella v. Pentec, Inc.*, 218 F. Supp. 2d 237, 247 (D. Conn. 2002) (same).[10]

---

[10] *See also Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998) ("When an arbitration clause has provisions that defeat the remedial purpose of the statute, therefore, the arbitration clause is not enforceable. This clause defeats the statute's remedial purposes because it insulates Avnet from Title VII damages and equitable relief.") (Cox, J. concurring; citation omitted); *Graham Oil Co. v. ARCO Prod. Co., a Div. of Atl. Richfield Co.*, 43 F.3d 1244, 1247-48 (9th Cir. 1994), *as amended* (Mar. 13, 1995) ("Here, the arbitration clause purports to forfeit certain important statutorily-mandated rights or benefits afforded to Graham Oil and other franchisees by the PMPA. First, the arbitration clause expressly forfeits Graham Oil's statutorily-mandated right to recover exemplary damages from ARCO if Graham Oil prevails on certain claims . . . . Second, the arbitration clause expressly forfeits Graham Oil's statutorily-mandated right to recover reasonable attorney's fees . . . Because the arbitration clause employed by ARCO compels Graham Oil to surrender important statutorily-mandated rights afforded franchisees by the PMPA, we hold that the clause contravenes the Act.").

### 3.      The Arbitration Provision is Invalid Because It Furthers a Fraudulent Scheme

While fraudulent inducement of the contract is generally not for a court to consider, there is an exception.  "[A]rbitration is not mandated where the arbitration clause is part of the fraudulent scheme – where it is used to carry out the fraud."  *Garten v. Kurth*, 265 F.3d 136, 142-144 (2nd Cir. 2001) (citing *Moseley v. Electronic & Missile Facilities, Inc*., 374 U.S. 167, 171 (1963)).  In *Garten*, reconciling *Moseley* with *Prima Paint*, the Second Circuit held that there must be "some substantial relationship between the fraud or misrepresentation and the arbitration clause in particular."...This 'substantial relationship'...must include "particularized facts specific to the...arbitration clause which indicate how it was used to effect the scheme to defraud."  265 F.3d at 143 (citation omitted).

While this is a rare exception, that is the exact situation here.  DraftKings not only used the arbitration provision to make it virtually impossible for Plaintiffs to obtain a remedy for its fraud, but, as shown above, it went "above and beyond" in concealing the nature of the arbitration process, including by making the delegation clause virtually impossible to find.  DraftKings' Terms of Use and arbitration provision furthered its overall fraudulent scheme by not only purporting to limit its liability to its own customers, but by using FanDuel's Terms of Use against FanDuel users as well.  *See* DraftKings' Motion at 16.  And FanDuel seeks the same protection from DraftKings' customers through DraftKings' Terms of Use for FanDuel's own fraud and concerted activities.  *See* FanDuel's Motion to Compel Arbitration, DE#318 at 13.  In sum, DraftKings and FanDuel acted in concert to defraud consumers and now are using arbitration as a shield against both their own customers as well as those of the other company.  In sum, DraftKings and FanDuel acted in concert to defraud consumers and now are using their own and each other's arbitration agreements as a shield against both their own customers and

those of the other company.  This fraudulent and concerted activity is inexorably linked to the arbitration clauses themselves, and therefore meets the exception in *Moseley* and *Garten*.[11]

### 4.   The Arbitration Agreement was Fraudulently Induced

Because fraudulent inducement is a generally applicable State-law contract defense, courts should apply this principle to determine whether to invalidate the arbitration agreement. *St. Fleur v WPI Cable Sys./Mutron*, 450 Mass 345, 350 (2008).  As just discussed, Plaintiffs in this case were induced by DraftKings into reasonably believing and understanding that the arbitration agreement they were entering was "substantially different from what it really was" – an agreement relinquishing consumer's statutory rights to seek economically feasible relief in a court of law for losses incurred through participating in DraftKings' illegal and unfair gambling contests.  Accordingly, the agreement was fraudulently induced and thus invalid.  *See e.g. Boston Five Cents Sav. Bank v. Brooks*, 309 Mass. 52, 55 (1941).  In addition, nowhere does DraftKings provide explanations of consumers' statutory rights for relief in a court of law, or a full explanation of what arbitration is, and how it affects those rights.[12]  Nor does the provision disclose that class-wide relief would likely be the *only* economical means of pursuing legal causes of action against DraftKings because arbitrating claims on an individual basis would likely be uneconomical for the vast majority of DraftKings users.

Finally, the Terms do not disclose that no consumer has ever filed an arbitration action against DraftKings, much less prevailed in one, and that arbitration in general is not a real avenue for consumers.  The New York Times compiled statistics through its own investigation

---

[11] Alternatively, Plaintiffs' allegations are sufficient to invoke the requirement that an evidentiary hearing be held by the Court on the issue.  *St. Fleur v. WPI Cable Systems/Mutron*, 250 Mass. 345, 356, 879 N.E.2d 27, 35 (2008) (where plaintiff produced sufficient evidence to raise a material issue of fact with respect to the existence of the arbitration agreement, the Court should have held a hearing and it was error to fail to do so).

[12] An arbitration clause is unenforceable if its terms do not "clearly and unambiguously signal to plaintiff that she was surrendering her right to pursue her statutory claims in court."  *Atalese v. U.S. Legal Services Group, L.P.*, 219 NJ 430, 448 (2014).  The provisions of an arbitration clause must also "explain what arbitration is" and "indicate how arbitration is different from a proceeding in a court of law." *Id.*, at 446.

based on thousands of court records and interviews with hundreds of lawyers, corporate executives, judges, arbitrators and plaintiffs in 35 states.  The Times determined that out of 1,179 federal class actions between 2010 and 2014 that companies sought to push into arbitration, courts ruled in their favor 80% of the time, but only 505 consumers then went to arbitration over a dispute of $2,500 or less.  In addition, Verizon, which has more than 125 million subscribers, faced only 65 consumer arbitrations in those five years; Time Warner Cable, which has 15 million customers, faced seven. and Sprint, a company with more than 57 million subscribers, faced only six arbitrations.[13]  Consumer arbitration in cases like this is not a real remedy, and DraftKings failed to disclose that fact to Plaintiffs.

### 5.    The Arbitration Agreement is Illusory and Unenforceable

The First Circuit has explained "that arbitration in this case may itself be an illusory remedy." *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 12 (1st Cir. 2009).  "If arbitration prevents plaintiffs from vindicating their rights, it is no longer a 'valid alternative to traditional litigation.'"  *Id.* (citing *Kristian v. Comcast Corp.*, 446 F.3d 25, 37 (1st Cir. 2006)).   In determining whether the arbitral forum or arbitration remedy is illusory, the Court must consider "whether the arbitration regime here is structured so as to prevent a litigant from having access to the arbitrator to resolve claims, including unconscionability defenses." *Awuah* at 13.  In defining what makes arbitration an "illusory" remedy, the First Circuit noted that "excessive arbitration costs" are a significant concern.  *See id.*  The First Circuit has stated that "if the remedy is truly illusory, a [C]ourt should not order arbitration at all but decide the entire dispute itself." *Id.*

Here, DraftKings' arbitration agreement does not provide any real remedy at all.  First, DraftKings does not provide any cost-shifting mechanism to cover the fees and costs associated with arbitration.  Second, DraftKings requires the arbitration to take place in Suffolk County,

---

[13] http://www.nytimes.com/2015/11/01/business/dealbook/arbitration-everywhere-stacking-the-deck-of-justice.html

Massachusetts, and the plane ticket, let alone the true costs of arbitration, would be more than the value of most.  *See, Awuah* at 13*; see also Saravia v. Dynamex, Inc.*, 310 F.R.D. 412, 420 (N.D. Cal. 2015) (finding delegation clause unconscionable because, in addition to being buried in the agreement, and using a reference to the AAA rules, the arbitration provision required that "proceedings, including those assessing the arbitrability of Saravia's claims, occur in Dallas," which is over 1,000 miles from where he resides) (emphasis added).  Third, as discussed above, DraftKings seeks to eliminate all liability, meaning that Plaintiffs could not actually enforce any arbitration award, rendering the remedy illusory.  In sum, the arbitration clause is structured so as to prevent consumers from having access to the arbitrator through sheer costs alone, and creates a system that is in reality an illusory remedy that is not enforceable.[14]

Like the contract formation issues, each of the foregoing challenges to the arbitration clause would be sufficient on its own.  Taken together, it shows that enforcing the arbitration clause would be unreasonable and against public policy and immunize companies from fraudulent, illegal behavior going forward.

**E.   DraftKings Cannot Enforce an Arbitration Agreement Against Non-Signatory Plaintiffs.**

### 1.     The Family Member Plaintiffs Are Not Bound By Arbitration Agreement

Each Family Member Plaintiff, an undisputed non-signatory to the arbitration agreement, brings his or her claim for recovery of gambling losses pursuant to one of four state statutes that provides for the recovery of such losses from the winners.[15]  Doc. 317 at ¶¶ 712-747.  No Family Member Plaintiff attempts to recover gambling winnings or use the benefits or protections offered under the purported agreements between any other plaintiff and DraftKings.  As non-

---

[14] http://www.nytimes.com/2015/11/01/business/dealbook/arbitration-everywhere-stacking-the-deck-of-justice.html.
[15] Georgia: O.C.G.A. § 13-8-3(b); Kentucky: KY. REV. STAT. § 372.040; Tennessee: TENN. CODE ANN. § 29-19-105; New Mexico: NEW MEXICO STAT. ANN. § 44-5-3.

signatories, the Family Member Plaintiffs are not subject to any arbitration agreement, and no exception to that rule applies.[16]

Massachusetts contract law generally does not bind nonparties to an arbitration agreement. *Licata v. GGNSC Malden Dexter LLC*, 2 N.E.3d 840, 859, 861 (Mass. 2014). There are exceptions, only one of which DraftKings raises: estoppel. DraftKings' Motion at 15-16. DraftKings also attempts to raise a second exception referred to as "derivative of," which is not supported by Massachusetts law. Motion at 15-16.

### a.    *Estoppel*

The law does not regard estoppel with favor. *Licata* at 848-49. To establish it, "a party must show (1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." *Id.* DraftKings fails to meet its burden to establish these elements; in fact, it ignores them entirely.

Moreover, there are two strands of the estoppel exception:  1) "direct benefits" estoppel and 2) "alternative" estoppel. *Walker v. Collyer*, 9 N.E.3d 854, 861-63 (Mass. App. Ct. 2013). DraftKings ignores these as well.  "Alternative" estoppel has "only allowed a *nonsignatory* to compel a *signatory* to participate in arbitration." *Id.* at 863 (emphasis in original).  It obviously does not apply here.

 For "direct benefits" estoppel to apply, a party must (1) knowingly exploit an agreement with an arbitration clause and (2) have knowingly accepted its benefits, and (3) the benefits must flow directly from the agreement. *Id.* at 861-62 (*citing Deloitte Noraudit A/S v. Deloitte Haskins*

---

[16] DraftKings does not argue that arbitrability of the Family Member's claims must be referred to the arbitrator.  As a matter of both state and federal law, the court, not an arbitrator, must determine arbitrability of claims where, as one Massachusetts court stated, there is a question of "the very existence of an agreement ...." *Walker v. Collyer*, 9 N.E.3d 854, 860 (Mass. App. Ct. 2013) (internal quotations omitted); *see also Granite Rock*, 561 U.S. at 296. Since the Family Member Plaintiffs dispute the existence of any agreement between themselves and DraftKings, this Court must decide the issue.

& *Sells*, U.S., 9 F.3d 1060, 1064 (2d Cir. 1993)).  None of these elements are met here.  First, the Family Member Plaintiffs did not knowingly exploit an agreement with an arbitration clause. Nothing they did has anything to do with the purported agreements.  They are simply suing under state statutes that give them a right to relief based on their status as family members. Second, the Family Members accepted no benefits whatsoever.  *They* didn't participate in DraftKings' contests.  Even if one might characterize their benefits as indirect through their participant-relatives, such beneficiaries cannot be bound if they "do[] not exploit (and thereby assume) the agreement itself."  *Walker* at 863.  DraftKings has not shown that the Family Member Plaintiffs exploited, and thereby assumed, the purported agreements.  And it simply has not happened.  Thus, the direct benefits exception to the general rule is inapplicable.

That should end the matter.  But DraftKings argues that *Walker* nevertheless supports its position because the Family Members somehow "knowingly exploited" the purported agreement – though they do not say how.  Yet (although DraftKings does not say so), *Walker* found in *favor* of the non-signatory party, a physician denying that he was bound by an arbitration agreement between his patient and the facility where he practiced.  *Walker*, 9 N.E.3d at 865.  The court's reasoning was that the doctor "would have had the opportunity to treat Karl irrespective of whether [the patient] had signed the arbitration agreement."  *Id.*, 9 N.E.3d at 862.  The same is true here.  The Family Members would be in the same position whether or not their relatives had ever signed an arbitration contract.  Thus, they are not bound pursuant to estoppel.

### b.    *"Derivative of"*

In support of its argument in favor of a "derivative of" exception, DraftKings principally relies on a case applying New Mexico law, *THI of N.M. at Hobbs Ctr., LLC v. Spradlin*. 893 F. Supp. 2d 1172 (D.N.M. 2012), *aff'd*, 532 F. App'x 813 (10th Cir. 2013).  But the parties agreed to apply Massachusetts law (*see* DraftKings' Motion at fn. 10), and Massachusetts does not

recognize this exception.  *See Walker*, 9 N.E.3d at 861.  Indeed, *THI* preceded *Walker* in time and was available to the *Walker* court for its analysis but ignored.  Moreover, the facts in *THI* are entirely different.  There the court held that a patient's estate that had brought a wrongful death action was bound by an arbitration agreement entered into by the patient-decedent.  The court stated that this claim was the same one "that Mr. Spradlin, had he lived, would have had."  893 F. Supp. at 1190.  But the Family Members' claims are independent of claims their relatives might have.  If one of the participant Plaintiffs were to *die* and his or her estate were to substitute itself for the Plaintiff in this case, maybe then *THI* would apply.  But not here.

DraftKings' two other cases are based on California law and are similarly inapplicable. In *Net2phone, Inc. v. Superior Court*, 109 Cal. App. 4th 583 (Cal. Ct. App. 2003), the court held that an organization "su[ing] in a representative capacity" on behalf of its members and "assert[ing] the rights of those who are parties to the contract" were bound  by a forum selection clause agreed to by the members.  *Id.*, 109 Cal. App. 4th at 589.  The inapplicability to this case, where the Family Member Plaintiffs are asserting their own independent rights, is obvious. Moreover, in *Lee v. Southern Cal. Univ. for Prof. Studies*, 148 Cal. App. 4th 782, 788 (Cal. Ct. App. 2007), the court declined to apply *Net2Phone* to an arbitration agreement because "it would conflict with the fundamental principle that arbitration requires consent ....."

DraftKings' other case, *Karnazes v. Expedia, Inc.*, 2014 WL 6696279 (Cal. Ct. App. 2014), is an unpublished decision where a sweepstakes winner and her "traveling companion" sued the sponsor for breach of contract and fraud.  The court held that both plaintiffs – the winner who had signed the agreement and the companion who had not – were bound by a forum selection clause.  *Id.*  at *11.  Again, not only are the facts different, but under *Lee* the decision does not apply to arbitration.

32

Thus, the Court should decline to apply estoppel or the "derivative of" exceptions.

### 2.       The Crossover Plaintiffs are not Bound by any Arbitration Agreement

DraftKings never entered into an agreement with the Crossover Plaintiffs,[17] yet it seeks to compel them to arbitrate their civil conspiracy claim against it by virtue of *FanDuel's* Terms of Use.[18]   *See* FAMC, Count XIV, ¶¶ 660-65.   "Because arbitration is a matter of contract, exceptional circumstances must apply' before a court will allow a non-contracting party to impose a contractual agreement to arbitrate." *Denney v. Jenkens & Gilchrist,* 412 F. Supp. 2d 293, 297 (S.D.N.Y. Dec. 12, 2005) (quoting *Miron v. BDO Seidman, L.L.P.,* 342 F. Supp. 2d 324 (E.D. Pa. 2004)).[19]   A non-signatory must rely on estoppel to compel a signatory to arbitrate, and only where, "'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *JLM Indus. v. Stolt-Nielsen SA,* 387 F.3d 163, 177 (2d Cir. 2004) (quoting *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.,* 271 F.3d 403, 406 (2d Cir. 2001)).

Thus, for DraftKings to be able to utilize the FanDuel arbitration provision, the Crossover Plaintiffs' conspiracy claim against DraftKings must be "intimately founded in and intertwined with" FanDuel's Terms of Use.   *JLM Indus.,* 387 F.3d at 178 (citing *Thomson–CSF,* 64 F.3d at 779).   That would be the case if "the merits of an issue between the parties [i]s bound up with a contract binding one party and containing an arbitration clause." *Denney,* 412 F. Supp. 2d at 298 (quoting *JLM Indus.,* 387 F.3d at 177) (citing *Choctaw,* 271 F.3d at 407).   The Court must make this inquiry with the purpose of equitable estoppel in mind, which is "to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from 'rely[ing] on the contract when it

---

[17] Plaintiffs herein adopt DraftKings' definition,"—"Plaintiffs who assert civil conspiracy claims against DraftKings arising from their use of FanDuel's website." (DraftKings' Motion at p. 7).

[18] For purposes of this response, Plaintiffs assume *arguendo* that a binding arbitration agreement exists between the Crossover Plaintiffs and FanDuel.

[19] Plaintiffs cite New York cases because, with the FanDuel terms, it is attempting to enforce a New York contract.

works to [his] advantage [by establishing the claim], and repudiat[ing] it when it works to [his] disadvantage [by requiring arbitration].'" *Id.* (quoting *In re Humana Inc. Managed Care Litig.,* 285 F.3d 971, 976 (11th Cir. 2002), *rev'd on other grounds sub nom. PacifiCare Health Sys. v. Book,* 538 U.S. 401 (2003) (quoting *Tepper Realty Co. v. Mosaic Tile Co.,* 259 F. Supp. 688, 692 (S.D.N.Y. Sept. 20, 1966)).   The signatory plaintiff must actually depend on the underlying contractual agreement in making out its claims against the non-signatory for equitable estoppel to apply. *Id.*

 The Crossover Plaintiffs are doing nothing of the sort.  Their conspiracy claim arises from allegations that FanDuel and DraftKings engaged in an unlawful agreement with each other, not with Plaintiffs, to allow each other's employees to profit from play on each other's sites. The Crossover Plaintiffs would possess this claim whether or not FanDuel had entered into its Terms of Use with them.

DraftKings, however, analogizes this case to *Ragone v. Atl. Video,* 2008 WL 4058480 (S.D.N.Y. Aug. 29, 2008).  But, in that case the court found the plaintiff estopped from avoiding arbitration of her sexual harassment and unlawful retaliation claims against a non-signatory where the arbitration agreement expressly referred to such claims. *Id.* at *8.  Additionally, the plaintiff's claims against the non-signatory arose directly through her employment with the signatory, because the signatory "assigned" her to work for the non-signatory. *Id.* at * 2.  By contrast, DraftKings' and FanDuel's fraudulent scheme arose separate and apart from any agreement entered into between FanDuel and the Crossover Plaintiffs.

*Govt. Emps. Ins. Co. v. Grand Medical Supply, Inc.,* 2012 WL 2577577 (E.D.N.Y. July 4, 2012), is similarly inapposite.  DraftKings argues that it supports the proposition that arbitration can be ordered where "the agreement containing the arbitration provision was 'the sole reason

that plaintiffs have any relationship with' the non-signatory."  Motion at 18.  True enough, but that is not the case here.  FanDuel's terms of use have nothing to do with the Crossover Plaintiffs' claims.  For the same reason, *JLM Indus.* 387 F.3d at 178 is inapplicable.

DraftKings additionally argues that allegations of concerted misconduct, taken alone, are sufficient to force arbitration by a non-signatory.   Motion at 18.  For this, they rely on a ruling by a Monroe County Supreme Court judge.  *Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 415 (Sup. Ct. 2005).  However, a decision later that year makes clear that it does not necessarily follow that "a claim against a co-conspirator of [the party entitled to compel arbitration] will *always* be intertwined to a degree sufficient to work an estoppel. The inquiry remains a fact-specific one." *Stechler v. Sidley Austin Brown & Wood,* 382 F. Supp. 2d 580, 591 (S.D.N.Y. Apr. 5, 2005) (quoting *JLM Indus.,* 387 F.3d at 177) (emphasis added)).  For the test to be satisfied, the plaintiffs must "treat the co-conspirators as though they were interchangeable and as a single unit." *Stechler,* 382 F. Supp.2d at 591 (citation omitted).  Or alternatively, "the merits of the issue between the parties [must be] bound up" with the contract containing the arbitration clause. *Denny*, 412 F. Supp.2d at 298 (citation omitted).  Neither is the case here.

## IV.   CONCLUSION

For the foregoing reasons, this Court must deny DraftKings' motion because it would be unreasonable to enforce the arbitration clause against any of the Plaintiffs here.

Respectfully submitted,

/s/ Christopher Weld, Jr.
Christopher Weld, Jr. (BBO # 522230)
**TODD & WELD LLP**
One Federal Street, 27th Floor
Boston, MA  02110
T: 617-720-2626
F: 617-227-5777
Email:  cweld@toddweld.com

Liaison Counsel and Executive Committee Member
Hunter J. Shkolnik
**NAPOLI SHKOLNIK, PLLC**
360 Lexington Avenue, 11th Floor
New York, NY  10017
T: 212-397-1000
F: 646-843-7603
Email:  hunter@napolilaw.com

Jasper D. Ward IV
Alexander C. Davis
**JONES WARD PLC**
Taylor Building
312 South Fourth Street, 6th Floor
Louisville, KY  40202
T: 502-882-6000
F: 502-587-2007
Email:  jasper@jonesward.com
alex@jonesward.com

Melissa R. Emert
Howard T. Longman
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY  10017
T: 212-687-7230
F: 212-490-2022
Email: memert@ssbny.com
hlongman@ssbny.com

Co-Lead Counsel

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on January 9, 2017, the foregoing was served via U.S. Mail and electronic mail to counsel of record for Defendant.

<u>/s/ Christopher Weld Jr.</u>
Christopher Weld, Jr.

4852-6650-8864, v. 1