## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In Re: DAILY FANTASY SPORTS LITIGATION | **:** | MDL No. 16-02677-GAO |
| | **:** | |
| | **:** | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO PAYMENT PROCESSOR DEFENDANTS'
## MOTION TO COMPEL ARBITRATION

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................ ii

Introduction ..............................................................................................................1

Argument ..................................................................................................................4

      A.     Plaintiffs' Claims Are Not Subject to Arbitration Without an Agreement of the Parties ................................................................................................4

      B.     Payment Processor Defendants Cannot Enforce the DFS Defendants' Agreement Through Equitable Estoppel Under Massachusetts Law .........5

      C.     The "Unclean Hands" Doctrine Also Prevents Payment Processor Defendants from Compelling Arbitration by Equitable Estoppel................6

      D.     Even if Payment Processor Defendants Can Advance an Equitable Estoppel Theory, Their Theory Fails Because the Claims Are Not "Intertwined"................................................................................................7

      E.     Payment Processor Defendants Did Not Have a Close Relationship with DraftKings and/or FanDuel Such that Plaintiffs Had a Reasonable Expectation that Dispute with a Non-Signatory PPDs Would Be Arbitrated................12

Conclusion ..............................................................................................................20

i

## TABLE OF AUTHORITIES

**CASES**

*Allandale Farm, Inc. v. Koch*, 1997 WL 1229248
  (Mass. Super. Ct. Nov. 3, 1997) ........................................................................4

*Arthur Andersen LLP v. Carlisle,* 556 U.S. 624 (2009) ..................................5,6

*AT&T Techs. v. Commc'ns Workers of Am.,* 475 U.S. 643 (1986).....................1

*Boston & Albany R.R. Co. v. Reardon,* 226 Mass. 286, 115 N.E. 408 (Mass. 1917)..........2

*Butto v. Collecto, Inc.,* 845 F.Supp.2d 491 (E.D.N.Y. 2012) ...........................14

*InterGen NV v. Grina*, 344 F.3d 134 (1st Cir. 2003) ......................................1, 8

*Chastain v. Robinson–Humphrey Co.,* 957 F.2d 851 (11th Cir. 1992)...............6

*Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.,* 271 F.3d 403
  (2d Cir. 2001)........................................................................................3, 11

*Combined Energies v. CCI, Inc.,* 514 F.3d 168 (1st Cir. 2008)...........................4

*Compare Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.,*
  271 F.3d 403 (2d Cir. 2001)..........................................................................11

*Contec Corp. v. Remote Solution Co.,* 398 F.3d 205 (2d Cir. 2005) ..................1

*Costco Wholesale Corp. v. AU Optronics Corp.,* Nos. M-07–1827 SI, C 11–0058 SI,
  MDL No. 1827, 2011 WL 4017961, (N.D. Cal. Sept. 9, 2011) .................................14, 15

*Denney v. BDO Seidman, LLP,* 412 F.3d 58 (2d Cir. 2005)..............................17

*Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293 (S.D.N.Y. Dec. 12, 2005) ...............8

*Dunkin' Donuts Inc. v. Panagakos,* 5 F. Supp. 2d 57 (D. Mass. 1998) ............7

*EEOC v. Waffle House, Inc.,* 534 U.S. 279 (2002)............................................1

*Fluehmann v. Assocs. Fin. Servs.,* No. CIV.A. 01-40076-NMG, 2002 WL 500564 ..........6

*Gold v. Deutsche Aktiengesellschaft,* 365 F.3d 144 (2d Cir. 2004)....................1

*Grigson v. Creative Artists Agency L.L.C.,* 210 F.3d 524 (5th Cir. 2000) ......................10

*Haviland v. Goldman, Sachs & Co.,* 947 F.2d 601 (2d Cir. 1991) ....................................1

*InterGen NV v. Grina,* 344 F.3d 134 (1st Cir. 2003) .........................................................8

*In re Currency Conversion Fee Antitrust Litig.,* 265 F.Supp.2d 385 (S.D.N.Y. 2003).....12

*In re Humana Inc. Managed Care Litig.,* 285 F.3d 971(11th Cir. 2002) .........................11

*JLM Indus., Inc.,* 387 F.3d at 178 & n.7 ...........................................................................3

*JLM Indus., Inc. v. Stolt-Nielsen, S.A.,* 387 F.3d 163 (2d Cir. 2004) ..................................3

*Johnson v. Polaris Sales, Inc.,* 257 F. Supp. 2d 300 (D.Me.2003)....................................11

*Jones v. Paradies,* 380 S.W.3d 13 (Mo. Ct. App. 2012) ....................................................8

*Klay v. PacifiCare Health Sys.,Inc.,* 389 F.3d 1191(11th Cir. 2004) ...............................11

*K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907 (1st Cir. 1989) .................................7

*Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,* 67 F.3d 20 (2d Cir. 1995) ........1

*Lenox MacLaren Surgical Corp., v. Medtronic, Inc.,* 449 Fed.Appx. 704
  (10th Cir. 2011)...............................................................................................................8

*Licata v. GGNSC Malden Dexter LLC,* 466 Mass. 793 (2014) ..........................................2

*Machado v. System4 LLC,* 28 N.E.3d 401 (Mass. 2015)....................................................3

*Myrick v. GTE Main Street Inc.,* 73 F. Supp. 2d 94 (D. Mass. 1999)...............................18

*Odom v. Microsoft Corp.*,  486 F.3d (9th Cir. 2007)  .......................................................15

*PacifiCare Health Sys.,Inc. v. Book,* 538 U.S. 401 (2003)...............................................11

*Page v. Mosely,* 806 F.2d 291 (1st Cir. 1980) ...................................................................4

*PaineWebber v. Bybyk,* 81 F.3d 1193 (2d Cir. 1996) ........................................................2

*Paradise v. Eagle Creek Software Servs., Inc.,* 989 F. Supp. 2d 132 (D. Mass. 2013).....11

*Paul Revere Variable Annuity Ins. Co. v. Thomas,* 66 F. Supp. 2d 217 (D. Mass. 1999) .11

*Paul Revere Variable Annuity Ins. Co.,* 66 F. Supp. 2d 217 (D. Mass. 1999) .................18

*Progressive Cas. v. C.A. Reaseguradora Nacional,* 991 F.2d 42 (2d Cir. 1993)...............2

*Ragone v. Atl. Video at Manhattan Ctr.,* 595 F.3d 115 (2d Cir. 2010)........................10, 19

*Rajagopalan v. Noteworld, LLC,* 718 F.3d 844 (9th Cir. 2013) ..........................................8

*Restoration Pres. Masonry v. Grove Europe Ltd.,* 325 F.3d 54 (1st Cir. 2003).................5

*Ross v. American Express Co.,* 478 F.3d 96 (2d Cir. 2007) ..................................... passim

*Saccucci Auto Grp., Inc. v. Am. Honda Motor Co.,* 617 F.3d 14 (1st Cir. 2010)...............3

*Sarhank Group v. Oracle Corp.,* 404 F.3d 657 (2d Cir. 2005)) ....................................2, 14

*Shaw Group v. Triplefine Int'l Corp.,* 322 F.3d 115 (2d Cir. 2003)....................................2

*Sokol Holdings, Inc. v. BMB Munai, Inc.,* 542 F.3d 354 (2d Cir. 2008) ......................8, 12

*Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.,* 526 F.3d 38 (1st Cir. 2008)..............5, 8, 10

*Southex Exhibitions, Inc. v. R.I. Builders Ass'n, Inc.,* 279 F.3d 94 (1st Cir. 2002) .............3

*StoltNielsen v. Animalfeeds Int'l Corp.,* 559 U.S. 662 (2010)..........................................14

*Tellium, Inc. v. Corning Inc.,* No. 03 Civ. 8487, 2004 WL 307238,
  (S.D.N.Y.  Feb. 13, 2004)................................................................................................2

*Thomson–CSF, S.A. v. Am.  Arbitration Ass'n,* 64 F.3d 773 (2d Cir. 1995)......................3

*Texaco P.R., Inc. v. Dep't of Consumer Affairs,* 60 F.3d 867 (1st Cir. 1995) ...................7

*United States v. Bagaric*, 706 F.2d 42 (2d Cir. 1983) ......................................................15

*USM Corp. v. Arthur D. Little Sys., Inc.,* 28 Mass.App.Ct. 108,
  546 N.E.2d 888 (Mass. App. Ct. 1989) ..........................................................................6

*Walker v. Collyer,* 85 Mass.App.Ct. 311, 9 N.E.3d 854 (Mass. App. Ct. 2014)...1, 2, 3, 13

## **OTHER**

18 USC § 1961(4) ............................................................................................................15

FAA, 9 U.S.C. § 6............................................................................................................4

FAA, 9 U.S.C. § 4............................................................................................................4

FAA, 9 U.S.C. § 2............................................................................................................4

## INTRODUCTION

In determining who may invoke an arbitration clause, a court must look to principles of contract law to give effect to the parties' reasonable expectations.  Who may avail themselves of an arbitration clause is a question that is answered by applying ordinary principles of contract law. "Whether one can be bound by an arbitration clause is usually determined by looking at generally accepted principles of contract law." *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004); *see also InterGen NV v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003) ("'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'") (quoting *AT&T Techs. v. Commc'ns Workers of Am.,* 475 U.S. 643, 648 (1986) (additional citations omitted)).

An agreement to arbitrate a dispute with someone is not an agreement to arbitrate that dispute with everyone, however.  *See Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 209 (2d Cir. 2005) ("[J]ust because a signatory has agreed to arbitrate issues of arbitrability with another party does not mean that it must arbitrate with any non-signatory"). "[N]othing in the [FAA] authorizes a court to compel arbitration of any issues, or *by any parties*, that are not already covered in the agreement." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (emphasis added).  "'Absent advance consent to [a contractual] agreement, a party cannot be compelled to arbitrate a dispute.'"  *Walker v. Collyer*, 85 Mass.App.Ct. 311, 9 N.E.3d 854, 861 (Mass. App. Ct. 2014) (citation omitted).

"[W]ith any contractual matter," the court's "main concern" is "to 'faithfully reflect[] the reasonable expectations of those who commit themselves to be bound by [them]." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 28 (2d Cir. 1995) (quoting *Haviland v. Goldman, Sachs & Co.*, 947 F.2d 601, 604 (2d Cir. 1991).  In contract law, courts give effect to

1

the manifest, mutual intention of the parties as they existed at formation and in performance. *See, e.g., Shaw Group v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (applying New York law); *PaineWebber v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996). "In all such situations," this Court "has found an agreement to arbitrate, under general principles of contract law" by examining whether "the totality of the evidence supports an objective intention to agree to arbitrate." *Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 662 (2d Cir. 2005). "The party seeking to compel arbitration has the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate." *Tellium, Inc. v. Corning Inc.,* No. 03 Civ. 8487, 2004 WL 307238, at *5 (S.D.N.Y.   Feb. 13, 2004) (citing *Progressive Cas. v. C.A. Reaseguradora Nacional,* 991 F.2d 42, 46 (2d Cir. 1993)).

Nonetheless, courts have "recognized a number of common law principles of contract law that may allow non-signatories to enforce an arbitration agreement, including equitable estoppel." *Ross v. American Express Co.*, 478 F.3d 96, 99 (2d Cir. 2007); *see Walker*, 9 N.E.3d at 861 (citing estoppel as a basis for enforcing an arbitration agreement with respect to a nonsignatory).  Here, the Payment Processor Defendants ("PPDs") seek to apply equitable estoppel to require Plaintiffs to arbitrate their claims.  But "[t]he law does not regard estoppels with favor, nor extend them beyond  the transactions in which they originate." *Licata v. GGNSC Malden Dexter LLC,* 466 Mass. 793, 804 (2014) quoting *Boston & Albany R.R. Co. v. Reardon,* 226 Mass. 286, 115 N.E. 408, 411 (Mass. 1917).

The type of estoppel PPDs seek to invoke here involves a non-signatory's (PPD's) efforts to compel a signatory (Plaintiffs) to arbitrate.  Under this type of estoppel, "a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of 'the relationship among the parties, the contracts they signed . . ., and the issues

that had arisen' among them discloses that 'the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *JLM Indus., Inc. v. Stolt-Nielsen, S.A.*, 387 F.3d 163, 177 (2d Cir. 2004) (quoting *Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403, 406 (2d Cir. 2001)).

"Equitable estoppel is 'extraordinary' relief, which 'will not be applied unless the equities *clearly* [are] balanced in favor of the party seeking relief.'" *Saccucci Auto Grp., Inc. v. Am. Honda Motor Co.*, 617 F.3d 14, 27 (1st Cir. 2010) (quoting *Southex Exhibitions, Inc. v. R.I. Builders Ass'n, Inc.,* 279 F.3d 94, 104 (1st Cir. 2002).  Courts have repeatedly observed that the estoppel analysis in the arbitration context is a fact-specific inquiry, *see JLM Indus., Inc.*, 387 F.3d at 178 & n.7, because estoppel, like all contract questions, turns on the reasonable expectations of the contracting parties.

Under Massachusetts law,[1] a *nonsignatory* may compel a *signatory* to arbitrate under an estoppel theory when (a) the nonsignatory has a close relationship with a signatory and (b) the underlying issues for arbitration are intertwined with an agreement the estopped party has actually signed. *Walker,* 9 N.E.3d at 861 (citing *Thomson–CSF, S.A. v. Am.  Arbitration Ass'n,* 64 F.3d 773, 779 (2d Cir. 1995)).  In such situations, a reviewing court should consider all of "'the relationships of persons, wrongs and issues'" in the case.  *Machado v. System4, LLC,* 28 N.E.3d 401, 409 (Mass. 2015) (citations omitted).

However, in cases where a court has allowed a non-signatory to compel a signatory to arbitrate, the facts indicated that the signatory had, or should have had, a reasonable expectation that the pertinent dispute with the non-signatory third party would be arbitrated.  Defendants cite

---

[1] As of 2015, the Massachusetts Supreme Court noted that "[t]here are no reported Massachusetts appellate decisions determining whether [estoppel] may be applied to extend the reach of an agreement to compel a signatory into arbitration with a nonsignatory," but the court noted that it was "guided in [its] analysis by several circuit courts of the United States Court of Appeals that have applied equitable estoppel in this precise context."  *Machado v. System4 LLC*, 28 N.E.3d 401, 408 (Mass. 2015).

no authority whatsoever for their proposition that members of a RICO Enterprise should seemingly be treated as one and the same when construing a consumer contract involving any member.  Here, the record is devoid of anything that would indicate that the signatory Plaintiffs had any reasonable expectation that they would be subject to arbitrate disputes with an unnamed third-party, payment processor (the PPDs).  The claims at issue are not closely intertwined with Defendants DraftKings, Inc., FanDuel, Inc. and FanDuel Deposits, LLC's ("the DFS Defendants") respective Terms of Use, nor do the PPDs have a close relationship with the DFS Defendants such that Plaintiffs should be estopped from avoiding arbitration with the PPDs. Accordingly, the Court should deny Paysafecard.com USA's and Vantiv, Inc.'s Motion to Compel Arbitration.

## **ARGUMENT**

### A.   **Plaintiffs' Claims Are Not Subject to Arbitration Without An Agreement of the Parties.**

In ruling on a motion to compel arbitration, a court must determine whether "there exists a written agreement to arbitrate."[2]  *Combined Energies v. CCI, Inc.*, 514 F.3d 168, 171 (1st Cir. 2008) (quotation omitted); Federal Arbitration Act ("FAA"), 9 U.S.C. § 2 (a "written provision" to "settle by arbitration a controversy" shall be enforceable); *id*. § 4 (court may compel arbitration "upon being satisfied that the making of the agreement for arbitration" is "not in issue").  Here, the Arbitration Agreements, at the heart of Plaintiffs' claims, contain no

---

[2] Applications to compel arbitration are generally made and heard by motion. *See* FAA, 9 U.S.C. § 6. Where there are disputed questions of fact concerning the making of an arbitration agreement, "the court shall proceed summarily to the trial thereof." FAA, 9 U.S.C. § 4. Here, the terms of the Arbitration Agreements (which contain no provision to arbitrate between PPDs and Plaintiffs) are clear.  Thus, the Court should simply deny the PPDs motion for PPDs failure to make a prima facie showing of a basis to proceed with arbitration.  *See Combined Energies*, 514 F.3d at 171 ("Only if all three prongs of the test [for the motion] are satisfied will a motion to compel arbitration be granted."); *Page v. Mosely*, 806 F.2d 291, 295 (1st Cir. 1980) (court cannot compel arbitration unless it is satisfied that a valid agreement to arbitrate exists); *see also Allandale Farm, Inc. v. Koch*, 1997 WL 1229248 at *6 (Mass. Super. Ct. Nov. 3, 1997) ("Where the existence of a contract is at issue, the burden is on the complainant to show that it was made.") (citations omitted).

reference, whatsoever, to arbitrate with PPDs.  For example, the DraftKings' arbitration provision expressly states that it is between "you and DraftKings."[3]  Likewise, the FanDuel Terms of Use simply refers to "the parties" as being subject to the agreement, but the term "parties" is never defined and the terms are written to simply include the user (plaintiffs) and FanDuel.[4]  Nor were PPDs signatories to the Agreements.[5]  Accordingly, because no agreement to arbitrate exists between Plaintiffs and PPDs, Defendants' Motion to Compel must be denied.

**B.     Payment Processor Defendants Cannot Enforce the DFS Defendants' Agreement Through Equitable Estoppel Under Massachusetts Law.**

Relying on a few inapposite cases[6], PPDs argue that the Court should compel arbitration of the claims against the Payment Processors under the doctrine of equitable estoppel absent of any written agreement between PPDs and Plaintiffs.  PPDs' argument is meritless.

"[T]raditional principles of state law" determine whether a "contract [may] be enforced by or against nonparties to the contract through . . . third-party beneficiary theories . . . and estoppel."  *Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 631 (2009) (citation and internal quotation marks omitted).  Under Massachusetts law, the interpretation of a contract is resolved by reading and construing the whole contract "in a reasonable and practical way, consistent with

---

[3] *See* DraftKings Terms of Use, § Arbitration, Consent to Jurisdiction in Massachusetts, Attorney's Fees.

[4] *See* FanDuel's Terms of Use, § 15.2.

[5] In their Brief, PPDs admit that "Plaintiffs did not enter into agreements directly with the Payment Processors regarding their play on DFS websites." (PPDs' Brief at 2).

[6] PPDs cite two cases in support of its position that "equitable estoppel permits non-signatories to an arbitration agreement to compel arbitration against signatories." PPDs Brief at 3.  However, each case is inapposite. In *Restoration Pres. Masonry v. Grove Europe Ltd.*, 325 F.3d 54, 63 (1st Cir. 2003), the court, in a single footnote, cites as dicta a handful of extra-jurisdictional cases that recognize the estoppel theory PPDs attempt to advance. However, the court never expressly adopts the theory nor does it apply the theory to the case.  In *Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*, 526 F.3d 38 (1st Cir. 2008), a signatory to a written partnership agreement that required international arbitration of commercial disputes brought suit against a partner's subsidiary, a non-signatory to arbitration agreement, and executive of both signatory partner and non-signatory subsidiary.  The court held that the plaintiff signatory was equitably estopped from avoiding arbitration of dispute with a non-signatory which involved issues intertwined with the contract between signatories.  Unlike this case, however, most of the plaintiffs' claims either directly or indirectly invoked the terms of the Agreement because plaintiff alleged counts of intentional interference with contractual and fiduciary relationships.  Such is not the case here.  Furthermore, the non-signatory was identified by name on the written partnership agreement containing an arbitration provision.  Not so here.

its language, background, and purpose." *USM Corp. v. Arthur D. Little Sys., Inc.,* 28 Mass.App.Ct. 108, 546 N.E.2d 888, 893 (Mass. App. Ct. 1989).   A party seeking to compel arbitration must therefore show, at the outset, that arbitration is consistent with the clear intent of the parties and the plain language of the contract.   To that end, mutual assent as objectively manifested by the contract itself is a necessary condition for the creation of a binding arbitration agreement." *Fluehmann v. Assocs. Fin. Servs.*, No. CIV.A. 01-40076-NMG, 2002 WL 500564 at *5 (citing *Chastain v. Robinson–Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992)).

Here, the Payment Processor Defendants admit that "Plaintiffs did not enter into agreements directly with the Payment Processors regarding their play on DFS websites"[7] or otherwise consent to arbitration.   While PPDs contend that the agreements may have "impliedly referenced Plaintiffs' alleged use of the ancillary payment processing services"[8], the plain language of the contracts at issue here is clear: At *no point* do the Agreements contain any explicit reference to the PPDs.   Likewise, the purpose and intent of the Agreements is clear: DFS Defendants intended that the Terms and Use apply to the Plaintiffs (the "users")[9].   Indeed, Plaintiffs had no way of knowing of the existence or role of payment processors in the transaction.[10]   As such, mutual assent objectively manifested by the contract does not exist between Plaintiffs and PPDs here.   *Fluehmann*, 2002 WL 500564 at *5.   Accordingly, a contract cannot be enforced through equitable estoppel, and PPDs' Motion to Compel must be denied.

### C.   The "Unclean Hands" Doctrine Also Prevents Payment Processor Defendants From Compelling Arbitration by Equitable Estoppel.

---

[7] PPDs' Brief at 2.
[8] PPDs' Brief at 2.
[9] Although Plaintiffs dispute that a binding arbitration agreement exists between the Plaintiffs and DFS Defendants, Plaintiffs assume *arguendo* that a binding arbitration agreement exists between the Plaintiffs and DFS Defendants solely for purposes of responding to PPDs specific arguments addressed in their Motion to Compel.
[10] First Amended Master Complaint (Dkt. No. 269) ("First Am. Compl.") ¶ 790.

As the First Circuit has noted, a party claiming the protections of estoppel must have "clean hands."  *K–Mart Corp. v. Oriental Plaza, Inc.* 875 F.2d 907, 910–911 (1st Cir. 1989); *Dunkin' Donuts Inc. v. Panagakos*, 5 F. Supp. 2d 57, 62 (D. Mass. 1998).  The "unclean hands" doctrine gives the Court discretion to deny equitable relief to a party that has acted in bad faith or with unclean hands.  *See Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 880 (1st Cir. 1995).  The doctrine applies when the misconduct is "directly related to the merits of the controversy between the parties, that is, when the tawdry acts in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." *Id.* (internal quotation marks omitted).

Here, PPDs have acted fraudulently and deceitfully with respect to the controversy at issue.  As a direct result of PPDs' participation in a racketeering scheme, PPDs received income derived directly and indirectly from the racketeering activity and through the collection of unlawful debts.[11]  As such, Payment Processor Defendants unlawfully retained payments from Plaintiffs and profited from the transactions.[12]  Moreover, PPDs have specifically acted with bad faith by facilitating the wire transfers associated with the illegal gambling operations of DFS Defendants.[13]  In light of PPDs' "unclean hands," they should not be permitted to use principles of equity to deprive Plaintiffs of their day in court.

> **D.    Even if Payment Processor Defendants Can Advance An Equitable Estoppel Theory, Their Theory Fails Because the Claims Are Not "Intertwined".**

In order for the Court to estop a signatory from avoiding arbitration with a nonsignatory, the issues the nonsignatory are seeking to resolve in arbitration must be intertwined with the

---

[11] First Am. Compl. ¶ 767.
[12] First Am. Compl. ¶ 657.
[13] First Am. Compl. ¶ 804(g).

agreement that the estopped party has signed. *Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*, 526 F.3d 38, 47 (1st Cir. 2008); *But cf. InterGen N.V.*, 344 F.3d at 138, 140, 145-146 (finding no basis for equitable estoppel where the complaint did not allege breach of contract nor sought to enforce any contractual right and were therefore not intertwined). However, not all jurisdictions consider the intertwining nature of the claims to be, on its own, a sufficient basis for equitable estoppel. For example, the Second Circuit has opined that while this is an essential prerequisite, there must also be a relationship among the parties of a nature that justifies a conclusion that the signatory should be estopped from denying an obligation to arbitrate a dispute with a nonsignatory. *See Sokol Holdings, Inc. v. BMB Munai, Inc.,* 542 F.3d 354, 358–359 (2d Cir. 2008)*; see also Ross,* 547 F.3d at 143–144. Echoing this sentiment, the Tenth Circuit in *Lenox MacLaren Surgical Corp., v. Medtronic, Inc.,* 449 Fed.Appx. 704, 710 (10th Cir. 2011), held that allegations of collusion alone are insufficient; the claims must also be "intimately founded in and intertwined with the obligations imposed by the contract containing the arbitration clause" (citation omitted). Additionally, one Missouri court has held that even if claims are "inextricably intertwined," compelling a signatory to arbitrate with a nonsignatory is inconsistent with the general principle that arbitration is ultimately a matter of agreement between the parties. *Jones v. Paradies,* 380 S.W.3d 13, 17–18 (Mo. Ct. App. 2012). Moreover, "'[b]ecause arbitration is a matter of contract, ***exceptional circumstances*** must apply' before a court will allow a non-contracting party to impose a contractual agreement to arbitrate." *Denney v. Jenkens & Gilchrist,* 412 F. Supp. 2d 293, 297 (S.D.N.Y. Dec. 12, 2005) (emphasis added) (citations omitted).

In fact, one circuit court, under a similar set of facts as here, refused to invoke an arbitration clause under the theory of equitable estoppel. *See Rajagopalan v. Noteworld, LLC*, 718 F.3d 844 (9th Cir. 2013) ("*NoteWorld*"). In *Noteworld*, the plaintiff signed up for First Rate

Debt Solutions ("First Rate") repayment program to settle his student loan debts. *Id*. The plaintiff was sent, and reviewed, a link to First Rate's contract, which contained an arbitration clause that plaintiff electronically signed. *Id.* at 846. After 11 months, the plaintiff sought to cancel his subscription and sought a full refund from NoteWorld, the payment processing defendant utilized by First Rate. *Id*. NoteWorld, however, would not refund all of the plaintiff's money, so the plaintiff filed a class action suit alleging *inter alia* violations under RICO. In response, Noteworld claimed that it was not an agent of FirstRate and that it never entered into a contract with the plaintiff. *Id*. Nevertheless, NoteWorld (a non-signatory to the agreement) filed a motion to compel arbitration against plaintiff (signatory to the agreement) seeking to invoke the theory of equitable estoppel. *Id*. The district court denied NoteWorld's motion to compel arbitration, holding that the arbitration agreement was substantively unconscionable and that NoteWorld could not invoke the arbitration agreement under the equitable estoppel doctrine. The Ninth Circuit affirmed.

In its opinion, the Ninth Circuit noted that it had "never previously allowed a non-signatory defendant to invoke equitable estoppel against a signatory plaintiff, and [it] decline[d] to expand the doctrine [in this case.]" *Id*. at 847. Furthermore, because the plaintiff made statutory (RICO) claims that were separate from and ***not intertwined with the contract itself***, the court declined to apply equitable estoppel to the case. *Id.* at 848. (emphasis added).

Like *Noteworld*, Plaintiffs' RICO claims here are separate from and not intertwined with the DFS Defendants' Agreements themselves. In fact, Plaintiffs do not seek to enforce the contracts at all. The primary allegations underlying Plaintiffs' claims are based on an unfair, deceptive and fraudulent business scheme that the First Amended Complaint alleges violates RICO and numerous state consumer protection laws. *See* First Amended Complaint. Thus, the

resolution of Plaintiffs' claims does not require the examination of any provisions of the contracts providing for arbitration nor do Plaintiffs allege that Defendants engaged in conduct in violation of obligations that essentially derive from the contracts.

Despite PPDs' assertions[14], Plaintiffs' claims against them do not arise out of and relate directly to DFS Defendants' Services nor do they relate to their Terms of Use.  Rather, Plaintiffs' statutory claims against the PPDs are limited to PPDs' activities as the payment processors, specifically, according to the First Amended Complaint, receiving income derived directly and indirectly from the racketeering activity and through the collection of unlawful debts[15]; knowingly providing the "player banking services" facilitating and processing payment between the customer and the DFS Defendants thus providing them with the ability to pay for all or part

---

[14] PPDs rely on a handful of cases where courts found that claims arising from the subject matter of the agreement satisfied the so-called "first prong of intertwinedness".  PPDs' Brief at 6.  Each of these cases is factually distinguishable and inapposite.  For example, as previously stated, the only First Circuit case cited by PPDs, *Sourcing Unlimited*, involved plaintiffs alleging claims of intentional interference with contractual and fiduciary relationships that either directly or indirectly invoked the terms of the Agreement at issue.  Furthermore, the non-signatory was identified by name on the written partnership agreement containing the arbitration provision.  Not so here.

   The Second Circuit case, *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115 (2d Cir. 2010) is likewise factually distinguishable and inapposite.  The *Ragone* court held that even though a cable television sports producer was not a signatory to an arbitration agreement made between an employee and her employer, the producer was essentially the employee's co-employer, so could compel her to arbitrate her Title VII claims of sexual harassment against it.  Specifically, the plaintiff's claims against the non-signatory arose directly through her employment with the signatory, as the signatory assigned her to work for the non-signatory.  *Ragone* is clearly distinguishable from the facts of this case because the fraudulent scheme entered into between Plaintiffs and PPDs arose separate and apart from any agreement entered into between the Plaintiffs and DFS Defendants.

   Finally, the Eleventh Circuit in *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524 (5th Cir. 2000) reasoned that the district court did not abuse its discretion by applying equitable estoppel to compel arbitration of the signatories' claim against non-signatories for tortious interference with contract, on grounds that the action was intertwined with, and dependent upon, a movie distribution agreement which contained an arbitration clause.  Again, like the aforementioned cases, this case is plainly distinguishable in the facts and the causes of action (relating explicitly to the contact) brought by plaintiffs.

[15] First Am. Compl. ¶ 767.

of the gambling operation of the DFS Defendants[16]; and knowingly participating in a gambling scheme and profiting from the scheme.[17]

Moreover, Plaintiffs do not allege that non-signatory PPDs conspired with the DFS Defendants to deprive Plaintiffs of the services to which they were entitled under the DFS Defendants' contract, and PPDs do not contend that they are, or were at the relevant time, in an agency relationship with DFS Defendants. In short, both the legal theories and the factual allegations at issue in this lawsuit are separate and distinct from the DFS Defendants' contracts. For these reasons, the cases upon which Defendants rely are inapposite.[18]

Furthermore, independent acts of fraud unrelated to any contractual provision, such as the allegations of fraud on which Plaintiffs base their RICO claims, likewise do not provide a basis on which to compel arbitration by equitable estoppel. *See In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 976 (11th Cir. 2002) (holding RICO claims are based on a "statutory remedy" that "stands apart from any available remedies for breach of contract" and thus refusing to compel arbitration by nonsignatories).[19] Because Plaintiffs assert allegations of fraud on which Plaintiffs base their RICO claims, Defendants cannot invoke the theory of equitable

---

[16] First Am. Compl. ¶ 790.

[17] First Am. Compl. ¶ 790.

[18] *Compare Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403 (2d Cir. 2001) (applying equitable estoppel and allowing surety to compel energy partnership to arbitrate controversy over surety contract, which contained no arbitration clause, under the arbitration clause of a separate construction contract to which energy partnership was a signatory and surety was not); *Paul Revere Variable Annuity Ins. Co. v. Thomas*, 66 F. Supp. 2d 217 (D. Mass. 1999) (holding that Employees' claims against insurance companies for breach of employment contract did not fall within insurance business exception to arbitration under National Association of Securities Dealers arbitration code and instead was primarily an employment dispute); *Paradise v. Eagle Creek Software Servs., Inc.*, 989 F. Supp. 2d 132 (D. Mass. 2013) (holding that where employee's claims against both his employer and the principal of his employer were inextricably intertwined, the employee could be compelled to arbitrate claims against both defendants, even if the principal was not a signatory to the arbitration agreement); *Johnson v. Polaris Sales, Inc.*, 257 F. Supp. 2d 300, 307 (D.Me.2003) (holding that non-signatories were bound to arbitrate when they owned the signatory company, enjoyed direct benefits of the contract, and based a lawsuit upon those benefits).

[19] *Humana* was reversed on other grounds by the Supreme Court. *PacifiCare Health Sys.,Inc. v. Book*, 538 U.S. 401 (2003). However, the portion of the decision relating to the RICO claims against nonsignatories was later affirmed by the 11th Circuit. *Klay v. PacifiCare Health Sys.,Inc.*, 389 F.3d 1191, 1198-99 (11th Cir. 2004).

estoppel in this case.  Yet, even if Defendants can invoke the theory, PPDs' theory also fails because PPDs did not have a close relationship with the DFS Defendants.

### E.  Payment Processor Defendants Did Not Have a Close Relationship with DraftKings and/or FanDuel Such That Plaintiffs Had a Reasonable Expectation that Dispute With a Non-Signatory PPDs Would Be Arbitrated.

"[I]n addition to the "intertwined" factual issues, there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement."  *Sokol Holdings, Inc. v. BMB Munai, Inc.,* 542 F.3d 354, 359 (2d. Cir. 2008).  This does not mean, however, "that whenever a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them, that party will be estopped from refusing to arbitrate . . . ."  *Id.*[20]  Instead, courts most often have applied "estoppel in cases involving subsidiaries, affiliates, agents, and other related business entities."  *Ross,* 547 F.3d at 144.  As such, this court should reject the proposition on which the PPDs rely:  that a nonsignatory related to a signatory merely as an alleged coconspirator may invoke the otherwise unrelated signatory's arbitration clause.  *Id.*

*Ross v. American Express Company* is instructive.  In *Ross,* which was related to a pending MDL—*In re Currency Conversion Fee Antitrust Litig.,* 265 F.Supp.2d 385 (S.D.N.Y. 2003), the plaintiffs were holders of MasterCard, VISA, and Diners Club credit cards.  *Id*. Among other defendants, the plaintiffs asserted claims against American Express Company and certain of its affiliated entities (collectively "Amex").  *Id*.  The plaintiffs' central allegation was that Amex "actively conspired with the MDL Defendants [including Network Defendants and

---

[20] Plaintiffs do not concede and, in fact, dispute that the allegations "deal" with the subject matter of the respective Terms of Use.

Issuing Banks] to fix, maintain, and conceal the artificially inflated" foreign currency transaction fees alleged in the MDL Action.  *Id.*  The plaintiffs in *Ross* were not holders of Amex credit cards and therefore did not seek relief as purchasers of Amex products. Rather, Amex was alleged to have "joined, participated, ratified, and materially supported [the] collusive arrangement between and among the MDL Defendants" to charge artificially inflated fees on MasterCard, VISA, and Diners Club transactions involving foreign currencies. Amex was not a signatory to the cardholder agreements.  *Id.*

In order to obtain their MasterCard and VISA credit cards, each plaintiff entered into a standard cardholder agreement with the Issuing Banks. *Id.* The cardholder agreements included a broad arbitration clause that provided that "[a]ny dispute, claim, or controversy . . . arising out of or relating to relating to this Agreement" be settled in an arbitral, not a judicial, forum.  *Id.*  The cardholder agreements left no doubt that, should either party choose it, arbitration shall be the exclusive means of dispute resolution.  *Id.*  Amex sought to compel arbitration via equitable estoppel in spite of not being a party to those cardholder agreements.  *Id.* at 140.

In holding that it would not apply equitable estoppel to compel the plaintiffs to arbitrate with Amex, the Second Circuit opined that "mere allegations of collusion by the signatory plaintiff do not satisfy the second 'relationship' prong[21] of the equitable estoppel test because 'arbitration is a matter of consent,' and a plaintiff does not consent to arbitrate with every entity who subverts their rights under the agreement containing the arbitration clause in concert with another signatory." *Ross,* 547 F.3d at 145. The court explained that applying equitable estoppel on the basis of conspiracy allegations "is problematic because . . . 'under general principles of contract law' parties should not be compelled to arbitrate unless 'the totality of the evidence

---

[21] The Second Circuit applied the same test for equitable estoppel as has been adopted in Massachusetts.  *See Walker,* 9 N.E.3d at 861.

supports an objective intention to agree to arbitrate.'" *Id.* at 148 (quoting *Sarhank Group v. Oracle Corp.,* 404 F.3d 657, 662 (2d Cir. 2005)); *see also Costco Wholesale Corp. v. AU Optronics Corp.,* Nos. M-07–1827 SI, C 11–0058 SI, MDL No. 1827, 2011 WL 4017961, at *5 (N.D. Cal. Sept. 9, 2011) (where the court held that a defendant could not "bootstrap its way into arbitration based on nothing more than the concerted misconduct about which the plaintiff complained in the first instance.").

Similarly, in *Butto v. Collecto, Inc.*, 845 F.Supp.2d 491 (E.D.N.Y. 2012), the court declined to compel the plaintiffs to arbitrate with a non-signatory debt collector.  There, the plaintiffs failed to pay their cellular telephone bills.  After the phone services were terminated, and a collection action was initiated, a collection agency sought to compel the plaintiffs to arbitrate their disputes based on an arbitration agreement included in the original service contracts with the cellular telephone carrier.  *Id.* at 493.  However, the court held that there was not a close relationship between the collection agency and the service provider: "[n]otwithstanding Collecto's current arguments, the Court finds that there has been no showing that the Plaintiffs intended to arbitrate disputes with a collection company when they signed their agreement with their wireless providers. '[C]ontractually speaking, the plaintiffs do not know [Collecto] from Adam.'" *Id.* at 499.

A reluctance to compel arbitration based on estoppel under the facts in *Ross* and *I* comports with the basic principle that arbitration is a matter of consent, not coercion.  The Supreme Court stated in *StoltNielsen v. Animalfeeds Int'l Corp.*, 559 U.S. 662, 684 (2010), that "parties may specify *with whom* they choose to arbitrate their disputes.  It falls to courts and arbitrators to give effect to these contractual limitations, and when doing so, courts and arbitrators must not lose sight of the purpose of the exercise: to give effect to the intent of the

parties." *Id.* (emphases in original) (internal citations omitted); *see also Ross,* 547 F.3d at 146 ("[T]he further necessary circumstance of some relation between Amex and the plaintiffs sufficient to demonstrate that the plaintiffs intended to arbitrate this dispute with Amex is utterly lacking here."); *Costco,* 2011 WL 4017961, at *5 ("[T]he Court agrees with Costco that, given that the defendants belong to distinct corporate families, there has been no showing that Costco intended to arbitrate disputes with all defendants at the time it signed its vendor agreements.").

Further, members of a RICO Enterprise remain distinct individuals and entities and are not necessarily one another's agents or affiliates or otherwise pertinently related to one another, because a RICO Enterprise need not be bound through such formal legal relationships as agency or corporate affiliation. 18 USC § 1961(4).  Being associated in fact toward a common criminal purpose does not equate to agency or corporate family status, and a reasonable consumer entering into a contract would not foresee having to arbitrate claims against hidden criminal coconspirators.[22]

In this case, Defendants argue that, because Plaintiffs have alleged that the DFS Defendants acted in concert with the PPDs in a RICO Enterprise, they are estopped from denying that the PPDs are sufficiently related to the original signatories to be entitled to compel arbitration.  However, Defendants fail to explain why or how Plaintiffs' factual allegations of a RICO Enterprise establish a kind of relationship between Defendant and the payment processor defendants that would allow the former to enforce the latter's agreements. *Ross,* 547 F.3d at 146. As the court in *Ross* explained, because arbitration is founded on consent, a party is estopped from declining to arbitrate with a nonsignatory only where compelling arbitration comports with

---

[22] *See e.g. Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) (two unaffiliated companies, Microsoft and Best Buy, allegedly associated in fact towards a common purpose could constitute a RICO Enterprise); *United States v. Bagaric*, 706 F.2d 42, 55-56 (2d Cir. 1983) (group of individuals associated in fact, "although not a legally cognizable entity in one of the traditional forms," may constitute RICO Enterprise) (abrogated on other grounds).

the party's reasonable expectations at the time the contract containing the arbitration agreement was executed. *Id.* at 145-146 (citation omitted).

Plaintiffs and other players did not reasonably expect that, by signing up to participate in DFS Defendants' competitions they were simultaneously entering into an agreement to arbitrate claims with any third-party that the DFS Defendants chose to manage some of the functions of their respective websites.   Where allegations of unlawful conspiracy are the only basis for connecting the PPDs to the DFS Defendants, it is unjust and unfair to hold estoppel applicable. The mere fact that DFS Defendants' respective Terms of Use made reference to "depositing money" or "the company processing credit card payments" did not put Plaintiffs or the putative class members on notice that the Payment Processor Defendants were subject to the Terms of Use or, in particular, the arbitration provisions.   For example, the DraftKings' arbitration provision expressly states that it is between "you and DraftKings."[23]   Likewise, the FanDuel Terms of Use simply refer to "the parties" as being subject to the agreement, but that term is never defined and the terms are written to simply include the user and FanDuel.[24]   Contractually, Plaintiffs did not know PPDs from Adam.

Just as in *Ross*, therefore, here, any "relation between [Defendants] and plaintiff[] sufficient to demonstrate that the plaintiff[] intended to arbitrate this dispute with [Defendants] is utterly lacking." *Id.* at 146.  The Terms of Use for the DFS Defendants do not mention the PPDs either by name or by function as among the parties that may enforce it.  Plaintiffs were unaware of the PPDs and had no dealings with them at the time of contracting; and the PPDs have no corporate affiliation with the DFS Defendants.  *Id.*  Therefore, just like Amex in *Ross*, the Payment Processor Defendants here may not compel arbitration as non-signatories.

---

[23] *See* DraftKings Terms of Use, § Arbitration, Consent to Jurisdiction in Massachusetts, Attorney's Fees.
[24] *See* FanDuel's Terms of Use, § 15.2.

The PPDs cite to a number of cases that purportedly support their position, yet each of the cases cited by Defendants are distinguishable.  PPD's primary support for their position arises from *Denney v. BDO Seidman, LLP,* 412 F.3d 58, 70 (2d Cir. 2005).  A close look, however, reveals stark differences between the facts of this case and those at issue in *Denney*.  In *Denney*, the plaintiffs sought damages from defendants for alleged RICO violations, among other claims.  Signatory and nonsignatory defendants sought to compel plaintiffs, including both signatories and non-signatories, to arbitrate with them.  The accounting firm defendants at issue had "recruited" plaintiffs into a tax shelter scheme. *Id*. at 61. The accounting firms entered into "consulting" agreements with certain plaintiffs, which agreements contained arbitration clauses. *Id*.  The scheme had been devised by the law firm defendants (who were then settled), *id*. at 62 n.4, whom plaintiffs had retained, *id.*, and who had provided "an independent opinion letter . . . attesting to [the scheme's] validity." *Id.* at 61. The law firm defendants "referred plaintiffs to the Deutsche Bank defendants, who counseled plaintiffs . . . and carried out the . . . transactions" to which the accounting firms had "recruited" plaintiffs.  *Id*. at 62 n.4.  Ultimately, the Second Circuit remanded for further proceedings, including a determination on whether the "issues" that Deutsche Bank sought to arbitrate were "intertwined with the consulting agreements" with the accounting firms.

What made Deutsche Bank's argument for estoppel colorable, however, was that a taxpayer, entering into a contract to use this tax scheme, should reasonably have understood that effecting the scheme necessarily required the efforts of accountants, lawyers, and bankers.  In short, the accounting defendants seemed to have been offering a package deal with the requisite services to be delivered by a cast of specialists including the bank. The reasonable expectation of the taxpayers may well have been that they were entering into dealings with all three types of

17

service providers, depending on the exact nature of the issues and the contract involved, which was the inquiry that this Court mandated on remand. Here, however, the Plaintiffs had no such expectations regarding the DFS Defendants' relationship with PPD or any other third-party affiliated with the DFS Defendant's services. Plaintiffs did not expect that DFS Defendants would be engaging in illegal conduct nor expect other parties would be involved in effectuating the RICO Enterprise.

In *Myrick v. GTE Main Street Inc.,* 73 F. Supp. 2d 94, 97 (D. Mass. 1999), the court determined that the non-signatory was an agent of the signatory. There, an employee brought suit against her employer and supervisor alleging a number of counts, including gender discrimination and retaliation. *Id.* at 95. The plaintiff, however, had a written consultant's agreement between herself and her employer that contained an arbitration provision. *Id.* The plaintiff's supervisor argued that the arbitration provision applied to him, as well. *Id.* at 96. In granting both the employer's and supervisor's motions to compel arbitration, the court found that the supervisor, not surprisingly, was a closely affiliated agent of the signatory employer. *Id.* 96-97. However, such an agency relationship does not exist in this situation. The PPD's are not agents of the DFS Defendants, nor do any of the parties assert such a relationship, rendering Defendant's reliance on *Myrick* inapposite.

Similarly, *Paul Revere Variable Annuity Ins. Co.*, 66 F. Supp. 2d 217 (D. Mass. 1999), involved employers seeking to compel the arbitration of contract actions brought against them in state court by former employees. *Id.* at 219. The entities seeking to compel arbitration "consist[ed] of The Paul Revere Corporation and three of its wholly owned subsidiaries—The Paul Revere Variable Annuity Insurance Company ("Variable"), The Paul Revere Life Insurance Company and The Paul Revere Protective Life Insurance Co.,—(collectively "Paul Revere") as

18

well as Provident Companies, Inc. ("Provident") and its wholly owned subsidiary Provident Life and Accident Company." *Id.* The actions brought by former employees allege that their employment contracts were unlawfully terminated following a merger between Paul Revere and Provident. *Id.* Given that the entities were either subsidiaries or merged entities, it is not difficult to see why the court found them to be closely affiliated. However, no such corporate affiliation or relationship exists between the PPDs or DFS Defendants in this instance.

Finally, in *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 127 (2d Cir. 2010), a make-up artist filed suit against the owner of a television studio and the cable television sports producer alleging sex discrimination. *Id.* at 117. The plaintiff's employment with the television studio was subject to her assent to an arbitration agreement. *Id.* at 118. The producer, ESPN, sought to compel the plaintiff to arbitrate her claims against ESPN as well under an estoppel theory, even though ESPN was a non-signatory to the agreement. In applying equitable estoppel to compel the plaintiff to arbitrate with ESPN, the court explained "it is plain that when Ragone was hired by AVI, she understood ESPN to be, to a considerable extent, her co-employer." *Id.* at 127. No such understanding exists in this case.

None of the fact patterns in the cases cited by the PPDs mirror those at issue here. In this instance, Plaintiffs had no reasonable expectation that they would be required to arbitrate with the PPDs because they were not aware of their existence at the time they agreed to the Terms of Use. Further, the PPDs do not have any corporate affiliation with the DFS Defendants such that Plaintiffs should be required to arbitrate with them. For these reasons, and those set forth above, there is not a close relationship between the DFS Defendants and the PPDs.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Honorable Court deny

Payment Processor Defendants' Motion to Compel Arbitration.


Respectfully submitted,

<u>/s/ Christopher Weld, Jr.</u>
Christopher Weld, Jr. (BBO # 522230)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA  02110
T: 617-720-2626
F: 617-227-5777
Email:  cweld@toddweld.com

Liaison Counsel and Executive Committee Member
Hunter J. Shkolnik
**NAPOLI SHKOLNIK, PLLC**
360 Lexington Avenue, 11th Floor
New York, NY  10017
T: 212-397-1000
F: 646-843-7603
Email:  hunter@napolilaw.com

Jasper D. Ward IV
Alexander C. Davis
**JONES WARD PLC**
Taylor Building
312 South Fourth Street, 6th Floor
Louisville, KY  40202
T: 502-882-6000
F: 502-587-2007
Email:  jasper@jonesward.com
alex@jonesward.com

Melissa R. Emert
Howard T. Longman
STULL, STULL & BRODY
6 East 45th Street
New York, NY  10017
T: 212-687-7230
F: 212-490-2022

20

Email: memert@ssbny.com
hlongman@ssbny.com

Co-Lead Counsel

## CERTIFICATE OF SERVICE

I, hereby certify that on January 9, 2017, the foregoing was served via U.S. Mail and electronic mail to counsel of record for Defendant.

/s/ Christopher Weld Jr.
Christopher Weld, Jr.

4843-6590-8544, v. 3

21