**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: DAILY FANTASY SPORTS LITIGATION )<br><br>This Document Relates To: )<br><br>    All Cases ) | MDL No. 16-02677-GAO |

**PLAINTIFFS' RESPONSE TO DEFENDANTS FANDUEL, LLC AND FANDUEL DEPOSITS, LLC'S MOTION TO COMPEL ARBITRATION**

## <u>TABLE OF CONTENTS</u>

I.   Introduction ..............................................................................................................1

II.  Factual Background ...................................................................................................2

    A.   FanDuel's Sign-Up Process and Terms of Use ...............................................2

    B.   FanDuel's Use of Arbitration Clause to Further Fraudulent Scheme .....................4

III. Argument ...................................................................................................................5

    A.   FanDuel Bears Burden of Proving to this Court a Valid Contract
        Formed with Plaintiffs ...................................................................................5

    B.   No Contract was Formed Between Plaintiffs and FanDuel ....................................8

        1.   FanDuel's "Sign-In Wrap" was Insufficient to Form a Binding
            Contract ...................................................................................................8

        2.   The Contract was Void at Formation for Illegality Under New
            York Law ...............................................................................................12

        3.   The Terms of Use Are Illusory and Therefore There Was No
            Consideration .......................................................................................16

    C.   The Delegation Clause is Unenforceable ......................................................17

        1.   Plaintiffs Challenge Delegation Clause in Response to FanDuel's
            Motion ...................................................................................................17

        2.   FanDuel Cannot Show Clear and Unmistakable Evidence
            of Delegation ........................................................................................17

        3.   Incorporation of Delegation Provision Impermissibly Conflicts with
            Other provisions Giving Court Authority .................................................18

            a.   Arbitration Provision Should be Evaluated in Context of
                Terms of Use Despite a Severability Clause ..................................18

            b.   Conflict with Severability Provision Undercuts FanDuel's
                Characterization of Delegation As Clear and Unmistakable .........20

        4.   The Delegation is Unenforceable Under General Contract Principles ......22

D.      The Arbitration Agreement is Invalid and Unenforceable ....................................23

        1.      The Arbitration Agreement Is Illusory and Unenforceable ......................24

        2.      The Arbitration Agreement Is Invalid to the Extent It
                Furthers a Fraudulent Scheme ..................................................................25

        3.      The Arbitration Provision Is Unenforceable Because It Does Not
                Allow Plaintiffs to Effectively Vindicate Their Rights Under RICO........27

        4.      The Arbitration Agreement was Fraudulently Induced ............................30

E.      FanDuel Cannot Enforce Arbitration Agreement Against Non-Signatory
        Plaintiffs.................................................................................................................31

        1.      The Family Member Plaintiffs Are Not Bound by Any
                Arbitration Agreement ..............................................................................31

        2.      The DraftKings Plaintiffs Are Not Bound By Any Arbitration
                Agreement ..................................................................................................33

Conclusion ............................................................................................................................35

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Suozzi*, 433 F.3d 220 227 (2d Cir. 2005).........................................................6

*Al-Sullami v. Broskie*, 40 A.D.3d 1021 (2d Dep't 2007)............................................12, 13

*Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013) .................................27, 28

*Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522 (2d Cir. 2011) .........6, 7

*Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7 (1st Cir. 2009).....................................24, 25

*Bank of Am., N.A. v. Diamond State Ins. Co.*, 38 Fed. Appx. 687 (2d Cir. 2002).........................6

*Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399 (E.D.N.Y. 2015) ......................................9, 10, 11

*Braunstein v. Jason Tarantella, Inc.*, 87 A.D.2d 203, 450 N.Y.S.2d 862 (App. Div. 1982).........15

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996 (9th Cir. 2010) ...........17

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006) .............................................7, 13

*Campaniello Imports, Ltd. v. Saporiti Italia, S.p.A.*, 117 F.3d 655 (2d Cir.1997) .......................26

*Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360 (2d Cir. 2003) .......................23

*Carr v. Hoy*, 2 N.Y.2d 185 (1957)...............................................................................15

*Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403 (2d Cir. 2001) ......34

*Cobarruviaz v. Maplebear, Inc.*, No. 15-cv-00697-EMC, 2015 WL 6694112
 (N.D. Cal. Nov. 3, 2015)..............................................................................................21

*Cowen & Co. v. Anderson*, 558 N.E.2d 27 (N.Y. 1990)..................................................12

*Cullinane v. Uber Techs., Inc.*, 2016 WL 3751652 (D. Mass. July 11, 2016) .........................7, 24

*Curtis Properties Corp. v. Greif Companies*, 212 A.D.2d 259 (1995).........................................25

*Dalessio v. Kressler*, 6 A.D.3d 57, 773 N.Y.S.2d 434 (App. Div. 2004)......................................14

*Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293 (S.D.N.Y. Dec. 12, 2005) ...................34, 35

*Express Indus. & Terminal Corp. v. N.Y. State DOT*, 715 N.E.2d 1050 (N.Y. 1999) .................12

*First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995)................................................18, 20, 21

*Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829 (S.D.N.Y. 2012) ......................................................11

*Gambardella v. Pentec, Inc.*, 218 F. Supp. 2d 237 (D. Conn. 2002)............................................29

*Garten v. Kurth*, 265 F.3d 136 (2nd Cir. 2001) ...........................................................25, 26, 27

*Glazer v. Lehman Bros., Inc.*, 394 F.3d 444 (6th Cir. 2005) .........................................................19

*Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1 (1st Cir. 2012) ...........................................................7

*Graham Oil Co. v. ARCO Prod. Co., a Div. of Atl. Richfield Co.*,
    43 F.3d 1244 (9th Cir. 1994) .......................................................................................29

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010) ................................................7

*Greenberg v. SNA Consultants, Inc.*, 55 A.D.3d 418 (2008)..........................................................14

*Harris v. Economic Opportunity Comm'n*, 171 A.D.2d 223 (N.Y. App. Div. 1991) ....................15

*Housekeeper v. Lourie*, 39 A.D.2d 280, 333 N.Y.S.2d 932 (App. Div. 1972)...............................30

*Ingalls v. Spotify USA, Inc.*, No. 16-cv-03533 WHA, 2016 WL 6679561
    (N.D. Cal. Nov. 14, 2016)............................................................................................21

*In re Checking Account Overdraft Litigation*, 685 F.3d 1269 (11th Cir. 2012)...........................19

*In re Humana Inc. Managed Care Litig.*, 285 F.3d 971 (11th Cir. 2002) .....................................34

*Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673 (2d Cir. 1972) ...........6

*Ivor B. Clark, Inc. v. Boston Rd. Shopping Ctr., Inc.*, 24 Misc 2d 84,
    207 N.Y.S.2d 582 (Sup. Ct. N.Y. County 1960) ........................................................16

*Janiga v. Questar Capital Corp.*, 615 F.3d 735 (7th Cir. 2010)......................................................7

*JLM Indus. v. Stolt-Nielsen SA,* 387 F.3d 163 (2d Cir. 2004) .................................................34, 35

*Johnson v. Circuit City Stores, Inc.*, 203 F.3d 821 (4th Cir. 2000) ..............................................29

*Katz v. Feinberg*, 290 F.3d 95 (2d Cir. 2002)................................................................................20

*Kristian v. Comcast Corp.*, 446 F.3d 25 (1st Cir. 2006)....................................................24, 28, 29

*Markowits v. Friedman*, 2016 NY Slip Op 07932, ¶ 3 (App. Div.) ...............................................30

*Matter of Belzberg v Verus Invs. Holdings Inc.*, 999 N.E.2d 1130 (N.Y. 2013) ..........................32

*Mazza Consulting Group v. Canam Steel* Corp., 2008 WL 1809313, at *1
   (E.D.N.Y. Apr. 21, 2008)..................................................................................................................6

*McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677 (7th Cir. 2002).......................................................29

*McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*,
   2015 U.S. Dist. LEXIS 3347 (S.D.N.Y January 12, 2015) ......................................................32

*Meyer v. Kalanick*, 2016 WL 4073071, *1 (S.D.N.Y. July 29, 2016) ...................................1, 8, 9

*Miron v. BDO Seidman, L.L.P.*, 342 F. Supp. 2d 324 (E.D. Pa. 2004) .........................................34

*Money Mailer, LLC v. Brewer*, No. 15-cv-1215RSL, 2016 WL 1393492
   (W.D. Wash. Apr. 8, 2016) .......................................................................................................20

*Moseley v. Electronic & Missile Facilities, Inc.*, 374 U.S. 167 (1963) ...................................26, 27

*Nat'l Fed'n of the Blind v. Container Store, Inc.*, 2016 WL 4027711 (D. Mass. July 27, 2016).....7

*Nesbitt v. FCNH, Inc.*, 811 F.3d 371 (10th Cir. 2016)..................................................................29

*Newton v. Am. Debt Servs., Inc.*, 549 F. App'x 692 (9th Cir. 2013) .............................................19

*Nichols v. Wash. Mut. Bank*, 2007 WL 4198252 (E.D.N.Y. Nov. 21, 2007) ...............................23

*Opals on Ice Lingerie v. Body Lines Inc.*, 320 F.3d 362 (2d Cir. 2003).......................................15

*PacifiCare Health Sys. v. Book,* 538 U.S. 401, 123 S. Ct. 1531, 155 L.Ed.2d 578 (2003) ...........34

*Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, (11th Cir. 1998) ................................29

*Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331 (11th Cir. 2016) ...............................................17

*PDC Labs, Inc. v. Hach, Co.*, 2009 WL 2605270 (C.D. Ill. Aug. 25, 2009)................................12

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S. Ct. 1801,
   18 L. Ed. 2d 1270 (1967)..............................................................................................15, 19, 26

*Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010)....................................................17, 19

*Riggs v. Palmer*, 115 N.Y. 506 (1889) .........................................................................................15

*Roby v. Corp. of Lloyd's,* 996 F.2d 1353 (2d Cir. 1993) ..............................................................12

*Ryan v. Delbert Servs. Corp.*, 2016 WL 4702352 (E.D. Pa. Sept. 8, 2016) .....................17, 21, 22

*Sanford v. Memberworks, Inc.*, 483 F.3d 956 (9th Cir. 2007) .........................................................7

*Saul v. Cahan*, 2014 NY Slip Op 51592(U), ¶ 7, 45 Misc. 3d 1214(A),
    999 N.Y.S.2d 798 (Sup. Ct.) ...................................................................................................16

*SBRMCOA, LLC v. Bayside Resort, Inc.*, 707 F.3d 267 (3rd Cir. 2013) ........................................7

*Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012) .............................................................6

*Schneider v. Kingdom of Thailand*, 688 F.3d 68 (2d Cir. 2012)....................................................32

*Senior Mgmt., Inc. v. Capps*, 240 F. App'x 550 (4th Cir. 2007) ...................................................19

*Shank/Balfour Beatty, a Joint Venture of M.L. Shank, Co., Balfour Beatty Constr. v.
    Int'l Bhd. of Elec. Workers Local 99*, 497 F.3d 83 (1st Cir. 2007)............................................18

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co.*,
    244 Cal. App. 4th 590 (2016) ...................................................................................................12

*Silgan Containers Corp. v. Sheet Metal Workers Int'l Ass'n, Local Union No. 2*, 820 F.3d 366
(8th Cir. 2016)...................................................................................................................................7

*Sirota v. Champion Motor Group, Inc.*, 849 N.Y.S.2d 426 (Sup. Ct. 2008) ...............................14

*Small Justice LLC v. Xcentric Ventures LLC*, 2015 WL 1431071 (D. Mass. Mar. 27, 2015).......12

Sourcing Unlimited, Inc. v. Asimco Int'l, Inc., 526 F.3d 38 (1st Cir. 2008) ................................. 34

*Spahr v. Secco*, 330 F.3d 1266 (10th Cir. 2003)............................................................................7

*Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002) ............................. 1, 8, 9

*Standardbred Owners Association v. Yonkers Raceway, Inc..*, 31 Msc. 2d 474
    (10th Dep't 1961)................................................................................................................12, 13

*Starke v. Gilt Groupe*, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) ...........................................11

*Stechler v. Sidley Austin Brown & Wood*, 382 F. Supp.2d 580 (S.D.N.Y. Apr. 5, 2005) ...........35

*St. Fleur v. WPI Cable Systems/Mutron*, 250 Mass. 345, 879 N.E.2d 27 (2008).........................27

*Strong v. Sheffield*, 144 N.Y. 392 (1985).....................................................................................25

*Swift v. Zynga*,  805 F.Supp.2d 904 (N.D. Cal. 2011) ..................................................................12

*Tepper Realty Co. v. Mosaic Tile Co.,* 259 F. Supp. 688 (S.D.N.Y. 1966) ..................................34

*Thompkins v. 23andMe, Inc.*, No. 5:13-cv-05682-LHK, 2014 WL 2903752), *aff'd*,
    840 F.3d 1016 (9th Cir. 2016) (N.D. Cal. June 25, 2014) ...........................................21

*Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995) .............32, 33, 34

*Tompkins v. 23andMe, Inc.*, 2014 WL 2903752 (N.D. Cal. June 25, 2014) ................................12

*Torres Major Auto Grp.*, 2014 WL 4802985 (E.D.N.Y. Sep. 25, 2014) ........................................5

*Town & Country Salida, Inc. v. Dealer Computer Servs., Inc.*,
    521 F. App'x 470 (6th Cir. 2013) ..................................................................................7

*United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960) ..........32

*Vargas v. Delivery Outsourcing, LLC*, No. 15-cv-03408-JST, 2016 WL 946112
    (N.D. Cal. Mar. 14, 2016) .............................................................................................20

Walker v. Collyer, 9 N.E.3d 854 (Mass. App. 2014) ...............................................................34

## Other

3 Richard A. Lord, *Williston on Contracts* § 7:7 (4th ed. 2013) ...................................................24

9 U.S.C. § 3 ..................................................................................................................................17

18 U.S.C. § 1962 ..........................................................................................................................27

18 U.S.C. § 1964 ....................................................................................................................27, 29

Georgia: O.C.G.A. § 13-8-3(b) ...................................................................................................32

Kentucky: KY. REV. STAT. § 372.040 .....................................................................................32

New Mexico: NEW MEXICO STAT. ANN. § 44-5-3 ...............................................................32

Restatement (Second) Of Contracts § 7 ......................................................................................14

South Carolina: S.C. CODE ANN. § 32-1-20 ............................................................................32

Tennessee: TENN. CODE ANN. § 29-19-105 ...........................................................................32

## I.   <u>INTRODUCTION</u>

Courts have provided a roadmap for companies to successfully bind individual consumers to arbitration clauses through online contracts of adhesion.  But FanDuel simply did not follow that clear roadmap, and therefore its attempt to compel Plaintiffs to arbitration fails under both longstanding, black-letter contract law and application of that law to modern online consumer transactions.  Under New York law, FanDuel has the burden of showing that it formed a contract with Plaintiffs.  Specifically, FanDuel has the burden to show "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms" by Plaintiffs.  *Meyer v. Kalanick*, 2016 WL 4073071, *1 (S.D.N.Y. July 29, 2016) *quoting Specht v. Netscape Communications Corp*., 306 F.3d 17, 35 (2d Cir. 2002).  These cases show how FanDuel's display of hyperlinks, sign-in buttons and page layout are fatal to contract formation in website adhesion contracts.

Finding that no contract exists ends the analysis and justifies denial of FanDuel's Motion.  However, even if the Court determines a contract was formed, it still must find the arbitration agreement unenforceable.  Plaintiffs did not clearly and unmistakably manifest assent to delegate decisions to the arbitrator, therefore the question of whether the arbitration agreement itself is valid and enforceable is for this Court.  Here, the arbitration agreement is invalid under long-standing contract principles and Supreme Court exceptions to arbitration clause enforcement: the arbitration agreement is illusory, prevents Plaintiffs from effectively vindicating federal substantive statutory rights, is in furtherance of a fraudulent scheme, and was fraudulently induced.

Accordingly, this Court must deny FanDuel's Motion.

## II.      FACTUAL BACKGROUND

**A.      FanDuel's Sign-Up Process and Terms of Use**

FanDuel and co-defendant DraftKings, Inc., ("DraftKings") are the primary companies offering Daily Fantasy Sports ("DFS") contests, where consumers compete against each other for cash prizes based on the individual performances of professional athletes in professional baseball, football and basketball games.  *See* Plaintiffs' First Amended Master Complaint ("FAMC"), DE#269, at ¶¶ 142-46.

FanDuel cannot establish the facts supporting its most basic threshold burden:  formation of a contract with Plaintiffs.  FanDuel seeks to enforce its Terms of Use containing an arbitration provision.  In order to register for FanDuel, Plaintiffs filled out basic information and clicked a "Play Now" button during the sign-up process.  *See* FanDuel's Motion at pg. 8.  In its Motion, FanDuel states that during this process the "phrase 'Terms of Use' [*sic*][1] is in bold font and hyperlinks, with a click of the mouse, directly to FanDuel's full Terms of Use, which make clear that by agreeing to the Terms, the player also agrees to arbitrate any disputes against FanDuel." FanDuel's Motion at pg. 8.  FanDuel carefully chose to use "hyperlinks" as a verb, and not indicate that the Terms of Service itself is a "hyperlink."  This is because it is not a hyperlink in the usual manner:  hyperlinks are typically underlined and/or in blue, like the other hyperlinks FanDuel used on the exact same screen:  "Got a Promo code or referral username?" and "Log in instead."

---

[1] The phase as captured on the webpage in Plaintiffs' Complaint is actually "Terms of Service".  FAMC at ¶484.

In addition, users could complete all of their information and click "PLAY NOW" without ever seeing what is below the "PLAY NOW" button or indicating that they did so. As discussed below, the way FanDuel presented its Terms of Use to users is fatal to FanDuel's contract formation argument under clear Second Circuit precedent.

FanDuel also seems to enforce the arbitration clause against two groups of Plaintiffs that did not actually use FanDuel's website and therefore are not subject to any agreement: "Family Member Plaintiffs" and "DraftKings Plaintiffs." Family Member Plaintiffs are household members of Plaintiffs who are entitled to recover under various state statutes for gambling losses incurred by a member of their household. See FAMC at ¶¶ 499-507. DraftKings Plaintiffs are players of DraftKings who did not play on FanDuel but who played against FanDuel employees in DraftKings contests, were targeted on DraftKings or otherwise were harmed by DraftKings and FanDuel's concerted action. *Id*. at ¶¶ 660-665.

## B.       FanDuel's Use of Arbitration Clause to Further Fraudulent Scheme

Fraud permeated FanDuel's growth.  FanDuel makes money from a fee - also known as the "rake" - that it takes from the entry fee each consumer pays to enter a contest.  *Id.* at ¶ 143. These fees, less the rake, are pooled together, and the winners are paid from these pools.  *Id.* at ¶ 144.  Beginning in 2014, FanDuel ran television, radio, internet and other advertising in order to attract players, including Plaintiffs.  *Id.* at ¶ 147.  In these advertisements, FanDuel made representations that its product was a 100% legal, easy game of skill that anyone could win, and that FanDuel would give away free bonus money to match anyone's initial deposit.  *Id.* at *e.g.*, ¶¶ 1, 5, 173, 177-78, 205-225, 266-276.  None of these representations were true, and FanDuel was aware that they were untrue.  *Id.* at *e.g.*, ¶¶ 1, 18, 22, 23, 277-283, 310-385.

There was a reason why it made these misrepresentations:  FanDuel needed less-skilled players to keep the better players, who entered more contests and therefore generated more rake, in the game.  *Id.* at *e.g.*, ¶¶ 10-14, 296-97, 345-49.  FanDuel's CEO Nigel Eccles admitted that its "marketing strategy is more about players than the mass market can identify with rather than 'Play the Pros.'"  *Id.* at ¶ 10.  Eccles further admitted that FanDuel analyzed the best way to help the players who provide the most entry fees to FanDuel win more profits, and that FanDuel determined that bringing in new, inexperienced players unlikely to win would be better for those players than reducing FanDuel's fees.  *Id.* at ¶ 11.  FanDuel then chose to spend hundreds of millions of dollars on misleading advertising that misrepresented its product over cutting its own fees.  *Id.* at ¶¶ 13-14.  At the same time it was telling consumers that anyone could win by misrepresenting the professional DFS players in its ads were actually amateurs, FanDuel knew - and was telling its investors - that only the top .1% of players actually win.  *Id.* at ¶¶ 14-17.

FanDuel also omitted material facts from consumers, such as its concerted agreement with DraftKings to allow each company's employees to profit by entering contests against

customers.  FanDuel employees used inside information to play contests on DraftKings, with DraftKings approval, and DraftKings employees played on FanDuel using inside information with FanDuel's approval.  *Id.* at ¶¶ 386-432.  This included using confidential data to give the employees an edge, even to the point of identifying FanDuel's worst players, figuring out their identities on DraftKings, and challenging them in one-on-one contests because it was easier to beat them.  *Id.* at ¶¶ 415.  FanDuel's employee policy noted that FanDuel employees had been "targeting weak users as opponents on other sites."  *Id.* at ¶ 415.  FanDuel omitted these material facts from consumers, as well.  *Id.* at ¶ 23.

In sum, FanDuel spent hundreds of millions of dollars on advertising to intentionally deceive consumers about its product in order to benefit a small slice of customers that produced the most revenue for FanDuel.  FanDuel then acted in concert with its primary competitor to allow employees to use inside information to further defraud its own customers on each other's websites.  As discussed below, FanDuel's purported arbitration agreement was in furtherance of this fraudulent scheme through concerted activity with DraftKings, and therefore unenforceable.

Under these facts, FanDuel cannot meet its burden to compel arbitration against any Plaintiff.

### III.    ARGUMENT

### A.    Fanduel Bears Burden of Proving to this Court a Valid Contract Formed with Plaintiffs

FanDuel's motion to compel arbitration is treated as a summary judgment motion and can only be granted "if there is no genuine issue of material fact as to the making of the arbitration agreement."  *Torres Major Auto Grp.*, 2014 WL 4802985 (E.D.N.Y. Sep. 25, 2014) (Garaufis, J.) (internal citation omitted).  As a result, "allegations related to the question of whether the parties formed a valid arbitration agreement" are evaluated to determine "whether they raise a

genuine issue of material fact that must be resolved by a fact-finder at trial." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012). While the party opposing arbitration shoulders the burden of proving its defense, "a district court should give [] the benefit of all reasonable doubts and inferences that may arise [to the party opposing arbitration on the ground that no agreement to arbitrate has been made]." *Mazza Consulting Group v. Canam Steel* Corp., 2008 WL 1809313, at \*1 (E.D.N.Y. Apr. 21, 2008) (Garaufis, J.) (internal citation omitted). Additionally, although "doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 526 (2d Cir. 2011).

Whether or not the parties have agreed to arbitrate is a question of state contract law. *Schnabel*, 697 F.3d at 119 (internal citations omitted); see also *Adams v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005) ("When contract formation is at issue in an FAA case, we generally apply state-law principles."). The parties have stipulated that New York law applies to the interpretation of the FanDuel contract. Stipulation ¶ 6, ECF No. 283 (filed Sept. 28, 2016). The FanDuel Terms of Use do not specifically refer to or incorporate the FAA as the governing statute, and specifically state that New York law should apply. *See* Terms of Use at 15.7 ("The Terms and the relationship between you and FanDuel shall be governed by the laws of the State of New York without regard to conflict of law provisions.").

Plaintiffs' contract formation challenges are for the Court, not the arbitrator. As noted by the Second Circuit, "it is well settled that a court cannot compel arbitration until it first resolves 'the question of the very existence' of the contract embodying the arbitration clause." *Bank of Am., N.A. v. Diamond State Ins. Co*., 38 Fed. Appx. 687, 688 (2d Cir. 2002) quoting *Interocean*

*Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972).   The Supreme Court has held that "where the dispute at issue concerns contract formation, the dispute is generally for the courts to decide."   *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010).   The proponent of arbitration in that case relied, as does FanDuel (*see* FanDuel's Motion at 15), on *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440 (2006), but the *Granite Rock* Court distinguished that case on the ground that "the formation of the parties' arbitration agreement was not at issue …." *Granite Rock Co*, 561 U.S. at 300.

Thus, relying on *Granite Rock*, the First Circuit has stated that the presumption of arbitrability "is utilized only where an arbitration agreement is 'validly formed and enforceable' under state law ...."   *Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 6 n. 2 (1st Cir. 2012).   790 F.3d 90, 97, fn.7;  *see also Cullinane v. Uber Techs., Inc.*, 2016 WL 3751652, at *4 (D. Mass. July 11, 2016) ("[I]f the contract containing the arbitration agreement was never binding on the plaintiffs, the arbitration clause cannot be enforced against them")*; Nat'l Fed'n of the Blind v. Container Store, Inc.*, 2016 WL 4027711, at *8 (D. Mass. July 27, 2016) ("questions regarding the formation or existence of a contract that contains an agreement to arbitrate is a gateway question for the court")*.*   The Second Circuit has cited *Granite Rock* for this proposition in *Applied Energetics, Inc., v. Newoak Capital Mkts, LLC*, 645 F.3d 522, 526 (2d Cir. 2011) [2] (*citing Granite Rock* at 288).

---

[2]Other courts of appeal agree.  *See  SBRMCOA, LLC v. Bayside Resort, Inc.*, 707 F.3d 267, 274 (3rd Cir. 2013) ("[R]elevant distinction is between challenges to a contract's validity, which are arbitrable, and challenges to a contract's formation, which generally are not."); *Town & Country Salida, Inc. v. Dealer Computer Servs., Inc.*, 521 F. App'x 470, 474 (6th Cir. 2013) (rejecting defendant's argument, based on *Granite* Rock); *Janiga v. Questar Capital Corp*., 615 F.3d 735, 742 (7th Cir. 2010) ("court must decide whether a contract exists"); *Silgan Containers Corp. v. Sheet Metal Workers Int'l Ass'n, Local Union No. 2*, 820 F.3d 366, 369 (8th Cir. 2016) (arbitration award vacated based on *Granite Rock*); *Sanford v. Memberworks, Inc.*, 483 F.3d 956, 962–64 (9th Cir. 2007) (challenge to whether contract was concluded must be determined by court); *Spahr v. Secco*, 330 F.3d 1266, 1268, 1272–73 (10th Cir. 2003) (courts hear a challenge to the whole contract based on the claim that the signor did not have mental capacity to sign).

**B.      No Contract was Formed Between Plaintiffs and Fanduel**

**1.  FanDuel's "Sign-In Wrap" was Insufficient to Form a Binding Contract**

To form a binding contract, FanDuel must prove the presence of "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms." *Meyer v. Kalanick*, 2016 WL 4073071 at *1, *quoting Specht v. Netscape Communications Corp.*, 306 F.3d at 35.  FanDuel cannot meet this burden, and therefore it cannot compel arbitration against Plaintiffs.  Its attempt to enforce an arbitration clause contained in its Terms of Service that it contends users agreed to when signing up for FanDuel's website is blatantly insufficient.

In *Meyer*, the court recently summarized the current state of online arbitration agreements in denying a motion to compel arbitration by Uber.  Regarding the right to jury trial, it stated: "This most precious and fundamental right can be waived only if the waiver is knowing and voluntary, with the courts 'indulg[ing] every reasonable presumption against waiver.'" *Id.* at *1-2 (citations omitted).[3]  The court termed the conclusion that ordinary consumers have waived the right to jury trial by agreeing to lengthy "terms and conditions" on the internet a "legal fiction" that was "sometimes justified." *Id.* at 2.  But, quoting then-Circuit Judge Sotomayor, the court added, "Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Id.* at *3 (*quoting Specht v. Netscape Communications Corp.*, 306 F.3d 17, 35 (2002)).

*Meyer* went on to discuss the different methods websites use to bind users to their terms and conditions, such as "browsewrap" and "clickwrap." *Id.* at *5-*6.  FanDuel uses "sign-in

---

[3] Uber has appealed this order, but the court's discussion and analysis of internet agreements is well-reasoned and persuasive on a number of issues, and collects the current state of the law involving online user agreements.

wrap," "[a] questionable form of internet contracting ...." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399 (E.D.N.Y. 2015). "Sign-in wrap couples assent to the terms of a website with signing up for use of the site's services." *Id.* at 395. Courts that uphold it only do so where there is "an effective opportunity to access terms and conditions." *Id.* at 400.

As *Meyer* noted, whether internet users agreed to arbitrate their claims 'turns more on customary and established principles of contract law than on newly-minted terms of classification.'" *Meyer,* 2016 WL 4073071 at *6 (citations omitted). *Meyer* followed then-Judge Sotomayor's standard, "whether plaintiff ... had '[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms." *Meyer*, 2016 WL 4073071 at *6 (*quoting Specht*, 306 F.3d at 35).

Factors to be considered include the location of the link on the screen, the size of the text relative to other information, the relative importance of the other information on the screen, and – of special significance here – the conspicuousness of the link to the terms of service. Remarkably, Uber's sign-in used much the same method and general layout as FanDuel's here:

- The consumer did not need to click on a box stating "I agree."

- The license terms did not "appear on the screen in view of the user."

- The hyperlink to the Terns of Service was not prominently displayed.

- Other information on the page was more prominently displayed than the link to the Terms of Service.

- The sign-in button was placed above the link to the Terms of Service.

*Id.* at *8; *see also Berkson*, 97 F.Supp. 3d at 373-74, 403-04. In light of these factors the court ruled that there was no contract. *Id.*

The same factors are present here. When one clicked on the "JOIN NOW" box on FanDuel's home page it brought up a window titled, "Create Your Account." That window,

reproduced in Sec. II.A above, did not include a box where users had to click "I agree", did not include the text of the Terms of Service on the screen, put the words "Terms of Service" (the link to the terms) below the "Play Now" button, and did not prominently display the statement that "Joining confirms you're 18+ years of age and that you agree to our **Terms of Service**" (indeed the statement was in tiny and even faint type). *See* FAMC at ¶484. The sign-in window cited by Plaintiffs does not make clear that "clicking Play Now" is what binds the user - it says "Joining" binds the user.[4]  Perhaps worst of all, FanDuel used a different format for the link to "Terms of Service" than it used for the other hyperlinks in the pop-up window. Those other, more obvious hyperlinks – "Got a Promo code or referral username?" and "Already have an account?  Log in instead." – were in blue, the color all internet users recognize as a hyperlink to another page. But inexplicably, the hyperlink to the "Terms of Service" was the same color as the surrounding text, black.      Contrast    that    with    the    way    Google    familiarly    does    it: https://www.google.com/#q=FanDuel+terms+of+service.  Its link is blue, and its non-linked text is black, either normal or bolded. Why would FanDuel put some links in blue and others in black unless it was trying to obscure that the black text was a link?

And compare FanDuel's "PLAY NOW" button and sign-on page with the one found insufficient to create a contract in *Berkson* (the text box and circling are the court's):

---

[4] Even FanDuel's proffered sign-in page during the time period covering Plaintiffs and the class shows the disconnect between the "Play Now" button and what users are doing:  "By signing up, you confirm that you are at least 18 years of age and agree to the Terms of Use" (*See* FanDuel's Motion at Ex. 1A).



*Id.* at 374.   The court found that this "design and content…did not make the 'terms of use'

readily and obviously available" to the plaintiff because, as is the case here, the hyperlink to the

Terms of Use was less prominent and user friendly than the SIGN IN button (the equivalent of

the "Play Now" button in FanDuel's case).   *Id.* at 404.   But what is striking is that the link in

*Berkson* is more prominent than FanDuel's.   It is in blue and appears above the "Sign In" button.

If there was no contract in *Berkson*, then surely there is no contract here.

In the face of all this, FanDuel relies on two cases involving sign-in wrap agreements,

*Starke v. Gilt Groupe*, 2014 WL 1652225, at *2 (S.D.N.Y. Apr. 24, 2014), and *Fteja v.*

*Facebook, Inc.*, 841 F. Supp. 2d 829 (S.D.N.Y. 2012) (*see* FanDuel Motion at 9).   But those

cases were specifically distinguished by *Berkson,* 97 F.3d at 401, and they are also inapposite

here.   In *Fteja*, the court found that the hyperlink was so clearly shown that a user "would

understand that the hyperlinked phrase "Terms of Use" is really a sign that says "Click Here for

Terms of Use."   *Fteja* 841 F. Supp. 2d at 839.   In *Starke*, the notice was even clearer.   "When

Starke clicked 'Shop Now,' he was informed that by doing so, and giving his email address, 'you

agree to the Terms of Membership for all Gilt Groupe sites.'   *Starke,* 2014 WL 1652225, at *3.

Neither of these companies obscured the hyperlink as FanDuel did, either through font and style or location.

FanDuel's other cases have nothing to do with the issue before the Court because they involved paper contracts signed by sophisticated commercial parties. *See FanDuel Motion at 8, citing Cowen & Co. v. Anderson*, 558 N.E.2d 27, 28 (N.Y. 1990) (brokerage firm and employee broker), *Roby v. Corp. of Lloyd's,* 996 F.2d 1353 (2d Cir. 1993) (British insurance company and insurance brokers) and *Express Indus. & Terminal Corp. v. N.Y. State DOT*, 715 N.E.2d 1050 (N.Y. 1999) (Merchants and state agency).[5]

FanDuel's Motion accordingly fails for this reason alone: there was never a contract formed between Plaintiffs and FanDuel.

## 2.   The Contract was Void at Formation for Illegality under New York Law

Because FanDuel's contests were illegal when Plaintiffs purportedly agreed to the Terms of Use, those Terms are void and were never formed as a matter of law.  Because New York law applies, whether an arbitration clause found in an illegal contract is void, and therefore never formed, is determined by this Court, not the arbitrator.  *See, e.g., Standardbred Owners Association v. Yonkers Raceway, Inc.*, 31 Misc. 2d 474, 475 (Sup. Ct. 1961), *Al-Sullami v. Broskie*, 40 A.D.3d 1021 (2d Dep't 2007); *see also Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co.*, 244 Cal. App. 4th 590, 604 (2016)[6].  In *Sheppard*, a party seeking to vacate an arbitral award "challenged the entire Agreement—rather than just a portion" as

---

[5] FanDuel's citations in fn. 11, pg. 9, are also inapplicable.  *Small Justice LLC v. Xcentric Ventures LLC* involved a copyright dispute, not an arbitration clause, and had the entire Terms in scrollable format and a checkbox "clickwrap" format.  2015 WL 1431071 (D. Mass. Mar. 27, 2015).  *Tompkins v. 23andMe, Inc.*, also involved a clickwrap agreement, not sign-in wrap like here.  2014 WL 2903752 (N.D. Cal. June 25, 2014).  The website in *Swift v. Zynga* included a "blue hyperlink" unlike here, and the agreement language is more clearly demarcated than here.  805 F.Supp.2d 904, 908 (N.D. Cal. 2011).  Finally, *PDC Labs, Inc. v. Hach, Co.*, involved two sophisticated parties, not online consumer contracts of adhesion like here.  2009 WL 2605270 (C.D. Ill. Aug. 25, 2009).
[6] The Supreme Court of California recently granted review in this case.  While *Sheppard* is not controlling and has no precedential value, its rationale is persuasive where, like here, state law and not the FAA specifically applies.

unenforceable on the ground that it violated the public policy of California. *Id.* at 604-05. The court held that, because the "parties … agreed that their arbitration agreement will be governed by California law," as opposed to the FAA, cases such as *Buckeye Check Cashing, Inc. v. Cardegna* "applying the FAA … are not controlling here." *See id.* at 605-06. California law, much like New York's, provides that "a challenge to the legality of an entire contract that contains an arbitration provision must be determined by the trial court, not the arbitrator. The power of the arbitrator to determine rights under a contract is dependent upon the existence of a valid contract under which this right might arise, and the question of the validity of the basic contract is essentially a judicial question, which cannot be finally determined by an arbitrator." *See id.*

Similarly, it has long been the law in New York that courts should decide whether a contract with an arbitration clause is void as illegal. *See, e.g., Standardbred Owners Association v. Yonkers Raceway, Inc.*, 31 Misc. 2d at 475 ("[W]hile it is true that arbitrators are sometimes somewhat illogically allowed to determine the validity of the very contract on which their own status depends, this is not so when the contract is challenged on the ground of illegality in that its performance is violative of a statute or of the public policy of the State."). This is still the law in New York, where other courts have held that, where its particular state arbitration statutes apply, a court must deny a defendant's motion to compel arbitration where an arbitration clause is found within an illegal contract. *See, e.g.*, *Al-Sullami v. Broskie*, 40 A.D.3d 1021 (2d Dep't 2007) ("[I]t is undisputed that the appellants did not possess the requisite license for a home improvement contractor [and a]ccordingly, the Supreme Court properly denied the appellants' motion … pursuant to CPLR 7503 to compel arbitration in accordance with a construction contract the defendant … entered into with the plaintiffs to renovate their home."); *accord*

*Greenberg v. SNA Consultants, Inc.,* 55 A.D.3d 418 (2008) (holding that an arbitration clause within an "interior design" services agreement was void where the agreement as a whole was unenforceable because the "interior design" actually constituted the unauthorized practice of architecture, and further holding that this was a question to be determined by the court, not the arbitrator).

Regardless of whether the FAA applies, under New York law, a contract with an illegal subject matter and/or that is against public policy is considered void and therefore never formed. *Sirota v. Champion Motor Group, Inc.,* 849 N.Y.S.2d 426, 430 (Sup. Ct. Kings County 2008) ("It is well settled that a contract which violates a prohibitory statute or which cannot be performed without violation of that statute is an unlawful undertaking and is illegal, void, and unenforceable.") (citations omitted).  Unlike a contract that is voidable - and therefore may be for the arbitrator to decide - a contract that is *void* was never a contract at all because the parties are not, and cannot be, bound by its terms.  *See Dalessio v. Kressler,* 6 A.D.3d 57, 61, 773 N.Y.S.2d 434, 436-37 (2d Dept. 2004) ("In the case of fraud in the factum, the maker is induced to sign something entirely different than what he thought he was signing. The instrument is 'void ab initio.' However, fraud in the inducement renders the obligation voidable based upon facts occurring prior or subsequent to its execution.") (citations omitted); *see also* Restatement (Second) Of Contracts § 7 cmt. a ("[A void contract] is not a contract at all.").

The FanDuel DFS game was illegal gambling in New York at the time of formation of the alleged contract.  In a cease and desist letter to FanDuel, the New York Attorney General wrote:  "Our review concludes that FanDuel's operations constitute illegal gambling under New York law . . ." and New York State Constitution.  *See* FAMC at ¶¶ 330-332.  The Hon. Manuel Mendez of the Supreme Court of New York then found that FanDuel and DraftKings were

14

operating illegal gambling games under New York law.  *See* FAMC at ¶ 333.[7]  Thus, FanDuel's arbitration clause purports to be an agreement to arbitrate disputes arising from illegal gambling activities on the FanDuel website.  This applies to any delegation clause FanDuel seeks to enforce as well.  *See e.g.*, *Harris v. Economic Opportunity Comm'n*, 171 A.D.2d 223 (2d Dept. 1991) (court refused to allow holder of winning raffle ticket to receive prize as lottery violated New York law).  The purpose of the FAA was "to make arbitration agreements as enforceable as other contracts, *but not more so*."  *Opals on Ice Lingerie v. Body Lines Inc.*, 320 F.3d 362, 369 (2d Cir. 2003) (emphasis in original) (*quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967)).

"It is the settled law of [New York] State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose."  *Braunstein v. Jason Tarantella, Inc.*, 87 A.D.2d 203, 207, 450 N.Y.S.2d 862, 865 (App. Div. 1982).  Thus, the original contract was never formed and FanDuel cannot carry it out now by enforcing an arbitration agreement.  New York law has long stood for the proposition that "No one shall be permitted to . . . take advantage of his own wrong, or to found any claim upon his own iniquity . . . These maxims are dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere been superseded by statutes."  *Carr v. Hoy*, 2 N.Y.2d 185, 187 (1957) *quoting Riggs v. Palmer*, 115 N.Y. 506, 511 (1889).  The Court should not assist FanDuel in carrying out its illegal enterprise, that is, enforce a void *ab initio* contract to arbitrate claims for fraudulent activity in the context of defendants' illegal gambling scheme.

---

[7] The New York Legislature ultimately changed New York law to allow DFS, but this was well after Plaintiffs first signed up for FanDuel.

### 3.   The Terms of Use are Illusory and Therefore there was No Consideration

FanDuel had the option to perform or not perform at will, and therefore FanDuel's Terms of Service are illusory and formed no contract.  For example, "Modification of Terms of Use" provides that except for the arbitration clause, FanDuel reserved the right, at its sole discretion, to modify the Terms of Use at any time (and any use of the website following modification purportedly constituted acceptance of the modified terms).  *See* FanDuel's Motion at Exhibit 1C at Section 4.  In another section, "Conditions of Participation," FanDuel asserted that it and any partners are not responsible for any . . . failures . . . or for any reason whatsoever . . ."  *Id*. at Section 7.  In the section "Indemnity" FanDuel attempts to get a complete waiver:  "By using FanDuel service  . . . you agree to release and hold harmless FanDuel . . . from any and all liability, claims or actions of any kind whatsoever . . ."  *Id.* at Section 9.  Similarly, in "Limitation on Liability," FanDuel seeks to eliminate any damages from any conduct:  "You understand and agree that FanDuel shall not be liable to you for any . . . damages. . ."  *Id*.  Even if Plaintiffs successfully arbitrated a claim, FanDuel could choose not to pay the judgment, meaning FanDuel has not bound itself to anything.

Such provisions effectively allowed FanDuel to perform or not perform as it wished.  If one of the parties to the contract "is free to perform it or not, as he wills, [the contract] is illusory, and will not be enforced."  *Ivor B. Clark, Inc. v Boston Rd. Shopping Ctr., Inc*., 24 Misc 2d 84, 89, 207 N.Y.S.2d 582 (Sup. Ct. N.Y. County 1960); *Saul v. Cahan*, 2014 NY Slip Op 51592(U), ¶ 7, 45 Misc. 3d 1214(A), 999 N.Y.S.2d 798, 798 (Sup. Ct. Kings County 2014).  Such an illusory contract is no contract at all, and therefore the Terms of Use did not create a binding contract.

### C.      The Delegation Clause is Unenforceable

#### 1.      Plaintiffs Challenge the Delegation Clause in Response to FanDuel's Motion

FanDuel argues that, because the Complaint did not challenge its purported delegation clause, it must be accepted as valid.  FanDuel's Motion at 14.  But Plaintiffs are challenging it where they are required to, right here in their opposition brief.  (And if the Court were to agree with FanDuel, presumably it would give Plaintiffs the opportunity to amend.)   Contrary to FanDuel's argument, *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010), did not hold that "the plaintiff must plead a separate and distinct challenge to the arbitration clause or delegation clause in the complaint."  *Ryan v. Delbert Servs. Corp.*, 2016 WL 4702352, at *5 n.8 (E.D. Pa. Sept. 8, 2016) (quotation marks and text alterations omitted).  "The topic of arbitration usually does not arise until a defendant moves to compel arbitration after the suit is filed, *see* 9 U.S.C. § 3, at which time the plaintiff may then address the validity of the delegation clause in a brief."  *Id.*

Indeed, *Rent-A-Center* itself addressed arguments in an opposition brief.  *See* 561 U.S. at 72 ("Nowhere in his opposition to Rent-A-Center's motion to compel arbitration did he even mention the delegation provision."); *see also Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331, 1335 n.1 (11th Cir. 2016) ("Because *Parm* directly challenged the delegation clause in her opposition to the motion to compel, there is no waiver ....") (citation omitted); *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1002 (9th Cir. 2010) ("[W]e look not only to the complaint, but to Plaintiffs' motion papers ....").

#### 2.      FanDuel cannot Show Clear and Unmistakable Evidence of Delegation

The Supreme Court has made clear that courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clea[r] and unmistakabl[e] evidence that they did so."

*First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quotation marks omitted; text alterations in original).   "[S]ilence or ambiguity on the 'who should decide arbitrability' point" favors judicial resolution.   *Id.* at 945.   "In this circuit, the clear and unmistakable evidence standard is a high one."   *Shank/Balfour Beatty, a Joint Venture of M.L. Shank, Co., Balfour Beatty Constr. v. Int'l Bhd. of Elec. Workers Local 99*, 497 F.3d 83, 89 (1st Cir. 2007) (quotation marks omitted).

While FanDuel included actual language related to delegation, unlike DraftKings' Terms of Use that included nothing whatsoever related to delegation, FanDuel's language still fails within the context of the entire agreement because it conflicts with the Terms of Use's severability clause.   Moreover, the delegation clause is unenforceable under basic contract law principles.   Notably, in the Terms of Use itself, the delegation language is not highlighted, bolded or otherwise clearly demarcated.   *See* Terms of Use at Section 15.   However, in its brief, FanDuel goes to great length to make the language clearer than that around it, bolding and highlighting it for the Court's review.   *See* FanDuel's Brief at 15.   How are consumers expected to clearly and unmistakably agree to a provision that is so difficult to read that FanDuel must take effort to draw attention to it in its brief?

### 3. Incorporation of Delegation Provision Impermissibly Conflicts with Other Provisions Giving Court Authority

#### a. *Arbitration Provision should be Evaluated in Context of the Terms of Use Despite a Severability Clause*

The severability rule does not require the Court to treat the arbitration provision and delegation clause as distinct contracts, separate from the remainder of the Terms of Use, despite FanDuel's assertions to the contrary.   It is concerned only with whether a court may properly adjudicate a challenge to the enforceability of an arbitration provision or delegation clause.   A

court may consider a challenge to those provisions, but not when made as part of a non-specific challenge to the agreement as a whole.  Thus, in *Rent-A-Center*, the Court stated:  "[U]nless Jackson challenged the delegation provision specifically, we must treat it as valid under § 2 [of the FAA], and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator."  561 U.S. at 72.  "*All that matters* is whether the party seeking to present the issue to a court has brought a discrete challenge to the validity of the arbitration [provision or delegation] clause."  *Id.* at 84 (emphasis added; quotation marks, citation, and text alteration omitted).  That is exactly what Plaintiffs are doing, challenging the supposed delegation provision, as discussed in the previous section and the next one.

What the severability rule does *not* require is that the Court treat the arbitration provision and delegation clause as distinct contracts, viewed in isolation from the rest of the Terms of Use's provisions. *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 454 (6th Cir. 2005) ("If arbitration clauses cannot be considered 'independent contracts' when examining contractual formation issues, like mutuality or consideration, how much more so should such provisions *not* be considered 'separate contracts' when examining other enforceability issues."). *See also Newton v. Am. Debt Servs., Inc.*, 549 F. App'x 692, 694 n.2 (9th Cir. 2013) ("[P]rovisions outside the specific arbitration clause may be considered in determining whether an arbitration agreement is unconscionable if those provisions 'as applied' to the arbitration clause render it unconscionable.") (quoting *Rent-A-Center*, 561 U.S. at 74); *In re Checking Account Overdraft Litigation*, 685 F.3d 1269, 1280 (11th Cir. 2012) (applying a cost-and-fee-shifting provision to find unconscionable an arbitration provision in a separate section of the agreement); *Senior Mgmt., Inc. v. Capps*, 240 F. App'x 550, 553 (4th Cir. 2007) ("Plaintiffs' assertions to the contrary, *Prima Paint Corp.* v. *Flood & Conklin Mfg.*, 388 U.S. 395 (1967)] does not stand for

the proposition that the district court may look to an arbitration provision in isolation[.]").

Accordingly, the Court may consider how the delegation clause and arbitration provision interact with the rest of the Terms of Use when evaluating their enforceability.

### b.     Conflict with Severability Provision Undercuts FanDuel's Characterization of Delegation as Clear and Unmistakable

FanDuel's assertion that the delegation clause is clear and unmistakable is undercut by the conflicts this would create with the severability clauses.  In *Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002) (per curiam; Parker, Straub, Sotomayor, JJ.), the Court concluded that a delegation clause was not "clear and unmistakable" where another provision assigned certain decisions not to the arbitrator, but to an accountant.  The court stated:  "We find the presence of both these clauses creates an ambiguity, which, under *First Options*, requires us to assign questions of arbitrability to the district court, not the arbitrator."  *Id.; see also Money Mailer, LLC v. Brewer*, No. 15-cv-1215RSL, 2016 WL 1393492, at *2 (W.D. Wash. Apr. 8, 2016) ("The Washington Addendum therefore leaves the impression that a Washington franchisee has recourse to the courts in at least some cases, further supporting the conclusion that there is not clear evidence that the question of arbitrability is delegated to the arbitrator."); *Vargas v. Delivery Outsourcing, LLC*, No. 15-cv-03408-JST, 2016 WL 946112, at *6 (N.D. Cal. Mar. 14, 2016) ("The delegation clause itself does clearly state that the threshold question of arbitrability is to be delegated to the arbitrator.  Taken as a whole, however, the Agreement is ambiguous. The very same paragraph also provides, 'If any provision of this Agreement or portion thereof is held to be unenforceable *by a court of law or equity*, said provision or portion thereof shall not prejudice the enforceability of any other provision or portion of the same provision . . . .'  This language is necessary only if questions concerning arbitrability are *not* resolved by the arbitrator. Other courts analyzing similar conflicts as the one here—an unambiguous delegation clause

contradicted by another provision of the contract—have declined to enforce the delegation clause.") (emphasis in original); *Cobarruviaz v. Maplebear, Inc.*, No. 15-cv-00697-EMC, 2015 WL 6694112, at *5 (N.D. Cal. Nov. 3, 2015) ("[T]he language of the purported delegation clause [in Section 7.1] is not clear and unmistakable . . . . While in isolation this language may appear to be clear, it is inconsistent with the severability clause in Section 10.").

The same inconsistency is present here.  While the purported delegation clause assigns to the arbitrator the "exclusive authority" to determine the enforceability of the provisions in the Terms of Use (FanDuel's Motion at Ex. 1C § 15), the agreement also contains a severability clause that assigns the same authority to a court:  "If any provision of the Terms is found by a *court* of competent jurisdiction to be invalid . . ." (*Id.* § 16).  The severability clause in later versions of the agreement is just as confusing because it assigns that authority to both a court and an arbitrator.  *See* FanDuel's Motion at Ex. 1D, § 18.2.  As in the cases cited above, the language from the severability clause invokes the authority of the court and is thus inconsistent and in considerable tension with the language in the delegation clause.[8]  Accordingly, the delegation clause is not clear and unmistakable.  Moreover, even if there were no conflict, "a delegation provision like this one, scattered among other contract boilerplate, is not the sort of 'clear and unmistakable' evidence that *First Options* requires."  *Ryan*, 2016 WL 4702352, at *3 n.6.

---

[8] This same argument applies to any delegation provision incorporated from the AAA commercial rules. Incorporating a delegation provision from the AAA rules is not appropriate in the world of online click-through consumer agreements.  *See Ingalls v. Spotify USA, Inc.*, No. 16-cv-03533 WHA, 2016 WL 6679561, at *4 (N.D. Cal. Nov. 14, 2016) ("In the absence of binding authority and with the benefit of a consistent trend of persuasive authority, this order finds that the parties, which included two ordinary consumers who could not be expected to appreciate the significance of incorporation of the AAA rules, did *not* clearly and unmistakably intend to delegate the issue of arbitra[bility] to an arbitrator.") (emphasis in original); *Thompkins v. 23andMe, Inc.*, No. 5:13-cv-05682-LHK, 2014 WL 2903752, at *11 (N.D. Cal. June 25, 2014), *aff'd*, 840 F.3d 1016 (9th Cir. 2016) ("There is good reason not to extend this doctrine from commercial contracts between sophisticated parties to online click-through agreements crafted for consumers.  While incorporation by reference is generally permissible under ordinary contract principles, incorporation of the AAA rules does not necessarily amount to 'clear and unmistakable' evidence of delegation, particularly when the party asked to accept the agreement is a consumer.") (citation omitted).

### 4.   The Delegation Clause is Unenforceable Under General Contract Principles

The delegation clause is also unenforceable as a matter of basic contract law.  As discussed above, FanDuel's sign-in wrap process did not make any terms, including the delegation clause, reasonably conspicuous or available to Plaintiffs and did not successfully form any agreement.  But even if Plaintiffs clicked on the words "Terms of Service" and were taken to the page called "Terms of Use," the purported delegation clause is buried at the end of the first sentence of a three-sentence paragraph, the fourth paragraph of a 12-paragraph section, on page 12 of a 14-page purported agreement.  *See* FanDuel's Motion at Ex. 1C, p. 12.  It is not separately labeled, highlighted or bolded.

The court in *Ryan* analyzed a four-page loan agreement with a delegation clause that was "obscured among ten paragraphs of boilerplate" (2016 WL 4702352 at *5.), like the delegation clause here, except that FanDuel's was buried in a lot more paragraphs than that.  The court ruled:  "Whether the delegation provision is characterized as unconscionable ..., outside of the parties' 'circle of assent,' ..., or an 'unknown term [ ] which [was] beyond the range of reasonable expectation' ..., it is unenforceable." *Id.* at *5.

The same rationale applies here, but even more so.  That is because FanDuel well understands the importance of clearly and directly bringing the attention of its audience to the delegation clause.  In fact, it did so in this lawsuit.  See how FanDuel presented the delegation clause to the Court in its motion here, in the section entitled, "Scope and Delegation":

authority to the arbitrator—including all threshold questions of arbitrability.

> The arbitrator, and **not** any federal, state or local court or agency, shall have exclusive authority to resolve **all disputes arising out of or relating to the interpretation, applicability, enforceability or formation** of [the Terms of Use], including, but not limited to any claim that all or any part of these Terms are void or voidable, or **whether a claim is subject to arbitration**.

*Id.* (emphasis added).

FanDuel's Motion at 4. FanDuel did not make the Court search for the clause, or hide it behind a hyperlink that does not look like a hyperlink. It presented the sentence that contains the clause in a block quote, set apart from the rest of the text. More than that, it emphasized, with bold-face italics, the words it wants the Court to pay attention to, including "whether a claim is subject to arbitration." This is the appropriate way to communicate the delegation clause if you want to make sure the message gets across. Why didn't FanDuel do anything like that in its actual Terms of Use? The answer, similar to the method used to obscure the hyperlinks discussed above, seems obvious: to obscure it from consumers.

For these reasons, the delegation clause is invalid, and it is up to the Court to evaluate the enforceability of the arbitration provision.

**D.     The Arbitration Agreement is Invalid and Unenforceable**

Even if the Court determines the Terms of Use constitute a valid contract, it still must not order arbitration here because the arbitration agreement itself is invalid. Because Plaintiffs have specifically challenged the validity of the arbitration clause and there is no enforceable delegation clause, this Court must decide whether the arbitration agreement itself is valid. *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel,* 346 F.3d 360, 366 (2d Cir. 2003). *See also Nichols v. Wash. Mut. Bank,* 2007 WL 4198252, at *7 (E.D.N.Y. Nov. 21, 2007). FanDuel cannot meet its burden to show that a valid arbitration agreement was ever formed between it and

any Plaintiffs for four reasons:  the arbitration remedy is (1) illusory; (2) in furtherance of a fraudulent scheme; (3) does not provide for an effective vindication of Plaintiffs' rights; and (4) procedurally and substantively unconscionable.

### 1.  The Arbitration Agreement is Illusory and Unenforceable

The First Circuit has explained "that arbitration in this case may itself be an illusory remedy." *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 12 (1st Cir. 2009).  "If arbitration prevents plaintiffs from vindicating their rights, it is no longer a 'valid alternative to traditional litigation.'"  *Id.* (citing *Kristian v. Comcast Corp.*, 446 F.3d 25, 37 (1st Cir. 2006)).  In determining whether the arbitral forum or arbitration remedy is illusory, the Court must consider "whether the arbitration regime here is structured so as to prevent a litigant from having access to the arbitrator to resolve claims, including unconscionability defenses." *Awuah* at 13.  In defining what makes arbitration an "illusory" remedy, the First Circuit noted that "excessive arbitration costs" are a significant concern.  *See id.*  The First Circuit has stated that "if the remedy is truly illusory, a [C]ourt should not order arbitration at all but decide the entire dispute itself."  *Id.*

While FanDuel asserts it will cover the costs of arbitration, another provision in the Terms of Use purports to eliminate all liability and damages, making any promise for mutual dispute resolution illusory.  *See* FanDuel's Motion, Ex. 1C at Section 9.  So no matter how much of the arbitration costs FanDuel agrees to pay, no consumer could ever recover even one cent from FanDuel.  Any promise to be "bound" by an arbitrator's judgment is not really a promise to do anything because of the liability and damages limitations provision.  It is axiomatic that "a promise merely in form, but in actuality not promising anything . . . cannot serve as consideration."  3 Richard A. Lord, *Williston on Contracts* § 7:7 (4th ed. 2013).  This Court has found that the illusoriness of a promise to arbitrate may rest not only on agreement's unilateral modifiability, but on the illusoriness of arbitration as a remedy.  *Cullinane v. Uber Techs., Inc.*,

No. CV 14-14750-DPW, 2016 WL 3751652, at *9 (D. Mass. July 11, 2016) (where an arbitration clause is structured to prevent a litigant from access to an arbitral remedy, it is illusory, and "a court should not order arbitration but should decide the entire dispute itself.") (*quoting Awuah*, 554 F.3d at 13).  FanDuel's arbitration clause is, precisely, a promise of a valueless remedy and therefore unenforceable as illusory.

Similarly, under New York law, a bilateral contract is invalid unless both parties make promises supported by consideration.  *Curtis Properties Corp. v. Greif Companies*, 212 A.D.2d 259, 265 (1st Dept. 1995).  And where one party makes a promise unsupported by consideration—for example, because he may decline to fulfill the promise without penalty like under Section 9 here —courts find the promise illusory and unenforceable.  *Id*; *see also Strong v. Sheffield,* 144 N.Y. 392 (1985) (promise to forbear from debt collection for an unspecified period of time is illusory).  FanDuel's promise to arbitrate is precisely such a meaningless promise.

To be sure, FanDuel has tried to dress up its arbitration clause as a genuine promise for consideration.  For example, FanDuel purports to provide an option for customers to opt out of arbitration (within 30 days of commencing use of the service), pay certain arbitration costs, and place time and notice limits on its ability to unilaterally modify the arbitration provision. FanDuel's Motion at pgs. 4-5.  But as discussed below, only a handful of the millions of FanDuel customers actually successfully opted out of this agreement, and the limitation of liability language would still make this remedy illusory.  The arbitration agreement itself is thus invalid.

## 2. The Arbitration Agreement is Invalid to the Extent It Furthers a Fraudulent Scheme

While fraudulent inducement of the contract is generally not for a court to consider, there is an exception.  "[A]rbitration is not mandated where the arbitration clause is part of the fraudulent scheme -- where it is used to carry out the fraud."  *Garten v. Kurth*, 265 F.3d 136,

142-144 (2nd Cir. 2001) (citing *Moseley v. Electronic & Missile Facilities, Inc.*, 374 U.S. 167, 171 (1963)).   In *Garten*, reconciling *Moseley* with *Prima Paint*, the Second Circuit held that there must be "some substantial relationship between the fraud or misrepresentation and the arbitration clause in particular."   ...   This 'substantial relationship' ... must include "particularized facts specific to the ... arbitration clause which indicate how it was used to effect the scheme to defraud." 265 F.3d at 143 (citation omitted).

In *Garten*, the Second Circuit grappled with the standard to apply to allegations that the arbitration clause was part of the overall fraudulent scheme and clarified that the following standard is to be applied, holding that:

> [As recognized in *Campaniello Imports, Ltd. v. Saporiti Italia, S.p.A.,* 117 F.3d 655, 666 (2d Cir.1997)], "the only way to reconcile *Prima Paint* with *Moseley* **is to *require some substantial relationship between the fraud or misrepresentation and the arbitration clause in particular*.**" *Campaniello*, 117 F.3d at 667. This "substantial relationship," we have held, requires more than a mere claim that the "arbitration clause is an element of the scheme to defraud"; it must include "particularized facts specific to the ... arbitration clause which indicate how it was used to effect the scheme to defraud." *Id*.

*Garten v. Kurth, supra* at 143 (emphasis added).

While this is a rare exception, that is the exact situation here.  FanDuel not only used the arbitration provision to make it virtually impossible for Plaintiffs to obtain a remedy for its fraud, but, as shown above, it went "above and beyond" in concealing the nature of the arbitration process, including by failing to clearly highlight the delegation clause, by obscuring the entire Terms of Use to begin with.  FanDuel used its Terms of Use and arbitration provision to further the overall fraudulent scheme by not only purporting to limit its liability to its own customers, but by using DraftKings' Terms of Use against DraftKings users as well.  *See* FanDuel's Motion at 13.  And DraftKings seeks the same protection from FanDuel's customers through FanDuel's

Terms of Use for DraftKings' own fraud and concerted activities.  *See* DraftKings' Motion to Compel Arbitration, #DE317 at 16.  In sum, FanDuel and DraftKings acted in concert to defraud consumers and now are using their own and each other's arbitration agreements as a shield against both their own customers and those of the other company.  This fraudulent and concerted activity is inexorably linked to the arbitration clauses themselves, and therefore meets the exception in *Moseley* and *Garten.*[9]

### 3.     The Arbitration Provision is Unenforceable Because It does not Allow Plaintiffs to Effectively Vindicate their Rights Under RICO

Plaintiffs assert claims against FanDuel and the other defendants for their concerted actions under 18 U.S.C. §1962 of the RICO statute.  *See* FAMC at ¶¶ 759-837.  That statute provides for treble damages, expenses and attorney's fees.  18 U.S.C. § 1964(c).  But the Terms of Use contain a limitation of liability clause, which applies to the entire agreement (including the arbitration provision) and prevents Plaintiffs from recovering these statutory damages.  Because the limitation-of-liability clause prevents Plaintiffs from effectively vindicating their federal statutory rights in arbitration, the Court should refuse to enforce the arbitration provision.

The Supreme Court's "decisions have developed a mechanism—called the effective-vindication rule—to prevent arbitration clauses from choking off a plaintiff's ability to enforce congressionally created rights."  *Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2313 (2013) (Kagan, J., dissenting).   "When an arbitration agreement prevents the effective vindication of federal rights, a party may go to court."  *Id.* at 2317.  The decision by the majority in *American Express* upheld a class-arbitration ban against the argument that the ban deprived

---

[9] Alternatively, Plaintiffs' allegations are sufficient to invoke the requirement that an evidentiary hearing be held by the Court on the issue.  *St. Fleur v. WPI Cable Systems/Mutron*, 250 Mass. 345, 356, 879 N.E.2d 27, 35 (2008) (where plaintiff produced sufficient evidence to raise a material issue of fact with respect to the existence of the arbitration agreement, the Court should have held a hearing and it was error to fail to do so).

them of an economic incentive to pursue their claims because of the expense of proving such claims on an individual basis.   At the same time, however, the Court recognized that the effective-vindication rule "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights" (*Am. Exp. Co.*, 133 S. Ct. at 2310), an exception that applies to the limitation-of-liability provision in FanDuel's Terms of Use.

Specifically, "if the remedies limitation in the arbitration agreement pose[s] a clear conflict with the remedies available in the RICO statute, that clear conflict would pose a question of arbitrability. In other words, in the face of a vindication of statutory rights claim based on such a clear conflict, the court would decide the question of the enforceability of the arbitration clause in the first instance."   *Kristian*, 446 F.3d at 46.   In *Kristian*, the court applied the effective-vindication rule to find an agreement's general limitation of liability, which foreclosed the recovery of punitive, treble, exemplary, special, indirect, incidental, or consequential damages, as applied to the arbitration provision, prevented plaintiffs from effectively vindicating their right to recover treble damages under the Sherman Act.   *Id.* at 44-48.[10]

Here, FanDuel seeks to shield itself from any damages or liability:   "notwithstanding anything to the contrary contained herein, FanDuel's liability to [Plaintiffs] for any cause whatsoever and regardless of the form of the action, will at all times be limited to the amount paid, if any, by [Plaintiffs] to FanDuel for general use of the site[.]" *See* FanDuel's Motion at Ex. 1C, Section 9.   This directly conflicts with Plaintiffs' right of recovery under RICO, which provides:   "Any person injured in his business or property by reason of a violation of section

---

[10] In *Kristian*, unlike here the limitation of liability provision contained its own broad savings clause, which provided that "[i]f the law does not permit waiver of a remedy, a plaintiff will still have that remedy, the . . . liability limitation notwithstanding."   446 F.3d at 48.   "The savings clause, in other words, remove[d] the conflict between the language of the arbitration agreements and the federal antitrust statutes on the issue of treble damages."   *Id.* While there is a *general* savings clause in the Terms of Use, as discussed below in Section VII, that is only applicable if the *court* finds a provision invalid, not the arbitrator.

1962 of this chapter . . . *shall* recover threefold the damages he sustains and the cost of suit, including reasonable attorney's fee[.]"  18 U.S.C. § 1964(c) (emphasis added); *see, e.g.*, *Kristian*, 446 F.3d at 47 ("Congress's use of the word 'shall' makes the treble damages remedy a mandatory result[.]").  Accordingly, the Court should refuse to enforce the arbitration provision. *See McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 685 (7th Cir. 2002) ("[T]he clause here purports to forfeit McCaskill's statutory right to attorney's fees, a remedy that we have already recognized is essential to fulfill the remedial and deterrent functions of Title VII.  Because the provision prevents her from effectively vindicating her rights in the arbitral forum by preemptively denying her remedies authorized by Title VII, the arbitration agreement is unenforceable.") (Rovner, J., concurring); *Johnson v. Circuit City Stores, Inc.*, 203 F.3d 821 (4th Cir. 2000) (per curiam) ( "the arbitration agreement was unenforceable because it failed to provide Johnson with the full set of remedies to which she would be entitled under Section 1981, and thus ... prevented Johnson from vindicating her rights") (quotation marks and text alterations omitted); *Gambardella v. Pentec, Inc.*, 218 F. Supp. 2d 237, 247 (D. Conn. 2002) (same).[11]

Finally, the fact that Plaintiffs could opt out of arbitration does not change this conclusion.  *See, e.g.*, *Nesbitt v. FCNH, Inc.*, 811 F.3d 371, 378 (10th Cir. 2016) ("[T]he effective vindication exception can apply even in situations where both parties voluntarily agreed, at the outset of their relationship, to arbitrate any claims that might arise between them.

---

[11] *See also Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998) ("When an arbitration clause has provisions that defeat the remedial purpose of the statute, therefore, the arbitration clause is not enforceable. This clause defeats the statute's remedial purposes because it insulates Avnet from Title VII damages and equitable relief.") (Cox, J. concurring; citation omitted); *Graham Oil Co. v. ARCO Prod. Co., a Div. of Atl. Richfield Co.*, 43 F.3d 1244, 1247-48 (9th Cir. 1994), *as amended* (Mar. 13, 1995) ("Here, the arbitration clause purports to forfeit certain important statutorily-mandated rights or benefits afforded to Graham Oil and other franchisees by the PMPA. First, the arbitration clause expressly forfeits Graham Oil's statutorily-mandated right to recover exemplary damages from ARCO if Graham Oil prevails on certain claims . . . . Second, the arbitration clause expressly forfeits Graham Oil's statutorily-mandated right to recover reasonable attorney's fees . . . Because the arbitration clause employed by ARCO compels Graham Oil to surrender important statutorily-mandated rights afforded franchisees by the PMPA, we hold that the clause contravenes the Act.").

Under this framework, the availability of an opt-out clause . . . does not impact the availability of the effective vindication exception. Consequently, we reject the Defendants' assertion that the availability for Nesbitt to opt out of the Arbitration Agreement now prevents her from invoking the effective vindication exception."). Despite having millions of users, fewer than ten ever opted out, and the limitations on liability term would render that opt out worthless. *See* Exhibit

### 4.      The Arbitration Agreement was Fraudulently Induced

FanDuel users were fraudulently induced to enter into the arbitration clause with FanDuel. FanDuel failed to disclose in its arbitration provision, and specifically in the delegation clause, that use of the FanDuel website to enter contests and make wagers was illegal gambling or any of the material omissions alleged by Plaintiffs. *See* FAMC at ¶ 23. These facts were known to FanDuel, material to the FanDuel arbitration agreement and FanDuel intended their omission to fraudulently induce potential customers to use the FanDuel website. *Housekeeper v. Lourie*, 39 A.D.2d 280, 283, 333 N.Y.S.2d 932, 936 (1st Dept. 1972) ("where fraud or duress, practiced against one of the parties, renders the [arbitration] agreement voidable", a court will deny arbitration.); *see* FAMC at ¶ 494 (Plaintiffs would not have agreed to the FanDuel Terms had they known about FanDuel's fraudulent activity). Fraud in the inducement affects the validity of the arbitration clause when the fraud relates to the arbitration provision itself, or was part of a grand scheme that permeated the entire contract. *Markowits v. Friedman*, 2016 NY Slip Op 07932, ¶ 3 (2d Dept. 2016).

Further, FanDuel misrepresents that the arbitrator shall be "empowered to grant whatever relief would be available in a court under law or in equity" when the arbitrator would not actually be empowered to grant relief on a class-wide basis under Section 15.4 or award any damages whatsoever under Section 9. FanDuel fails to disclose that class-wide relief would

likely be the only economical means of pursuing legal causes of action against FanDuel because arbitrating claims on an individual basis would likely be uneconomical for the vast majority of FanDuel users.   In addition to the "whatever relief would be available in a court" term conflicting with the unavailability of class-wide relief or the award of any damages whatsoever, there is no disclosure of what a class or representative action is or how class actions affect an individual's legal rights in a way that would be understood by an average consumer.

Finally, the Terms do not disclose that no consumer has ever successfully prevailed in arbitration against FanDuel, and that arbitration in general is not a real avenue for consumers. The New York Times compiled statistics through their own investigation that was based on thousands of court records and interviews with hundreds of lawyers, corporate executives, judges, arbitrators and plaintiffs in 35 states.   After an examination of federal cases filed between 2010 and 2014, the Times determined that out of 1,179 class actions that companies sought to push into arbitration, judges ruled in their favor in four out of every five cases, but only 505 consumers went to arbitration over a dispute of $2,500 or less.   In addition, Verizon, which has more than 125 million subscribers, faced only 65 consumer arbitrations in those five years; Time Warner Cable, which has 15 million customers, faced seven and Sprint, a company with more than 57 million subscribers, faced only six arbitrations.[12]   Consumer arbitration in cases like this is not a real remedy, and FanDuel failed to disclose that fact to Plaintiffs.

**E.     Fanduel Cannot Enforce Its Arbitration Agreement Against Non-Signatory Plaintiffs**

**1.     The Family Member Plaintiffs Are Not Bound By Any Arbitration Agreement**

Each Family Member Plaintiff, an undisputed non-signatory to the arbitration agreement,

---

[12] http://www.nytimes.com/2015/11/01/business/dealbook/arbitration-everywhere-stacking-the-deck-of-justice.html.

brings his or her cause of action for recovery of gambling losses (not winnings) pursuant to one of five state statutes that provides for the recovery of such losses.[13]   Doc. 317 at ¶¶ 712-758.   No Family Member Plaintiff attempts to recover gambling winnings or use the benefits or protections offered under the purported agreements between any other plaintiff and FanDuel.   As non-signatories, the Family Member Plaintiffs are not subject to any arbitration agreement and no exception to that rule applies.   To the extent that there exists a question as to the arbitrability of the Family Member Plaintiffs' claims, the Court must decide.   *McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*, 2015 WL 144190 at *14 (S.D.N.Y January 12, 2015) (*quoting Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012)).   "Courts have generally found that agreements that do not mention or reference a particular non-signatory do not clearly or unmistakably evidence an agreement by that non-signatory to have an arbitrator determine whether the agreement is arbitrable."   *Id.*   Accordingly, as no arbitration agreement that may exist between DFS Players and FanDuel mentions or references the particular Family Member Plaintiffs, the Court must decide the issue of arbitrability.

Arbitration is contractual by nature and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."   *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (*quoting United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).   Generally a non-signatory is not subject to an arbitration agreement that it did not intend to be subject to.   *Matter of Belzberg v Verus Invs. Holdings Inc.*, 999 N.E.2d 1130, 1133 (N.Y. 2013).   There is one exception: estoppel.   *Thomson*, 64 F.3d at 778; FanDuel's Motion at pg. 10.

FanDuel must show that the Family Member Plaintiffs knowingly exploited an agreement

---

[13] The following statutes provide the Family Member Plaintiffs with their right to relief:  Georgia: O.C.G.A. § 13-8-3(b); Kentucky: KY. REV. STAT. § 372.040; Tennessee: TENN. CODE ANN. § 29-19-105; New Mexico: NEW MEXICO STAT. ANN. § 44-5-3; South Carolina: S.C. CODE ANN. § 32-1-20.

with an arbitration clause and received a direct benefit from the agreement. *Thomson*, 64 F.3d 773, 778. An indirect benefit is insufficient to apply estoppel. *Id.* But Family Member Plaintiffs received no benefit from the agreement between the DFS Players and FanDuel – they sustained only losses. Until very recently, the Family Member Plaintiffs were unaware of the existence of any agreement, much less arbitration agreement, between the DFS Players and FanDuel. Family Member Plaintiffs did not knowingly exploit an agreement with an arbitration clause. Nothing they did has anything to do with the purported agreements. They are simply suing under state statutes that give them a right to relief based on their status as family members. Second, the Family Members accepted no benefits whatsoever. *They* did not participate in FanDuel's contests.

### 2. The DraftKings Plaintiffs Are not Bound by any Arbitration Agreement

FanDuel additionally argues that the "DraftKings Plaintiffs"[14] should be compelled to arbitrate their claims against FanDuel by virtue of the DraftKings Plaintiffs' alleged assent to DraftKings' Terms of Use.[15] FanDuel refers to the DraftKings Plaintiffs' claim for civil conspiracy against FanDuel. *See* FAMC, Count XIV, ¶¶ 660-65. As FanDuel is not a signatory to any agreement between the DraftKings Plaintiffs and DraftKings, FanDuel must rely on an estoppel theory to compel arbitration against the DraftKings Plaintiffs.

A non-signatory may use an estoppel theory to compel a signatory to arbitrate where, "a careful review of 'the relationship among the parties, the contracts they signed ..., and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in

---

[14] For purposes of this Response, Plaintiffs adopt FanDuel's definition of "DraftKings Plaintiffs, -- those plaintiffs who registered only with FanDuel's competitor, DraftKings, but who nevertheless assert claims against FanDuel" (Doc. 318, p. 8 n. 1).

[15] Although Plaintiffs dispute that a binding arbitration agreement exists between the DraftKings Plaintiffs and DraftKings, Plaintiffs assume *arguendo* that a binding arbitration agreement exists between the DraftKings Plaintiffs and DraftKings solely for purposes of responding to FanDuel's specific argument.

arbitration are intertwined with the agreement that the estopped party has signed.'" *JLM Indus. v. Stolt-Nielsen SA,* 387 F.3d 163, 177 (2d Cir. 2004) (*quoting Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.,* 271 F.3d 403, 406 (2d Cir. 2001)); *see also Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.,* 526 F.3d 38, 47 (1st Cir. 2008); *Walker v. Collyer,* 9 N.E.3d 854, 861 (Mass. App. 2014). Importantly, "'[b]ecause arbitration is a matter of contract, exceptional circumstances must apply' before a court will allow a non-contracting party to impose a contractual agreement to arbitrate." *Denney v. Jenkens & Gilchrist,* 412 F. Supp. 2d 293, 297 (S.D.N.Y. Dec. 12, 2005) (*quoting Miron v. BDO Seidman, L.L.P.,* 342 F. Supp. 2d 324 (E.D. Pa. 2004) (*citing Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 779 (2d Cir. 1995)).

The Court must determine whether the DraftKings Plaintiffs' conspiracy claim against FanDuel is "intimately founded in and intertwined with" DraftKings' Terms of Use. *JLM Indus.,* 387 F.3d at 178 (*citing Thomson–CSF,* 64 F.3d at 779). The claim is intertwined if "the merits of an issue between the parties [i]s bound up with a contract binding one party and containing an arbitration clause." *Denney,* 412 F. Supp. 2d at 298 (*quoting JLM Indus.,* 387 F.3d at 177) (citing *Choctaw,* 271 F.3d at 407). The Court must assess this inquiry with the purpose of equitable estoppel in mind, which is "to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from 'rely[ing] on the contract when it works to [his] advantage [by establishing the claim], and repudiat[ing] it when it works to [his] disadvantage [by requiring arbitration].'" *Id.* (*quoting In re Humana Inc. Managed Care Litig.,* 285 F.3d 971, 976 (11th Cir. 2002), *rev'd on other grounds sub nom. PacifiCare Health Sys. v. Book,* 538 U.S. 401, 123 S. Ct. 1531, 155 L.Ed.2d 578 (2003) (*quoting Tepper Realty Co. v. Mosaic Tile Co.,* 259 F. Supp. 688, 692 (S.D.N.Y. 1966)). Thus, the signatory plaintiff must actually depend on the underlying contractual agreement in making out its claims against the non-signatory for equitable

estoppel to apply.  *Id.*

Despite FanDuel's assertions, the DraftKings Plaintiffs' conspiracy claim against it does not depend or rely upon DraftKings' Terms of Use.  FanDuel argues that because the DraftKings Plaintiffs' conspiracy allegations are based on concerted misconduct between FanDuel and DraftKings, FanDuel can compel arbitration of that claim.  However, it does not necessarily follow that "a claim against a co-conspirator of [the party entitled to compel arbitration] will *always* be intertwined to a degree sufficient to work an estoppel.  The inquiry remains a fact-specific one."  *Stechler v. Sidley Austin Brown & Wood,* 382 F. Supp. 2d 580, 591 (S.D.N.Y. Apr. 5, 2005) (*quoting JLM Indus.,* 387 F.3d at 177) (emphasis added)).

The conspiracy claim arises from allegations that FanDuel and DraftKings engaged in an unlawful agreement to allow each other's employees to profit from play on each other's sites. Thus, the DraftKings Plaintiffs do not allege that DraftKings' Terms of Use are integral to the fraudulent scheme.  The fraudulent scheme between DraftKings and FanDuel arises separate and apart from any agreement entered into between the DraftKings Plaintiffs and DraftKings. DraftKings' Terms of Use are not a component of the DraftKings Plaintiffs' conspiracy claim against FanDuel and the alleged conspiracy does not relate in any way to DraftKings' Terms of Use.  An allegation of concerted misconduct, taken alone, does not warrant an application of equitable estoppel under these circumstances.  *See Denney,* 412 F. Supp. 2d at 301 (*citing Stechler,* 382 F. Supp. 2d at 580; *JLM Indus.,* 387 F.3d at 177).  Thus, because the DraftKings Plaintiffs' conspiracy claim against FanDuel does not rely upon DraftKings' Terms of Use, the DraftKings Plaintiffs are not estopped from avoiding arbitration of that claim.

## **CONCLUSION**

FanDuel's Motion to Compel Arbitration should be denied.

Respectfully submitted,

/s/ Christopher Weld, Jr.
Christopher Weld, Jr. (BBO # 522230)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA  02110
T: 617-720-2626
F: 617-227-5777
Email:  cweld@toddweld.com

Liaison Counsel and Executive Committee Member
Hunter J. Shkolnik
**NAPOLI SHKOLNIK, PLLC**
360 Lexington Avenue, 11th Floor
New York, NY  10017
T: 212-397-1000
F: 646-843-7603
Email:  hunter@napolilaw.com

Jasper D. Ward IV
Alexander C. Davis
**JONES WARD PLC**
Taylor Building
312 South Fourth Street, 6th Floor
Louisville, KY  40202
T: 502-882-6000
F: 502-587-2007
Email:  jasper@jonesward.com
alex@jonesward.com

Melissa R. Emert
Howard T. Longman
STULL, STULL & BRODY
6 East 45th Street
New York, NY  10017
T: 212-687-7230
F: 212-490-2022
Email:  memert@ssbny.com
hlongman@ssbny.com

Co-Lead Counsel

## CERTIFICATE OF SERVICE

I, hereby certify that on January 9, 2017, the foregoing was served via U.S. Mail and electronic mail to counsel of record for Defendant.

/s/ Christopher Weld Jr.
Christopher Weld, Jr.