1                  UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS

3

4    **********************************
     IN RE:                          )
5    DAILY FANTASY SPORTS LITIGATION   )  No. 16-MD-02677-GAO
                                     )
6    **********************************

7

8
             BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
9                  UNITED STATES DISTRICT JUDGE
                         MOTION HEARING
10

11

12

13         John Joseph Moakley United States Courthouse
                       Courtroom No. 22
14                     One Courthouse Way
                   Boston, Massachusetts 02210
15

16

17                    December 12, 2018
                         2:21 p.m.
18

19

20
               Kathleen Mullen Silva, RPR, CRR
21                  Official Court Reporter
           John Joseph Moakley United States Courthouse
22             One Courthouse Way, Room 7209
                   Boston, Massachusetts 02210
23             E-mail: kathysilva@verizon.net

24

25         Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2
             Todd & Weld
 3           By: Christopher Weld, Jr., Esq.
             One Federal Street, 27th Floor
 4           Boston, Massachusetts 02110
             617.720.2626
 5           and
             Jones Ward PLC
 6           By: Jasper D. Ward, Esq.
             312 S. Fourth Street, 6th Floor
 7           Louisville, Kentucky 40202
             502.882.6000
 8           and
             Stull, Stull & Brody
 9           By: Howard T. Longman, Esq.
             6 East 45th Street, Suite 500
10           New York, New York 10017
             212.687.7230
11           for Plaintiffs

12
             ZwillGen PLLC
13           By: Marc J. Zwillinger, Esq.
             By: Jacob A. Sommer, Esq.
14           1900 M Street NW, Suite 250
             Washington, DC 20036
15           312.861.2000
             and
16           Morrison & Foerster LLP
             By: David F. McDowell, Esq.
17           707 Wilshire Boulevard, Suite 6000
             Los Angeles, California 90017-3543
18           213.892.5200
             for FanDuel, Inc. and FanDuel Deposits, LLC
19
20           Boies, Schiller & Flexner LLP
             By: Damien Marshall, Esq.
21           By: Leigh M. Nathanson, Esq.
             575 Lexington Avenue, 7th Floor
22           New York, New York 10022
             212.446.2300
23           for DraftKings, Inc.

24

25
```

```
 1    APPEARANCES (Continued):

 2

 3            Paul Hastings LLP
             By: Behnam Dayanim, Esq. (By teleconference)
 4            875 15th Street, NW
             Washington, DC 20005
 5            202.551.1737
             for Paysafecard.com USA, Inc.

 6

 7            Ifrah PLLC
             By: George R. Calhoun, V, Esq. (By teleconference)
 8            1717 Pennslyvania Avenue, NW
             Washington, DC 20006
 9            202.524.4140
             for Vantiv, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2           THE CLERK:  All rise.  United States District Court
3    for the District of Massachusetts.  Court is in session.
4       Be seated for a hearing in the case of In Re:  Daily
5    Fantasy Sports litigation, 16-MD-02677.
6       Would counsel identify yourselves for the record.
7           MR. WELD:  Good afternoon, your Honor.  Christopher
8    Weld, Jr. for the plaintiff class.
9           MR. WARD:  Good afternoon.  Jasper Ward on behalf of
10   plaintiffs in the class.
11          MR. LONGMAN:  Your Honor, Howard Longman also on
12   behalf of the plaintiffs in the class.
13          MR. MARSHALL:  Damien Marshall from Boies, Schiller &
14   Flexner on behalf of DraftKings.
15          MS. NATHANSON:  Leigh Nathanson also from Boies,
16   Schiller & Flexner LLP on behalf of DraftKings.
17          MR. ZWILLINGER:  Good afternoon.  Mark Zwillinger from
18   ZwillGen on behalf of FanDuel.
19          MR. SOMMER:  Jacob Sommer, ZwillGen, on behalf of
20   FanDuel.
21          MR. McDOWELL:  And David McDowell on behalf of
22   FanDuel.
23          THE COURT:  All right.  So the limited occasion for
24   this is the filings last summer, I guess, concerning the
25   Cullinane case that came from the circuit.  Since the
```

```
 1   plaintiffs called it to my attention, I think we'd hear from
 2   them first --
 3           MR. WELD:  Thank you, your Honor.
 4           THE COURT:  -- as to what meaning it may have, if any,
 5   for our purposes.
 6           MR. WELD:  Actually, there are two cases that came to
 7   your attention:  The *Meyer* case and the *Cullinane* case.
 8           THE COURT:  Okay.  *Meyer* from the Second Circuit?
 9           MR. WELD:  From the Second Circuit, yes.  I think
10   that's important.
11           THE COURT:  Right.  Okay.  You're right.
12           MR. WELD:  I think it's important to put them in
13   juxtaposition with each other in order to point out
14   similarities and differences --
15           THE COURT:  Fine.
16           MR. WELD:  -- in the FanDuel presentation.
17           The two cases did not dramatically change the
18   landscape in terms of the legal standard to be applied.
19   However, I do believe that they helped home the court in on
20   certain factors that those two appellate courts found to be
21   important in determining whether the standard was met or not
22   met.
23           As a basic matter, the standard is twofold.  One is,
24   are the terms and conditions reasonably conspicuous to an
25   ordinary consumer to whom they're intended to be presented, in
```

1   this case smartphone users, et cetera.  And, secondly, was

2   there unambiguous acceptance or consent to those terms.  Those

3   two concepts run through both *Meyer*, *Cullinane* and, frankly,

4   all of the other appellate decisions in both circuits.

5          The *Cullinane* case starts from Mass. law, the *Ajemian*

6   case.  It cites to a Second Circuit case to get to the same

7   result.  The Second Circuit comes from a little different

8   route, but the basic principles are the same both in Mass. and

9   New York.  And the second thing that is important here is that

10  the distinction that FanDuel raises in its brief that there is

11  a choice of law or a difference between the law in two

12  jurisdictions I would suggest is a red herring.  It's not the

13  case.

14         The basic principles remain the same and they're not

15  changed by either the reference to *Ajemian* in Mass. law or to

16  the other cases such as Specht in the Second Circuit.  The

17  *Ajemian* case, in fact, recites Specht in determining the

18  standard to be applied, as I just advanced to the court.

19         Additionally, I think important to note, as we try to

20  parse these screens, is that the burden of proof in both

21  Massachusetts and New York on proving the existence of an

22  agreement, or sorry, an agreement established by the screens is

23  on the parties seeking to enforce the agreement, in this case

24  FanDuel.

25         Also for clarification, these new cases apply really

1    exclusively to our argument against FanDuel as to its screen

2    presentation and whether a contract was formed that involved a

3    requirement to arbitrate.

4        *Cullinane* and *Meyer* are essentially consistent in how

5    they focus on the factors to be considered in determining

6    whether there was conspicuous presentation of terms and

7    unambiguous acceptance, and although they weighted different

8    factors in the various opinions, I believe those factors run

9    between both -- or through both cases, and I see them as really

10   five factors.

11       One is, first, what is the nature of the hyperlink

12   itself?  Is it clear that the terms and conditions or terms of

13   use, depending on the case, are clearly called out as a

14   hyperlink?  The cases focus really on three elements of that

15   determination.  First, is the hyperlink in light blue

16   consistent with normal usage of a smartphone user?  Number two,

17   is the hyperlink underlined, also a traditional way of calling

18   out a hyperlink?  And number three, is there some distinction

19   in the type of type used, either bold or capitalized, that

20   calls out the nature of a hyperlink?

21       In fact, the Second Circuit case, which FanDuel argues

22   is most applicable, the *Meyer* case, really suggests that the

23   hyperlink nature is almost a threshold determination that one

24   has to get over before you look at the other factors.  In fact,

25   the court held that as long as the hyperlink text was itself

1    reasonably conspicuous, and we conclude that it was, a

2    reasonably prudent smartphone user would have constructive

3    notice of the terms.  So *Meyer* really focused on what does that

4    link look like.

5         The second element or factor that seemed to run

6    between both cases is, are there other hyperlinks on the page

7    and how do they compare to the hyperlink that is the terms or

8    use that call out the arbitration provision.  So that if there

9    are other hyperlinks or they're in more bold type, that

10   dictates against conspicuous presentation of the hyperlink that

11   contains the arbitration provision.

12        The third element is, is the page laid out or the

13   screen laid out in a manner that is uncluttered and deals

14   fundamentally with the subject matter that is sought to be

15   conveyed, meaning that there are terms and conditions, and if

16   you sign up or join, that you are accepting those terms and

17   conditions.  Where there is other verbiage on the page using

18   different types of color types, different sizes of types,

19   that's a factor that suggests that these terms were not

20   conspicuous.

21        The fourth element is what is the configuration of the

22   screen.  What's the relative position of the terms of use to

23   the button on which you're sending?  And where there is a lot

24   of information in between those two things the courts seem to

25   suggest there is more a likelihood that the consumer will not

1   understand that A is linked to B, therefore forming a contract.

2   Whereas if there's no -- where there's no space in between or

3   either directly above or below, that dictates that perhaps the

4   consumer would be more likely to understand that by clicking on

5   a button they are accepting terms.

6           And the final element is the unambiguous acceptance

7   element, which focuses on is it clearly conveyed to the

8   consumer that when you click on whatever the assent button is,

9   you are accepting these terms.  Are they verbally effectively

10  connected?

11          So the first thing that we need to think about in

12  analyzing the FanDuel screen in light of *Meyer* and *Cullinane* is

13  what screen are we analyzing?  Because there is a screen that

14  is Exhibit A to the Kidder affidavit in the original papers

15  that FanDuel has presented which, according to their affidavit,

16  says that it was in effect sometime in 2015.  There is a second

17  screen that has more verbiage on it that is part of the first

18  amended complaint, and in using the -- what I'm told is called

19  the Wayback Machine, one can go online and determine when

20  certain things were in use.  And that screen is in use from

21  August 2015 to the fall of 2016.  And that's the screen we

22  suggest to your Honor is most relevant here.

23          There are not huge differences between the two, but

24  there are some, and we'll talk about them in a moment.  But it

25  is interesting that the affidavit submitted by FanDuel ignores

1    what apparently was the screen that existed for a large portion

2    of this class period, particularly the period of time from

3    August 2015 to October 2015 when the largest amount of

4    advertising was going on and the largest number of signups of

5    potential class members.

6         So if I can get my screen to work, I'd like to walk

7    through these screens and demonstrate the differences in how

8    these concepts should be applied.

9         Okay.  So let's start first with the *Meyer* case, which

10   is the Second Circuit case in which the Second Circuit found

11   that a contract was formed.  So most importantly, as I pointed

12   out when we applied the first factor, what does the hyperlink

13   look like, it has all the three major indicia of a hyperlink.

14   It's blue, it's underlined, and it's capitalized.

15        THE COURT:  Would it make a difference if it was red?

16        MR. WELD:  I don't think so, but it might.

17        THE COURT:  How about orange?

18        MR. WELD:  I think probably the most important thing

19   is, is it called out in an emphatic manner, but cases do

20   discuss that it is customary to call out a hyperlink in light

21   blue.  So I think it's relevant that it's light blue, but I

22   don't think it's determining whether it's orange or light blue.

23        Secondly, is there a clear indication that the user is

24   creating an account or signing up, and here it clearly says by

25   creating an Uber account you are agreeing to the terms and

1 | conditions.

2 |     Third, as I mentioned, the question is what's the

3 | configuration of the page?  How close are these terms and

4 | conditions to the manifestation of assent, and here as shown by

5 | the arrow, there is no type or print in between the assent

6 | buttons and the terms and conditions as called out.

7 |     And finally, to the extent there are other hyperlinks

8 | on the page, they are less dominant or called out than the

9 | hyperlink for the terms of service.  They are not in

10 | highlighted print, and they do not distract from the fact that

11 | the most visual piece of this screen is the highlighted

12 | capitalized light blue type.

13 |     So these are the four elements that we believe the

14 | court focused on in order to say this conveys conspicuous -- or

15 | this is a conspicuous delivery of the terms to the user.

16 |     We then go over to the FanDuel page, and this is the

17 | page from the amended complaint.  If we look at this sort of

18 | threshold issue, according to *Meyer*, of what do the terms of

19 | service button look like or hyperlink, it's not all caps.  It's

20 | in smaller font than several other of the indications on the

21 | page, including the promo callout.  It's not in blue or any

22 | other color.  And it's not underlined.  I'll come back to the

23 | underline issue at the end of the presentation, but that's what

24 | the page looks like when the user sees it.

25 |     There are two other hyperlinks on the page.  Both of

1    them are in light blue, even though the terms of service are

2    not in light blue, and the "Got a Promo" code is in larger font

3    than the terms of service.

4         Further, on the clutter issue, as the courts call it,

5    there is an unrelated sentence in the middle of this

6    presentation to the user that talks about you getting exclusive

7    offers and messages about FanDuel that has nothing to do with

8    the signup process or the conveyance of terms and the

9    acceptance of terms.  Again, the cases refer to it,

10   particularly *Cullinane*, as unnecessary clutter.

11        And in terms of unambiguous acceptance of terms, we

12   have a "Play Now" button, but the invitation to look at the

13   terms talk about joining.  They don't talk about playing.  So

14   the "Play Now" does not match the "Join" button.  You may say,

15   well, that's semantics, but at the time this was going on,

16   FanDuel and DraftKings were both offering free play to people.

17   So it's conceivable that a consumer looking at this could say,

18   "Well, I don't want to join but I'm interested in playing."

19        So if we look at the four factors from *Meyer*, none of

20   them are present on the FanDuel screen.  In fact, the exact

21   opposite is the issue.  The FanDuel screen violates four of the

22   five factors that I outlined from the *Meyer* and *Cullinane*

23   cases.

24        So let's go over to *Cullinane* and say, okay, here's

25   the First Circuit applying very similar rules, produces an

1    exact opposite result.  They conclude there's no contract, no

2    agreement to arbitrate.  So the first question is -- we look

3    again at the terms of service and how they're called out.

4    *Cullinane* notes they're not in all caps.  They're not

5    underlined.  They're not in blue.  Same as the FanDuel screen.

6          We then go to the hyperlinks.  There's two hyperlinks

7    or hyperlink-type devices.  Both of them are in blue, similar

8    to FanDuel.  In fact, the FanDuel screen is worse because the

9    hyperlinks are much more dominant and at least one of them is

10   in larger font.

11         We go to the clutter issue, and the First Circuit says

12   the presence of these hyperlinks, as well as the "Cancel" and

13   the "Link Payment" heading is additional clutter unrelated to

14   the formation of the contract itself and dictates against the

15   notion that these terms were reasonably conveyed.

16         So in *Cullinane*, they focus on these three factors,

17   all of which the FanDuel screen also fails.  Again, this is

18   essentially a repeat, but comparing it to the *Cullinane* screen.

19   We've got multiple hyperlinks, unrelated clutter, no

20   unambiguous assent and the terms of service are not properly

21   highlighted.

22         So the screen that FanDuel wants to present, which,

23   again, is suggested to be sometime in 2015 with no definition,

24   there are some differences.  However, I would suggest to your

25   Honor they're immaterial.  One difference is they have changed

1    the signup button now so it says by signing up, you confirm

2    that you are 18 and agree to the terms.  But they still don't

3    match the "Play Now" button.  Of course, after this case is

4    filed, they now match the "Play Now" button.

5            And although some of the clutter is removed, they've

6    removed the one sentence about "not receiving emails" -- or

7    "receiving emails," excuse me, but the same hyperlink

8    distractions, font problems, et cetera, all still exist.

9            So when you actually compare the three cases, it is

10   clear that FanDuel falls on the *Cullinane* side of this

11   discussion, the driver being the highlights of the hyperlink,

12   the conflicting hyperlinks, the clutter on the screen and the

13   non-match between the assent button and the agreement language.

14           Now, on Monday evening we received an affidavit from

15   FanDuel with no motion filed on ECF in which there's an

16   indication that on this screen that you see before you, your

17   Honor, that if you hover over the terms of use with a mouse,

18   that a line appears and it's underlined and, therefore, the

19   consumer would know, voila, you have a hyperlink.  But first,

20   it seems somewhat of a stretch to say that the user, a normal

21   user needs to hover over every element on this page to decide

22   which ones are hyperlinks, and perhaps more important -- and I

23   think this really goes to the core of the argument, which is

24   FanDuel knew how to make this a binding contract.  There's a

25   few things that they could do that were easy.  They could make

1  this into a click-wrap presentation, which is where you

2  formally have to physically check a button and say, "I agree to

3  these terms," which they elected not to do.  And they could

4  have called out the "Terms of Use" in bold language, bold

5  letters, excuse me, blue hyperlink and an underline, and they

6  would have been squarely within the law in terms of forming a

7  contract.  They chose not to do that.  They chose to obscure

8  the terms.  They chose to obscure the assent button, and,

9  frankly, they should not be rewarded for doing so.  They bear

10  the burden of proving the binding agreement.  And I suggest to

11  you, your Honor, when you look at this screen against the *Meyer*

12  screen and the *Cullinane* screen, there's no question that this

13  screen falls on the *Cullinane* side of the line.

14        THE COURT:  Doesn't that argument import into your --

15  into the first inquiry as to the existence of an agreement to

16  arbitrate defenses to an agreement?

17        MR. WELD:  I'm sorry.  I'm not following your

18  question.

19        THE COURT:  In other words, I'm hearing, maybe

20  incorrectly, some arguments of the nature of unconscionability

21  and so on.  Those are after -- those are for consideration

22  after the question has been answered whether there is an

23  agreement.

24        MR. WELD:  That's correct.  And there's no question

25  that the court decides -- the issue of whether there's an

1  agreement to arbitrate is question one.  There's no question

2  that it's a question for the court.  And at least as to the

3  Fanduel --

4        THE COURT:  I guess my point that I want to be clear

5  on, that there is a voidable agreement to arbitrate is not a

6  question that arises in that instance?

7        MR. WELD:  That's correct.

8        THE COURT:  Okay.

9        MR. WELD:  Thank you, your Honor.

10       THE COURT:  Okay.

11       MR. ZWILLINGER:  Good afternoon, your Honor.  Mark

12  Zwillinger for FanDuel.

13       Before I begin, I wonder if I could ask my paralegal,

14  Jamie Moses, to flip the display board we're going to be using

15  during the presentation.  Thank you, your Honor.

16       Your Honor, as I listened to plaintiffs' presentation,

17  I can't help but think he's lost the forest for the trees.

18  This case has one question.  It's a simple question.  Would a

19  reasonable Internet user who pushes that button, that green

20  "Play Now" button understand they were agreeing to something,

21  and did we show them where they could find what they were

22  agreeing to?  That's the question.

23       And let me explain why the two Circuit Court of

24  Appeals cases that came down say that's the question and why

25  they say that the answer to that question is unequivocally yes.

1    I'll start with the *Meyer* case.

2         What's interesting about the *Meyer* case is we are

3    talking today, plaintiffs' counsel, about all the things that

4    were different between FanDuel's flow and the *Meyer* flow, but

5    when we argued this last summer and when he stood up here and

6    filed his original briefing, he talked about how they were the

7    same, because originally Judge Rakoff in the *Meyer* case did not

8    uphold the agreement to arbitrate, and the Second Circuit,

9    using California law and New York law, reversed him, and said

10   that there was unequivocal assent to the clause in the *Meyer*

11   case, *Meyer v. Uber*.

12        So just to remind the court what plaintiffs' counsel

13   had said, the next board is an excerpt from page 9 of the

14   brief.  I understand why plaintiffs' counsel wants to walk away

15   from the holding of the case, but it can't walk away from the

16   facts so easily.  And you should all have a set of screen shots

17   in front of you that have this as well if the board is too far.

18        But the plaintiff said, remarkably, Uber used much the

19   same method and general layout as FanDuel did here, and then

20   they proceeded to explain all the similarities, that there was

21   no "I agree" box in either case, that the terms were presented

22   in a link and not on the screen, that the hyperlink was not

23   prominently displayed, that there was other information more

24   prominently displayed on the page than the hyperlink, including

25   the button.  And they stood up here last time and said it's the

1    most similar and the closest case.  And that is the one thing

2    we agree upon.  It is the most similar and closest case, but it

3    goes in FanDuel's favor.  And it goes in FanDuel's favor in

4    part for the same reasons the plaintiffs told you it did,

5    because the signup process is virtually identical.

6          Rather than the five-factor test that was not in

7    either of those cases, I want to look at the *Meyer* case and the

8    Uber signup flow and what the court actually did say about it.

9    So if we could put up that flow.

10          First, the court had the same questions, was there

11   reasonably conspicuous notice of the terms, did the plaintiffs

12   unambiguously manifest their assent, but the court said the key

13   inquiry is whether the plaintiffs were on inquiry notice, those

14   two words that never came out of plaintiffs' mouth:  Inquiry

15   notice.  Notice that would cause a reasonable person who looked

16   at the signup page to know that there is a place to look to

17   find out what they're agreeing to.

18          It's the same logic inquiry notice that has upheld

19   contracts in New York and here in Massachusetts for years,

20   contracts on the back of sporting event tickets, contracts on

21   the back of plane tickets.  Inquiry notice.  Do the plaintiffs

22   have reason to inquire as to what those terms are?

23          So the court went through the analysis with this

24   screen, and the court said first it was uncluttered.  It mainly

25   consisted of fields where the user could enter data.  And it

1    said on it by creating an account, you would agree to the terms

2    of service and privacy policy.  So a reasonable user would know

3    that there was something there to look at.  And it said that

4    the hyperlinks were directly below the button for registration,

5    although I'll point out that plaintiffs -- the button for

6    registration is actually the gray button.  So it's not quite as

7    close as he says.  The "PayPal" button and "Google Wallet"

8    would take you to another screen where you would have to sign

9    into those services.  So the action button is the "Register"

10   button.

11          The terms, the court said, were presented at the same

12   time as the enrollment.  Those were the reasons why the court

13   said this was inquiry notice.  Was it perfect?  No.  The court

14   said it wasn't perfect.  The font was small, very small, and we

15   know from the district court case that that hyperlink didn't

16   even go to the terms.  It went to a landing page where the user

17   could then click terms or privacy policies.  So there was

18   something in between.  Was it perfect?  No.  But the court said

19   on the whole this signup flow gave a plaintiff a clear signal

20   that registering would subject them to contractual terms, and

21   the user did not have to go far to find them.  That's the test,

22   not whether the appearance is perfect not whether every link is

23   blue, but do they know they're agreeing to something and do

24   they know how to find it.

25          Let's looked at the FanDuel flow now.  Let me address

1   the question of the three FanDuel flows in the record before we

2   talk about it.

3           This is the FanDuel flow from 2015.  Plaintiffs'

4   counsel makes you think that we improved the flow by going to

5   this one.  This was the original flow.  It was in the Dylan

6   Kidder affidavit as Exhibit A.  The new affidavit we filed on

7   Monday pinpoints that this was in use in May of 2015 because we

8   showed that Wayback Machine page.  Then we also put in a 2016

9   flow that we authenticated with the Dylan Kidder affidavit, and

10  the plaintiffs' flow, while in use at some point, is only based

11  on their complaint.  We did not put that in to authenticate it.

12  That's basically their complaint.  But we're happy with all

13  three flows.  We will defend all three of them because they all

14  come to the same conclusion.  In fact, there are things I like

15  better about the plaintiffs' flow.  That's why it was in use

16  later.

17          But let's look at it.  Using the factors from *Meyer*,

18  exactly what the Second Circuit did, it's not cluttered.  It's

19  even less cluttered than the Uber flow.  It's hard to imagine

20  something less cluttered than this.  It's on a white background

21  and everything jumps out.  It doesn't require any scrolling.

22  It was all presented when the user got to the page.  It says

23  what Uber said.  By signing up, you confirm you're 18 years of

24  age, that's new for FanDuel, but that you agree to the terms of

25  use.  It's right there.  The reference to the terms is as close

1    or closer to the action button, which is the "Play Now" button,

2    as it was in Uber.  I think it's closer because the action

3    button was the "Register" button.

4         So the question is, would a reasonable user be on

5    notice that the terms existed?  Now, plaintiffs have problems

6    it.  They say it's not blue.  And the Court correctly asked

7    would it matter if it were red or orange because it wouldn't.

8    The GILT case, which we'll see the screen shot in a minute,

9    GILT was yellow.  It doesn't have to be blue.  In fact, if it

10   were blue, I think the *Cullinane* court would say we lose

11   because the *Cullinane* court said there are too many things that

12   are blue on the page.  Our terms of use is the only thing

13   that's bolded below the button.  It definitely looks different

14   than those other hyperlinks.  So if a user had any interest in

15   reading the terms, they could click on the terms.  They could

16   hover over the terms and they would see it became a hyperlink,

17   and that's what we put in on Monday.  So if you see Exhibit 4

18   it's the same exact screen that shows you what happens if you

19   mouse over it.

20        And we put in the record just to clarify, because I

21   felt like the plaintiffs were being a little bit misleading,

22   there was no dispute that this was a hyperlink.  Everybody

23   agreed it was a hyperlink and it took you to the terms.  And

24   the way a hyperlink works is if you mouse over a hyperlink in a

25   browser, it underlines.  So it didn't seem particularly

1    controversial, but they kept making a big deal out of no

2    underline.  So we wanted to be clear, and you can check the

3    link in the affidavit, that it underlines.  If they did click

4    the terms, by the way, just to remind the court, the very first

5    line of the terms of use references the arbitration clause.

6    It's not a scrolldown.  It's not buried somewhere.  It is the

7    very first line.  They click that link and it says, "Terms of

8    use are subject to an arbitration provision."

9         If that's the inquiry notice question, let me turn to

10   the manifestation of assent question, because that's the second

11   question, did the plaintiffs unambiguously manifest their

12   assent.  And the court in the *Meyer* case said a reasonable user

13   would know by clicking the registration button that he was

14   agreeing to the terms and conditions whether or not he read

15   them.

16        The court said it doesn't matter that the button did

17   two things.  The plaintiffs say it's not a clickwrap.  It is a

18   clickwrap.  You click it and the button does two things.  You

19   sign up for an account, you agree to the terms.  The *Meyer*

20   court was presented with the same argument, that two things

21   isn't unambiguous.  They said it is.

22        And the *Meyer* court addressed the same argument the

23   plaintiffs are making here that the language under the button

24   doesn't match the language in the button.  And then in 2016 we

25   changed it.  True, it doesn't match.  It didn't match in Uber.

1    In Uber it said "Register."  The language under the button

2    said, "Creating an Account."  Our version of this says, "By

3    signing up."  The plaintiffs' version says, "By joining," but,

4    remember, to get to this page, the plaintiff first had to click

5    "Join Now."  That's what they were doing, "Join Now."  So the

6    fact that the language under the button said, "By signing up"

7    or "By" joining," it means the same thing.

8            If you could put up the GILT page.

9            We referred to this in the recent briefing.  It's not

10   the recent case, but I just wanted to remind the court that it

11   doesn't matter what the button says.  This button said "Shop

12   Now."  "Shop Now" is about as similar to "Play Now" as you can

13   get.  And this link isn't blue.  It's yellow.  But the court

14   said this was enforceable.  And other courts have enforced

15   things with a button not matching the text as well.  One of the

16   buttons in the Uber flow said "Done."  That's the *Cordas* case.

17   One of the buttons said, "Place Order."  One of the buttons

18   said "Sign Up."  The word is not important.  The standard is

19   whether the user understood that by clicking the word they were

20   agreeing to the terms.

21           Put up the FanDuel flow side-by-side with the Uber

22   flow, please.

23           Again, plaintiffs said this was the most similar flow.

24   It is the most similar flow.  Much more similar than *Cullinane*.

25   And what the court said at the end of *Meyer*, and I want to

1    direct this court to it because it wasn't really highlighted as

2    much in the briefs.  It's on page 30.  The court said, it's

3    critically important to remember -- or I'm saying it's

4    critically important to remember what the court said, excuse

5    me, that the registration process here contemplated a

6    continuing relationship between the user and Uber, one that

7    would provide payment information.  It would require some terms

8    and conditions to govern the relationship.  That's what they

9    were doing in Uber.  They were signing up.  Here they were

10   playing on FanDuel.

11          This wasn't a one-time thing.  This wasn't a purchase

12   of items at a store.  They were joining, signing up for an

13   account to play a contest that has rules, that has pay-outs,

14   where they have to look at the results.  They were going to

15   have a continuing relationship with FanDuel.

16          The court said what would a reasonable Internet user

17   expect on the Uber flow, that they would have a continuing

18   relationship with Uber and some terms would apply and they knew

19   where to find them, and we say it's the same thing here.  The

20   opposite certainly couldn't be true.  No reasonable user could

21   come to this page and think that they could engage in a contest

22   on FanDuel and there would be no terms and conditions that

23   would apply.  Maybe in 1999 someone could think that but not in

24   2012.

25          So let me last turn to *Cullinane*.  I think it's clear

how the FanDuel page and Uber flow are similar in *Meyer*.  Now
let's look at how different they are in *Cullinane*.

In *Cullinane*, of course, the court was applying
Massachusetts law.  We don't disagree -- there aren't that many
differences between Massachusetts and New York law.  But the
Massachusetts courts do not keep going to this inquiry notice
question that the New York courts do.  *Meyer* is in a long line
of cases where they've upheld clauses using the concept of
inquiry notice.  That's what we're looking at.  That's the
difference in law.  The difference in fact is pretty apparent.
The one thing the plaintiffs didn't point out is that dark gray
line on the black background above the terms and conditions,
which I think had a major impact on the case.  It's barely
legible.  It seems almost intentionally designed to fade into
the background.  The court called it a dark gray, small size,
non-bolded font against a black background.  If there's one
animating factor from that case, it's that, that you can't see
that.  That's the line that says you're agreeing to the terms
and conditions.

Here's what the court didn't say:  The lack of an
underlined blue hyperlink is fatal.  The court didn't say that.
The court didn't say it had to be blue.  It said the exact
opposite:  That Uber's bolded hyperlink to its terms might have
been sufficient but for the appearance of other things on the
page that are equally prominent and didn't set off the terms.

1    It didn't say you lose if it's not blue.  That's just not the

2    holding of that case.

3           Now, if you look at that flow, the Uber *Cullinane*

4    flow, and you put back up Exhibit 4, and this is where I'll end

5    it, nothing in our flow looks like that Uber flow, nothing's on

6    a black background.  Noting's hard to read.  Everything is on a

7    white background.  The terms of use jumps out at you as a

8    bolded term underneath the action button.  We win under the

9    court's analysis in either case, in *Meyer* or *Cullinane*.  But if

10   you're going to follow one of them, you should follow *Meyer*,

11   because the court applied common principles to New York law,

12   because our consent flow is much more like *Meyer* than

13   *Cullinane*, and because *Meyer* continues a line of New York cases

14   that includes the GILT case and the Facebook case where they

15   enforced the terms.

16          The question is, did FanDuel make it clear that a

17   reasonable Internet user could understand the terms would

18   govern their relation and did they make it clear how to find

19   those terms.  FanDuel did that, and that's all they needed to

20   do.

21          Thank you, your Honor.

22          THE COURT:  Okay.  Anything from DraftKings?

23          MR. MARSHALL:  Your Honor, plaintiffs' counsel and I

24   believe FanDuel counsel indicated DraftKings had a click-wrap

25   agreement that's not implicated by any of these cases, and the

1  last time we were here plaintiffs' counsel conceded valid

2  formation for the DraftKings.

3          MR. WELD:  Just two brief points, your Honor.

4          In his argument my colleague said what could be more

5  simple than this.  And, in fact, if we had put the terms of use

6  in blue, we would have been violative of the *Cullinane* opinion

7  because it would have blended in with the other blue.  Well,

8  the point is why didn't they put the terms of use in blue and

9  eliminate the "promo code" information, eliminate the "log in

10 instead" information because if they really intended to convey

11 to the consumer, These are the terms of use, it was easy to do.

12 They could have one hyperlink.  It would be blue, capitalized

13 and underlined as it was in the *Meyer* case.  In the *Meyer* case,

14 there are no other blue items on the page, and they're not

15 called out separately.

16          The real question is what was one of prominence,

17 what's conspicuous.  There's no discussion in either case about

18 what the flow is.  There are elements that are broken down, and

19 those are what I tried to discern in these five factors.  And

20 if you put the five factors on both cases, you see the subtle

21 differences.  They're subtle, there's no question about it, but

22 that's the way the state of the law is.  This is a highly

23 factual analysis applying fairly generalized concepts, but the

24 real question is, is there an effort by the vendor to convey

25 the terms such that a reasonable user would see that they're

1   going to be bound by something, and I suggest that there is

2   more clutter and there isn't a hyperlink clearly displayed.

3            THE COURT:  So an interesting observation you make

4   about how fact-specific this is.  In Cullinane, and I think in

5   the *Meyer* opinion as well, calls this decision a conclusion of

6   law.  It's a conclusion of law that is, I think from your

7   presentation, influenced almost entirely by an assessment of

8   factual matter.

9            MR. WELD:  I think that's correct.  I think you would

10  almost liken it to a summary judgment where you have -- the

11  screen's the screen.  So there are no factual disputes about

12  what you have to consider, but you have to apply these

13  principles to the screens.

14           THE COURT:  Right.  But in that case we wouldn't

15  decide that on summary judgment.  We'd leave it to the jury to

16  decide what would have been reasonable under the circumstance.

17           MR. WELD:  I think the cases are pretty clear.

18           THE COURT:  They say it.

19           MR. WELD:  It's on you.

20           THE COURT:  No, no, I agree with that.  I belive they

21  say it rather clearly, that it's a question of law.  Then they

22  analyze it as if it were a question of fact.

23           MR. WELD:  I agree.

24           THE COURT:  I'm not sure how useful that guidance is.

25           Let me just ask you, to the extent there's a factual

1    element to the conclusion of law, the standard is a reasonable

2    person?  It's an objective standard?

3         MR. WELD:  It's an objective standard in both

4    jurisdictions.

5         THE COURT:  Is there a difference between a reasonable

6    person, as a general matter, and a reasonable Internet user?

7         MR. WELD:  The cases, to be perfectly frank, talk

8    about a reasonable smartphone user.  I don't -- I'm not sure

9    where that falls on the spectrum, because clearly a spectrum

10   from an unsophisticated user to a sophisticated user, I suppose

11   it's someplace in the middle.

12        THE COURT:  Okay.

13        MR. ZWILLINGER:  May I address that, your Honor?

14        THE COURT:  Go ahead.

15        MR. ZWILLINGER:  The case talks about a reasonable

16   user doing the things that we're looking at.  In Uber it was a

17   smartphone user.  Here we're looking at people who register on

18   the Web.  So it's a reasonable computer user.

19        THE COURT:  You'd say it's even more specific than a

20   reasonable Internet generalist.  You'd say it's the type of

21   person who would be attracted to this activity.

22        MR. ZWILLINGER:  I think it should be a reasonable

23   Internet user and the type of person who could navigate

24   sufficiently to a page in the first place.  You don't navigate

25   to the FanDuel page to play online sports if you're shopping.

1  You're here for a reason.  So it's a reasonable user doing the

2  thing that's at issue in the case.  In this case it's

3  navigating the Web to play fantasy sports.

4        THE COURT:  How does that figure into a legal

5  conclusion as opposed to a factual one?

6        MR. ZWILLINGER:  Well, there's no factual dispute.

7  That I agree with my brother, that there's no factual dispute

8  as to what the pages say.  But there is a dispute about what it

9  means to be a reasonable user.  Let me give you one example.

10  Google News is one of the most popular sites on the Internet.

11  350 million people go there every month.  None of their

12  hyperlinks are blue.  All the headlines to all the articles are

13  in black.  You mouse over them and they underline and then you

14  click them.  A reasonable Internet user is confronted with

15  things like Google or Facebook all the time.  So the age in

16  which only a hyperlink was blue I think is long past, and the

17  only reason I mention that is not to get in the record of how

18  many people use Google, but to get the court to -- that a

19  reasonable user in 2012, 2013, 2014, 2015 is experiencing the

20  Internet as a whole and knows that not everything is blue, not

21  everything is bold or not bold.  They understand how to

22  navigate a website.  That's the point I was making.

23        MR. WELD:  Your Honor, if I may just reply to that

24  briefly.

25        THE COURT:  Go ahead.

1          MR. WELD:  We have a June 2018 opinion from the First

2     Circuit that says, "Uber's terms of service and privacy policy

3     hyperlink did not have the common appearance of a hyperlink.

4     While not all hyperlinks need to have the same characteristics,

5     they are," quote, "'commonly blue and underlined,'" close

6     quote.  So certainly the First Circuit would take issue with

7     that interpretation.

8          THE COURT:  Am I bound by that conclusion, the

9     numerosity part of it, typically?  Is that --

10         MR. WELD:  I'm not sure there's that level of guidance

11    in this opinion.

12         THE COURT:  Okay.  Thank you all.

13         MR. WELD:  Thank you.

14         MR. MARSHALL:  Thank you, your Honor.

15         THE COURT:  I'll take it under advisement.

16         THE CLERK:  All rise for the court.  The court will be

17    in recess.

18              (The proceedings adjourned at 3:03 p.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT )

4   DISTRICT OF MASSACHUSETTS    )

5

6

7           I certify that the foregoing is a correct transcript

8   from the record of proceedings taken December 12, 2018 in the

9   above-entitled matter to the best of my skill and ability.

10

11

12  /s/ Kathleen Mullen Silva              12/18/18

13  Kathleen Mullen Silva, RPR, CRR            Date
    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25