_____
                                                )
                                                )
In re: DAILY FANTASY SPORTS LITIGATION   )   MDL No. 16-02677-GAO
                                                )
This Document Relates To:                )
                                                )
       All Cases                                )
                                                )
                                                )
_____)


## OPINION AND ORDER
November 27, 2019

O'TOOLE, S.D.J.

This action consolidates for centralized pretrial proceedings more than eighty individual and putative class actions filed either in this Court or transferred here by the Judicial Panel on Multidistrict Litigation. While the separately filed actions present separately drafted claims, the complaints all generally allege improper and/or unlawful conduct by DraftKings, Inc. ("DraftKings") and FanDuel, LLC and FanDuel Deposits, LLC ( "FanDuel"), which are providers of daily fantasy sports contests accessible on the Internet (together, the "DFS defendants"). Claims are also presented against Paysafecard.com USA, Inc. and Vantiv, Inc., companies providing payment processing services for DraftKings and FanDuel ("payment processing defendants" or "PPDs"). A First Amended Master Class Action Complaint (the "Complaint") asserts twenty-seven claims arising under both state and federal law against the defendants.

Presently pending before the Court are motions by DraftKings, FanDuel, and the PPDs to compel arbitration against most of the individual plaintiffs (dkt. nos. 317, 318, & 320).[1] The DFS defendants argue that the player plaintiffs entered into valid agreements to arbitrate their claims, including threshold questions of arbitrability. In response, the plaintiffs argue that no valid and enforceable agreements to arbitrate were formed.

The DFS defendants further argue that certain other plaintiffs, so-called "cross-over" and "family member" plaintiffs, must also be compelled to arbitrate their claims even in the absence of an express agreement to do so because their claims derive from the player-plaintiffs' agreements with the DFS defendants, which include arbitration clauses.

For their part, the PPDs contend in support of their separate motion that the plaintiffs are estopped from avoiding arbitration of their claims against the PPDs because those claims are intertwined with the claims brought against the DFS defendants.

## I.       General Background

### A.       The Parties and Claims

DraftKings, a Massachusetts-based company, and FanDuel, a New York-based company, provide online platforms enabling persons to participate in daily fantasy sports contests. Through the DFS defendants' websites and mobile applications, players compete against each other in contests for cash prizes based on the real-world performance of both professional sports teams and individual athletes.

---

[1] Some plaintiffs (Brackie Bryant, Peter Johnson, and Aissa Khirani) apparently timely elected to opt out of arbitration with FanDuel, and the issues addressed in this Opinion and Order are inapplicable to them. An additional purported plaintiff (Nelson Steiner) appears not to have had an account with either DraftKings or FanDuel.

Paysafecard.com and Vantiv are alleged to be intermediaries that provide the banking functionality that enables the financial transactions between the players and the DFS defendants. The PPDs receive a fee for each transaction that they facilitate.

For present purposes, the plaintiffs fall into three general categories: (1) the "player plaintiffs," who assert claims against one or both of the DFS defendants with which they have created accounts; (2) the "cross-over plaintiffs," who have accounts with only one of the DFS defendants but assert a civil conspiracy claim against both DFS defendants; and (3) the "family member plaintiffs," who assert claims under various state laws regarding gambling.

The plaintiffs seek money damages, equitable relief, and disgorgement of ill-gotten gains against the DFS defendants and their affiliates.

B.      Becoming a Player

To participate in the fantasy sports contests sponsored either by DraftKings or by FanDuel, a person would have to register as a player.

i.      *DraftKings' Registration Process*

During the relevant time, in order to participate in DraftKings' contests, a player had to register an account using the DraftKings website or mobile application. A prospective player was presented with the following screen:



(Compl. ¶ 452.) Using this screen, a prospective player was required to enter a username and email address, create a password, and provide other personal identifying details. The prospective player would not be able to complete the sign up without checking a box next to text stating "I agree to the Terms of Use and Privacy Policy and confirm that I am at least 18 years of age." The underlined words "Terms of Use" and "Privacy Policy" functioned as hyperlinks. A prospective player had to check the box indicating agreement to the Terms of Use and Privacy Policy before the sign up could be completed. In other words, clicking on the "SIGN UP" button would be ineffective unless the player had affirmatively checked the "I agree to the Terms of Use and Privacy Policy" box.

The Terms of Use agreement has changed several times since DraftKings launched its site in 2012. In all versions of the Terms of Use, DraftKings has reserved the right to amend the terms at any time without notice. All versions have also provided that a player's continued use of DraftKings' services after any unilateral change constitutes acceptance of the change(s) to the agreement's terms.

An arbitration provision was first added to the Terms of Use in 2014, and no changes have been made specifically to that provision since it was added. DraftKings represents that the named plaintiffs created and/or used their accounts after the date that the arbitration term was added in 2014, which the plaintiffs do not dispute. Thus, if the Terms of Use were validly agreed to, even if they subsequently changed, a player's continued use of the site would amount to acceptance of the revised terms. Accordingly, for the purpose of resolving DraftKings' motion, the Court considers the most recent version of the Terms of Use submitted to the Court, the version submitted as Exhibit C to the Declaration of Tim Dent in Support of Defendant DraftKings, Inc.'s Motion to Compel Arbitration (dkt. no. 317-4), to be the operative agreement.

Clicking on the hyperlink to the Terms of Use, the player would have been presented with the full text of the Terms, which in print format is fourteen pages long and contains topical subsections with capitalized and bolded headings. The first page of the Terms of Use, under the bolded heading "**IMPORTANT LEGAL NOTICE REGARDING TERMS OF USE OF DRAFTKINGS**," states: "IMPORTANT! PLEASE CAREFULLY READ THESE TERMS OF USE BEFORE USING DRAFTKINGS, AS THEY AFFECT YOUR LEGAL RIGHTS AND OBLIGATIONS." (Decl. of Tim Dent in Support of Def. DraftKings, Inc.'s Mot. to Compel Arbitration, Ex. C at 2 (dkt. no. 317-4) ("Dent Decl.").)

Central to the present dispute, the Terms of Use contain the following provision under the heading "**ARBITRATION, CONSENT TO JURISDICTION IN MASSACHUSETTS, ATTORNEY'S FEES**":

> Any and all disputes, claims or controversies arising out of or relating to this Agreement, the breach thereof, or any use of the Website (including all commercial transactions conducted through the Website) ("Claims"), except for claims filed in a small claims court that proceed on an individual (non-class, non-representative) basis, shall be settled by binding arbitration before a single arbitrator appointed by the American Arbitration Association ("AAA") in accordance with its then

governing rules and procedures, including the Supplementary Procedures for Consumer-Related Disputes, where applicable. In agreeing to arbitrate all Claims, you and DraftKings waive all rights to a trial by jury in any action or proceeding involving any Claim. The arbitration shall be held in Suffolk County, Massachusetts, and judgment on the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. This arbitration undertaking is made pursuant to and in connection with a transaction involving interstate commerce, and shall be governed by and construed and interpreted in accordance with the Federal Arbitration Act at 9 U.S.C. Section 1, et seq. This arbitration provision shall survive termination of this Agreement. Subject to the limitations set forth below, the arbitrator shall have authority to award legal and equitable relief available in the courts of the Commonwealth of Massachusetts, provided that:

The arbitrator shall not have authority to award punitive damages; and

Any and all claims shall be arbitrated on an individual basis only, and shall not be consolidated or joined with or in any arbitration or other proceeding involving a Claim of any other party. You and DraftKings agree that the arbitrator shall have no authority to arbitrate any Claim as a class action or in any other form other than on an individual basis.

For any Claims that are not subject to arbitration: (a) the exclusive jurisdiction and venue for proceedings involving Claims shall be the courts of competent jurisdiction sitting within Suffolk County, Massachusetts (the "Forum"), and the parties hereby waive any argument that any such court does not have personal jurisdiction or that the Forum is not appropriate or convenient; (b) you and DraftKings waive any and all rights to trial by jury with respect to any Claims.

In the event that either party initiates a proceeding involving any Claim other than an arbitration in accordance with this Section, or initiates a proceeding involving a Claim under this Section other than in the Forum, the other party shall recover all attorneys' fees and expenses reasonably incurred in enforcing this Agreement to arbitrate and the Forum to which the parties have herein agreed.

(Id. at 12–13.)

The American Arbitration Association rules and procedures ("AAA Rules"), which are referred to in the arbitration provision, include a provision delegating to the arbitrator determinations concerning the extent of the arbitrator's own jurisdiction, as well as other threshold issues of arbitrability: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." (See Decl. of Benjamin D.

Williams Re: Joint Request for Judicial Notice in Supp. of Defs. FanDuel, Inc., FanDuel Deposits, LLC, and DraftKings, Inc's Respective Mots. to Compel Arbitration, Ex. 1 at 14 (dkt. no. 319-2); see also id., Ex. 2 at 18 (dkt. no. 319-3).)[2]

Also arguably relevant to the dispute at hand is the following provision in the Terms of Use under the heading "**MISCELLANEOUS**" on the page following the arbitration provision:

> These Terms of Use shall be governed by the internal substantive laws of the Commonwealth of Massachusetts, without respect to its conflict of laws principles. Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts.

(Dent Decl., Ex. C at 13.)

### ii. *FanDuel's Registration Process*

Similarly, in order to participate in FanDuel's contests during the relevant time period, a player had to create an account using the FanDuel website or mobile application. A prospective player was presented with the following screen (the "Create Your Account Screen"):[3]

---

[2] The delegation provision is the same in the two versions of the AAA Rules submitted to the Court.

[3] Three versions of this screen have been submitted to the Court. The versions other than the one discussed in the text are attached as Addendum A. Because the Court does not view the slight differences in these screens as material to the present issues, and because the version included here is the one (a) cited by the plaintiffs in the Complaint and (b) reproduced in the Plaintiffs' Response to Defendants FanDuel, LLC and FanDuel Deposits, LLC's Motion to Compel Arbitration (dkt. no. 332), it is the version addressed in the present context.



(Compl. ¶ 272.) Using this screen, a prospective player was required to enter his name and email address and create a username and password for the account. To complete the registration process and become able to participate in FanDuel's contests, the player then had to click a green button containing in contrasting white text the words "Play Now." Below that button was blue text asking "Got a Promo code or referral username?" Directly below that was the following notice, written in black text: "Joining confirms you're 18+ years of age and that you agree to our **Terms of Service**. You'll also get exclusive offers and messages about FanDuel. See our **Privacy Policy** for full details." The bolded words "Terms of Service" and "Privacy Policy" were both hyperlinks. Clicking the "Terms of Service" link took a prospective player to the Terms of Service agreement.[4]

---

[4] At some point, the title of the agreement and the language on the Create Your Account Screen changed from "Terms of Service" to "Terms of Use." Because the version of the Create Your Account Screen cited in the Complaint refers to "Terms of Service," and because this more clearly distinguishes the contract from DraftKings' Terms of Use, Terms of Service is used herein.

Unlike the DraftKings link to the agreement, a prospective player was not prevented from clicking the registration hyperlink until the player had affirmatively acknowledged agreement to the Terms of Service.

FanDuel's Terms of Service begin with the following advisory: "**IMPORTANT NOTICE:** THIS AGREEMENT IS SUBJECT TO BINDING ARBITRATION AND A WAIVER OF CLASS ACTION RIGHTS AS DETAILED IN SECTION 15." (Decl. of Dylan Kidder in Supp. of FanDuel, Inc. and FanDuel Deposit[s] LLC's Mot. to Compel Arbitration, Ex. D at 1 (dkt. no. 318-5) ("Kidder Decl.").) Section 15 appears on page 22 of the printed version of the terms, below the heading "**Binding arbitration and class action waiver**." In somewhat smaller but still prominent text size it also says: "PLEASE READ THIS SECTION CAREFULLY – IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO FILE A LAWSUIT IN COURT." In relevant part the text of Section 15.2 provides:

> [E]ither party may initiate binding arbitration as the sole means to resolve claims, subject to the terms set forth below. Specifically, all claims arising out of or relating to these Terms (including their formation, performance and breach), the parties' relationship with each other and/or your use of the Service shall be finally settled by binding arbitration administered by the American Arbitration Association in accordance with the provisions of its Commercial Arbitration Rules and the supplementary procedures for consumer related disputes of the American

---

The terms of FanDuel's agreement have also changed numerous times since FanDuel launched its site. Four versions have been submitted to the Court in conjunction with the pending motions. The Court treats FanDuel's operative Terms of Service as of the time of the filing of its pending motion to compel arbitration as the relevant document for the purpose of resolving the motion. That version of the agreement was attached as Exhibit D to the Declaration of Dylan Kidder in Support of FanDuel, Inc. and FanDuel Deposit[s] LLC's Motion to Compel Arbitration. FanDuel represents that the players who registered accounts before the arbitration provision in its current form was added to the Terms of Service agreement continue to maintain active accounts. The agreement in force when those players joined FanDuel provided that use of the site following any modifications to the terms would constitute acceptance of the terms as modified. Therefore, if a player validly agreed to the Terms of Service agreement in use upon joining FanDuel's site, even if the terms subsequently changed, specific notice of any changes would not be required; a player's continued use of the site would constitute acceptance of the revised terms.

Arbitration Association (the "AAA"), excluding any rules or procedures governing or permitting class actions.

The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms, including, but not limited to any claim that all or any part of these Terms are void or voidable, or whether a claim is subject to arbitration. The arbitrator shall be empowered to grant whatever relief would be available in a court under law or in equity. The arbitrator's award shall be written, and binding on the parties and may be entered as a judgment in any court of competent jurisdiction.

The Commercial Arbitration Rules governing the arbitration may be accessed at www.adr.org or by calling the AAA at +1.800.778.7879. To the extent the filing fee for the arbitration exceeds the cost of filing a lawsuit, FanDuel will pay the additional cost. If the arbitrator finds the arbitration to be non-frivolous, FanDuel will pay all of the actual filing and arbitrator fees for the arbitration, provided your claim does not exceed $75,000. The arbitration rules also permit you to recover attorney's fees in certain cases. The parties understand that, absent this mandatory provision, they would have the right to sue in court and have a jury trial. They further understand that, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court.

(Id. at 23–24.)

## II.     Applicable Legal Principles

### A.     The FAA

The Federal Arbitration Act (the "FAA") provides that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability." Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).

The FAA was enacted by Congress "in response to widespread judicial hostility to arbitration." Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 232 (2013). Whether the parties

have agreed to arbitrate a particular dispute is "typically an 'issue for judicial determination.'" Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 296 (2010) (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002)). Section 4 of the FAA instructs a federal court "to order arbitration to proceed once it is satisfied that 'the making of the agreement for arbitration or the failure to comply (with the arbitration agreement) is not in issue.'" Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403 (1967) (quoting 9 U.S.C. § 4). "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been [formed]." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (emphasis in original).

An arbitration clause is severable from the larger agreement of which it is (or may be) a part so that the threshold question can be asked—that is, whether the parties agreed to arbitrate disputes arising under the contract. Rent-a-Center, West, Inc. v. Jackson, 561 U.S. 63, 70–71 (2010); Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445 (2006). If the putative agreement to arbitrate *itself* was not validly formed, there is no arbitration agreement to be enforced.

However, questions about the valid formation of the host agreement which includes an arbitration clause are for the arbitrator, and not the court, to decide in the first instance. Buckeye Check Cashing, 546 U.S. at 445–46; Prima Paint, 388 U.S. at 403–04. In Buckeye Check Cashing, "the Court clarified that, when parties agree to arbitrate all disputes under their contract, questions concerning the validity of the entire contract are to be resolved by the arbitrator in the first instance, not by a federal or state court." Preston v. Ferrer, 552 U.S. 346, 349 (2008) (describing Buckeye Check Cashing). Put another way, arguments about the validity or enforceability of the contract *as a whole*, as opposed to the arbitration clause alone, are in the first instance not for the court but

11

rather for the arbitrator. See Sleeper Farms v. Agway, Inc., 506 F.3d 98, 103 (1st Cir. 2007) ("As a matter of federal law, the arbitration clause is unaffected even if the substance of the contract is otherwise void or voidable." (citing Prima Paint, 388 U.S. at 403–04)). As the First Circuit noted, "Without this rule, the merits of a contractual dispute would often have to be adjudicated in court in order to determine whether the dispute is arbitrable." Id. This is emphatically the case where the parties have, in the arbitration clause itself, delegated formation and validity questions to the arbitrator. Unless the delegation clause is itself invalid, "any challenge to the validity of the Agreement as a whole [is] for the arbitrator." Rent-a-Center, 561 U.S. at 72.

B.      State Contract Law Principles

Courts must "rigorously enforce" arbitration agreements that are validly formed pursuant to ordinary state-law principles governing the formation of contracts. See Italian Colors Rest., 570 U.S. at 233 (quoting Byrd, 470 U.S. at 221). Whether the player plaintiffs entered into valid and enforceable contracts with the DFS defendants is determined under applicable state law principles regarding the formation and enforceability of contracts. Here, the parties have agreed that Massachusetts law governs the issue of arbitration with respect to DraftKings' contracts, while New York law governs with respect to FanDuel's contracts.

The contracts at issue are not mutually negotiated. They are form contracts offered respectively by DraftKings and FanDuel to would-be participants in their fantasy sports contests. In each case, any prospective participant is required to accept the offered terms in order to be admitted to play.

Non-negotiable form contracts are hardly unusual in contemporary commercial transactions; indeed, they have been common from a time whence the mind of man runneth not to the contrary. "Take it or leave it" has long been a common feature of offer and acceptance. In the past if you wanted to rent a horse from Mr. Hobson, you would take the one he gave you. If you

wanted to buy an automobile from Mr. Ford, you could have whatever color you wanted, as long as it was black.

Non-negotiated form contracts are sometimes described as contracts of "adhesion," a term apparently first used in international law to describe a non-signatory nation's decision to "adhere" to the terms of a treaty negotiated between other nations. <u>See</u> Edwin W. Patterson, <u>The Interpretation and Construction of Contracts</u>, 64 Colum. L. Rev. 833, 856 n.96 (1964). Its first use in American contract law appears to have been in reference to non-negotiated terms of an insurance policy. <u>See</u> <u>Bekken v. Equitable Life Assur. Soc. of U.S.</u>, 293 N.W. 200, 212 (N.D. 1940). Such contracts are a staple of modern commercial law, used in all kinds of transactions: home mortgages, credit card financing, transportation tickets, bills of lading, ski lift tickets, bailments, warranties, and myriad other routine transactions, including admission to the bleachers at Fenway Park.

The term "contract of adhesion" has taken on a patina of disapprobation that the term "standard form contract" has avoided. But there are many judicial recognitions of the ubiquity and commercial utility of standard form transactions. <u>See, e.g.</u>, <u>Carnival Cruise Lines, Inc. v. Shute</u>, 499 U.S. 585, 593–94 (1991) ("[W]e do not adopt the Court of Appeals' determination that a nonnegotiated forum-selection clause in a form ticket contract is never enforceable simply because it is not the subject of bargaining."); <u>Silva v. Encyclopedia Britannica Inc.</u>, 239 F.3d 385, 389 (1st Cir. 2001) ("[T]hat the forum-selection clause is a 'boilerplate' provision does not *ipso facto* render it invalid. 'It is not the law that one must bargain for each and every written term of a contract.'" (quoting <u>Lambert v. Kysar</u>, 983 F.2d 1110, 19–20 (1st Cir. 1993))).

As one learned commentator has noted,

Despite the potential that contracts of adhesion have for abuse, there are important advantages to their use. Indeed, they are essential to the functioning of the

economy. We live in an era of mass production of standardized goods and services. The movement of goods and services on the scale and rapidity with which they are produced or rendered requires that transactions not get bogged down in prolonged negotiations about the ancillary terms of the contract. It would be unimaginable to negotiate the terms of use of every internet site accessed. . . . The standardization of forms for contracts is a rational and economically efficient response to the rapidity of market transactions and the high cost of negotiations.

1 Arthur L. Corbin et al., <u>Corbin on Contracts</u> § 1.4 (Joseph M. Perillo ed. 2019).

Under Massachusetts law, a party seeking to enforce the terms of an online contract must show that the terms of the contract were "reasonably communicated and accepted." <u>Ajemian v. Yahoo!, Inc.</u>, 987 N.E.2d 604, 612 (Mass. App. Ct. 2013). "Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential" to formation of a valid and enforceable agreement. <u>Id.</u> (quoting <u>Specht v. Netscape Commc'ns Corp.</u>, 306 F.3d 17, 35 (2d Cir. 2002)). Under Massachusetts law, there is "no reason to apply different legal principles . . . simply because [the term at issue] is contained in an online contract." <u>Cullinane v. Uber Techs., Inc.</u>, 893 F.3d 53, 61 (1st Cir. 2018) (quoting <u>Ajemian</u>, 987 N.E.2d at 612).

Under New York law, a binding contract requires a "manifestation of mutual assent . . . sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." <u>Starke v. SquareTrade, Inc.</u>, 913 F.3d 279, 289 (2d Cir. 2019). "In regard to online contracts, courts look for evidence that a website user had actual or constructive notice of the terms of using the website." <u>Resorb Networks, Inc. v. YouNow.com</u>, 30 N.Y.S.3d 506, 510–11 (N.Y. Sup. Ct. 2016) (citing <u>Schnabel v. Trilegiant Corp.</u>, 697 F.3d 110, 120 (2d Cir. 2012)). "Where an offeree does not have actual notice of certain contract terms, he is nevertheless bound by such terms if he is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." <u>Starke</u>, 913 F.3d at 289 (emphasis omitted) (citing <u>Schnabel</u>, 697 F.3d at 120)). In the context of electronic agreements, this requires "some action

demonstrating that [the user has] at least constructive knowledge of the terms of the agreement, from which knowledge a court can infer acceptance." Hines v. Overstock.com, Inc., 380 F. App'x 22, 25 (2d Cir. 2010).

C.    Standard of Review

Under First Circuit precedent, a party bringing a motion to compel arbitration must show that: (1) a valid agreement to arbitrate exists, (2) the movant is entitled to invoke the arbitration clause, (3) the arbitration clause is binding on the other party, and (4) the claim being asserted comes within the scope of the arbitration clause. Sourcing Unlimited, Inc. v. Asimco Int'l Inc., 526 F.3d 38, 46–47 (1st Cir. 2008) (quoting InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003)). In the Second Circuit, a court deciding whether claims are subject to arbitration must consider: "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d 113, 128 (2d Cir. 2011).

It is not disputed that the player plaintiffs' claims fall within the scope of the relevant arbitration agreements. Accordingly, the discussion that follows focuses on the threshold questions whether valid arbitration agreements were formed and whether the various categories of plaintiffs are bound by them to arbitrate. It is also necessary to determine whether threshold issues of arbitrability are properly decided by the Court or by the arbitrator. See Howsam, 537 U.S. at 83–84.

## III.    Discussion

### A.    DraftKings' Motion to Compel the Player Plaintiffs' Claims to Arbitration

As to plaintiffs' claims against DraftKings, the questions are whether the player plaintiffs entered into valid agreements (1) to arbitrate the merits of any claims against DraftKings and (2) to delegate the resolution of threshold challenges to arbitrability to the arbitrator.

The manner of gaining access to DraftKings' contests has been described above. In order to be admitted to participation in the offered contest, a player must affirmatively check a box labeled "I agree" that appears directly adjacent to a hyperlink to both the site's "Terms of Use" and "Privacy Policy." It is not possible for the would-be player to get to the contests without affirmatively signifying assent. This procedure easily satisfies the Ajemian test for determining whether an enforceable contract has been formed with the player plaintiff: reasonable communication of applicable terms and unambiguous assent. See Ajemian, 987 N.E.2d at 612.

Signatories are bound by agreements regardless of whether they actually have read or understood the terms before signifying assent. See Awuah v. Coverall N. Am., Inc., 703 F.3d 36, 44 (1st Cir. 2012) ("Awuah II"). Moreover, the reference to AAA Rules in the arbitration provision is consistent with language the First Circuit has found sufficient to constitute incorporation of those rules into the parties' agreement. See Awuah v. Coverall N. Am., Inc., 554 F.3d 7, 9 (1st Cir. 2009) ("Awuah I"). In Awuah I, the Circuit found the AAA Rules incorporated when the relevant agreement's arbitration provision stated explicitly that "arbitration shall be in accordance with the then current Rules of the American Arbitration Association." Id. Similarly, the DraftKings arbitration term provides that disputes and claims "shall be settled by binding arbitration before a single arbitrator appointed by the American Arbitration Association . . . in accordance with its then governing rules and procedures." (Dent. Decl., Ex. C at 12.) "Under Massachusetts law, the

language used in a contract to incorporate extrinsic material by reference . . . must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract." Awuah II, 703 F.3d at 43 (citation and internal quotation marks omitted). That standard has been met here.[5]

The plaintiffs advance various arguments about why their clicking acceptance of the Terms of Use did not result in a binding and enforceable agreement. As noted above, however, established law is clear that challenges to the validity or enforceability of the contract generally, rather than to the validity or enforceability of the arbitration clause specifically, are to be resolved by the arbitrator. Rent-a-Center, 561 U.S. at 70–72; Buckeye Check Cashing, 546 U.S. at 445; see also Farnsworth v. Towboat Nantucket Sound, Inc., 790 F.3d 90, 96–97 (1st Cir. 2015). It is only when the claim is that the arbitration agreement *itself* is invalid, as distinguished from the contract as a whole, that the Court must resolve the issue. Rent-a-Center, 561 U.S. at 80; Sleeper Farms, 506 F.3d at 103.

Recognizing this, the plaintiffs make four arguments that they say are addressed not to the contract as a whole, but to the arbitration clause specifically. First, they contend that the clause conflicts with another provision in the DraftKings Terms of Use that appears to authorize to some unclear degree the availability of a judicial remedy. Any such conflict might raise a question about ambiguity as to remedy, but that would be a question of interpretation of the contract, not of its formation. The interpretive question would be for the arbitrator to resolve. Moreover, ambiguities are generally to be resolved in favor of arbitration. See Mastrobuono v. Shearson Lehman Hutton,

---

[5] That the AAA Rules have been amended over time does not undermine this conclusion because the plaintiffs are bound by the Rules as they existed when each plaintiff agreed to the Terms of Use. The plaintiffs do not dispute that the AAA Rules included a delegation provision throughout the time period relevant to this case.

Inc., 514 U.S. 52, 62 (1995) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 476 (1989)).

The plaintiffs next argue that by excluding from the arbitrator the authority to award punitive damages, the arbitration clause improperly limits multiple damages under their claims of RICO violations. Of course, the appropriateness of a RICO remedy depends on the establishment of a RICO violation. That question is plainly within the scope of the arbitration clause. It could be that the question of awarding multiple damages under RICO never arises, because the violation question is answered (in arbitration) in the defendants' favor. See PacifiCare Health Sys., Inc. v. Book, 538 U.S. 401, 407 (2003); see also Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 476–77 (1st Cir. 2011) and cases cited therein. In any event, whether the exclusion of punitive damages would apply to exclude multiplication of damages under RICO appears to be an unresolved question. PacifiCare Health Sys., 538 U.S. at 405–06.

The other arguments the plaintiffs make about fraudulent inducement, fraudulent scheme, illusory contract, and unconscionability all are directed not to the arbitration clause itself, but to the entire contractual relationship. Such issues have plainly been delegated to the arbitrator.

B.  FanDuel's Motion to Compel the Player Plaintiffs' Claims to Arbitration

As described above, FanDuel's website was unlike DraftKings' in that it did not ask a prospective player to affirmatively select the statement "I Agree" to signify acceptance of the site's Terms of Service. Rather, two lines below the "Play Now" button, in a four-line block of text, the site displayed the notice "Joining confirms you're 18+ years of age and that you agree to our **Terms of Service**." Any reasonable viewer considering whether to click the "Play Now" button would necessarily notice that text block, including the bolded text. Because the text is simple and uncluttered, though small in size, any viewer noticing the block itself would notice the bolded

words "**Terms of Service**" within it and would recognize the phrase as a hyperlink to another document. The viewer would thus understand that there were terms that would govern the parties' relationship and that the terms were available to be reviewed.

"That the Terms of Service were available only by hyperlink does not preclude a determination of reasonable notice." Meyer v. Uber Techs., Inc., 868 F.3d 66, 78 (2d Cir. 2017); see also Fteja v. Facebook, Inc., 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012) ("[C]licking [a] hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket. In both cases, the consumer is prompted to examine terms of sale that are located somewhere else."). Following the Fteja court's analogy, on the cusp of the third decade of the twenty-first century it can fairly be said that following a hyperlink is like turning a page in a printed document. Any reasonable viewer would realize that access to the text of the terms would be simple and immediate.

The question is not whether the FanDuel sign-up page could have had a better design. It surely could have; for an obvious example, it could have required an explicit acknowledgment of the terms ("I Agree"), as DraftKings' site did. But the question at hand is not whether the site was optimally designed, but whether a player had actual or constructive notice that there were terms requiring his assent to which he did give assent. Starke, 913 F.3d at 289; Schnabel, 697 F.3d at 120. Any player who deliberately clicked the "Play Now" button had such notice from the text immediately adjacent to the button and, by clicking the button, indicated consent.[6]

---

[6] It bears noting that the FanDuel plaintiffs are different internet users from, say, a randomized population of potential purchasers of a common consumer product being marketed over the internet. By their own calculation, they are not ingenues when it comes to the internet. Rather, they self-selected as having sufficient skill to be able to participate profitably in online fantasy sports contests. That they would have been actually puzzled or fooled by the FanDuel sign-in screen is highly implausible.

By consenting to the terms of the arbitration clause, the FanDuel player agreed to submit all issues of validity and enforceability to the arbitrator in the first instance, for essentially the same reasons discussed above regarding DraftKings' Terms. It is not necessary to recapitulate that discussion here.

C.   The DFS Defendants' Motions to Compel the Cross-Over Plaintiffs' Claims to Arbitration

Employees of the DFS defendants were not allowed to participate in contests conducted by their respective employers, but the Complaint alleges that each defendant allowed its employees to participate in the other DFS defendant's contests. That is, a DraftKings employee was permitted to participate in FanDuel contests, and a FanDuel employee was permitted to participate in DraftKings contests. The Complaint alleges that the employees, by reason of their inside positions with either of the DFS defendants, thus gained an unfair advantage over the plaintiffs. Count XIV of the Complaint alleges that DraftKings and FanDuel engaged in an unlawful civil conspiracy that harmed the player plaintiffs. The claim is made not only against the defendant with whom a particular plaintiff had a contractual relationship, but also against the defendant with whom that player had no contractual relationship. Plaintiffs asserting the latter claims are referred to by the parties as "cross-over" plaintiffs.

For the reasons discussed above, a DraftKings cross-over plaintiff is bound by the accepted Terms of Use to arbitrate his civil conspiracy claim against DraftKings, but he has no similar contractual obligation to arbitrate the same claim against FanDuel. Mutatis mutandis, the same is true for a FanDuel plaintiff. As a matter of strict contract law, then, a DraftKings player is required to arbitrate his civil conspiracy claim as it is asserted against DraftKings but is contractually free to litigate in court the identical claim as it is asserted against FanDuel. At the same time, FanDuel

must arbitrate the civil conspiracy claim made by one of its own players, but not the very same conspiracy claim asserted against it by a DraftKings player.

Courts in both Massachusetts and New York have recognized that there may be rare circumstances where a party may be required to arbitrate a claim even in the absence of an express contractual obligation to do so, if the claim not subject to such an obligation is closely "intertwined" with claims that are contractually subject to arbitration. See Sourcing Unlimited, 526 F.3d at 47 (quotation omitted); InterGen, 344 F.3d at 145 (quotation omitted); Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir. 1995). The theoretical justification for compelling a party to arbitrate a claim without having agreed to do so is a species of equitable estoppel: under the unique facts of the case at hand, it would be inequitable to allow the party not contractually bound to arbitrate to avoid participation in an arbitration in which the issues and interests of both the bound and unbound parties are affected.

A DraftKings player's civil conspiracy claim against FanDuel is not just "intertwined" with his arbitrable civil conspiracy claim against DraftKings, *it is the very same claim.* It is the common claim of each of the player plaintiffs that DraftKings and FanDuel conspired unlawfully together to cause economic harm to the player plaintiffs.

There is no good reason to split the prosecution of the player plaintiff's conspiracy claims between arbitral and judicial forums. Apart from the pointless duplication of proceedings, there is likely some risk of inconsistent outcomes. It is at least theoretically possible for a DraftKings player to succeed on the civil conspiracy claim against DraftKings in arbitration, but thereafter lose on that same claim against FanDuel in civil litigation.

The cross-over claims should be presented in the arbitration proceedings in which each of the player plaintiffs is now required to participate. See Sokol Holdings, Inc. v. BMB Munai, Inc.,

542 F.3d 354, 359 (2d Cir. 2008) (stating "in addition to the 'intertwined' factual issues, there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement"); Machado v. System4 LLC, 28 N.E.3d 401, 409 (Mass. 2015) (noting that nonsignatory may be compelled to arbitrate claims of substantially interdependent and concerted misconduct by both nonsignatory and signatory). In the rare circumstance present in these cases, the player plaintiffs are estopped from resisting arbitration of their cross-over claims.

      D.      The Payment Processor Defendants' Motion to Compel Arbitration

Paysafecard.com and Vantiv, the payment processor defendants, have also moved to compel the player plaintiffs to arbitrate the claims asserted against them, although the plaintiffs have no explicit contractual obligation to do so. The claims the player plaintiffs assert against the PPDs are for unjust enrichment (CountXIII), RICO violation (Count XXV), and RICO conspiracy (Count XXVI). These counts allege that the PPDs unlawfully retained payments from the plaintiffs and profited from a pattern of racketeering which allowed the DFS defendants to grow and attract more participants in their illegal gambling scheme.

The PPDs' motion to compel the player plaintiffs to arbitrate the claims asserted against them raises similar issues to those just addressed concerning claims by cross-over plaintiffs. Again the relevant questions are whether the plaintiffs' claims against the PPDs arise under or are intertwined with the claims required to be arbitrated under the player plaintiffs' agreement with the DFS defendants. See Sourcing Unlimited, 526 F.3d at 47; InterGen, 344 F.3d at 145 (citing Thomson-CSF, 64 F.3d at 779; Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co., 271

F.3d 403, 406 (2d Cir. 2001); <u>Moss v. BMO Harris Bank, N.A.</u>, 24 F. Supp. 3d 281, 287–88 (E.D.N.Y. 2014).

As with the cross-over claims, the player plaintiffs assert, among other things, a conspiracy between the PPDs and the DFS defendants. In relevant part, the player plaintiffs allege that the "Payment Processor Defendants have been unjustly enriched through their retention of wagers placed pursuant to the DFS Defendants' online gambling scheme" (Compl. ¶ 658); that the DFS defendants conducted their affairs "through a pattern of racketeering activity" (<u>id.</u> ¶ 761), and that the PPDs "received income derived directly and indirectly from the racketeering activity and through the collection of unlawful debts" (<u>id.</u> ¶ 767); and that the "Defendants," which term is used to include the PPDs, conspired "to conduct or participate in, directly or indirectly, the conduct of the affairs of, the promotion of deceptive and illegal daily fantasy sports contests as described previously through a pattern of racketeering activity" (<u>id.</u> ¶ 829).

These allegations make clear that the claims against the PPDs are substantially "intertwined" with claims asserted against the DFS defendants. Success on the claims against the PPDs will depend, if not entirely then at least to a substantial and legally significant degree, on the plaintiffs' success on claims asserted against the DFS defendants. Although they may not have used the word "intertwined" in the language of the Complaint, by their allegation of conspiratorial and joint tortfeasor cooperation between the PPDs and the DFS defendants they have substantively alleged the nature and degree of "intertwinedness" that cases in both the First and Second Circuits have recognized as justifying an equitable estoppel preventing the plaintiffs from declining to arbitrate with non-contracting parties claims that are as closely related, both factually and legally, with claims bound to be arbitrated against contractual partners.

The final group of plaintiffs whom the DFS defendants seek to compel to arbitrate their claims comprises family members of DraftKings and FanDuel players. These plaintiffs have brought claims against the DFS defendants under various state laws that allow, in disparate ways, a gambler's family members to recover the gambler's losses. These claims are set forth in Counts XIX through XXIV of the Complaint. The DFS defendants again argue that the family member plaintiffs should be compelled to arbitrate based on a theory of equitable estoppel. This presents the inverse scenario from that discussed above with respect to the cross-over plaintiffs and the PPDs. In the claims discussed above, defendants who were not parties to an agreement to arbitrate sought to compel plaintiffs to arbitrate their claims not only against defendants who were parties to an arbitration agreement but also against related nonsignatories because of the close connection between the two classes of claims. With respect to the family members claims, the positions of signatories and non-signatories are reversed. The signatories (the DFS defendants) seek to compel the non-signatories to any arbitration agreement (the family member plaintiffs) to arbitrate simply because the player plaintiffs are obliged to do so by their arbitration agreements with the DFS defendants. While federal courts generally have been willing to estop a signatory to a valid arbitration agreement from avoiding arbitration with a non-signatory, see Thomson-CSF, 64 F.3d at 779, the courts have acted with more caution when presented with a motion to compel a non-signatory to any arbitration agreement nonetheless to arbitrate. See InterGen, 344 F.3d at 145–46.

Under Massachusetts law, to apply estoppel under the latter circumstance, the non-signatories would have to have derived a direct benefit from the agreement (to which they were strangers) that contained the arbitration clause. See Walker v. Collyer, 9 N.E.3d 854, 861 (Mass. App. Ct. 2014). The First Circuit has required such non-signatories to have "embraced" the

contract in order for equitable estoppel to prevent them from avoiding an arbitration provision. See InterGen, 344 F.3d at 146.

Under New York law, non-signatory family member plaintiffs could be compelled to arbitrate if they had received a direct benefit from a player plaintiff's agreement containing an arbitration clause and/or if their claims were integrally related to that agreement. See Thomson-CSF, 64 F.3d at 779.

The defendants' theory is that these plaintiffs likely benefitted from the agreements because they would have shared with their family member player plaintiff the financial rewards of the player's winnings. This is rank speculation. The DFS defendants do not actually claim, and certainly offer no evidence to show, that the players received any winnings in which the family member plaintiffs shared.

Because no plausible arbitration agreement binds the family member plaintiffs, and because there are no specific allegations tending to show that they derived any substantial benefit from any arbitration agreement, the well-established principle that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit" dictates the result. AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986) (quotations omitted). The family member plaintiffs are not bound to arbitrate their distinct claims.

## IV.    Conclusion

For the reasons stated herein, DraftKings', FanDuel's, and the Payment Processor Defendants' motions to compel arbitration (dkt. nos. 317, 318, & 320) are GRANTED as to the player plaintiffs and the cross-over plaintiffs, and DENIED as to the family member plaintiffs.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
Senior United States District Judge

**Addendum A**



## Play Now

×

**Full name**

**Email address**

**Username**

**Password**  min. 8 characters

Play Now

Got a Promo code or referral username?

By signing up, you confirm that you are at least 18 years of age and agree to the **Terms of Use**.

Already have an account? Log in instead

## Create your Account

**Full name**

**Email address**

**Username**

**Password**  min. 8 characters

**Got a Promocode or referral username?** Optional

Play Now

Clicking "Play Now" confirms you're age 18+ (21+ in state of MA) and agree to our **Terms** & **Privacy Policy**. You'll also get offers and messages from the FanDuel companies.

Already have an account? Log in instead